**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re:<br><br>**SOUTH HILLS OPERATIONS, LLC, *et al.*,**[1]<br><br>Debtors. | **Case No.: 24-21217-CMB**<br><br>**Chapter 11**<br>***Joint Administration Requested***<br><br>**Doc. No.:** |
| **SOUTH HILLS OPERATIONS, LLC, *et al.*,**<br><br>Movant,<br><br>-vs -<br><br>**P & G BROKERAGE, INC.; FIRST INSURANCE FUNDING, A WINTRUST COMPANY; PHILADELPHIA INSURANCE COMPANIES (PHLY); FEDERAL INSURANCE COMPANY (CHUBB); LANDMARK AMERICAN INSURANCE COMPANY, A BERKSHIRE HATHWAY COMPANY; THE TRAVELERS INDEMNITY COMPANY; THE HARTFORD; KINSALE INSURANCE COMPANY; PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION; and AMTRUST INSURANCE COMPANY,**<br><br>Respondents. | **Related to Document No.:**<br><br>**Hearing Date:**<br><br>**Hearing Time:**<br><br>**Response Deadline:** |

[1]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835). The Debtors' address is 485 Lexington Avenue, 10th Floor, New York, NY 10017.

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO (I) CONTINUE THEIR INSURANCE AND SURETY
BOND PROGRAMS, (II) CONTINUE TO FINANCE INSURANCE AGREEMENTS,
(III) PAY ALL PREPETITION AND POSTPETITION OBLIGATIONS WITH
RESPECT THERETO, AND (IV) AUTHORIZING BANKS TO HONOR AND
PROCESS CHECKS AND TRANSFERS RELATED TO SUCH INSURANCE
OBLIGATIONS**

South Hills Operations, LLC, and its debtor affiliates, as debtors and debtors in possession
(collectively, the "Debtors") in the above captioned chapter 11 cases (the "Chapter 11 Cases"), by
and through their undersigned counsel, respectfully submit this motion (the "Motion") as follows:

**RELIEF REQUESTED**

1.      The Debtors seek entry of interim and final orders, substantially in the forms
attached as **Exhibit A** and **Exhibit B** (the "Proposed Orders"): (a) authorizing, but not directing,
the Debtors, in their sole discretion, to (i) continue their insurance and surety bond programs,
including their insurance premium financing agreements, and honor pre-petition and post-petition
obligations with respect thereto; and (ii) renew, supplement, modify, extend, terminate, or
purchase insurance and bond coverage and finance insurance premiums in the ordinary course of
business; (b) authorizing and directing applicable banks and financial institutions to honor and
process checks and transfers related to such insurance obligations; and (c) granting related relief.

**JURISDICTION**

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157
and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the
Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 364,
503(b), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules
6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2

**BACKGROUND**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no statutory committees have been appointed or designated.

5.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' filing of voluntary petitions for relief filed under chapter 11 of the Bankruptcy Code, are set forth in greater detail in the *Declaration of Louis E. Robichaux IV in Support of First Day Relief* (the "First Day Declaration")[2], filed contemporaneously herewith.  This Motion incorporates by reference the facts set forth in the First Day Declaration as if fully set forth herein.

**SUMMARY OF INTERIM RELIEF REQUESTED**

6.      *Interim Relief Requested.*  The Debtors request the Court enter an interim order on an expedited basis substantially in the form attached hereto (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) continue their insurance and surety bond programs, including their insurance premium finance agreements, and honor pre-petition and post-petition obligations with respect thereto; and (ii) renew, supplement, modify, extend, terminate, or purchase insurance or bond coverage and finance insurance premiums in the ordinary course of business; (b) authorizing and directing applicable banks and financial institutions to honor and process checks and transfers related to such insurance obligations; and (c) granting related relief.

---

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meaning ascribed to them in the First Day Declaration.

7.      *Basis for Urgency*.  The need for immediate relief is particularly important to not only preserve the status quo while transitioning into bankruptcy, but also to reassure residents that their care and well-being are not at risk.  The relief sought in this Motion is necessary to avoid immediate and irreparable harm and is ultimately in the best interests of all creditors, employees, residents, patients, and other parties-in-interest.

## INSURANCE PROGRAM AND RELATED OBLIGATIONS

**I.      Insurance Program**

8.      The Debtors' insurance program (the "Insurance Program") is comprised of commercial insurance policies maintained by the Debtors, a summary of which is attached hereto as **Exhibit C** (each, a "Commercial Insurance Policy" and, collectively, the "Commercial Insurance Policies"), that are administered through various insurance carriers (the "Insurers") and which provide coverage for, among other things, automobile, flood, ERISA, professional liability, employment practices liability, general liability, property, and workers' compensation.[3]

9.      The Insurance Program is essential to the continued operation of the Debtors' businesses and is required under the laws of the various states in which the Debtors operate, applicable federal law, and certain of the Debtors' contracts and leases.  Thus, the Debtors submit that the Court should authorize, but not direct them, to continue to pay premiums, claims,

---

[3]The Debtors believe that **Exhibit C** is a complete list of their Commercial Insurance Policies as of the Petition Date. If, however, any Commercial Insurance Policy has been omitted from that list, the Debtors request that any order granting the relief sought herein apply to any and all of the Commercial Insurance Policies, even if not specifically identified on **Exhibit C**. In addition to the Commercial Insurance Policies listed on **Exhibit C**, the Debtors maintain other insurance policies and programs with respect to employee benefits including, without limitation, health, dental, disability, and life insurance. These programs and policies are addressed in detail in the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Benefits and Other Compensation Obligations, (II) Authorizing Financial Institutions to Honor All Obligations Related Thereto, and (III) Granting Related Relief* filed contemporaneously herewith.

deductibles, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Program as such obligations come due in the ordinary course of the Debtors' business.

### A. Commercial Insurance Policies

10. The Debtors pay premiums under the Commercial Insurance Policies based upon a rate each Insurer establishes and bills (collectively, the "Insurance Premiums," together with all other obligations under the Commercial Insurance Policies, obligations under the Financing Agreements (as defined below), obligations to the Brokers, fees, assessments, and taxes, the "Insurance Obligations"). Collectively, the Debtors pay approximately $2,716,000 in annual Insurance Premiums. More than half of this amount relates to required workers' compensation insurance. It is not always economically advantageous for the Debtors to pay all of the Insurance Premiums on a lump-sum basis. As such, the Debtors pay most of the Insurance Premiums through an installment schedule each Insurer provides, but also finance some of the Insurance Premiums through premium financing agreements (the "Financing Agreements") with First Insurance Funding or IPFS of New York, LLC (the "PFA Lenders"). Pursuant to the Financing Agreements, the PFA Lenders agree to pay the insurance premiums due under certain of the Commercial Insurance Policies. In exchange, the Debtors make a down payment, followed by between four (4) and eight (8) equal monthly installments. The amounts financed under the Financing Agreements accrue interest at fixed annual percentage rates. Payments of amounts due under each of the Financing Agreements occurs on various dates throughout the month. A listing of the Financing Agreements, including a summary of their terms, is attached as **Exhibit D.** The Debtors' obligations under the Financing Agreements are secured by the right to cancel the relevant Commercial Insurance Policies and thereby obtain a refund, including any unearned premiums or other sums that may become payable under the Commercial Insurance Policies. The effect of such

an action would be to terminate or reduce the coverage available to the Debtors under the applicable Commercial Insurance Policies.

11. In the Debtors' business judgment, the terms of the Financing Agreements represent fair and reasonable terms for financing the premiums of the Commercial Insurance Policies under the circumstances, and the Debtors' estates will benefit from maintaining this low-cost financing from the PFA Lenders. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms, to the extent needed. Thus, the Debtors request authority to continue honoring their obligations pursuant to the Financing Agreements and to continue to grant the PFA Lenders security interests.

12. Certain Commercial Insurance Policies are subject to regular audits, loss assessments, and operating cost adjustments (the "Insurance Policy Audits"), which may result in an adjustment of the Insurance Premiums owed on account thereof. Insurance Policy Audits for certain pre-petition Insurance Premium payments may not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits is unknown at this time.

13. As of the Petition Date, the Debtors estimate that the amount accrued and outstanding related to the prepetition period that Debtors propose to pay is approximately (i) $200,000 in connection with the Insurance Premiums paid through installment schedules each Insurer provides, and (ii) $53,000 under the Financing Agreements. By this Motion, the Debtors request the Court authorize, but not direct them, to pay all amounts related to their Commercial Insurance Policies that may become due and owing during these Chapter 11 Cases, including the authority to renew the Financing Agreements. The Debtors' maintenance of their relationships with the Insurers is critical to ensuring continued insurance coverage availability and reasonable

6

pricing of such coverage for future policy periods.  Further, there may be pre-petition amounts due and owing to the Insurers of which the Debtors are unaware; for example, if audits are conducted after the Petition Date.

### B.    Insurance Broker

14.    In the ordinary course of business, the Debtors employ P&G Brokerage Inc. or Hub International Northeast Limited, insurance brokerage firms (collectively, the "Broker") to assist the Debtors in procuring and negotiating elements of the Debtors' Insurance Program.  For Broker-related services, the Debtors pay the Broker's commissions in the ordinary course of business (the "Broker Fees").[4] The Broker is essential to the Debtors' ability to secure insurance coverage, as it structures and manages the Insurance Program in a reasonable and prudent manner and enables the Debtors to realize considerable savings in the procurement of aspects of the Insurance Program. The Debtors do not have access to certain key markets unless represented by the Broker as of the date hereof.  The Debtors believe that they are current in their obligations to the Broker.  The Debtors seek Court authority to continue to employ the Broker in the ordinary course of business and to pay Broker Fees as necessary in connection with the procurement and maintenance of the Insurance Program.

### II.    Surety Bond Program

15.    In the ordinary course of business, the Debtors are required to provide surety bonds (the "Surety Bonds") to secure the Debtors' payment or performance of certain obligations in connection with resident trust funds Debtors hold (the "Surety Bond Program").  Certain sureties issue the Surety Bonds (each, a "Surety") including Western Surety Company and Merchants

---

[4]The Debtors do not pay any funds directly to the Broker; rather, the Broker collects its fees related to the Debtors' policies via the Debtors' Insurers' commission-based programs throughout the policy year.

Bonding Company (Mutual). The Surety Bonds the Debtors provided are listed on **Exhibit E**, attached hereto.

16.     Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a rate each Surety establishes and bills (collectively, the "Surety Premiums"). The Surety Premiums are generally determined on an annual basis and average in the aggregate approximately $22,000 per year (the "Surety Bond Obligations," and, together with the Insurance Obligations, the "Insurance and Surety Obligations"). The Debtors remit premium payments on an annual basis when the bonds are issued or renewed or when increases or decreases are required. The Debtors do not believe that they have any outstanding pre-petition Surety Bond Obligations. By this Motion, the Debtors seek authority, but not direction, to pay the Surety Bond Obligations and any Surety Premiums that may become due and owing during these Chapter 11 Cases.

### RELIEF REQUESTED

17.     By this Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue their Insurance Program and Surety Bond Program on an uninterrupted basis in the ordinary course of the Debtors' business, (b) renew, supplement, modify, extend, or terminate their Commercial Insurance Policies and Financing Agreements or obtain replacement coverage and premium financing, as necessary, on substantially similar terms, in the ordinary course of their business on an on-going basis; (c) as applicable, pay in their discretion all pre-petition Insurance Obligations for all undisputed premiums, Broker Fees and related claims, Financing Agreement obligations, deductibles, administrative fees, and other obligations relating to the Insurance Program, as applicable, up to a maximum of $275,000; (d) pay the Surety Bond Obligations that may become due in the ordinary course of business during these Chapter 11 Cases; and (ii) authorizing and directing the applicable banks and financial institutions to receive, process,

honor and pay all checks and fund transfers on account of the Insurance Obligations that had not been honored and paid as of the Petition Date, as well as to rely on the Debtors' representations regarding the same, provided there are sufficient funds on deposit.

### A. Continuation of the Insurance Program is Necessary to Comply with Applicable Obligations of the Debtors.

18. Maintenance of the Debtors' insurance coverage under the Insurance Program is required under the terms of various managed care contracts through which services are provided, as well as various financial agreements require the Debtors to maintain insurance coverage under the Insurance Program. The Operating Guidelines from the Office of the United States Trustee also require the Debtors to maintain insurance. Accordingly, the Debtors submit that continuing the Debtors' Insurance Program—through payment of the Insurance Obligations, and the renewal, revision, extension, supplementation, modification, or entry into new insurance coverage, as needed in the Debtors' business judgment is necessary and essential to the Debtors' business operations during these Chapter 11 Cases.

### B. Payment of the Insurance and Surety Obligations is Authorized Under Sections 1107(a) and 1108 of the Bankruptcy Code

19. Bankruptcy Code sections 1107 and 1108 authorize the Debtors to pay the Insurance and Surety Obligations. The Debtors are operating their business as debtors in possession under Bankruptcy Code sections 1107(a) and 1108 as fiduciaries for their estates. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (citation omitted); *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.* at 497.

20. Payment of the Insurance and Surety Obligations and the renewal, revision, extension, supplementation, modification, or entry into new insurance policies and/or Surety

9

Bonds, as needed in the Debtors' business judgment, will protect the Debtors' ongoing operations. Applicable state and federal law as well as certain contractual arrangements of the Debtors require they maintain insurance coverage. Moreover, as the bankruptcy estates' fiduciaries, the Debtors could be violating their duties if they jeopardize the coverage and protections provided under the Insurance Program and Surety Bond Program. Non-payment of the Insurance and Surety Obligations could result in cancellation of the Insurance Program and/or Surety Bond Program, and the Debtors may be unable to find alternative insurance or bond coverage, or else find such alternatives at a much higher cost than the Debtors currently incur. Therefore, the relief requested in this Motion is essential to satisfy the Debtors' fiduciary obligations.

> **C.**  **Continuing the Insurance Program and the Surety Bond Program and Paying All Associated Undisputed Obligations is Necessary to Preserve the Value of the Debtors' Estates.**

21. Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur administrative expenses as "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Additionally, under section 363(b) of the Bankruptcy Code, a bankruptcy court may authorize a chapter 11 debtor to use property of the estate other than in the ordinary course of business where the Debtors have articulated a valid business justification for the requested use of estate assets. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the Debtors to show that a sound business purpose justifies such actions."); *In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, *12 (Bankr. D. Del. Apr. 29, 2014) ("Where the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct.") (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) gives the court "broad flexibility" for

the debtors to pay pre-petition wages as long as the debtors articulate a business justification).

22.     Once a debtor articulates such a valid business justification, a presumption exists in favor of the debtor's business decisions. *See In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumption of the business judgment rule on the merits is a near-Herculean task."); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (describing the business judgment rule as "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company"). A court may authorize non-ordinary-course transactions using property of the estate pursuant to Section 363(b)(1) "when a sound business purpose dictates such action." *Stephens Industries, Inc. v. McClung,* 789 F.2d. 386, 390 (6th Cir. 1986); *In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 694 (Bankr. N.D. Ohio 2018) (same). The Debtors submit that the use of estate funds for payment of undisputed pre-petition Insurance Obligations is permitted by sections 503(b)(1) and 363(b) of the Bankruptcy Code as necessary costs of preserving the Debtors' estates and should be approved as such.

23.     Further, section 105(a) of the Bankruptcy Code supplements these explicit powers and permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtors is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175; *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts are authorized to approve orders allowing payment of pre-petition claims that are necessary for the debtors to have a successful reorganization); *In re Just For Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay pre-petition claims that are essential to the continued

operation of the debtor's business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same). "Under 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing the doctrine of necessity and authorizing the debtors to pay pre-petition claims if such payment was essential to the continued operation of the debtors).

24.     With these statutory underpinnings, the "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical pre-petition claims the Bankruptcy Court does not explicitly authorize. See Lehigh, 657 F.2d at 581 (holding that the court may authorize payment of pre-petition claims if such payment was essential to continued operation of the debtor); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing existence of judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation). This doctrine is frequently invoked early in chapter 11 cases, particularly in connection with the payment of pre-petition claims. The rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11: "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Friedman's Inc.*, No. 09-10161 CSS, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[N]ormally, a debtor only pays pre-petition, unsecured claims through a confirmed plan of reorganization . . . most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."). Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant

the relief requested in this Motion.

25.     The nature and extent of the Debtors' business operations make it essential to maintain their Insurance Program and Surety Bond Program on an uninterrupted basis. If the Debtors fail to pay any premiums, deductibles, or related fees under the Insurance Program, then the Insurers may seek to terminate existing Commercial Insurance Policies, or they may decline to renew the Commercial Insurance Policies or refuse to insure the Debtors in the future. If the Commercial Insurance Policies lapse without renewal, the Debtors could be exposed to substantial liability for personal and/or property damages to the detriment of all stakeholders.  In addition, the Debtors would be in default under certain key contracts and applicable law, which require that the Debtors maintain adequate insurance coverage. Consequently, if the Debtors' Commercial Insurance Policies lapsed, the Debtors would be required to obtain replacement coverage on an emergency basis and, likely, at significant expense. Furthermore, the Debtors are required to provide and maintain the Surety Bonds in order to secure the Debtors' payment or performance of certain obligations in connection with resident trust funds held by the Debtors. Continuing maintenance of the Surety Bonds is critically necessary to ensure protection of the resident trust funds and in any event is required for Debtors' operational compliance. Therefore, the continuation of the Insurance Program and Surety Bond Program on an uninterrupted basis and the payment of the Insurance and Surety Obligations are essential to preserve the Debtors' business and the value of the Debtors' estates.

        **D.**      **Continuing the Insurance Financing Program and Paying All Associated Undisputed Obligations Is Necessary to Preserve the Value of the Debtors' Estates.**

26.     The Debtors request authority, but not direction, to pay amounts outstanding in connection with its insurance financing program, as applicable. If the Debtors are unable to make any payments that arise under the Financing Agreements, the PFA Lenders may be permitted to

terminate the Commercial Insurance Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost. If the Debtors are required to obtain replacement insurance, the premium may be the same or greater than what the Debtors are currently obligated to pay. Moreover, the Debtors may be required to pay the premium for such new policy in a lump sum and losing the benefit of financing under the Financing Agreements will further strain the Debtors' limited liquidity. Thus, in view of the importance of maintaining the related insurance coverage and preserving their cash flow by financing certain of their insurance premiums, the Debtors believe that it is in the best interest of their estates for the Court to authorize the Debtors to honor their obligations under the Financing Agreements.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

27.     The Financing Agreements grant the PFA Lenders a security interest in their respective Commercial Insurance Policies, including any unearned premiums or other sums that may become payable under the Commercial Insurance Policies. Security interests created by premium finance arrangements are generally recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements. *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.*), 67 B.R. 990, 994–95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164–66 (Bankr. D.D.C. 1981).  Moreover, section 361 of the Bankruptcy Code specifically contemplates providing adequate protection to the extent of the diminution in value of a secured creditor's collateral. *See, e.g.*, *In re Waverly Textile Processing, Inc.*, 214 B.R. 476, 480 (Bankr. E.D. Va. 1997); *TIFCO*, 67 B.R. at 1000. Security interests such as those under the Financing Agreements warrant adequate protection in the form of periodic payments pursuant to the Financing Agreements' terms.

28.     Therefore, if the Debtors are unable to continue making payments under the Financing Agreements, the PFA Lenders could seek relief from the automatic stay to cancel applicable Commercial Insurance Policies in accordance with the Financing Agreements' terms or to seek adequate protection of their respective investment. *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay). The Debtors then would be required to obtain replacement insurance on an expedited basis and at significant cost to the estate. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay to the PFA Lenders under the Finance Agreements, and any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies, as needed. Accordingly, the Debtors submit that the practical solution is to continue making the premium financing payments.

29.     In addition, the Debtors submit that the Court should also authorize the Debtors to renew or enter into new premium finance agreements post-petition in the ordinary course of business and consistent with the Debtors' past practice. Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estates in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

30.     The Debtors submit that the renewal of the Financing Agreements and/or the execution of new premium finance agreements constitute transactions in the ordinary course of

business, within the meaning of section 363(c)(1) of the Bankruptcy Code, that do not require prior bankruptcy court approval.

31.     The Debtors also request authority to enter into new premium finance agreements pursuant to Bankruptcy Code § 364(c)(2), consistent with their ordinary course practices.  Section 364(c)(2) authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate. 11 U.S.C. § 364(c)(2). Under any new premium finance agreement, the counterparty would likely require that the Debtors grant a security interest in the unearned premiums under the financed policies. *See In re Schwinn Bicycle Co.*, 200 B.R. 980, 982 (Bankr. N.D. III. 1996) (describing insurance premium financing agreements).

32.     Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See, e.g.*, *In re General Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for post-petition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) the debtors needed post-petition financing to "to preserve [their] assets and continue their operations"; and (c) the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Grp., Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug. 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Because borrowing to maintain essential insurance coverage is in the best interests of the

Debtors' estates, the Debtors submit that the Court should authorize them to renew the Financing Agreements and execute new premium finance agreements post-petition, as appropriate.

### E.      Financial Institutions Should be Authorized to Honor and Process Related Checks and Transfers.

33.      The Debtors also request that all applicable banks and other financial institutions (the "Banks") be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by, the Debtors related to the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, and (b) rely on the Debtors' designation of any particular check as approved by the Court's order.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003(B) ARE SATISFIED

34.      Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003, which governs the availability of certain types of relief within twenty-one (21) days after the Petition Date.  Pursuant to Bankruptcy Rule 6003, a court may grant this relief on an expedited basis if it is necessary to avoid immediate and irreparable harm. The Debtors submit that the facts set forth herein and in the First Day Declaration demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and thus, Bankruptcy Rule 6003 has been satisfied.

### REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(H)

35.      For the successful implementation of the foregoing, the Debtors seek a waiver of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As set forth above and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors. Specifically, the Insurance Program is essential to prevent potentially irreparable damage to the Debtors'

17

Chapter 11 Cases and the ability to preserve, generate, and recover value for the benefit of their estates. Accordingly, ample cause exists to justify the waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## **RESERVATION OF RIGHTS**

36.     Nothing contained herein is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission to the validity, priority, enforceability, or perfection of any lien on, security interest in, or encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **NOTICE**

37.     Notice of this Motion has been provided by email, facsimile or overnight mail to: (i) the Office of the United States Trustee for the Western District of Pennsylvania, Federal Building, 1000 Liberty Avenue, Suite 1316, Pittsburgh, PA 15222; (ii) counsel to CIBC Bank, U.S.A., Liz Boydston, Max Schlan, and Alexandria Rahn, Gutnicki, LLP, 10440 N. Central Expressway, Suite 800, Dallas, TX 75231; lboydston@gutnicki.com; mschlan@gutnicki.com;

arahn@gutnicki.com; (iii) counsel to Cuarzo Healthcare, LLC, Elizabeth A. Green and Andrew Layden, BakerHostetler, 200 South Orange Avenue, Suite 2300, Orlando, FL 32801; egreen@bakerlaw.com; alayden@bakerlaw.com; (iv) *lis pendens* parties (a) Harmony Property Management LLC; (b) Irwin Property Management LLC; (c) New Castle Property Management LLC; (d) New Wilmington Property Management LLC; (e) Latrobe Property Management LLC; and, (f) Washington Property Management LLC in care of Michael A. Shiner, Esq., and Maribeth Thomas, Esq., Tucker Arensberg, PC, 1500 One PPG Place, Pittsburgh, PA 15222; mshier@tuckerlaw.com; mthomas@tuckerlaw.com; (v) U.S. Foods, 9399 West Higgins Road, Rosemont, IL 60018; (vi) Department of Human Services, Office of Long-Term Living, Bureau of Finance, Forum Place 6th Floor, 555 Walnut Street, Harrisburg, PA 17101; (vii) CT Corporation, 330 N. Brand Blvd., Suite 700, Attn: SPRS, Glendale, CA 91203; (viii) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; (ix) the list of the 30 largest unsecured creditors of the Debtors on a consolidated basis; (x) U.S. Department of Labor, Office of the Regional Solicitor, 1835 Market Street, Mailstop SOL/22, Philadelphia, PA 19103-2968, Attn: Alejandro A. Herrera, Esq. Herrera.alejandro.a@dol.gov; facsimile (215) 861-5162; (xi) the Broker; (xii) the PFA Lenders; (xiii) all holders of Commercial Insurance Policies and (xiv) the following governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases: (a) Internal Revenue Service, PO Box 7346, Philadelphia, PA 19101-7346; (b) United States Attorney's Office for the Western District of Pennsylvania, Attn: Eric G. Olshan, Joseph F. Weis, Jr., United States Courthouse 700 Grant Street, Suite 4000, Pittsburgh, PA 15219; and (c) Commonwealth of Pennsylvania Attorney General, Attn: Michelle A. Henry, 16th Floor, Strawberry Square, Harrisburg, PA 17120.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested

herein, the Debtors respectfully submit that no further notice is required.

## **CONCLUSION**

WHEREFORE the Debtors respectfully request that the Court (i) enter an order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the interim and final relief requested in this Motion and (ii) grant such other and further relief as the Court may deem proper.

Dated  May 17, 2024
       Pittsburgh, Pennsylvania

Respectfully submitted:

**WHITEFORD TAYLOR & PRESTON, LLP**

 */s/ Daniel R. Schimizzi*
Daniel R. Schimizzi (PA ID No. 311869)
Michael J. Roeschenthaler (PA ID No. 87647)
Mark A. Lindsay (PA ID No. 89487)
Sarah E. Wenrich (PA ID No. 325834)
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-275-2401
Facsimile:  412-275-2404
Email: dschimizzi@whitefordlaw.com
mroeschenthaler@whitefordlaw.com
mlindsay@whitefordlaw.com
swenrich@whitefordlaw.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

*-AND-*

Glenn B. Rose (*pro hac vice* pending)
Paul G. Jennings (*pro hac vice* pending)
Gene L. Humphreys (*pro hac vice* pending)
Jordan E. Thomas (*pro hac vice* pending)
Alfonso Cuen (*pro hac vice* pending)
**BASS, BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
grose@bassberry.com
pjennings@bassberry.com
ghumphreys@bassberry.com
jordan.thomas@bassberry.com
alfonso.cuen@bassberry.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

21