## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **In Re:** | **Case No.: 24-21217-CMB** |
| **SOUTH HILLS OPERATIONS, LLC,** *et al.,*[1] | **Chapter 11**<br>*Joint Administration Requested* |
| **Debtors.** | **Doc. No.:** |
| **SOUTH HILLS OPERATIONS, LLC,** *et al.,* | **Related to Document No.:** |
| **Movant,** | **Hearing Date:** |
| **-vs -** | **Hearing Time:** |
| **NO RESPONDENTS.** | **Response Deadline:** |

## DECLARATION OF LOUIS E. ROBICHAUX IV, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

I, Louis E. Robichaux IV, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information and belief:

1.      I am the Debtors' Chief Restructuring Officer.  I have served in this position since December 1, 2023.  In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835). The Debtors' address is 485 Lexington Avenue, 10th Floor, New York, NY 10017.  See also **Exhibit 1**.

2.      Each of the twenty-two (22) debtors (the "Debtors") for which joint administration is sought have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") today (the "Petition Date"), commencing the above-captioned bankruptcy cases (the "Chapter 11 Cases").

3.      I submit this declaration in support of Debtors' "First Day Motions" in these Chapter 11 Cases (the "Declaration").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion, based upon my experience and knowledge of Debtors' business operations and financial conditions.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.      Part I of this Declaration describes my background and relevant experience.  Part II of the Declaration describes Debtors' businesses and organizational, financial, and operational structure.  Part III of this Declaration explains the Debtors' existing indebtedness.  Part IV describes the events and the circumstances surrounding the filing of these Chapter 11 Cases, and Part V sets forth the relevant facts in support of several of the Debtors' First Day Motions filed concurrently herewith.  The Debtors have also filed separate declarations in support of their request for two separate DIP loans, one to support the Cuarzo Facilities (defined herein) and a second to support the Maybrook and Consulate Facilities (defined herein).

## I.      MY BACKGROUND AND EXPERIENCE

5.      I am currently a Senior Managing Director with Ankura Consulting, LLC.  I have approximately thirty years of experience in the interim management, restructuring and insolvency industry, including serving as a chief restructuring officer, interim CFO and key company advisor for multiple healthcare sector companies, including matters involving; skilled nursing facilities,

hospitals, HMO/managed care organizations, outpatient rehabilitation facilities, independent physician practice associations, physician practice management companies, dental/orthodontic practice management companies, ambulatory care clinics, continuing care retirement communities, and home healthcare/home durable medical equipment companies. I am also a former Licensed Nursing Home Administrator licensed in the State of Texas. Specifically, my experience includes, *inter alia*, the following healthcare matters:

(i)     Tuomey Healthcare System: Served as chief restructuring officer and turnaround consultant for this $200 million, 300-bed community non-profit hospital located in Sumter, SC to assist the client with efforts to (i) settle a $237 million Department of Justice lawsuit, and (ii) develop and implement a comprehensive operational performance improvement plan, which garnered our team the Turnaround Management Association Non-Profit Transaction of the Year – 2016.

(ii)    Healthcare Partners Investments LLC: Served as interim CFO and restructuring advisor to this operator of three hospitals, two ambulatory surgical centers, and other related healthcare businesses, which resulted in the successful completion of an out-of-court turnaround and recapitalization (including a $20 million equity infusion).

(iii)   A large health system in Puerto Rico: Retained as restructuring advisor and valuation expert by a large regional lending institution in connection with a $400 million senior secured loan to a privately-held health system in Puerto Rico. Engagement included extensive due diligence on the underlying operations, tax analysis, and an expert valuation report.

(iv)    St. Francis' Hospital, Poughkeepsie, NY: Retained by the hospital to assist in negotiating a stalking horse bid, and to manage the §363 solicitation and auction process. Our team was awarded the M&A Advisor Restructuring Deal of the Year for 2014 ($10 million – $100 million) for this engagement.

(v)     Medicalodges Inc.: Retained as turnaround advisor for a $90 million operator of skilled nursing facilities and assisted living facilities based in Kansas. Successfully implemented an out-of-court turnaround and recapitalization, including an engagement team member serving as interim chief operating officer. .

(vi)    Senior Living Properties LLC: Retained as CRO responsible for the financial and operational restructuring of the company, including overall responsibility for day-to-day operations. The organization was a $170 million operator of 80 skilled nursing facilities in Texas and Illinois.

(vii)    Vencor (n.k.a. Kindred Health Care): Retained as restructuring advisor prior to and during the company's Chapter 11 restructuring and provided a broad spectrum of restructuring services. Vencor was a $3 billion operator of long-term acute care hospitals and skilled nursing facilities.

(viii)   Virginia United Methodist Homes of Williamsburg Inc.: Retained as restructuring advisor prior to and during the company's Chapter 11 restructuring to assist and advise management of the debtor.

(ix)    The Clare at Water Tower: Retained as restructuring advisor to a 53-story luxury high-rise continuing care retirement community located in downtown Chicago.

(x)     Ascent Group: Retained as debtor's transaction advisor to manage the §363 marketing and auction process. Ascent Group owned and operated a freestanding emergency room in an affluent suburban area of Dallas. Our team was instrumental in the successful sale and conclusion to the bankruptcy case.

(xi)    Sage Physician Partners Inc. d/b/a American Physician Housecalls: Retained as financial advisor to sell the company's assets through a §363 auction process. Sage Physician Partners was a healthcare management company that provided mobile chronic disease management services in a physician-centric model.

(xii)   Orthodontic Centers of America: Retained as financial advisor to the secured lenders. The company was a $400 million publicly traded orthodontic practice management firm based in New Orleans.

(xiii)  MMH Medical Holdings Inc.: Served as interim chief executive officer of this $25 million provider of oncology-focused continuing medical education and publisher of peer-reviewed medical journals.

II.    **DEBTORS' BUSINESSES AND ORGANIZATIONAL, FINANCIAL, AND OPERATIONAL STRUCTURE**

   **A. Description of the Debtors and their Business**

6.      *When reading the balance of this Declaration, please refer to the table attached hereto as* **Exhibit 1**, *which summarizes the defined terms used herein to describe the various classifications of Debtors.*

7.      The thirteen (13) OpCo Debtors operate skilled nursing facilities located in Western Pennsylvania.  Each of the OpCo Debtors is a defendant in a civil action filed by the United States

Department of Labor (the "DOL") alleging violations of federal wage and hour laws, case number 2:18-cv-01608-WSS, United States District Court for the Western District of Pennsylvania (the "DOL Action").  The real property and certain personal property associated with four (4) of the OpCo Debtors are leased from a third party, as noted below.  Each of the nine (9) PropCo Debtors owns the real property and substantially all assets leased to certain OpCo Debtors, as more fully explained herein.  The Debtors have overlapping owners, but they do not all have the same owners.

### a.  The Cuarzo Debtors

8.      The four (4) Cuarzo Debtors lease their facilities pursuant to a master lease dated February 1, 2017 (the "Master Lease") with affiliates of Cuarzo Healthcare Capital ("Cuarzo"), headquartered in Ft. Smith, Arkansas.[2]  Neither Cuarzo nor the Cuarzo Landlords have any overlapping ownership or management with any of the Debtors.

9.      South Hills Operations, LLC is a 104-bed facility located in Canonsburg, Pennsylvania doing business as South Hills Rehabilitation and Wellness Center.  Monroeville Operations, LLC is a 120-bed facility located in Monroeville, Pennsylvania doing business as Monroeville Rehabilitation and Wellness Center.  Murrysville Operations, LLC is a 120-bed facility located in Murrysville, Pennsylvania doing business as Murrysville Rehabilitation and Wellness Center.  Mt. Lebanon Operations, LLC is a 120-bed facility located in Mt. Lebanon, Pennsylvania doing business as Mt. Lebanon Rehabilitation and Wellness Center.

---

[2]The lessors of these facilities are GPH Canonsburg LP, GPH Monroeville LP, GPH Murrysville LP and GPH Mt. Lebanon LP (collectively, the "Cuarzo Landlords" or "Cuarzo DIP Lenders"). These entities are affiliates of Cuarzo and are also the DIP Lender to the Cuarzo Debtors.

### b. The Maybrook Debtors

10.    The seven (7) Maybrook OpCo Debtors lease their facilities from the seven (7) Maybrook PropCo Debtors.   Below is a listing of each Maybrook OpCo Debtor and the corresponding Maybrook PropCo Debtor:

| _Maybrook OpCo Debtor_ | _Maybrook PropCo Debtor_ |
|---|---|
| Maybrook-C Briarcliff Opco, LLC | Maybrook-C Briarcliff Propco, LLC |
| Maybrook-C Evergreen Opco, LLC | Maybrook-C Evergreen Propco, LLC |
| Maybrook-C Kade Opco, LLC | Maybrook-C Kade Propco, LLC |
| Maybrook-C Latrobe Opco, LLC | Maybrook-C Latrobe Propco, LLC |
| Maybrook-C Overlook Opco, LLC | Maybrook-C Overlook Propco, LLC |
| Maybrook-C Silver Oaks Opco, LLC | Maybrook-C Silver Oaks Propco, LLC |
| Maybrook-C Whitecliff Opco, LLC | Maybrook-C Whitecliff Propco, LLC |

11.    In this Declaration and in the First Day Motions generally, these seven (7) facilities are also referred to as the "Maybrook Facilities".

12.    Maybrook-C Briarcliff Opco, LLC is a 120-bed facility located in North Huntingdon, Pennsylvania doing business as The Grove at North Huntingdon.   Maybrook-C Evergreen Opco, LLC is a 115-bed facility located in Harmony, Pennsylvania doing business as The Grove at Harmony.  Maybrook-C Kade Opco, LLC is a 74-bed facility located in Washington, Pennsylvania doing business as The Grove at Washington.  Maybrook-C Latrobe Opco, LLC is a 107-bed facility located in Latrobe, Pennsylvania doing business as The Grove at Latrobe. Maybrook-C Overlook Opco, LLC is a 115-bed facility located in New Wilmington, Pennsylvania doing business as The Grove at New Wilmington.  Maybrook-C Silver Oaks Opco, LLC is a 62-bed facility located in New Castle, Pennsylvania doing business as The Grove at New Castle. Maybrook-C Whitecliff Opco, LLC is a 154-bed facility located in Greenville, Pennsylvania doing business as The Grove at Greenville.

### c. The Consulate Debtors

13. The two (2) Consulate OpCo Debtors lease their facilities from the two (2) Consulate PropCo Debtors. Below is a listing of each Consulate OpCo Debtor and the corresponding Consulate PropCo Debtor:

| *Consulate OpCo Debtor* | *Consulate PropCo Debtor* |
| --- | --- |
| Cheswick Rehabilitation and Wellness Center, LLC | 3876 Saxonburg Boulevard Propco, LLC |
| North Strabane Rehabilitation and Wellness Center, LLC | 100 Tandem Village Road Propco, LLC |

14. These two (2) operating facilities are referred to as the "Consulate Facilities".

15. Cheswick Rehabilitation and Wellness Center, LLC is a 121-bed facility located in Cheswick, Pennsylvania doing business as Cheswick Rehabilitation and Wellness Center. North Strabane Rehabilitation and Wellness Center, LLC is a 62-bed facility located in Canonsburg, Pennsylvania doing business as North Strabane Rehabilitation and Wellness Center.

### d. Organizational, Financial, and Operational Structure

16. An organizational chart showing the relationship among the various Debtors is attached as **Exhibit 2**.

17. Each of the Debtors is a limited liability company, and each of the Debtors either owns or operates a single skilled nursing facility. Because of the overlapping, but not identical, ownership interests among the Debtors, all of the Debtors are affiliated, limited liability companies.

18. With respect to their operating and financial structure, each of the Debtors contracts with CHMS Group, LLC, a non-Debtor affiliate, to manage, *inter alia*, its cash, receivables, and payables. Each of the Debtors maintains one or more separate bank accounts that are utilized in the ordinary course of business (the "Cash Management System"). The Cash Management System

currently consists of 83 bank accounts (the "<u>Bank Accounts</u>"), most of which are maintained at CIBC Bank, U.S.A. ("<u>CIBC</u>").  Additional information about the Cash Management System is set forth in Section V.E of this Declaration.[3]

19.    The Debtors do not consolidate their financial statements.  **<u>Exhibit 3</u>** hereto reflects, as of December 31, 2023, the amount recorded in the books and records of each Debtor as its total assets, including accounts receivable and fixed assets, as well as its total liabilities.  As discussed in Part II below, several of the Debtors are jointly liable on various debts.

20.    **<u>Exhibit 4</u>** hereto reflects each of the Debtors' recorded total revenues and expenses for the two years ended 2023 and 2022.

21.    **<u>Exhibit 5</u>** hereto shows the amount recorded on each Debtors' books and records for accounts receivable as of March 31, 2024, including an aging thereof.

22.    With respect to operational revenue, the OpCo Debtors derive the majority of their revenue from the residents residing in the Debtors' skilled nursing care facilities.

23.    The only source of revenue for the PropCo Debtors is the rent owed to them under their leases with its affiliated OpCo Debtor.

---

[3]A list identifying each of the Bank Accounts, along with the type of account, the last four digits of each Bank Account number, and the balance of each Bank account as of May 15, 2024 is attached to the Debtors' Cash Management Motion (as defined herein).

### III.    EXISTING INDEBTEDNESS

#### a.  Secured Indebtedness

24.    The Debtors have granted security interests in their assets as summarized in the

chart below:

| Secured Creditor | Obligated Debtors | Outstanding Amount | Collateral |
|---|---|---|---|
| Cuarzo | Cuarzo Debtors | Past due amount $5,521,378[4] | Security interest in all assets of the Cuarzo Debtors |
| CIBC | Cuarzo Debtors | $0 | Security interest in all assets of the Cuarzo Debtors |
| CIBC | Maybrook PropCo Debtors (guaranteed by Maybrook OpCo Debtors) | $45,589,054.00 (Term Loan) $2,284,964.54 (Revolver) | (i) Mortgages on the real property owned by the seven Maybrook PropCo Debtors; (ii) security interest in the accounts and all other assets owned by the Maybrook OpCo Debtors. |
| CIBC | Consulate PropCo Debtors (guaranteed by Maybrook OpCo Debtors) | $6,230,778.04 (Term Loan) $935,800.00 (Revolver) | (i) Mortgages on the real property owned by the two Consulate PropCo Debtors; (ii) security interest in the accounts and all other assets owned by the Consulate OpCo Debtors. |
| Various property taxing authorities | Consulate PropCo Debtors and Maybrook PropCo Debtors | Approximately $750,000 | Statutory liens on owned real property |
| U.S. Food Services | Maybrook-C Latrobe Opco, LLC | $27,391.76 | Security interest in the accounts and all other assets owned by the obligated Debtor |

25.    The primary secured creditor of the Cuarzo Debtors is Cuarzo.  The Master Lease

granted Cuarzo a security interest in all assets of the Cuarzo Debtors, including accounts, which

security interest was perfected by the filing of UCC statements on April 14, 2017 and renewed

March 31, 2022.  As of the Petition Date, the Cuarzo Debtors are delinquent in the rent due under

the Master Lease and have failed to make other payments due under that lease.

---

[4] Cuarzo asserts that the amount owed under the terms of the Master Lease, including accelerated rent, future real estate taxes and future cap ex requirements, equals $15,708,676.

26.     CIBC made a $4,000,000 revolving line of credit loan to the Cuarzo Debtors dated February 4, 2020 and recorded UCC financing statements reflecting a security interest in all of the assets of the Cuarzo Facilities on February 6, 2020.  This line of credit has expired, and the Debtors assert that all obligations owed under this financing have been satisfied in full; however, the recorded UCC lien has not been released.

27.     Each of the Maybrook Debtors is obligated on a loan initially made by CIBC on August 15, 2016 (the "Maybrook Loan").  The Maybrook PropCo Debtors are borrowers, and the Maybrook OpCo Debtors are guarantors.  The Maybrook Loan is secured by recorded mortgages on the real property owned by the Maybrook PropCo Debtors and by a security interest in the accounts and all other assets owned by the Maybrook Debtors.  UCC statements evidencing CIBC's lien on the personal property owned by the Maybrook Debtors were filed in 2016 and renewed in 2021.  As of the Petition Date, approximately $47,800,000 remains due and owing on the Maybrook Loan.

28.     Each of the Consulate Debtors is jointly and severally obligated on a loan made by CIBC Bank on September 15, 2017 (the "Consulate Loan").  The Consulate Loan is secured by recorded mortgages on the real property owned by the Consulate PropCo Debtors and by a security interest in the accounts and all other assets owned by the Consulate Debtors.  UCC statements evidencing CIBC's lien in the personal property owned by the Consulate Debtors were filed in 2017 and renewed in 2022.  The Consulate Loan is further secured by real property owned by non-Debtor affiliate 200 Tandem Village Road Propco, LLC and personal property in that facility owned by non-Debtor affiliate North Strabane Retirement Village, LLC.  As of the Petition Date, approximately $7,200,000 remains due and owing on the Consulate Loan.

29.     U.S. Food Services asserts a lien against Debtor Maybrook-C Latrobe Opco, LLC. It filed a UCC financing statement in May 2019, reflecting a lien in all assets of that Debtor.

30.     Each of the OpCo Debtors have potential obligations for nursing facility assessments (the "Nursing Facility Assessments") to the Commonwealth of Pennsylvania's Department of Human Services (the "Department"). The estimated potential total obligations exceed $17,800,000. The Department has not recorded a lien against any of the Debtors with respect to the Nursing Facility Assessments.

31.     The Maybrook Debtors contracted to sell substantially all of their assets to affiliates of Kadima Healthcare Group, Inc. ("Kadima") in the fall of 2023. For reasons discussed later in this Declaration, that sale never closed, and the Kadima affiliates filed *lis pendens*, which have not been released as of the Petition Date, against the seven Maybrook PropCo Debtors.

**b. Debtors' Leases**

32.     The Master Lease governing the four Cuarzo Facilities was entered by and among the four Cuarzo Landlords and the four Cuarzo Debtors. The Master Lease commenced on February 1, 2017, with an initial term of ten (10) years. The base rent under the Master Lease is $2,600,000.00 annually. On the first day of the second lease year and annually thereafter during the term, the base rent increases by a CPI adjustment. The base rent for the first lease year of each extension term is equal to the greater of: (a) the fair market rental of the premises, or (b) the sum of the base rent payable during the immediately preceding lease year increased by a CPI adjustment. Annual rent escalators apply to all extension terms.

33.     The leases for each of the Maybrook Facilities (between a Maybrook OpCo Debtor and its affiliate Maybrook Propco Debtor) are substantially the same other than the amount of rent. Each lease was executed on August 15, 2016, and has an initial term ending July 31, 2026, which

automatically renews for four successive periods of five years each unless the lessor provides the lessee notice of its election not to renew the lease at least 90 days prior to the commencement of the applicable renewal term. The base rent for the first five years of the agreement is fixed at the amounts set forth below. During the sixth through tenth lease years, and for each five-year period thereafter during the term, annual base rent increases by ten percent over the annual base rent during the preceding five-year period. The lessees are also responsible for payment of additional rent as defined in the leases, including additional rent obligations arising under certain loan agreements to which the lessor is a party. The base rent for each facility as of the lease commencement is as follows:

a. Maybrook-C Whitecliff         $1,610,000 per annum

b. Maybrook-C Evergreen         $1,470,000 per annum

c. Maybrook-C Latrobe            $1,080,000 per annum

d. Maybrook-C Silver Oaks         $390,000 per annum

e. Maybrook-C Overlook           $660,000 per annum

f. Maybrook-C Briarcliff         $1,370,000 per annum

g. Maybrook-C Kade               $710,000 per annum

34.    A single lease covers both of the Consulate Facilities, as well as the retirement center owned by non-Debtor affiliate 200 Tandem Village Road Propco, LLC. The lease between 100 Tandem Village Road Propco, LLC, non-Debtor 200 Tandem Village Road Propco, LLC, and 3876 Saxonburg Boulevard Propco, LLC, and North Strabane Rehabilitation and Wellness Center, LLC, non-Debtor North Strabane Retirement Village, LLC, and Cheswick Rehabilitation and Wellness Center, LLC commenced on September 18, 2017 with the lease term ending on September 18, 2027. The term automatically renews for four successive periods of five years each

unless lessor notifies lessee in writing of lessor's election not to renew the term at least 90 days prior to the commencement of the applicable renewal term. The original base rent was $1,100,000.00 per annum, allocated per facility. The base rent increases by one percent every lease year. The lessees are also responsible for additional rent obligations arising under certain loan agreements to which the lessor is a party. The base rent for the two Consulate Facilities as of the lease commencement date was as follows:

a.  North Strabane Rehabilitation and Wellness        $203,000

b.  Cheswick Rehabilitation and Wellness              $697,000

### c.  Unsecured Debt

35.    Each of the OpCo Debtors is also a defendant in the DOL Action, and each owes significant sums to vendors and other creditors for goods and services provided. The total number of unsecured creditors is estimated to be more than 450, and the total amount of unsecured debt owed by all Debtors exceeds $54 million.

36.    In addition, in the ordinary course of business, current or former residents or their representatives have also asserted claims against the Debtors alleging negligence and related professional liability claims.

### d.  Unionized Facilities; Information regarding Employees

37.    As of the Petition Date, the thirteen OpCo Debtors employed approximately 1,246 people (collectively, the "Employees"), most of whom are paid hourly and some of whom are paid on salary.

38.    Excepting Debtors Maybrook-C Overlook Opco, LLC and Maybrook-C Whitecliff Opco, LLC, all other OpCo Debtors are parties to collective bargaining agreements. The

agreements are with different unions and cover certain groups of employees. The following is a

listing of the Debtors' collective bargaining agreements (the "CBAs"):

(a)     Agreement between The Grove at Irwin - Briarcliff (Maybrook-C Briarcliff
Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15,
2016 – June 30, 2021);

(b)     Agreement between Maybrook-C Briarcliff Opco, LLC, dba The Grove at
Irwin and OPEIU Healthcare Pennsylvania Local 112, Local 112 OPEIU,
AFL-CIO, CLC (dated March 31, 2017);

(c)     Memorandum of Agreement (in negotiations) between Maybrook-C
Briarcliff Opco, LLC d/b/a The Grove at Irwin and OPEIU Local 153, AFL-
CIO, CLC  (January 1, 2022 – December 31, 2024);

(d)     Agreement between The Grove at Harmony - Evergreen (Maybrook-C
Evergreen Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC
(August 15, 2016 – June 30, 2021);

(e)     Agreement between The Grove at Washington (Maybrook-C Kade Opco,
LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15, 2016 –
June 30, 2021);

(f)     Agreement between Latrobe Health Rehabilitation Center (Maybrook-C
Latrobe Opco, LLC) and International Brotherhood of Teamsters Local
Union No. 30 (April 1, 2021 – March 31, 2026);

(g)     Agreement between The Grove at New Castle (Maybrook-C Silver Oaks
Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15,
2016 – June 30, 2021);

(h)     Collective Bargaining Agreement between South Hills Operations, LLC
d/b/a South Hills Rehabilitation and Nursing Center and General Teamsters
Local Union 585 (January 1, 2022 – December 31, 2024);

(i)     Agreement between Cheswick Rehabilitation and Wellness Center and
SEIU Healthcare Pennsylvania CTW, CLC (September 1, 2022 – August
31, 2025);

(j)     Agreement between North Strabane Rehabilitation and Wellness Center
LLC, North Strabane Retirement Village, LLC and SEIU Healthcare
Pennsylvania CTW, CLC (September 1, 2017 – August 1, 2022);

(k)     Tentative Agreement (in negotiations) between North Strabane
Rehabilitation and Wellness, LLC and SEIU Healthcare Pennsylvania
(September 1, 2022 – August 31, 2025);

(l)     Memorandum of Agreement between SEIU Healthcare Pennsylvania and
North Strabane Rehabilitation and Wellness, LLC (extending agreement
through August 31, 2025);

(m)     Agreement between Monroeville Operations LLC (Monroeville Rehabilitation and Wellness Center), Mt Lebanon Operations LLC (Mt Lebanon Rehabilitation and Wellness Center), Murrysville Operations LLC (Murrysville Rehabilitation and Wellness Center) and SEIU Healthcare Pennsylvania CTW, CLC (February 1, 2017 – June 30, 2021); and

(n)     Tentative Agreement between SEIU Healthcare PA and Monroeville Rehabilitation & Wellness Center, Mt. Lebanon Rehabilitation and Wellness Center, Murrysville Rehabilitation & Wellness Center, The Grove at Harmony, The Grove at Irwin, The Grove at New Castle, The Grove at Washington (September 8, 2022 – May 31, 2025).

39.     The Debtors have no pension programs, and the only retirement benefits they offer to their employees are 401(k) retirement plans.  In some of these plans, the Debtors match a small portion of the employee's contribution.

## IV.    CIRCUMSTANCES LEADING TO THE FILING OF THESE CASES

40.     Prior to the Covid-19 pandemic in 2020, the fourteen Debtor facilities were generally performing well.  Unfortunately, the pandemic had a severe negative impact on the Debtors' facilities.  During this period, costs increased dramatically while occupancy levels declined.  As a result, during 2023 the Debtors' liquidity declined significantly.  Skilled labor shortages resulted in increased staff wages and greater reliance on costly agency nurses.  Meanwhile, resident headcounts at the facilities declined and the managed care Medicaid rates paid by the Commonwealth of Pennsylvania for many of the residents were not enough to offset the increased costs.

41.     The Debtor Mt. Lebanon Operations, LLC was also negatively impacted financially by a federal legal action against this Debtor and several other defendants, including certain officers of the Debtors, which concluded in December 2023.  The jury acquitted each of the individual defendants, but found Mt. Lebanon Operations, LLC guilty of three counts of falsifying records to obstruct a federal investigation and one count of falsifying medical records.  A motion to set aside

the guilty verdict against the facility Debtor is pending, and the sentencing of the Debtor Mt. Lebanon Operations, LLC is currently scheduled for August 2024.

42.     The trial of the DOL Action against the OpCo Debtors and other non-Debtor affiliates concluded in February, 2024.  The federal district court judge who heard the matter has not yet rendered a decision.

43.     Both of these legal actions had materially negative effects upon the OpCo Debtors. The fees incurred in the defense of these actions were significant, and the negative publicity surrounding these legal actions affected the resident census, which resulted in lower revenue. During the investigations and discovery related to these actions, regional and facility personnel were often distracted from the facilities' day-to-day operations.  Now that the trials have concluded, the Debtors have endeavored to re-focus their efforts on improving operational results and census at the facilities; however, the economic consequences and overhang of the continuing legal actions remain problematic.

44.     I understand, based on conversations with the Debtors, Trey Marinello ("Marinello") at Houlihan Lokey, and others, that Marinello and Houlihan Lokey were retained to conduct a strategic marketing process to find new operators for the Cuarzo Facilities.  I understand that this process started in May, 2023 and that after an extensive search only one operator, WeCare Centers ("WeCare"), emerged as willing and able to take over the Cuarzo Debtors' operations, and only to the extent that the Cuarzo Landlords agreed to provide significant concessions to WeCare.[5]

45.     In the fall of 2023, the Cuarzo Debtors entered into Operations Transfer Agreements (collectively, the "OTAs") contemplating the orderly transfer operations of the Cuarzo Facilities to WeCare, but that transaction has not yet closed because of the new operator's

---

[5]Mr. Marinello will submit a declaration describing this process in detail in connection with the Cuarzo Debtors' motion to approve a private sale of the Cuarzo Facilities to WeCare.

concerns about successor liability for any judgment obtained by the DOL and potential obligations owed to the Department for Nursing Facility Assessments.

46.     Also in 2023, the Maybrook Debtors entered into an agreement to sell their assets and transfer operations to a new operator.  The buyers under this agreement were affiliates of Kadima.  This sale was not consummated for two reasons: (1) there was no way to satisfy the obligations of the Maybrook OpCo Debtors to the Department, and (2) the DOL sought an injunction to prohibit the sale.  After initially entering a temporary restraining order preventing the sale, the United States District Court denied the DOL's request for an injunction.  Nevertheless, the potential buyer of the Maybrook Facilities elected not to consummate the sale in light of its ongoing concerns regarding those two issues.

47.     By agreement dated February 8, 2024, the Maybrook and Consulate Debtors (together, the "CIBC Debtors") retained Blueprint Healthcare Real Estate Advisors, LLC ("Blueprint") in cooperation with Cummings and Co. Realtors, LLC ("Cummings") to market the nine (9) skilled nursing facilities owned and operated by these Debtors for sale.  The efforts to market and sell these properties are ongoing, and the Debtors intend to seek Court approval for the employment of Blueprint and Cummings to continue their work on the terms set forth in their engagement agreement dated February 8, 2024.

48.     Since entering into that agreement, Blueprint has engaged in a prepetition marketing process with potential strategic and financial buyers to solicit interest in the CIBC Facilities (defined herein).  Blueprint contacted more than twenty potential acquirers and sent teasers and/or non-disclosure agreements to certain interested parties.  Furthermore, Blueprint distributed the Offering Memorandum and conducted initial pitch calls to thoroughly vet each potential acquirer's financial ability and transactional experience to reduce interest to the most

qualified and capable potential acquirers that represented the highest level of execution certainty.

Ten (10) entities executed a non-disclosure agreement and were provided access to an electronic

data room and invited to submit initial, non-binding offers for the Purchased Assets.  In March

2024, Blueprint received three offers for the Maybrook Facilities and the Consulate Facilities

(together, the "CIBC Facilities").  After negotiation with these three parties, the Debtors, in

consultation with CIBC and Blueprint, accepted an opening bid for the sale of the Purchased

Assets, subject to higher and better offers, from Kadima Healthcare Group, Inc. (the "Stalking

Horse Bidder").

49.    As of the Petition Date, the Debtors' financial condition is dire.  The Debtors are

unable to operate on a day-to-day basis without outside funding, and transfers to stable and

responsible operators is the only viable path forward to ensure appropriate resident care.

50.    Given these circumstances, the Debtors believe that the best way to maximize the

value of their assets and provide continuity of care to their residents is through a transfer of their

assets as quickly as possible pursuant to section 363 of the Bankruptcy Code—the primary goal of

these Chapter 11 Cases.  Absent a transfer of assets and operations pursuant to section 363 free

and clear of all liabilities and liens, including the Nursing Facility Assessments and any successor

liability claims, the Debtors will almost certainly have to shut down their operations, which will

greatly harm the residents of the Debtors' Facilities, result in hundreds of lost jobs, and will not

maximize the value of the Debtors' assets.

51.    For these reasons, the CIBC Debtors intend to pursue immediately a sale of the

CIBC Facilities to the Stalking Horse Bidder pursuant to section 363 of the Bankruptcy Code.  A

motion to approve sale procedures and a sale of assets to the Stalking Horse Bidder, subject to

higher and better offers, will be filed no later than a few days after the Petition Date.  Similarly,

the Cuarzo Debtors, after consulting with Cuarzo and its advisors, are filing a motion pursuant to

section 363 of the Bankruptcy Code to transfer operation of the Cuarzo Facilities to WeCare.

52.    The Debtors' accounts receivable will be excluded from both transactions.

## V.    FIRST DAY MOTIONS AND APPLICATIONS

53.    Along with Debtors' petitions, Debtors filed certain motions for expedited relief

(the "First Day Motions"). [6]

54.    Generally speaking, the relief requested in the First Day Motions is necessary for

the continuation of Debtors' operations and services with little or no disruption.  I believe that an

expedited resolution of the issues raised in the First Day Motions is crucial to the success of

Debtors' bankruptcy cases and restoration of Debtors' normal business operations.  Specific

factual information in support of each of the First Day Motions is provided below as well as in the

various applications and motions.

### A.    Administrative – Joint Administration Motion

55.    The Debtors filed an Emergency Motion for Entry of an Order Directing Joint

Administration of Chapter 11 Cases (the "Joint Administration Motion").

56.    The Debtors seek entry of an order consolidating the Debtors' Chapter 11 Cases for

procedural purposes only and waiving the requirement that the Debtors' caption contain complete

tax identification numbers.

57.    The Bankruptcy Code authorizes a Court to order joint administration of the estates

of a debtor and its affiliates.  In this situation, while all the Debtors do not have identical ownership,

PA2 Holdings, LLC, either directly or indirectly, owns at least twenty percent of each of the

Debtors.  Thus, the Debtors are affiliates of one another as defined by the Bankruptcy Code.  *See*

---

[6] Any term not defined herein shall have the meaning ascribed to it in its respective First Day
Motion.

11 U.S.C. § 101(2)(A). Furthermore, each of the OpCo Debtors is a defendant in the DOL Action.

In that action, the Court has already found that all of these defendants are a "common employer"

and, as such, each operating Debtor will be jointly and severally liable for any judgment entered

in the DOL Action. Accordingly, the Debtors request the Court jointly administer these Chapter

11 Cases.

58.     Joint administration of the Debtors' Chapter 11 Cases will permit the Clerk of the

Court to use a single general docket for each of the Debtors' Chapter 11 Cases and to combine

notices to creditors and other parties in interest of the Debtors' respective estates.

59.     More significantly, joint administration will save time and money and avoid

duplicative and potentially confusing filings by permitting counsel for all parties in interest to

(a) use a single caption on the numerous documents that will be served and filed herein and (b) file

the papers in one case rather than in multiple cases.

60.     Joint administration will not adversely affect the rights of the respective creditors

of each of the Debtors because the relief sought is purely procedural and is not intended to affect

substantive rights. The Debtors propose that the official caption be the caption for South Hills

Operations, LLC. The Debtors propose to use a footnote to identify the other Debtors' names,

which will help to identify the other Debtors involved in these Chapter 11 Cases.

61.     Furthermore, the Debtors request that the Court make separate docket entries on

the dockets of the Affiliate Debtors' Chapter 11 Cases, substantially as follows:

> An Order has been entered in accordance with rule 1015(b) of the
> Federal Rules of Bankruptcy Procedure and rule 1002-6 of the Local
> Rules of Bankruptcy Practice and Procedure of the United States
> Bankruptcy Court for the Western District of Pennsylvania directing
> joint administration of the Chapter 11 Cases of the following
> entities: South Hills Operations, LLC; Monroeville Operations,
> LLC; Mt. Lebanon Operations, LLC; Murrysville Operations, LLC;
> Cheswick Rehabilitation and Wellness Center, LLC; 3876

Saxonburg Boulevard Propco, LLC; North Strabane Rehabilitation and Wellness Center, LLC; 100 Tandem Village Road Propco, LLC; Maybrook-C Briarcliff Opco, LLC; Maybrook-C Briarcliff Propco, LLC; Maybrook-C Evergreen Opco, LLC; Maybrook-C Evergreen Propco, LLC; Maybrook-C Kade Opco, LLC; Maybrook-C Kade Propco, LLC; Maybrook-C Latrobe Opco, LLC; Maybrook-C Latrobe Propco, LLC; Maybrook-C Overlook Opco, LLC; Maybrook-C Overlook Propco, LLC; Maybrook-C Silver Oaks Opco, LLC; Maybrook-C Silver Oaks Propco, LLC; Maybrook-C Whitecliff Opco, LLC; Maybrook-C Whitecliff Propco, LLC. The docket in the chapter 11 case of South Hills Operations, LLC, Case No. 24-21217-CMB, should be consulted for all matters affecting the Chapter 11 Cases of any foregoing entities.

62.     The Debtors believe that many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors. Consequently, joint administration will reduce costs and facilitate a more efficient administrative process, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, Chapter 11 Cases. Joint administration will also allow the Court and the Debtors to employ a single docket for all of these Chapter 11 Cases and to confine, and thereby simplify, notice to creditors and other parties in interest. Joint administration will also enable parties in interest in each of the Chapter 11 Cases to stay apprised of all matters before the court. Finally, joint administration will ease the burden on the office of the United States Trustee in supervising these Chapter 11 Cases.

### B. Administrative – Claims Agent and Administrative Agent Motions

63.     The Debtors seek entry of an order retaining Omni Agent Solutions, Inc. ("Omni") to be their claims and noticing agent effective as of the Petition Date.

64.     The Debtors also desire to engage Omni to provide various administrative services related to these Cases. The Debtors believe that employing Omni will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their sale and reorganization efforts. Omni possesses substantial experience in matters of this size and

complexity and has acted as the official claims and noticing agent in many bankruptcy cases filed in this and other districts.

### C. Administrative – Extension of Time, Consolidation, Resident Noticing Procedures, and Notice of Commencement

65.     The Debtors have filed an emergency motion requesting: (i) additional time within which to file the required schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") as well as their creditors' lists and matrices; (ii) the authority to file a consolidated matrix and list of the 30 largest general unsecured creditors; (iii) approval of certain procedures to maintain the confidentiality of resident information establishing resident noticing procedures; and (iv) approval of the form and manner of notice of the commencement of these Chapter 11 Cases and of the meeting of creditors (the "Extension, Consolidation and HIPAA Motion").

66.     I believe cause exists to extend the deadline for filing the Schedules and Statements. The Debtors have not had sufficient time to assemble all of the requisite financial data and other information the Schedules and Statements require.  To prepare this information, the Debtors must thoroughly examine their books, records, and documents, which will require substantial time and effort.

67.     The Debtors' management team has been, and will continue to be, very busy performing work related to Debtors' ongoing business operation, as well as performing new duties necessitated by the filing of these Chapter 11 Cases.  The volume of work these employees will have in the immediate future weighs in favor of extending the time to file the Schedules and Statements.  Additionally, an extension will aid the Debtors in filing complete and accurate Schedules, thereby benefiting all parties in interest in these Chapter 11 Cases.

68.     The Debtors have already begun compiling the necessary information to complete the Schedules and Statements as soon as possible.  The Debtors and their professionals are currently reviewing that information.  The Debtors expect to complete this process on or before the extended deadline proposed herein, which is forty-four (44) days after the Petition Date.

69.     Relatedly, given the anticipated volume of parties that the Debtors will identify as they prepare their Schedules, I also believe that the preparation of separate creditors' lists for each Debtor would be expensive, time-consuming, administratively burdensome, and of little incremental benefit.  This is especially true where, as here, the Debtors, working with Omni before the Petition Date, have already prepared a single, consolidated creditors' list in electronic format. The filing of a single consolidated matrix would also facilitate the U.S. Trustee's review of creditors' claims and the appointment of a single creditors' committee in these Cases.

70.     The Debtors also seek the authority to file a single consolidated list of their 30 largest general unsecured creditors.  A consolidated list of the 30 largest general unsecured creditors, together with a consolidated creditor matrix, will help alleviate administrative burdens, costs, and the possibility of duplicative services.

71.     Additionally, the Debtors seek the authority to implement certain noticing procedures set forth in the motion.  I believe these procedures adequately balance safeguarding confidential resident information with the Bankruptcy Code's disclosure requirements relating to creditors and parties in interest.

72.     Finally, the Debtors propose to serve the Commencement Notice, via regular mail, on all residents, and by publication as soon as practicable following the entry of an order granting the Extension, Consolidation and HIPAA Motion.  This will not only avoid confusing creditors,

but will also prevent the Debtors' estates from incurring unnecessary costs associated with serving

multiple notices to the parties on the Debtors' voluminous creditor matrix.

73.     Accordingly, on behalf of the Debtors, I believe that it is in the best interest of the

Debtors' estates and all creditors and other interested parties to adopt the foregoing procedures.

### D.  Operational Matters – Employee Wages and Benefits

74.     The Debtors filed a Motion for Entry of Interim and Final Orders (I) Authorizing

the Debtors to Pay Certain Prepetition Wages, Benefits and Other Compensation Obligations, (II)

Authorizing Financial Institutions To Honor All Obligations Related Thereto, And (III) Granting

Related Relief (the "Wage Motion").

75.     The Debtors seek authority to pay and honor certain prepetition claims and continue

to honor obligations on a postpetition basis relating to all of their Employee Obligations and

Employee Programs (as defined in the Wage Motion), including among other things: wages,

reimbursable expenses, employee payroll taxes, tax withholding and deduction obligations, health

and welfare programs, paid time off benefits, matching retirement contributions, COBRA benefits

and certain other benefits that the Debtors historically provided in the ordinary course.   The

Debtors also seek authority for relevant banks to receive, process, and pay any and all checks

drawn on the Debtors' payroll accounts and any and all automatic payroll transfers to the extent

that such checks or transfers relate to the Employee Obligations and Employee Programs.

76.     The Debtors employ approximately 859 full-time employees and approximately

387 part-time employees (collectively, the "Employees").   Approximately 1,083 Employees are

paid on an hourly basis and approximately 163 Employees are paid a salary.

77.     The Debtors' ability to provide quality care at the Facilities depends on the

continued service and morale of the Debtors' workforce.   The Employees perform functions

critical to the Debtors' ordinary course operations and the orderly administration of these Chapter 11 Cases.  For example, the Employees are distinctly familiar with the Debtors' processes and systems and possess specialized knowledge, skills, or experience that the Debtors cannot easily replace.  Among other duties, the Employees provide direct care to Facilities' residents, as well as dietary needs, maintenance, and supervision of the Facilities' operations.    Moreover, the Employees possess the experience and skills necessary to support the OpCo Debtors' business operations during these Chapter 11 Cases while the Debtors pursue a successful sale of their businesses.

78.    Furthermore, the vast majority of the Employees rely on their compensation to pay their daily living expenses and to support their families.  The Employees will be exposed to significant financial hardship if the Debtors are not permitted to pay amounts due for work performed prior to the Petition Date and to continue paying these amounts in the ordinary course of business.  These Chapter 11 Cases will likely create Employee anxiety, and the requested relief is critical to adequately alleviate some of their concerns.

79.    The Debtors compensate Employees at several of the Facilities who belong to a union pursuant to the CBAs identified earlier in this Declaration.  The Bankruptcy Code requires that the compensation and benefits owed under these agreements be continued until the Court orders otherwise.

80.    In summary, continuing to pay Employee Obligations and Employee Programs to all Employees will minimize the personal hardship that the Employees would suffer if prepetition employee-related obligations are not paid when due or as expected and maintain morale and stability in the Debtors' workforce during this critical time.

(i)    Employee Wages

81.     On average, the OpCo Debtors pay approximately $4,658,000 in gross wages and salary per month for their current Employee base.[7]  In the ordinary course of business, the OpCo Debtors disburse payroll (the "Employee Wages") on a bi-weekly basis, but on different schedules at different Facilities.  As of the Petition Date, the OpCo Debtors owe Employee Wages for work performed prior to the Petition Date.  Those postpetition disbursements are owed to Employees for accrued but unpaid Employee Wages as of the Petition Date with respect to such payroll periods.  Accrued but unpaid Employee Wages may also be due as of the Petition Date for other reasons, such as Employees being owed some amount for previous payroll periods or for expense reimbursement.

82.     As of the Petition Date, the OpCo Debtors estimate that they owe approximately $1,390,000 for prepetition Employee Wages all of which will become due and payable within the Interim Period.  The Debtors seek authority, but not direction, to satisfy the prepetition Employee Wages in the ordinary course of business, including reissuing any unreceived pay or uncashed checks as necessary, subject to the Priority Cap[8], and to honor Employee Wages accrued on or after the Petition Date in the ordinary course.

83.     CHMS Group, LLC ("CHMS"), which has overlapping ownership with several of the Debtors, manages the processing and payment of the various obligations described herein for the OpCo Debtors' Employees.  CHMS processes payroll and withholdings, remits pay, and reports payroll taxes for the Employees.  Each of the OpCo Debtors pay a monthly fee to CHMS for these and other administrative services, including billing and collection of accounts receivable,

---

[7] This amount reflects an 8-month average of the Debtors' Facilities as of the Petition Date.

[8] The current Priority Cap is $15,150 per employee. *See* 11 U.S.C. § 507(a)(4).

financial reporting, preparing cost reports and verifying, accounting for and managing accounts payable.

(ii)    Bonuses

84.    The Debtors seek authority to continue, at their discretion and in a manner consistent with prepetition practice, their bonus programs to drive performance, to preserve Employee morale, and to ensure the Debtors maintain a motivated workforce during these Cases. In the ordinary course of business, the Debtors provide various incentive awards to eligible Employees, including employee referral programs, sign-on bonuses, and performance bonuses. In the six (6) months prior to the Petition Date, the Debtors paid approximately $300,000 in bonuses. The Debtors estimate that there are approximately $15,000 in accrued but unpaid obligations owed under the bonus programs, which the Debtors seek to pay in the ordinary course.

(iii)    Reimbursable Expenses

85.    In the ordinary course of business, the Debtors also reimburse eligible Employees for reasonable approved expenses incurred performing their job functions (the "Reimbursable Expenses"). Reimbursable Expenses include certain work-related travel expenses and other qualifying business expenses, including certain costs related to employee training. Employees are expected to use sound judgment when incurring business expenses for which they seek reimbursement. In the eight (8) months before the Petition Date, the Debtors incurred an average of approximately $1,500 per month for Reimbursable Expenses. As of the Petition Date, the Debtors estimate they owe approximately $1,500 in the aggregate for Reimbursable Expenses.

86.    The Debtors' inability to pay Reimbursable Expenses could impose hardship on Employees where they incurred Reimbursable Expenses believing the Debtors would timely reimburse such expenses. Accordingly, the Debtors request authority to pay prepetition

Reimbursable Expenses and to continue paying Reimbursable Expenses on a postpetition basis in the ordinary course of business.

(iv)    <u>Withholding and Deduction Obligations</u>

87.    Each pay period, the OpCo Debtors routinely deduct certain amounts directly from Employees' pay, including, but not limited to: (i) garnishments, child support, employee savings and other similar deductions, as applicable; and (ii) other pre- and after-tax deductions payable pursuant to the Employees Obligations, legally-ordered deductions and other miscellaneous deductions (collectively, the "<u>Deductions</u>").

88.    Based upon the Employees' salaries and wages, the law requires the OpCo Debtors to also withhold amounts related to federal, state, and local income taxes, as well as Social Security and Medicare, and to remit such withholdings to the applicable authorities.  The law also requires the OpCo Debtors to make matching payments from their own funds for Social Security and Medicare and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (all of the foregoing, collectively, the "<u>Payroll Tax Obligations</u>").  Each pay cycle, the OpCo Debtors withhold applicable Payroll Tax Obligations from Employees' wages and remit such amounts to the applicable authorities.

89.    In the eight (8) months before the Petition Date, the Debtors incurred, on average, approximately $1,700,000 per month for Deductions and Payroll Tax Obligations.  As of the Petition Date, the OpCo Debtors have withheld approximately $497,000 in prepetition Deductions and Payroll Tax Obligations (collectively, the "<u>Withholding Obligations</u>") that they must pay or remit within the Interim Period.  Thus, the OpCo Debtors seek authorization, but not direction, to

pay and remit the Withholding Obligations to the appropriate authorities consistent with the OpCo Debtors' prepetition practices.

      (v)    <u>Health and Wellness Benefits</u>

90.    The OpCo Debtors offer insurance to Employees.  The specific insurance benefits available to any specific Employee is based on various factors, such as the terms of any applicable CBA, the terms of the facility's employee handbook, and the Employee's seniority and status (full or part-time).  Generally, eligible Employees may purchase for themselves and their eligible family members medical, dental and vision coverage, and some of the OpCo Debtors also offer short-term disability, long-term disability, basic life and accidental death and dismemberment coverage, voluntary life, voluntary short-term disability, and voluntary accident and critical illness (collectively, the "<u>Benefit Plans</u>").

91.    The OpCo Debtors pay a portion of the premiums owed for insurance plans providing medical benefits, and they also withhold from Employees' pay the Employee portion of the premiums.  Generally, the Debtors pay the premiums monthly.  As of the Petition Date, the Debtors owe an estimated $197,000 for the Benefit Plans, all of which will become due and payable during the Interim Period.  The OpCo Debtors seek authority, but not direction, to honor all Benefit Plan contributions that arose prepetition and honor any amounts that become due in the ordinary course, and to pay all premiums due on the various policies associated with the Benefit Plans.

      (vi)    <u>Retirement Benefit Plans</u>

92.    The OpCo Debtors also offer Employees the ability to voluntarily contribute to a 401k retirement savings program (the "<u>Retirement Benefits Plans</u>"), and the OpCo Debtors usually offer to match a portion of gross wages that an Employee chooses to voluntarily contribute.  As of

the Petition Date, approximately 106 employees participate in the Retirement Benefits Plans. By this Motion, the OpCo Debtors seek authority, but not direction, to honor all Retirement Benefits Plans contributions (including the Debtors' matching contribution) that arose prepetition and honor any amounts that become due in the ordinary course of business postpetition.

93.     Intac Actuarial Services, Inc. (part of FuturePlan by Ascensus) ("Intac") acts as the third-party administrator for the Retirement Benefits Plans and bills for its services on a semi-annual basis. Historically, Intac's fees have been no greater than $15,000 annually. As of the petition date, the Debtors have not received Intac's 2024 invoice. Out of an abundance of caution, the Debtors seek authority, but not direction, to honor their prepetition obligations estimated to be $5,000.

(vii)   Accrued PTO and Holidays

94.     In the ordinary course of business, the OpCo Debtors provide eligible Employees with paid time off for vacation ("Vacation Leave") and illness ("Sick Leave"), bereavement, and jury duty (collectively, "PTO"). These benefits are determined by the terms of the CBAs described above for Employees who are union members, and by a facility handbook for Employees who are not in a union. The benefits provided and the accrued PTO (the "Accrued PTO") vary from facility to facility, between Employees who are union members and those who are not, and depend upon the Employees status (full or part-time).

95.     The OpCo Debtors seek authority to continue their PTO policy in the ordinary course of business on a postpetition basis, provided that: (i) each Employee will be required to use any postpetition Accrued PTO first, any Accrued PTO earned within 180 days of the Petition Date second, and any remaining prepetition Accrued PTO to be applied thereafter; and (ii) all requests to use accrued Vacation Leave must be coordinated and approved by the applicable Employee's

supervisor, consistent with past practices, to ensure no disruption to the Debtors' ongoing business operations.

96.     As of the Petition date, the Debtors owe approximately $1,602,000 for Accrued PTO.  Upon termination, whether voluntary or involuntary, Employees are entitled to receive payment for any unused Accrued PTO at 50% of their pay rate (excluding exempt and management employees).  The Debtors request the Court authorize, but not require them, to honor all prepetition Accrued PTO, subject to the Interim Period and the Priority Cap, and continue to honor all postpetition Accrued PTO as it comes due in the ordinary course.

97.     The OpCo Debtors also offer paid holidays to eligible Employees.  As with other benefits, the holidays offered vary based on various factors, such as the terms of any applicable CBA, the terms of the facility's employee handbook, and the Employee's seniority and status (full or part time).  By the Wage Motion, the Debtors seek to continue to honor these holidays in the ordinary course of their operations.  The OpCo Debtors believe that continuing to do so will help boost Employee morale and confidence in the Debtors, and maintain the current workforce.

(viii)   Miscellaneous Employee Benefits

98.     Several of the Debtors' CBAs require the Debtor to reimburse Employees for one-half of the costs of certain training programs and certifications and to contribute a percentage (usually 1% of gross bargaining unit wages) to the union's training and education fund.  By the Wage Motion, the Debtors' request authority, in their sole discretion, to make payments due under the provisions of their CBAs.  The Debtors believe that the maximum amount that would be due for this benefit for amounts accrued prior to the Petition Date is $56,000.  If the Court grants the Debtors permission to make these payments, then there will be less disruption in the unionized workforce, and the Debtors can comply with the CBAs' terms.

(ix)    COBRA Benefits

99.    Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former employees of the Debtors (the "COBRA Participants") may, in certain cases, continue insurance coverage under various health benefit plans, including medical and dental plans, and life insurance following the termination of their employment with the Debtors (the "COBRA Benefits").   The law entitles COBRA Participants to continue to receive COBRA Benefits for up to 18 months and, in certain cases, up to 36 months, following employment termination.   The COBRA Participants bear their insurance coverage costs subsequent to termination unless the Debtors otherwise subsidize it.

100.    As of the Petition Date, the Debtors estimate that they owe approximately $3,000 for the COBRA Benefits.  The Debtors request the Court authorize, but not direct or require them, to pay the COBRA Benefits, honor any outstanding obligations as of the Petition Date related to the COBRA Benefits, and continue to administer COBRA Benefits for all eligible former Employees on a postpetition basis.

**E.  Operational Matters – Cash Management**

101.    The Debtors filed a Motion for Entry Of An Order (A) Authorizing The Debtors To (I) Maintain Their Cash Management System and Pay Bank Fees, (II) Waive Certain U.S. Trustee Requirements, and (III) Continue Using Existing Checks And Business Forms, and (B) Authorizing And Directing The Debtors' Bank To Honor All Employee Related Payment Requests (the "Cash Management Motion").

102.    The U.S. Trustee Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts for which the signature cards shall indicate that the debtor is a "Chapter 11 Debtor-in-Possession"; (b) establish

a new payroll account; and (c) maintain any funds over the amount required for current operations in an interest-bearing account.  The Debtors seek a waiver of these requirements and the authority to continue using their existing bank accounts.

103.     In the ordinary course of business, each of the Debtors manages their cash, receivables, and payables through a cash management system (the "Cash Management System").  Each of the Debtors uses the Cash Management System to efficiently collect, transfer, concentrate, and disburse funds generated from its operations.  The Cash Management System also enables each Debtor to monitor the collection and disbursement of funds, and the administration of its bank accounts.  Each Debtor maintains accounting controls with respect to each of its bank accounts and can accurately trace the funds through its Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  To that end, the Debtors reconcile their books and records and produce financial statements on a regular basis.

104.     The Debtors request that the Court authorize them to maintain their books and records relating to the Cash Management System to the same extent the Debtors maintained such books and records prepetition.  Accordingly, this will allow the Debtors to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of their bankruptcy estate and for all parties in interest.

(i)     Bank Accounts

105.     The Cash Management System currently consists of 83 bank accounts (the "Bank Accounts"), the majority of which are maintained at CIBC, with the others maintained at CitiBank USA ("Citibank") and Citizens Bank ("Citizens" and collectively, the "Banks").  A list identifying each of the Bank Accounts, along with the type of account, the last four digits of each Bank Account number, and the balance of each Bank Account as of May 15, 2024, is attached as Exhibit

C to the Cash Management Motion, and a diagram illustrating the foregoing Cash Management System is attached to the Cash Management Motion as Exhibit D.

106.    Generally, each of the OpCo Debtors maintains four bank accounts: an operating account, a payroll account, a government receivables account, and a clearing account.  Each of the PropCo Debtors primarily uses a single account, but a few maintain a separate account for capital expenditures.  Furthermore, certain Facilities maintain a resident trust account (the "Resident Trust Account").  Deposits are received into the Debtors' clearing account then transferred to the Resident Trust Account, or are directly deposited into the Resident Trust Account.  Upon written resident authorization, the applicable OpCo Debtor facility (each, a "Facility") must hold, safeguard, manage, and account for such resident's personal funds as federally mandated.  The funds in the Resident Trust Accounts are not property of the Debtors' estates, but rather are property of the Debtors' residents.  A resident may direct a draw from the Facility's Resident Trust Account upon request.

107.    In accordance with W.PA.LBR 1002-7(a), the Debtors note that, under the Cash Management System, in the ordinary course of business, there are some money transfers between Debtors and to non-debtor affiliates.  The primary form of transfers between Debtors are OpCo Debtors' payments to its related PropCo Debtor under the terms of the lease agreement between the two Debtors.  The PropCo Debtors use the rents received to pay debt service.

108.    All of the Maybrook PropCo Debtors transfer their Maybrook Opco Debtor rent received to Maybrook-C Kade Propco LLC operating account x2937, and the debt payment due to CIBC is withdrawn from that account.  For the Consulate Debtors, all rent payments are transferred to 100 Tandem Village Road Propco, LLC operating acct x3536, and the debt payment due to CIBC is withdrawn from that account.  Additionally, each of the OpCo Debtors use in the ordinary

course of their business fuel charge cards issued by Wex Bank pursuant to a contract with non-Debtor Comprehensive Healthcare Management Services, LLC ("Comprehensive").  Each OpCo Debtor is responsible to reimburse Comprehensive for its monthly charges on the Wex cards used by it.  Finally, each of the OpCo Debtors make payments to non-Debtor CHMS for administrative services, including payroll processing, billing and collection of accounts receivable, financial reporting, cost report preparation and work to verify, account for and manage accounts payable.

109.    CIBC accounts x8923 and x4984 are designated capital expenditure cash reserve accounts (the "Reserve Accounts"), which are required under the CIBC loan agreements.  Due to the Debtors' current liquidity constraints, the Reserve Accounts are not active in the normal course.  Under normal circumstances, to access funds in the Reserve Accounts the Debtors would need CIBC's authorization pursuant to a process that requires submission of a request to CIBC along with invoices and payment backup prior to the release of funds.  The use of, and request for, Reserve Account funds is typically for non-ordinary course expenditures and is distinct from everyday capital expenditure maintenance purchases, which are run through Debtors' operating accounts via the accounts payable system.

110.    The Debtors respectfully request that the Court authorize them to maintain and continue to use the Bank Accounts, and authorize the Banks to maintain, service, and administer the Bank Accounts without interruption and in the ordinary course of business consistent with past practice.  For the avoidance of doubt, the funds in the Resident Trust Accounts are not property of the Debtors' estates, but rather are property of the Debtors' residents.  Nevertheless, the Debtors request that the Court authorize the applicable Banks to continue to maintain, service, and administer the applicable Resident Trust Accounts without interruption in the ordinary course of business.

111.    The Debtors further request that the Banks be authorized to receive, process, honor, and pay any and all checks, drafts, wires, ACH and intrabank transfers, and other instructions, payable through, drawn, or directed on the Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, provided that sufficient funds are on deposit in the applicable Bank Account to cover such payments.  Notwithstanding the foregoing, any check, advice, draft, or other notification that the Debtors advise the Banks to have been drawn or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.  The Debtors currently anticipate that only prepetition checks and ACH transactions in their payroll accounts will be honored after the Petition Date.

(ii)    Bank Fees

112.    In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, a number of fees, charges, and expenses related to administering the Bank Accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account and any other items the Bank gives provisional credit for (including during the prepetition period) (collectively, the "Bank Fees").  The Bank Fees for all the Bank Accounts are debited directly from the Bank Accounts.  The Debtors pay, on average, approximately $30,000 per month in bank fees in connection with the Bank Accounts.  The Debtors owe the Bank approximately $30,000 in accrued Bank Fees as of the Petition Date.  The Debtors seek permission to pay these Bank Fees during the Interim Period and to continue to pay any bank fees in the ordinary course of business on a final basis.

(iii)    Business Forms

113.    As part of the Cash Management System, the Debtors utilize numerous pre-printed business forms (including, without limitation, letterhead, purchase orders, invoices, and checks, collectively, the "Business Forms") in the ordinary course of business.  The Office of the United

36

States Trustee, Region 3 has established certain operating guidelines (the "U.S. Trustee Guidelines") which require, among other things, that checks for all debtor-in-possession accounts bear the name of the debtor, the designation "Debtor in Possession," the bankruptcy case number, and the type of account. To minimize expenses to the Debtors' estates and to avoid confusion on the part of Employees, vendors, customers, and suppliers, the Debtors request that the Court waive such requirements and authorize the Debtors' continued use of all correspondence and Business Forms as such forms were in existence immediately before the Petition Date (*i.e.*, without reference to the Debtors' status as debtor in possession), rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as the U.S. Trustee Guidelines require.

114.    The relief requested in the Cash Management Motion will minimize any disruption in the Debtors' business operations during the course of these Chapter 11 Cases and preserve the value of the Debtors' estates. Indeed, any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations. To avoid the potential erosion of value that could ensue from any such interruptions in the Debtors' ordinary course business operations, I believe it is necessary that the Court authorize the Debtors to continue the Cash Management System consistent with their historical practices.

### F.  Operational Matters – Utilities

115.    The Debtors filed a motion seeking the entry of the Proposed Orders: (i) approving the Debtors' proposed adequate assurance of payment for future service from utilities and determining that their proposed adequate assurance provides Utility Providers with adequate assurance of payment under section 366 of the Bankruptcy Code; (ii) prohibiting Utility Providers from altering, refusing, or discontinuing services to, or discriminating against, the Debtors; (iii) establishing procedures for resolving requests for additional or other adequate assurance; (iv)

permitting utility companies to opt out of the procedures for determining adequate assurance; (v) scheduling a final hearing to consider entry of the Proposed Final Order; and (vi) granting related relief (the "Utilities Motion").

116.    In connection with their business operations, the Debtors obtain electric, natural gas, water, sewer, internet, electronic data services, cable, phone, cellular phones, trash/garbage removal, fire alarm monitoring, and other similar services (collectively, the "Utility Services") from a number of Utility Providers at the Debtors' thirteen (13) skilled nursing facilities in Pennsylvania.

117.    The Debtors use Utility Services at each Facility and also at some ancillary properties used in connection with the business of certain Facilities.

118.    The providers of these services to the Debtors (collectively, the "Utility Providers") and currently identifiable accounts are attached as Exhibit C to the Utilities Motion (the "Utility List").

119.    The Debtors believe the Utility List is a complete list of all Utility Providers and currently open accounts.  The Debtors will provide a copy of the Motion, the Interim and Final Orders, if entered by the Court, and the Utility List to all Utility Providers.  The entity's inclusion on or omission from the Utility List should not be considered the Debtors' admission that such entity is or is not a utility within the meaning of Bankruptcy Code § 366, and the Debtors reserve their rights with respect thereto.  In addition, the Debtors request that the Utilities Motion apply to all of Debtors' Utility Providers, whether or not any given Utility Provider is included on the Utility List.  The Debtors have proposed a procedure for supplementing the Utility List.

120.    Uninterrupted utility service is essential to the Debtors' ongoing operations and, therefore, to the success of these Chapter 11 Cases.  Should any Utility Provider refuse or

Case 24-21217-CMB    Doc 20    Filed 05/17/24    Entered 05/17/24 17:42:34    Desc Main
Document      Page 39 of 48

discontinue service, even for a brief period, it could cause the Debtors to default on their own

obligations and create tremendous difficulty for the Debtors' ongoing business operations, not to

mention a health and safety hazard to the residents of the Debtors' Facilities.  The temporary or

permanent discontinuation of Utility Services could irreparably harm the Debtors' businesses and

jeopardize these Chapter 11 Cases.

121.    On average, the Debtors pay approximately $300,000 each month for third-party

Utility Services, calculated as a historical average payment for the twelve-month period ending

December 31, 2023.  Accordingly, the Debtors estimate that their cost for Utility Services during

the initial 30 days following the Petition date is $300,000.  To the best of the Debtors' knowledge,

the Debtors do not have any existing prepayments or deposits with any Utility Providers, but

certain Debtors may have provided prepetition deposits to certain Utility Providers in the ordinary

course.  The Debtors intend to pay their post-petition obligations to the Utility Providers timely.

Subject to Court approval, the Debtors will make these payments from Cash Collateral or proceeds

from the DIP Facilities.

122.    Additionally, the Bankruptcy Code permits a utility, under certain circumstances,

to alter, refuse, or discontinue a chapter 11 debtor's utility service if the utility does not receive

adequate "assurance of payment" within 30 days of the commencement of the debtor's chapter 11

case.  The Bankruptcy Code defines the phrase "assurance of payment" to mean, among other

things, a cash deposit.  Accordingly, the Debtors propose to provide a deposit for each Utility

Provider in an amount equal to the cost of one-half of one month's average service from that Utility

Provider, totaling $150,000 (the "Adequate Assurance Deposit").  This Adequate Assurance

Deposit is calculated based on the Debtors' average utility expenses for the twelve-month period

ending December 31, 2023, net of any prepetition deposits provided to the Utility Providers in the

39

ordinary course.  The proposed Adequate Assurance Deposits for each Utility Provider is the amount disclosed on the Utility List, attached as Exhibit C to the Utility Motion.

123.    The Debtors will hold the Adequate Assurance Deposit in the segregated account for the benefit of the Utility Providers (the "Adequate Assurance Account") for the duration of these Chapter 11 Cases and the Debtors may apply it to any postpetition defaults in payment to the Utility Providers.  The Debtors will deposit the Adequate Assurance Deposit in the Adequate Assurance Account within fifteen (15) days after entry of the Interim Order granting this Utilities Motion.

124.    The Debtors submit that the Adequate Assurance Deposit, in connection with the Debtors' operating cash flow and debtor-in-possession financing, demonstrates their ability to pay for future Utility Services in accordance with their prepetition practices (collectively, the "Proposed Adequate Assurance") and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

### G.  Operational Matters – Insurance Programs and Financing

125.    The Debtors have requested that the Court enter an order on an expedited basis (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) continue their insurance and surety bond programs, including their insurance premium finance agreements, and honor pre-petition and post-petition obligations with respect thereto; and (ii) renew, supplement, modify, extend, terminate, or purchase insurance or bond coverage and finance insurance premiums in the ordinary course of business; (b) authorizing and directing applicable banks and financial institutions to honor and process checks and transfers related to such insurance obligations; and (c) granting related relief (the "Insurance Motion").

126.    The need for immediate relief is particularly important to not only preserve the status quo while transitioning into bankruptcy, but also to reassure patients and residents that their care and wellbeing are not at risk.  The relief sought in the Insurance Motion is necessary to avoid immediate and irreparable harm and is ultimately in the best interests of all creditors, employees, residents, patients, and other parties-in-interest.

(i)    <u>Insurance Program</u>

127.    The Debtors' insurance program (the "<u>Insurance Program</u>") is comprised of commercial insurance policies maintained by the Debtors, a summary of which is attached to the Insurance Motion as Exhibit C (each, a "<u>Commercial Insurance Policy</u>" and, collectively, the "<u>Commercial Insurance Policies,</u>"), that are administered through various insurance carriers (the "<u>Insurers</u>") and which provide coverage for, among other things, automobile, flood, ERISA, professional liability, employment practices liability, general liability, property, and workers' compensation.

128.    The Insurance Program is essential to the continued operation of the Debtors' businesses and is required under the laws of the various states in which the Debtors operate, applicable federal law, and certain of the Debtors' contracts and leases.  Thus, the Debtors submit that the Court should authorize, but not direct them, to continue to pay premiums, claims, deductibles, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Program as such obligations come due in the ordinary course of the Debtors' business.

129.    The Debtors pay premiums under the Insurance Policies based upon a rate each Insurer establishes and bills (collectively, the "<u>Insurance Premiums</u>," together with all other obligations under the Commercial Insurance Policies, obligations under the Financing Agreements, obligations to the Brokers, fees, assessments, and taxes, the "<u>Insurance Obligations</u>").

Collectively, the Debtors pay approximately $2,716,000 in annual Insurance Premiums. More than half of this amount relates to required workers' compensation insurance. It is not always economically advantageous for the Debtors to pay all of the Insurance Premiums on a lump-sum basis. As such, the Debtors pay most of the Insurance Premiums through an installment schedule each Insurer provides, but also finance some of the Insurance Premiums through premium financing agreements (the "Financing Agreements") with First Insurance Funding or IPFS of New York, LLC (the "PFA Lenders"). Pursuant to the Finance Agreements, the PFA Lenders agree to pay the insurance premiums due under certain of the Commercial Insurance Policies. In exchange, the Debtors make a down payment, followed by between four (4) and eight (8) equal monthly installments. The amounts financed under the Financing Agreements accrue interest at fixed annual percentage rates. Payments of amounts due under each of the Financing Agreements occurs on various dates throughout the month. A listing of the Finance Agreements, including a summary of their terms, is attached as Exhibit D to the Insurance Motion. The Debtors' obligations under the Financing Agreements are secured by the right to cancel the relevant Commercial Insurance Policies and thereby obtain a refund, including any unearned premiums or other sums that may become payable under the Commercial Insurance Policies. The effect of such an action would be to terminate or reduce the coverage available to the Debtors under the applicable Insurance Policies.

130.    In the Debtors' business judgment, the terms of the Financing Agreements represent fair and reasonable terms for financing the premiums of the Commercial Insurance Policies under the circumstances, and the Debtors' estates will benefit from maintaining this low-cost financing from the PFA Lenders. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms, to the extent

needed. Thus, the Debtors request authority to continue honoring their obligations pursuant to the Financing Agreements and to continue to grant the PFA Lenders security interests.

131.    Certain Commercial Insurance Policies are subject to regular audits, loss assessments, and operating cost adjustments (the "Insurance Policy Audits"), which may result in an adjustment of the Insurance Premiums owed on account thereof. Insurance Policy Audits for certain prepetition Insurance Premium payments may not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits is unknown at this time.

132.    As of the Petition Date, the Debtors estimate that the amount accrued and outstanding related to the prepetition period that Debtors propose to pay is approximately (i) $200,000 in connection with the Insurance Premiums paid through installment schedules each Insurer provides, and (ii) $53,000 under the Financing Agreements. In the Insurance Motion, the Debtors request the Court authorize, but not direct them, to pay all amounts related to their Insurance Policies that may become due and owing during these Chapter 11 Cases, including the authority to renew the Financing Agreements. The Debtors' maintenance of their relationships with the Insurers is critical to ensuring continued insurance coverage availability and reasonable pricing of such coverage for future policy periods. Further, there may be prepetition amounts due and owing to the Insurers of which the Debtors are unaware; for example, if audits are conducted after the Petition Date.

133.    In the ordinary course of business, the Debtors employ P&G Brokerage Inc. or Hub International Northeast Limited, insurance brokerage firms (collectively, the "Broker"), to assist the Debtors in procuring and negotiating elements of the Debtors' Insurance Program. For Broker-related services, the Debtors pay the Broker's commissions in the ordinary course of business (the

"Broker Fees").[9]  The Broker is essential to the Debtors' ability to secure insurance coverage, as it structures and manages the Insurance Program in a reasonable and prudent manner and enables the Debtors to realize considerable savings in the procurement of aspects of the Insurance Program. The Debtors do not have access to certain key markets unless represented by the Broker as of the date hereof.  The Debtors believe that they are current in their obligations to the Broker.  The Debtors seek Court authority to continue to employ the Broker in the ordinary course of business and to pay Broker Fees as necessary in connection with the procurement and maintenance of the Insurance Program.

(ii)    Surety Bond Program

134.    In the ordinary course of business, the Debtors are required to provide surety bonds (the "Surety Bonds") to secure the Debtors' payment or performance of certain obligations in connection with resident trust funds the Debtors hold (the "Surety Bond Program").  Certain sureties issue the Surety Bonds (each, a "Surety") including Western Surety Company and Merchants Bonding Company (Mutual).  The Surety Bonds the Debtors provide are listed on Exhibit E of the Insurance Motion.

135.    Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a rate each Surety establishes and bills (collectively, the "Surety Premiums").  The Surety Premiums are generally determined on an annual basis and average in the aggregate approximately $22,000 per year (the "Surety Bond Obligations," and, together with the Insurance Obligations, the "Insurance and Surety Obligations").  The Debtors remit premium payments on an annual basis when the bonds are issued or renewed or when increases or decreases are required by the Obligee.  The

---

[9]The Debtors do not pay any funds directly to the Broker; rather, the Broker collects its fees related to the Debtors' policies via the Debtors' Insurers' commission-based programs throughout the policy year.

Debtors do not believe that they have any outstanding prepetition Surety Bond Obligations.  By the Insurance Motion, the Debtors seek authority, but not direction, to pay the Surety Bond Obligations and any Surety Premiums that may become due and owing during these Chapter 11 Cases.

### H.  Financing – DIP Financing

136.    The Debtors have filed two motions for Debtor-in-possession financing and use of cash collateral.  One motion relates to the Maybrook and Consulate Debtors ("<u>CIBC DIP Financing Motion</u>"), and the other motion relates to the Cuarzo Debtors ("<u>Cuarzo DIP Financing Motion</u>"). The Debtors have filed separate declarations in support of each of these motions.

### I.  Vendors – Patient Care Critical Vendors

137.    The Debtors seek entry of an Interim Order authorizing, but not requiring, the Debtors to pay the prepetition claims of certain critical vendors whose services or products directly impact the Debtors' ability to provide quality care to the residents of their nursing facilities (the "<u>Patient Care Critical Vendors</u>" and the "<u>Patient Care Critical Vendor Claims</u>") in an amount not to exceed $150,000 on an interim basis and $200,000 on a final basis (with respect to each of the interim and final periods, as applicable, (the "<u>Patient Care Critical Vendor Cap</u>").

138.    The thirteen skilled nursing facilities operated by Debtors require a steady supply of goods and/or services from the Patient Care Critical Vendors that provide essential healthcare goods and services to the residents of those facilities. The continued, uninterrupted provision of goods and services, including staff supplied by staffing agencies, medical supplies, food, maintenance and other critical services, plays a crucial role in the Debtors' ability to fulfill their ongoing responsibility for the care of the residents of their skilled nursing facilities.  A disruption in the supply of such goods and services could jeopardize the availability of life-saving care and

could compromise the Debtors' ability to maintain the required standards of resident care and safety. Moreover, without these goods and services, the Debtors may not be able to provide the legally required care to residents of their skilled nursing facilities.

139.    In order to avoid the severe disruption to the Debtors' operations that would occur if the Debtors were to lose several of their Patient Care Critical Vendors, it is prudent for the Debtors, in their discretion, to be authorized to pay selected Patient Care Critical Vendors some or all of their prepetition claims. Consistent with these needs, the Debtors seek authority to implement procedures that will be vital to the well-being of the Debtors' current and future residents.

140.    Before paying any Patient Care Critical Vendor claim, the Debtors will make a good faith determination that payment is in the best interests of the Debtors' bankruptcy estates because, among other things, (i) a supplier is a sole source or limited source supplier, without whom the Debtors could not continue to operate without disruption, (ii) the Debtors' lack the ability to find alternative sources of supply and face a potential disruption to patient care  revenues if payment is not made, (iii) the supplier is vital and would be expensive to replace, or (iv) loss of the supplier would present an unacceptable risk to the care of the residents of the Debtors' facilities.

141.    I believe that payment of some or all Patient Care Critical Vendor Claims owed to Patient Care Critical Vendors will be necessary to maintain quality of care to the residents of the skilled nursing facilities operated by the Debtors. During this period, it is imperative that the Debtors remain focused and avoid distractions from vendors attempting to assert leverage or deny provision of goods and services going forward, suddenly and without notice, which could put residents of the nursing facilities in danger. Moreover, the loss of Patient Care Critical Vendors and the efforts that would be required to replace such vendors would be a substantial and costly

distraction at a time when the Debtors must focus on ensuring the care of the continuing high standards of care in the nursing facilities.

142.    As healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country. The Debtors' ability to operate in the healthcare space relies, among other things, on their ability to fulfill their mandate as a skilled nursing care provider and meet regulatory requirements.  In some cases, local, state, and federal law require the Debtors to provide services that are available only from certain Patient Care Critical Vendors. In my opinion, it is absolutely vital to the well-being of the Debtors' current and future residents that the Debtors maintain their business relationships with the Patient Care Critical Vendors.

143.    Absent the ability to make payments to Patient Care Critical Vendors, I have grave concerns that the Debtors' ability to provide quality care to their residents will be jeopardized, possibly precipitously, and I believe the requested relief is necessary to avoid immediate and irreparable harm.

This 17th day of May 2024.

/s/ Louis E. Robichaux IV
Louis E. Robichaux IV

Dated: May 17, 2024
Pittsburgh, Pennsylvania

Respectfully submitted:

**WHITEFORD TAYLOR & PRESTON, LLP**

 */s/ Daniel R. Schimizzi*
Daniel R. Schimizzi (PA ID No. 311869)
Michael J. Roeschenthaler (PA ID No. 87647)
Mark A. Lindsay (PA ID No. 89487)
Sarah E. Wenrich (PA ID No. 325834)
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-275-2401
Facsimile:  412-275-2404
Email: dschimizzi@whitefordlaw.com
mroeschenthaler@whitefordlaw.com
mlindsay@whitefordlaw.com
swenrich@whitefordlaw.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

-AND-

Glenn B. Rose (*pro hac vice* pending)
Paul G. Jennings (*pro hac vice* pending)
Gene L. Humphreys (*pro hac vice* pending)
Jordan E. Thomas (*pro hac vice* pending)
Alfonso Cuen (*pro hac vice* pending)
**BASS, BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
grose@bassberry.com
pjennings@bassberry.com
ghumphreys@bassberry.com
jordan.thomas@bassberry.com
alfonso.cuen@bassberry.com

*Proposed Counsel to the Debtors and
Debtors in Possession*