**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | Case No.: 24-21217-CMB |
| SOUTH HILLS OPERATIONS, LLC, *et al.,*[1] | Chapter 11<br>*Joint Administration Requested* |
| Debtors. | Doc. No.: |

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835).  The Debtors' address is 485 Lexington Avenue, 10th Floor, New York, NY 10017.

| | |
|---|---|
| SOUTH HILLS OPERATIONS, LLC, *et al.,*<br><br>Movant,<br><br> -vs -<br><br>CIBC BANK, USA, as Administrative Agent; US FOODS, INC.; PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES; NEW WILMINGTON BOROUGH TAX COLLECTOR; RICHARD L. RAPONE, LAWRENCE COUNTY TREASURES; UNITY TOWNSHIP TAX COLLECTOR; WESTMORELAND COUNTY TAX CLAIM BUREAU; ROBERT OHR, TAX COLLECTOR; MERCER COUNTY TAX CLAIM BUREAU; WASHINGTON COUNTY TAX CLAIM BUREAU; DONALD J. PROGAR, TAX COLLECTOR; KEYSTONE COLLECTION GROUP; JULIE LEVENTRY, TAX COLLECTOR; SHELLEY BUCHANAN, TAX COLLECTOR; CITY OF NEW CASTLE,<br><br>Respondents. | Related to Document No.<br><br>Hearing Date:<br><br>Hearing Time:<br><br>Response Deadline: |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE MAYBROOK AND CONSULATE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move (the

"Maybrook DIP Motion"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the

United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)"), and Rule 4001-2 of the

Local Bankruptcy Rules of the United States Bankruptcy Court for the Western District of

Pennsylvania (the "Local Rule(s)"), for the entry of interim and final orders, substantially in the

form attached hereto as **Exhibit A** (the "Proposed Interim Order" and the "Proposed Final Order"

and, collectively with the Proposed Interim Order, the "Proposed Orders"): (i) authorizing the

Maybrook Debtors (as defined herein) and the Consulate Debtors (as defined herein) to obtain

postpetition debtor-in-possession financing under the terms of the *Senior Secured Super-Priority*

*Debtor-in-Possession Loan and Security Agreement* dated May 17, 2024 (the "Maybrook DIP

Credit Agreement"), and the Proposed Orders, (ii) authorizing the use of Cash Collateral (as

defined herein) by the Maybrook and Consulate Debtors (as defined herein), (iii) granting liens

and providing superpriority administrative expense status, (iv) granting adequate protection, (v)

modifying the automatic stay, (vi) scheduling a final hearing, and (vii) granting related relief as

follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and the *Standing Order of*

*Reference from the United States District Court for the Western District of Pennsylvania*, dated

October 16, 1984.

2.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364, and 507 of the Bankruptcy Code. Such relief is further warranted under Bankruptcy Rules 2002, 4001, and 6004 and Local Rule 4001-2.

## BACKGROUND

4.      On May 17, 2024 (the "Petition Date"), each of the Debtors commenced the above-captioned cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no request for the appointment of a trustee or examiner has been made and no statutory committee has been appointed in these chapter 11 cases.

5.      Additional information regarding the Debtors (including specific information concerning the Maybrook and Consulate Debtors) and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, the events leading to the commencement of this case and the facts and circumstances supporting the relief requested herein, is set forth in the *Declaration of Louis Robichaux, IV, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and Various First Day Applications and Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]

---

[2]   Capitalized terms used but not otherwise defined in this Maybrook DIP Motion shall have the meaning set forth in the First Day Declaration, the Maybrook DIP Financing Declaration, or the Proposed Interim Order, as applicable.

6.      In support of this Motion, the Maybrook and Consulate Debtors rely on the *Declaration of Louis Robichaux, IV, Chief Restructuring Officer, of the Debtors in Support of the Maybrook and Consulate Debtors' Motion for Interim and Final Orders (I) Authorizing the Maybrook and Consulate Debtors to Obtain Postpetition Financing, (II) Authorizing the Maybrook and Consulate Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Maybrook DIP Declaration"), attached as **Exhibit B**.

### A.  Prepetition Secured Obligations

7.      As discussed below, the following creditors have filed liens against the assets of either the Maybrook Debtors or the Consulate Debtors:

| Secured Creditor | Obligated Debtors | Outstanding Amount | Collateral |
|---|---|---|---|
| CIBC | Maybrook PropCo Debtors and Maybrook OpCo Debtors | $45,589,054 (Term Loan) $2,284,964.54 (Revolver) | (i) Mortgages on the real property owned by the seven Maybrook PropCo Debtors; (ii) security interest in the accounts and all other assets owned by the Maybrook Debtors. |
| CIBC | Consulate PropCo Debtors and Consulate OpCo Debtors | $6,230,778.04 (Term Loan) $935,800.00 (Revolver) | (i) Mortgages on the real property owned by the two Consulate Propco Debtors; (ii) security interest in the accounts and all other assets owned by the Consulate Debtors. |
| U.S. Foods, Inc. ("U.S. Foods") | Maybrook-C Latrobe Opco, LLC | $27,391.76 | Asserted security interest in the accounts and all other assets owned by Maybrook-C Latrobe Opco, LLC. As discussed below, the Maybrook and Consulate |

| | | | Debtors submit that any claim of U.S. Foods is an unsecured claim and therefore, reserve all rights with respect to challenging the purported security interest asserted by U.S. Foods. |
|---|---|---|---|
| Taxing Bodies[3] | Maybrook Propco Debtors and Consulate Propco Debtors | Approximately $750,000.00 | Real Property owned by Maybrook Propco Debtors and Consulate Propco Debtors |

8.      As set forth in the First Day Declaration, seven of the Debtors known as the "Maybrook OpCo Debtors"[4] lease their facilities from seven of the other Debtors known as the "Maybrook PropCo Debtors"[5] (together, with the Maybrook OpCo Debtors, the "Maybrook Debtors"). As further set forth in the First Day Declaration, two of the Debtors known as the "Consulate OpCo Debtors"[6] lease their facilities from two of the Debtors known as the "Consulate

---

[3]      The "Taxing Bodies" include New Wilmington Borough Tax Collector, Richard L. Rapone, Lawrence County Treasurer, Unity Township Tax Collector, Westmoreland County Tax Claim Bureau, Unity Township Tax Collector, Westmoreland County Tax Claim Bureau, Robert Ohr, Tax Collector; Mercer County Tax Claim Bureau; Washington County Tax Claim Bureau; Donald J. Progar, Tax Collector; Keystone Collection Group; Julie Leventry, Tax Collector; Shelley Buchanan, Tax Collector, and the City of New Castle.

[4]      The Maybrook OpCoDebtors include Maybrook-C Evergreen Opco, LLC, Maybrook-C Briarcliff Opco, LLC, Maybrook-C Silver Oaks Opco, LLC, Maybrook-C Overlook Opco, LLC, Maybrook-C Latrobe Opco, LLC, Maybrook-C Whitecliff Opco, LLC and Maybrook-C Kade Opco, LLC.

[5]      The Maybrook PropCo Debtors include Maybrook-C Evergreen Propco, LLC, Maybrook-C Briarcliff Propco, LLC, Maybrook-C Silver Oaks Propco, LLC, Maybrook-C Overlook Propco, LLC, Maybrook-C Latrobe Propco, LLC, Maybrook-C Whitecliff Propco, LLC and Maybrook-C Kade Propco, LLC.

[6]      The Consulate OpCo Debtors include Cheswick Rehabilitation and Wellness Center, LLC and North Strabane Rehabilitation and Wellness Center, LLC.

PropCo Debtors" [7] (together, with the Consulate OpCo Debtors, the "Consulate Debtors") (collectively, the Maybrook Debtors and the Consulate Debtors, the "Maybrook and Consulate Debtors").

9. The Maybrook Debtors are parties to that certain *Loan and Security Agreement*, dated as of August 15, 2016, as borrowers, and with certain financial institutions as the lenders ("Maybrook Prepetition Term Loan Lenders"), and CIBC Bank, USA ("CIBC"), as administrative agent for the Maybrook Prepetition Term Loan Lenders, pursuant to which certain loans to and extensions of credit on behalf of those certain borrowers were made for certain purposes as set forth therein (as amended, the "Maybrook Prepetition Term Loan Facility").

10. The Maybrook Debtors are also parties to that certain *Revolving Loan and Security Agreement*, dated as of August 15, 2016, as borrowers, and with certain financial institutions as the lenders ("Maybrook Prepetition Revolving Loan Lenders," and together with the Maybrook Prepetition Term Loan Lenders, the "Maybrook Prepetition Lenders"), and CIBC, as administrative agent for the Maybrook Prepetition Revolving Loan Lenders, pursuant to which certain loans to and extensions of credit on behalf of those certain borrowers were made for certain purposes as set forth therein (as amended, the "Maybrook Prepetition Revolving Loan Facility,"

---

[7] The Consulate PropCo Debtors include 3876 Saxonburg Boulevard Propco, LLC and 100 Tandem Village Road Propco, LLC.

and together with the Maybrook Prepetition Term Loan Facility, the "Maybrook Prepetition Loan Facilities").

11. The Maybrook Prepetition Obligations (as defined herein) are secured by recorded mortgages on the real property owned by the Maybrook PropCo Debtors and by a security interest in the accounts and all other assets owned by the Maybrook Debtors (with respect to such liens, the "Maybrook Prepetition Liens," and with respect to such collateral, the "Maybrook Prepetition Collateral"). UCC financing statements evidencing the Maybrook Prepetition Liens in the personal property owned by the Maybrook Debtors were duly filed and remain in effect as of the Petition Date. As of the Petition Date, approximately $47.9 million remains due and owing on the Maybrook Prepetition Loans (the "Maybrook Prepetition Obligations").

12. The Consulate Debtors are parties to that certain *Loan and Security Agreement*, dated as of September 15, 2017, as borrowers, and with certain financial institutions as the lenders ("Consulate Prepetition Term Loan Lenders"), and CIBC, as administrative agent for the Consulate Prepetition Term Loan Lenders, pursuant to which certain loans to and extensions of credit on behalf of those certain borrowers were made for certain purposes as set forth therein (as amended, the "Consulate Prepetition Term Loan Facility").

13. The Consulate Debtors are also parties to that certain *Revolving Loan and Security Agreement*, dated as of September 15, 2017, as borrowers, and with certain financial institutions as the lenders (the "Consulate Prepetition Revolving Loan Lenders," and together with the

Consulate Prepetition Term Loan Lenders, the "Consulate Prepetition Lenders," and further together with the Maybrook Prepetition Lenders, the "Maybrook and Consulate Prepetition Lenders"), and CIBC, as administrative agent to the Consulate Prepetition Revolving Loan Lenders, pursuant to which certain loans to and extensions of credit on behalf of those certain borrowers were made for certain purposes as set forth therein (as amended, the "Consulate Prepetition Revolving Loan Facility," and together with the Consulate Prepetition Term Loan Facility the "Consulate Prepetition Loan Facilities", and further together with the Maybrook Prepetition Loan Facility, the "Maybrook and Consulate Prepetition Loan Facilities").

14.     The Consulate Prepetition Loan Facilities are secured by recorded mortgages on the real property owned by the Consulate PropCo Debtors and by a security interest in the accounts and all other assets owned by the Consulate Debtors (with respect to such liens, the "Consulate Prepetition Liens," and together with the Maybrook Prepetition Liens, the "Maybrook and Consulate Prepetition Liens," and with respect to such collateral, the "Consulate Prepetition Collateral," and together with the Maybrook Prepetition Collateral, the "Maybrook and Consulate Prepetition Collateral"). UCC financing statements evidencing the Consulate Prepetition Liens in the personal property owned by the Maybrook Debtors were duly filed and remain in effect as of the Petition Date. The Consulate Prepetition Loans are further secured by assets of two non-debtor

9

affiliate entities.[8] As of the Petition Date, approximately $7.2 million remains due and owing on the Consulate Prepetition Loans (the "Consulate Prepetition Obligations", together with the Maybrook Prepetition Obligations, the "Maybrook and Consulate Prepetition Obligations").

15.     As of the Petition Date, the aggregate amount due under the Maybrook and Consulate Prepetition Loan Facilities is approximately $55 million, subject to ongoing interest, fees and costs under and in accordance with the Maybrook and Consulate Prepetition Loan Facilities.

16.     Additionally, there are real estate taxes asserted by the Taxing  Bodies related to the real property owned by the Maybrook and Consulate Debtors totaling approximately $750,000.00 (the "Real Estate Taxes"), some of which may have recorded liens against the assets of the Maybrook and Consulate Debtors prior to the Petition Date.[9]

17.     U.S. Foods has also filed UCC financing statements against Maybrook-C Latrobe Opco, LLC. The Maybrook and Consulate Debtors have no record of a security agreement collateralizing any obligations due and owing U.S. Foods. Accordingly, the Maybrook and Consulate Debtors submit that U.S. Foods does not have a validly perfected security interest against Maybrook-C Latrobe Opco, LLC. To the extent that such asserted security interest is determined to be valid, by virtue of being junior to the Maybrook and Consulate Prepetition Liens,

---

[8]     These entities are 200 Tandem Village Road Propco, LLC and North Strabane Retirement Opco, LLC.

[9]     The DIP Liens do not prime the Real Estate Taxes.

the Maybrook and Consulate Debtors submit that, as of the Petition Date, any claim held by U.S.

Foods is not secured, but rather is a general, unsecured claim.

18. The Maybrook and Consulate Debtors may also be subject to unpaid nursing

assessments (the "Department Assessments") owed to the Pennsylvania Department of Human

Services (the "Department"). Without waiver of any of their rights to challenge or contest the

amount, validity, priority and/or extent of the Department Assessments and any potential lien in

favor of the Department, the Maybrook and Consulate Debtors anticipate that the Department will

assert a statutory lien pursuant to 62 P.S. 811-A[10] against the assets of the Maybrook and Consulate

---

[10]  Any assessments implemented and interest and penalties assessed against a nursing facility pursuant to this article shall be a lien on the real and personal property of the nursing facility in the manner provided by section 1401 of [72 Pa. Stat. Ann. §§ 1 *et seq.* (the "Fiscal Code")] may be entered by the department in the manner provided by section 1404 of 'The Fiscal Code' and shall continue and retain priority in the manner provided in section 1404.1 of 'The Fiscal Code.'

62 Pa. Stat. Ann. § 811-A.

Section 1404.1 of the Fiscal Code provides, in pertinent part,

 "All tax liens shall have priority to and be fully paid before any other obligation, judgment, claim, lien or estate paid and satisfied out of the judicial sale of the real and personal property with which that property may subsequently become charged or for which that property may subsequently become liable, ***subject, however, to mortgage or other liens existing and duly recorded at the time the tax lien is recorded***."

72 Pa. Stat. Ann. § 1404.1 (emphasis added).

Debtors in an effort to collateralize the Department Assessments. However, the Department has not recorded any lien against the Maybrook and Consulate Debtors which, upon information and belief and as discussed more fully below, renders any potential statutory liens junior to the Maybrook and Consulate Prepetition Liens and, therefore extensively, if not entirely, unsecured.

### B. Other Prepetition Obligations

19.     As more fully set forth in the First Day Declaration, the Maybrook and Consulate Debtors are also subject to obligations arising from administrative and/or priority tax obligations, and general unsecured debt (including obligations under a collective bargaining agreements).

20.     The Maybrook and Consulate Debtors estimate that, as of the Petition Date, they were subject to the following asserted obligations in the following amounts in addition to the amounts set forth above: (i) approximately $750,000 in asserted Real Estate Taxes, some of which may have resulted in liens against the assets of the Maybrook and Consulate Debtors ; and (ii) more than $54 million of general unsecured debt.

### C. Status of Sale Efforts

21.     Recognizing the need to effectuate a strategic transaction to deleverage their balance sheets and ensure the continuation of high-quality care to their residents, in the fall of 2023, the Maybrook and Consulate Debtors contracted to sell substantially all of their assets to affiliates of Kadima Healthcare Group, Inc. ("Kadima"). For reasons discussed in the First Day

Declaration, that sale never closed, and affiliates of Kadima filed *lis pendens* against the seven

Maybrook PropCo Debtors, which have not been released as of the Petition Date.

22.     Notwithstanding the failure to close on the sale in the fall of 2023, the Maybrook

and Consulate Debtors, CIBC, and Kadima remained in active negotiations regarding a strategic

transaction designed to preserve the Maybrook and Consulate Debtors' operations as a going

concern and safeguard the care and well-being of their residents. In addition to Kadima, the

Debtors, with the assistance of their professionals, solicited the opportunity to various other

interested parties.

23.     The ongoing dialogue proved successful, as the Debtors obtained three (3) bids for

the purchase and sale of all or substantially all assets of the Maybrook and Consulate Debtors.

Notably, as a direct result of CIBC's willingness to finance Kadima's offer to purchase all or

substantially all of the assets of the Maybrook and Consulate Debtors, Kadima's proposed

purchase price exceeded the other offers received prior to the Petition Date by over $10 million.

24.     As a result, shortly before the Petition Date, the Maybrook and Consulate Debtors,

and Kadima, with the consent of CIBC, entered into a *Contract for Sale Dated May 17, 2024* (as

may be amended, modified, and supplemented from time to time by written agreement, the

"Stalking Horse Agreement") in which Kadima agreed to submit a stalking horse bid (the "Stalking

Horse Bid") that, upon consummation, will result in the Maybrook and Consulate Debtors

receiving $53 million in exchange for the sale of all or substantially all of their assets, subject to

the terms and conditions of definitive documentation which is currently under negotiation, as well as a transfer of the Maybrook and Consulate Debtors' operations to Kadima pursuant to the *Operations Transfer Agreement Dated May 17, 2024* (the "OTA").

### D. Post-Petition Financing

25.     In order to pursue a sale of all or substantially all of their assets while maintaining the quality of care for their residents, the Maybrook and Consulate Debtors need capital.

26.     Based on the review and evaluation of the financial forecasts for the Maybrook and Consulate Debtors and the proposed Maybrook Budget by the Debtors' restructuring advisors, the Maybrook and Consulate Debtors believe it is prudent to secure an immediate capital infusion in the form of the Maybrook DIP Facility (defined below) and access to Cash Collateral in order to operate their business postpetition, to preserve the estates of the Maybrook and Consulate Debtors as going concerns, to facilitate the consummation of a sale of all or substantially all of their assets, and most importantly, to ensure the continued high-quality care for their residents.

27.     The Maybrook and Consulate Debtors believe that it is appropriate to come into the Chapter 11 Cases with access to the Maybrook DIP Facility and Cash Collateral to fund working capital needed to continue operations until the Debtors' assets can be transferred to a new owner, including to satisfy vendor obligations, pay suppliers, cover overhead costs, and pay expenses and billings related to the operations of the Maybrook and Consulate Debtors. Having access to working capital will also give comfort to the residents of the Maybrook and Consulate Debtors'

facilities by knowing that they will continue to receive the high-quality care to which they have grown accustomed and will not be forced to relocate on minimal notice.

28.     Additionally, immediate access to the Maybrook DIP Facility and Cash Collateral will cover the projected costs of the Chapter 11 Cases for the Maybrook and Consulate Debtors and make any other payments that are essential for the continued management, operation, and preservation of the business of the Maybrook and Consulate Debtors. The ability to satisfy these expenses when due is essential to the continued operation of the business of the Maybrook and Consulate Debtors during the pendency of these cases. Access to the Maybrook DIP Facility and Cash Collateral give the Maybrook and Consulate Debtors a liquidity cushion to guard against the uncertainties of the Chapter 11 Cases.

29.     Accordingly, and with the support of DIP Lenders (as defined herein) and CIBC, as administrative agent, the Debtors have determined that, in the exercise of their sound business judgment, obtaining the Maybrook DIP Facility under the terms of the Maybrook DIP Credit Agreement, in the form attached as **Exhibit A-1** to the Proposed Interim Order, the other DIP Loan Documents (as defined herein), and the Proposed Orders, all in accordance with the Maybrook Budget (as defined in and attached as **Exhibit A-2** to the Proposed Interim Order), is in the best interests of the Debtors and their estates and creditors.

30.     Given the current financial condition, financing arrangements, and capital structure of the Maybrook and Consulate Debtors, they are unable to obtain adequate financing from sources

other than the DIP Lenders on terms more favorable than the Maybrook DIP Facility. Notwithstanding its efforts with the assistance of its advisors, the Maybrook and Consulate Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

31.     The Maybrook and Consulate Debtors also have been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Maybrook and Consulate Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Maybrook and Consulate Debtors and their estates that is subject to a lien.

32.     Further, financing on a postpetition basis is not otherwise available without granting the Maybrook DIP Lender: (i) perfected security interests in and liens on (each as provided herein) all of the existing and after-acquired assets of the Maybrook and Consulate Debtors with the priorities set forth herein; (ii) superpriority claims; and (iii) the other protections set forth in the proposed Interim Order

33.     In summary, the DIP Lenders are willing to make loans and other financial accommodations to the Maybrook and Consulate Debtors, but only in accordance with, and on the terms and conditions set forth in, the Maybrook DIP Credit Agreement and the Proposed Interim Order.

**RELIEF REQUESTED**

34.     Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and to Bankruptcy Rules 2002, 4002, and 6004, the Debtors seek entry of the Proposed Orders for, among other things:

i.      authorizing the Maybrook and Consulate Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of the senior secured super-priority debtor-in-possession credit facility in the aggregate principal amount of up to Thirty-Eight Million and 00/100 Dollars ($38,000,000.00) (the "Maybrook DIP Facility") in commitments and loans from certain financial institutions that are or may from time to time become parties thereto (the "DIP Lenders"), and CIBC, as administrative agent, which shall consist of (a) a new money delayed draw term loan facility ("New Money Maybrook DIP Loan") in an aggregate principal amount of up to Twelve Million Five Hundred Thousand and 00/100 Dollars $12,500,000 ("New Money Maybrook DIP Ceiling"), and (b) Twenty-Five Million Five Hundred Thousand and 00/100 Dollars ($25,500,000.00) delayed draw term loan facility to roll up a portion of the existing outstanding obligations under the Maybrook and Consulate Prepetition Loan Facilities (the "Roll-Up", and collectively with the New Money Maybrook DIP Loan, the "Maybrook DIP Facility") effective immediately

upon entry of the Proposed Interim Order, in each case to be afforded the liens and priority set forth in the Proposed Orders and as set forth in the Maybrook DIP Credit Agreement and other Maybrook DIP Loan Documents (together, the "DIP Liens").

ii.      authorizing the Maybrook and Consulate Debtors to execute and deliver the Maybrook DIP Credit Agreement and any other agreements, instruments, pledge agreements, control agreements and other documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the Maybrook DIP Credit Agreement, the "Maybrook DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the Maybrook DIP Loan Documents;

iii.     authorizing the Maybrook and Consulate Debtors to use proceeds of the Maybrook DIP Facility as permitted in the Maybrook DIP Loan Documents and in accordance with the Proposed Orders and the Maybrook Budget;

iv.      granting to the DIP Agent, for the benefit of itself and the DIP Lenders on account of the Maybrook DIP Facility and all obligations owing thereunder and under, or secured by, the Maybrook DIP Loan Documents (collectively,

18

the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases of the Maybrook and Consulate Debtors and any Successor Cases (as defined herein), subject only to the Carve Out (as defined herein) and payable only from the proceeds of the Collateral of the Maybrook and Consulate Debtors;

v.  granting to the DIP Lenders the DIP Liens which shall constitute automatically perfected security interests in and liens on all property of the Maybrook and Consulate Debtors, including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") (together, the "DIP Collateral"), in which DIP Collateral the DIP Liens shall have first priority, but excluding Avoidance Actions;

vi.  authorizing and directing the Maybrook and Consulate Debtors to pay the principal, interest, fees, expenses and other amounts payable under the Maybrook DIP Documents as such become earned, due and payable, including, without limitation, continuing commitment fees, closing fees, upfront fees, the reasonable fees and disbursements of the DIP Lenders' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the Maybrook DIP Documents;

vii.      authorizing the Maybrook and Consulate Debtors to use all of their respective assets existing as of the Petition Date, including all Cash Collateral, the Maybrook and Consulate Prepetition Collateral and the DIP Collateral, and providing adequate protection to the Maybrook and Consulate Prepetition Lenders for any and all diminution in value thereof from and after the Petition Date for any reason, including, without limitation, any such diminution resulting from (i) the use of Cash Collateral, (ii) the priming of any security interests in and liens on any of the Maybrook and Consulate Prepetition Collateral (including by the Carve Out) by the DIP Liens pursuant to the Maybrook DIP Documents and the Proposed Orders, (iii) the use, sale, or lease of the Maybrook and Consulate Prepetition Collateral, including Cash Collateral, and (iv) the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code or otherwise pursuant to Sections 361(a), 363(c), 364(c), 364(d)(1), and 507(b) of the Bankruptcy Code ("Diminution in Value");

viii.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Maybrook DIP Loan Documents and the Proposed Orders;

ix.      subject to and effective upon entry of the Proposed Final Order, waiving the Debtors' ability to surcharge any Maybrook and Consulate DIP Collateral or Maybrook and Consulate Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in Section 552(b) of the Bankruptcy Code;

x.      scheduling a final hearing (the "Final Hearing") within thirty-five (35) days of the Petition Date to consider the relief requested in the Maybrook DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing;

xi.      waiving any applicable stay with respect to effectiveness and enforceability of the Proposed Interim Order (including under Bankruptcy Rule 6004); and

xii.      granting the Debtors such other and further relief as is just and proper.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY
RULES 4001(B) AND THE LOCAL RULE 4001-2**

35.    The following chart contains a summary of the material terms of the proposed Maybrook DIP Facility, together with references to the applicable sections of the relevant source documents as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B). Capitalized Terms included in the following table referring to the Maybrook DIP Credit Agreement shall have the meanings set forth therein.

21

| Bankruptcy Rule | Summary of Material Terms/Rule 3(c)(vii) Provisions |
|---|---|
| **Parties to the Agreement**<br>*Rule 4001(c)(1)(B)* | Borrowers: Maybrook-C Evergreen Propco, LLC; Maybrook-C Briarcliff Propco, LLC; Maybrook-C Silver Oaks Propco, LLC; Maybrook-C Overlook Propco, LLC; Maybrook-C Latrobe Propco, LLC; Maybrook-C Whitecliff Propco, LLC; Maybrook-C Kade Propco, LLC; Maybrook-C Evergreen Opco, LLC; Maybrook-C Briarcliff Opco, LLC; Maybrook-C Silver Oaks Opco, LLC; Maybrook-C Overlook Opco, LLC; Maybrook-C Latrobe Opco, LLC; Maybrook-C Whitecliff Opco, LLC; Maybrook-C Kade Opco, LLC; 100 Tandem Village Road Propco, LLC; Maybrook-C Propco Holdings, LLC; Maybrook-C Opco Holdings, LLC; 3876 Saxonburg Boulevard Propco, LLC; Cheswick Rehabilitation and Wellness Center, LLC; and North Strabane Rehabilitation and Wellness Center, LLC.<br><br>Guarantors: None.<br><br>DIP Agent: CIBC Bank, USA<br><br>DIP Lenders: CIBC Bank, USA; Ephram Lahasky[11]<br><br>*Preamble; Annex A to Maybrook DIP Credit Agreement* |
| **Term**<br>*Rule 4001(b)(1)(B)(iii) and 4001(b)(1)(B)* | The Maybrook DIP Facility shall terminate at the earliest of (the defined terms below shall have the meanings ascribed thereto in the DIP Credit Agreement):<br><br>1.  The Maturity Date (or two hundred ten (210) days after the Petition Date);<br>2.  The date of consummation of a sale of all or substantially all of the Credit Parties' assets under Section 363 or a plan under Section 1129 of the Bankruptcy Code;<br>3.  The effective date of an Approved Plan;<br>4.  The date on which the Loan obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise; and,<br>5.  The date which the Administrative Agent delivers written notice to the Borrowers of its election, on account of the occurrence of an Event of Default, to accelerate all Loan obligations. |

---

[11] Of the $38 million DIP Loan, Ephram Lahasky, an Insider of the Debtors, has committed to fund $2,000,000.00. *See* Annex A to the Maybrook DIP Credit Agreement.

| | |
|---|---|
| | *Maybrook DIP Credit Agreement,* Art. 1.1; 3.1<br>Interim DIP Order, ¶ 30 |
| **Commitments**<br>*Rule 4001(c)(1)(B)* | The DIP Facility shall consist of the following loan commitments:<br><br>1.      The New Money Maybrook DIP Loan in an aggregate principal amount of up to Twelve Million Five Hundred Thousand and 00/100 Dollars $12,500,000, of which $3,600,000 of the New Money Maybrook DIP Loan shall be available upon entry of the Proposed Interim Order, subject to satisfaction of the applicable conditions precedent, and the remainder shall become available to be drawn upon entry of the Proposed Final Order;<br>2.      The Roll-Up Maybrook DIP Loan in the amount of Twenty-Five Million Five Hundred Thousand and 00/100 Dollars ($25,500,000.00) to roll up a portion of the existing outstanding obligations under the Prepetition Credit Agreement which, upon entry of the Proposed Interim Order, subject to satisfaction of the applicable conditions precedent, $3,200,000.00 of the Roll-Up Maybrook DIP Loan shall be rolled up, and the remainder of the Roll-Up Maybrook DIP Loan shall be rolled up upon entry of the Proposed Final Order, subject to satisfaction of the applicable conditions precedent; and,<br>3.      The Roll-Up Maybrook DIP Loan shall roll up the entire amount of outstanding obligations of the Consulate Debtors under the Consulate Prepetition Loan Facilities and the Maybrook Prepetition Revolving Loan Credit Agreement and any remaining amount of the Roll-Up Maybrook DIP Loan shall roll up a corresponding amount of the outstanding obligations of Borrowers under the Maybrook Prepetition Term Loan Credit Agreement.<br><br>*Maybrook DIP Credit Agreement*, Recital L, Art. 3.1(a)<br>Interim DIP Order, ¶¶ 2-3 |
| **Conditions of Borrowing**<br>*Rule 4001(c)(1)(B)* | The obligation of the Lenders to fund under the Maybrook DIP Credit Agreement are subject to the Borrowers satisfying the conditions precedent set forth in Article 5.1 of the Maybrook DIP Credit Agreement, including: (i) maintenance of required insurance coverage; (ii) obtaining and maintaining all licenses and permits required under the Maybrook DIP Credit Agreement; (iii) obtaining all operating approvals; (iv) providing the Administrative Agent with various certifications relating to the operation of their businesses; (v) obtaining the entry of the Interim DIP Order and |

23

| | approval of the rights and protections set forth therein; (vi) providing the DIP Lenders with the Maybrook Budget; and (vii) other customary conditions relating to post-petition financing, in each case in form and substance reasonably satisfactory to the Administrative Agent.<br><br>*Maybrook DIP Credit Agreement*, Art. 5.1 |
|---|---|
| **Interest Rates**<br>*Rule 4001(c)(1)(B)* | The Maybrook DIP Facility contains the following interest rates (the defined terms below shall have the meanings ascribed thereto in the DIP Credit Agreement):<br><br>• Term SOFR for the applicable Term SOFR Interest Period for such day, plus the SOFR Margin; and,<br>• Default Rate of 5% plus the Loan Rate.<br><br>*Maybrook DIP Credit Agreement,* Art. 3.6, 3.7, 15.4 |
| **Use of DIP Facility and Cash Collateral**<br>*Rule 4001(b)(1)(B)(ii)* | The proceeds of the DIP Facility shall be used (a) to pay fees and expenses required hereunder or in the DIP Orders, (b) for general working capital purposes of Borrowers in accordance with the Approved Budget or (c) as otherwise permitted under the DIP Orders and the Approved Budget.<br><br>*Maybrook DIP Credit Agreement*, Art. 11.16<br>Interim DIP Order, ¶¶ 9, 11 |
| **Entities with Interests in Cash Collateral**<br>*Rule 4001(b)(1)(B)(i)* | Maybrook and Consulate Prepetition Lenders; U.S. Foods (unsecured); the Department (unsecured).<br><br>*Maybrook DIP Motion,* ¶¶ 7-17 |
| **Fees**<br>*Rule 4001(c)(1)(B)* | Borrowers shall pay: (i) the Commitment Fee of $190,000, which shall be due and payable in full as a condition precedent to the first disbursement of proceeds; (ii) an Administrative Agent Fee of $10,000 per month on the first of every month until the Termination Date; (iii) Management Fees in accordance with the Approved Budget, in an amount not to exceed the lesser of (a) the actual, out-of-pocket costs and expenses of the recipient of such Management Fee, or (b) three and one half percent (3.5%) of the net revenues of Operator Borrowers; and (iv) fees and costs, including reasonable attorneys' fees, of the DIP Lenders accrued during the Chapter 11 Cases. |

| | |
|---|---|
| | *Maybrook DIP Credit Agreement,* Art. 1.1 (Borrowers' Liabilities); Art. 3.9, 11.36<br>Interim DIP Order, ¶¶ 2, 35 |
| **Budget**<br>*Rule 4001(c)(1)(B)* | Borrowers shall provide DIP Lenders with an Approved Budget that shall govern the Borrowers' use of proceeds of the DIP Facility, subject to a Permitted Variance (operational or accrued professional fee disbursements shall not exceed 10% of aggregate total disbursements for such period as set forth in the Approved Budget) calculated by Variance Reports on a bi-weekly basis. The initial Approved Budget is attached to the Interim DIP Order and the Maybrook DIP Credit Agreement.<br><br>*Maybrook DIP Credit Agreement*, Art. 11.19, Exhibit H<br>Interim DIP Order, ¶ 19 |
| **Milestones**<br>*Rule 4001(c)(1)(B)* | o By **May 17, 2024**, the Debtors will file chapter 11 petitions for relief and various first day motions reasonably acceptable to CIBC, including an appropriate motion seeking approval of the DIP Facility on an interim and final basis;<br>o By **May 22, 2024**, the Borrowers will obtain approval of the Interim DIP Order acceptable to the DIP Lender on a final basis;<br>o By **May 24, 2024,** the Borrowers will file the Sale and Procedures Motion acceptable to the DIP Lender, together with a motion to expedite hearing on the foregoing;<br>o By **May 24, 2024**, the Debtors will file applications: (i) to retain the Chief Restructuring Officer as chief restructuring officer and financial advisor to the Debtors; and (ii) to retain Blueprint as the investment banker for the Borrowers, provided that such applications must be heard on the "2nd Day" hearings in these Chapter 11 Cases;<br>o By **June 7, 2024**, the Borrowers will obtain the entry of a final order from the Bankruptcy Court (the "Procedures Order") approving the Bidding Procedures (as defined in the Sales and Procedures Motion), which shall require a sale closing by **September 16, 2024**;<br>o By **June 18, 2024**, the Borrowers will obtain approval of the Final DIP Order acceptable to DIP Lender;<br>o **July 12, 2024**, shall be the Bid Deadline (as defined in the Procedures Order);<br>o By **July 17, 2024**, to the extent that the Borrowers receive more than one (1) Qualified Bid (as defined in the Procedures Order) by the |

|  |  |
|---|---|
|  | Bid Deadline, the Borrowers shall conduct an Auction pursuant to the Procedures Order;<br><br>o By **August 7, 2024**, the Borrowers will obtain a final order (the "Sale Order") granting the relief requested in the Sale and Procedures Motion and approving a sale of the Borrowers' assets pursuant to one or more Successful Bidder(s); and,<br><br>o By **September 16, 2024**, the Borrowers shall have closed on the transactions authorized under the Sale Order.<br><br>*Maybrook DIP Credit Agreement*, Art. 11.18<br>Interim DIP Order, ¶ 32 |
| **Liens and Priorities**<br>*Rule 4001(c)(1)(B)(i)* | On account of DIP Facility and DIP Obligations (including the DIP Roll-Up Obligations), DIP Lenders to receive DIP Liens in the priorities set forth in the Interim DIP Order and the Maybrook DIP Credit Agreement, which are senior to all liens and security interests in favor of the Maybrook and Consulate Prepetition Lenders, including the Maybrook and Consulate Prepetition Liens against the Maybrook and Consulate Prepetition Collateral.<br><br>*Maybrook DIP Credit Agreement,* Art. 8<br>o Interim DIP Order, ¶¶ 5-10 |
| **Carve Out**<br>*Rule 4001(c)(1)(B)* | Carve Out means, subject, in each case, to application of any retainers that may be held by the applicable professionals, without duplication: (i) the payment of all allowed and unpaid professional fees and disbursements incurred by the Maybrook and Consulate Debtors and any statutory committees appointed in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for any of their respective professionals retained by final order of the Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "Case Professionals") at any time prior to the delivery of the Carve Out Trigger Notice (as defined below) allowed by this Court (the "Allowed Professional Fees"), in an aggregate amount not to exceed the Professional Fee Carve Out Cap (defined below) and which amounts are reflected as a reserve for estimated professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to the delivery of a Carve Out Trigger Notice; (ii) after delivery of a notice by the DIP Agent to the Maybrook and Consulate Debtors that an Event of Default has occurred and is continuing and the |

| | |
|---|---|
| | DIP Agent has delivered notice to the Maybrook and Consulate Debtors to the effect that the application of the Carve Out has occurred (the "Carve Out Trigger Notice"), the payment of allowed and unpaid professional fees and disbursements incurred by the Case Professionals following the delivery of the Carve Out Trigger Notice in an aggregate amount not in excess of $300,000 (the "Wind-Down Carve Out Amount"), *plus* (iii) the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk of the Court, which fees shall not be limited to amounts that may be set forth in the Maybrook Budget.<br><br>*Maybrook DIP Credit Agreement*, Art. 1.1 (Carve Out)<br>Interim DIP Order, ¶ 39 |
| **Challenge Period**<br>*Rule 4001(c)(1)(B)* | The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Stipulations") are and shall be binding on the Maybrook and Consulate Debtors. In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Maybrook and Consulate Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 42) challenging the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than three (3) days before the hearing approving the sale of the assets of the Maybrook and Consulate Debtors (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of CIBC, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline; *provided* that if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Deadline or (2) the |

27

| | |
|---|---|
| | tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court; and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.<br><br>Interim DIP Order, ¶ 42 |
| **Adequate Protection**<br>*Rule 4001(b)(1)(B)(iv),*<br>*Rule 4001(c)(1)(B)(ii)* | In exchange for funding the DIP Facility and consenting to the Borrowers' use of Cash Collateral in accordance with the Approved Budget: (i) the DIP Lenders are entitled to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Maybrook and Consulate Prepetition Collateral; and (ii) pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, the CIBC shall receive the Prepetition Adequate Protection Liens as adequate protection for any Diminution in Value of their respective interests in the Maybrook and Consulate Prepetition Collateral.<br><br>Interim DIP Order, ¶¶12-17 |
| **Events of Default**<br>*Rule 4001(c)(1)(B)* | The Events of Default, which are usual and customary for debtor-in-possession financing, are set forth in Article 14 of the Maybrook DIP Credit Agreement and include, among other Events of Default: (i) failure to pay any installment of principle or interest on the date when due; (ii) failure to comply with any covenant or agreement set forth in certain sections of the Maybrook DIP Credit Agreement; (iii) failure to maintain all Licenses; (iv) the failure of any material provision of the Interim DIP Order or Final DIP Order to be in full force and effect; (v) the occurrence of any event having a Material Adverse Effect as determined by Administrative Agent's good faith credit judgment and reasonable discretion; and (vi) any reversal or modification of the Roll-Up DIP Loans provided for under the Maybrook DIP Credit Agreement and the Interim DIP Order.<br><br>*Maybrook DIP Credit Agreement*, Art. 14<br>Interim DIP Order, ¶ 31 |
| **Waiver/Modification of the Automatic Stay** | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to |

| | |
|---|---|
| *Rule 4001(c)(1)(B)(iv)* | implement and effectuate the terms of the Proposed Interim Order and the Maybrook DIP Loan Documents.<br><br>Interim DIP Order, ¶ 21 |
| **Indemnification**<br>*Rule 4001(c)(1)(B)(ix)* | The Borrowers agree to indemnify the DIP Lenders for all claims and causes of action incurred by the DIP Lenders as a result of, or arising out of: (A) any purchase of assets to be financed with the proceeds of the DIP Facility; (B) the use, handling, release, emission, discharge, transportation, storage, treatment, or disposal of any hazardous materials at any property owned or leased by the Borrowers; (C) any violation of any environmental laws with respect to any property owned or leased by any Borrower or the operations conducted thereon; (D) the investigation, cleanup, or remediation of offsite locations at which any Borrower or their respective predecessors are alleged to have directly or indirectly disposed of hazardous materials, or (E) the execution, delivery, performance or enforcement of the Maybrook DIP Agreement or any other Loan Documents by any of the Lender Parties, except for any such indemnified liabilities arising on account of the applicable Lender Party's gross negligence or willful misconduct as determined by a final, non-appealable judgment by a court of competent jurisdiction.<br><br>*Maybrook DIP Credit Agreement*, Art. 16.5 |

## REQUIREMENTS UNDER LOCAL RULE 4001-2

36.     Local Rule 4001-2(b)(1) requires that certain provisions contained in the Maybrook

DIP Credit Agreement be highlighted and that the Debtors provide justification for the inclusion

of each such highlighted provision. Below, the Debtors identify and discuss the following

provisions of the Maybrook DIP Credit Agreement and the Proposed Interim Order in accordance

with Local Rule 4001-2(b)(1) in the context and circumstances of the Chapter 11 Cases.

   **A. *Local Rule 4001-2(b)(1)(A)***

37.  <u>Cross-Collateralization</u>. Local Rule 4001-2(b)(1)(A) requires disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors *i.e.*, clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law).

38.  The DIP Credit Agreement provides for cross-collateralization protection of the DIP Lenders. As set forth above, on a prepetition basis, the Maybrook Prepetition Lenders had security interests in the accounts and all assets owned by the Maybrook Debtors and were also secured by recorded mortgages on the real property owned by the Maybrook PropCo Debtors. Similarly, the Consulate Prepetition Lenders had security interests in the accounts and all assets owned by the Consulate Debtors and were also secured by recorded mortgages on the real property owned by the Consulate PropCo Debtors.

39.  As a condition of the DIP Lenders' agreement to provide the Maybrook DIP Facility, the DIP Lenders required cross-collateralization of the assets and property of the Maybrook and Consulate Debtors. As a result, the DIP Lenders who previously only had liens on the assets of the Maybrook Debtors will now have liens on assets of the Consulate Debtors as well. Similarly, the DIP Lenders who previously only had liens on the assets of the Consulate Debtors will now have liens on the assets of the Maybrook Debtors. To the extent necessary, the DIP Lenders consent to the cross-collateralization as to their respective pre-petition collateral. The

Debtors believe and assert that the Debtors' critical need for the DIP Facility funding and the resulting benefits to the estates to be derived from such DIP funding justify the granting of such cross-collateralization as a condition to the DIP Lenders providing the DIP Facility.

### B.  *Local Rule 4001-2(b)(1)(B)*

40.       Stipulation and Challenge Provisions. Local Rule 4001-2(b)(1)(B) requires disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy five (75) days from the date of the order or (b) sixty (60) days from the date a committee is formed and retains counsel, to investigate such matters.

41.       Pursuant to paragraph F of the Proposed Interim Order, the Debtors make various stipulations, including, but not limited to, stipulations regarding (i) the validity and amount of the obligations and liens under the CIBC Prepetition Liens; (ii) the fact CIBC is not a control person or insider of the Maybrook and Consulate Debtors; (iii) the Debtors' release of certain claims and defenses that arose prior to the entry of the Proposed Interim Order against CIBC and any of its its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, members, directors, managers, employees, attorneys, agents, and professionals, past, present, and future, and its and their respective heirs, predecessors, successors, and assigns, and (iv) CIBC's cash collateral.

42.      Under paragraph F of the Proposed Interim Order, the Debtors and their estates are bound by these stipulations in all events. However, these stipulations are only binding on the Debtors and the Debtors' estates. Paragraph G and paragraph 42 provide that other parties-in-interest may challenge these stipulations by obtaining standing and filing an applicable proceeding or contested matter within the Challenge Period.

43.      The Challenge Period extends through the date that is three days before the hearing approving the sale of the assets of the Maybrook and Consulate Debtors. The Case Milestones require a sale hearing to occur on or before July 24, 2024. The Debtors acknowledge that this Challenge Period is accordingly shorter than the time frame provided by Local Rule 4001-2(b)(1)(B). However, the timing of the stated Challenge Period is necessary in light of the Case Milestones provided in the DIP Credit Agreement, which require approval of a sale on or before July 24, 2024 and consummation of a sale on or before September 9, 2024. This Court has previously established similar challenge periods when a chapter 11 case's timeline is constrained by DIP milestones. *See In re rue21, inc.,* No. 17-22045 (GLT) (Bankr. W.D. Pa. June 13, 2017) (Docket No. 529) (when DIP milestone provided that confirmation order must be entered by no later than 105 days from petition date, court established the following challenge periods: (a) for equitable subordination or recharacterization claims, approximately 75 days from the date of entry of an interim order, and (b) for all other applicable claims, 60 days from formation of committee). Further, the DIP Facility funding is critical to the success of these Chapter 11 Cases and the

32

minimally truncated challenge period is ultimately in the best interest of the estates in light of the alternative of not obtaining the necessary DIP funding. Under the circumstances, the Maybrook and Consulate Debtors believe and assert that the stipulations and challenge period are reasonable.

### C. Local Rule 4001-2(b)(1)(C)

44. <u>Chapter 5 of the Bankruptcy Code Waiver</u>. Local Rule 4001-2(b)(1)(C) requires disclosure of provisions that seek to waive or release, without notice and/or hearing, whatever rights the estate may have under applicable law, including without limitation, chapter 5 of the Bankruptcy Code. Other than the claims and causes of action waived by the Debtor pursuant to the stipulations discussed above (which stipulations are not binding on third parties until the expiration of the Challenge Period), the DIP Documents do not waive or release any rights of the estates under applicable law, including without limitation, chapter 5 of the Bankruptcy Code.

### D. Local Rule 4001-2(b)(1)(D)

45. <u>Liens on Avoidance Actions</u>. Local Rule 4001-2(b)(1)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, and 549.

46. The DIP Liens do not include a lien on Avoidance Actions. However, pursuant to paragraph 5 of the Proposed Interim Order, subject to entry of the Proposed Final Order, the DIP Liens will include liens on Avoidance Proceeds.

### E. Local Rule 4001-2(b)(1)(E)

33

47.     <u>Roll-Up</u>. Local Rule 4001-2(b)(1)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code.

48.     As already disclosed herein, the Maybrook DIP Facility includes the Roll-Up, which is a Twenty-Five Million Five Hundred Thousand and 00/100 Dollars ($25,500,000.00) delayed draw term loan facility to roll up a portion of the existing outstanding obligations under the Maybrook and Consulate Prepetition Loan Facilities. *See* Maybrook DIP Credit Agreement, Article 3, Section 3.1(a)(ii); Proposed Interim Order, ¶ I(vii). Moreover, upon entry of the Proposed Interim Order, subject to satisfaction of the applicable conditions precedent, only $3,200,000.00 of the Roll-Up shall be rolled up, and the remainder of the Roll-Up shall be rolled up upon entry of the Proposed Final Order, subject to satisfaction of the applicable conditions precedent. The roll-up of prepetition amounts relative to new money in the Proposed Interim Order has a ratio of approximately 0.89:1.

49.     The roll-up of these prepetition amounts was a condition of CIBC's extension of necessary new money DIP financing to the Maybrook and Consulate Debtors. Furthermore, the amount of the Roll-Up relative to the new money to be provided under the Maybrook DIP Facility (a ratio of approximately 2.04:1) is consistent with or favorable to the Maybrook and Consulate Debtors when compared with ratios that have been approved in other cases in this Circuit. *See,*

*e.g.*, *In re Rockdale Marcellus*, No. 21-22080 (GLT) (Bankr. W.D. Pa. Oct. 18, 2021) (Docket No. 271) (approving $60 million financing with a $40 million roll-up or 2:1 ratio); *In re R.E. Gas Development, LLC*, No. 18-22032 (JAD) (Bankr. W.D. Pa. May 18, 2018) (Docket No. 427) (approving $411 million financing with $311 million roll-up or 3.11:1 ratio); *In re rue21, inc.,* No. 17-22045 (GLT) (Bankr. W.D. Pa. May 18, 2017) (Docket No. 141) (approving $150 million financing with $100 million roll-up or 2:1 ratio); *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. Apr. 20, 2015) (Docket No. 282) (approving $120 million financing with $99.8 million roll-up or 4.9:1 ratio); *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) (Docket No. 947) (approving $285 million financing with $250 million roll-up or a 7.1:1 ratio); *In re NEC Holdings Corp.*, No. 10-11890 (PJW) (Bankr. D. Del. Jul. 16, 2010) (Docket No. 223) (approving $139 million financing with $110 million roll-up or 3.79:1 ratio); *In re Real Mex Rests., Inc.*, No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011) (Docket No. 392) (approving $49 million financing with $37.5 million roll-up or 3.26:1 ratio); *In re Pacific Energy Res., Ltd.*, No. 09-10785 (KJC) (Bankr. D. Del. Jun. 4, 2009) (Docket No. 415) (approving $183 million financing with $143 million roll-up or 3.58:1 ratio); *In re American Apparel, Inc.*, No. 1512055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (Docket No. 80) (approving $90 million financing with $60 million roll-up or 2:1 ratio).

50.     The Roll-Up in the Maybrook DIP Facility was part of a wholistic negotiation of the Maybrook DIP Financing terms and CIBC would not agree to provide the necessary Maybrook

35

DIP Facility absent this Roll-Up. As part of a global negotiation of the Maybrook DIP Credit Agreement, the Maybrook DIP Facility is generally beneficial and is the most favorable outcome that could have been achieved for the Debtors under the circumstances. Accordingly, the Maybrook and Consulate Debtors believe and assert that their agreement to roll-up CIBC's prepetition debt is necessary and reasonable under the circumstances.

### F.  Local Rule 4001-2(b)(1)(F)

51.    Carve-Out. Local Rule 4001-2(b)(1)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.

52.    Paragraph 39 of the Proposed Interim Order provides for a professional fee carve-out (the "Carve-Out") for professionals of the Debtors and professionals hired by any official committee of unsecured creditors (such committee, a "Committee"). The Debtors submit that the treatment of the Debtors' and Committee's professionals under the Carve-Out is substantially similar. More specifically, under the Carve-Out, prior to delivery of a Carve-Out Trigger Notice (as defined in the Proposed Orders), the Carve-Out will encompass all of the Debtors' and Committee's accrued and unpaid professional fees up until that point in time. Further, for the period following the delivery of a Carve-Out Trigger Notice, the Carve-Out sets aside $300,000 for the Debtors' and Committee's professionals, given the likelihood that the Debtors' professionals would be necessary to effect any wind down following the delivery of such notice.

36

Given that the Carve-Out in these two periods is commensurate with the Debtors' and Committee's professionals' anticipated efforts during such period, the Debtors submit that the Carve-Out does not create disparate treatment between such professionals.

### G. *Local Rule 4001-2(b)(1)(G)*

53. <u>Priming Liens</u>. Local Rule 4001-2(b)(1)(G) requires disclosure of provisions that prime any secured lien without the consent of that lienor.

54. The Maybrook and Consulate Prepetition Lenders consent to the priming of their validly attached and properly perfected Maybrook and Consulate Prepetition Liens against the Maybrook and Consulate Prepetition Collateral by the DIP Liens. *See* Maybrook DIP Credit Agreement, Article 3, Section 3.1(a)(ii); Proposed Interim Order, ¶ I(ii).

55. With respect to the purported liens of U.S. Foods, the Maybrook and Consulate Debtors contest any assertion that U.S. Foods has a valid security interest against the Maybrook and Consulate Debtors. With respect to the Department, the Maybrook and Consulate Debtors believe that any potential lien in favor of the Department would be junior to the Maybrook and Consulate Prepetition Liens and, as a result, unsecured. The value of the Maybrook and Consulate Prepetition Collateral is, upon information and belief, insufficient to allow for either: (a) the payment in full of the Maybrook and Consulate Prepetition Liens; or (b) a non-priming facility, such that, the only way for the Maybrook and Consulate Debtors to obtain the capital necessary to prosecute these Chapter 11 Cases is by accessing the DIP Facility requested in this Maybrook DIP

37

Motion. To the extent that the Taxing Bodies hold any valid lien(s) on the Maybrook and Consulate

Debtor's real property, with regard to which the Maybrook and Consulate Debtors reserve any and

all rights, claims and defenses, the Maybrook and Consulate Debtors do not seek to prime any such

liens pursuant to this Motion.

## BASIS FOR RELIEF REQUESTED

### A. *Basis for Emergency Relief*

56.     The Maybrook and Consulate Debtors bring this Maybrook DIP Motion on an

emergency basis given the immediate and irreparable harm that they will potentially suffer if they

are denied the ability to obtain post-petition credit and to use Cash Collateral, which is necessary

to sustain the ongoing business operations of the Maybrook and Consulate Debtors and to achieve

their future business objectives. The Maybrook DIP Facility and Cash Collateral will permit the

Maybrook and Consulate Debtors to preserve the value of their bankruptcy estates, continue

operating their business in an orderly fashion, maintain business relationships with vendors,

suppliers, and employees, provide quality care for their residents, meet ongoing business

disbursements, and satisfy other working capital and operational needs.

57.     Without access to the Maybrook DIP Facility and Cash Collateral, the Maybrook

and Consulate Debtors will be unable to meet their ongoing financial obligations, thereby resulting

in: (i) an inability keep their facilities in operation; (ii) the risk of an immediate loss of the

workforce necessary to provide care for their residents; and (iii) the ultimate closure of their

38

facilities, thereby displacing their residents and putting them in grave danger due to a disruption in the care provided by the Maybrook and Consulate Debtors.

### B. *Authority in Support of Post-Petition Financing*

58.     The Maybrook and Consulate Debtors, along with their advisors, have determined that the most prudent course of action is to secure immediate access to post-petition financing and use of Cash Collateral to preserve estates' assets and facilitate the Debtors' emergence from chapter 11. For those reasons, the Maybrook and Consulate Debtors request that the Court enter the Proposed Interim Order and subsequently, the Proposed Final Order, authorizing the Maybrook and Consulate Debtors to, among other things, access the Maybrook DIP Facility and to use Cash Collateral, subject to the terms of the Proposed Orders and the Maybrook DIP Credit Agreement.

59.     Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit outside the ordinary course of business, and (iii) obtaining credit with specialized priority or on a secured basis. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code, then the court may authorize such debtors to obtain credit or to incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, a junior lien on encumbered property, or a combination of the foregoing. Finally, Section 364(d)(1) of the Bankruptcy Code provides,

> The court, after notice and a hearing, may authorize the obtaining of credit
> or the incurring of debt secured by a senior or equal lien on property of the

39

> estate that is subject to a lien only if – (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

60.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part, the following:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c). Accordingly, the Court is authorized to grant the relief requested herein.

### C. Authority for Adequate Protection and Cash Collateral

61.     Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or court approval. 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien if

an existing secured creditor's interest in the collateral security is adequately protected. 11 U.S.C.

§ 364(d)(1).

62.     What constitutes adequate protection must be decided on a case-by-case basis. *See*

*In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985);

*In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Southwest Assocs.*, 140

B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986).

The focus of the requirement is to protect a secured creditor from diminution in the value of its

interest in the particular collateral during the period of use. *See In re 495 Central Park Avenue*

*Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker*, 58 B.R. at 736; *In re Hubbard*

*Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

63.     By this Maybrook DIP Motion, the Maybrook and Consulate Debtors seek

authority to use the Maybrook and Consulate Prepetition Collateral and provide adequate

protection to any entity having an interest in the Maybrook and Consulate Prepetition Collateral

for any and all Diminution in Value thereof from and after the Petition Date for any reason,

including, without limitation, any such diminution resulting from (i) the use of Cash Collateral,

(ii) the priming of any security interests in and liens on any of the Maybrook and Consulate

Prepetition Collateral (including by the Carve Out) by the DIP Liens pursuant to the Maybrook

DIP Documents and the Proposed Orders, (iii) the use, sale, or lease of the Maybrook and

Consulate Prepetition Collateral, including Cash Collateral, and (iv) the imposition of the

41

automatic stay under Section 362(a) of the Bankruptcy Code or otherwise pursuant to Sections 361(a), 363(c), 364(c), 364(d)(1), and 507(b) of the Bankruptcy Code.

64.     As adequate protection of the interests of the Prepetition Lenders in the Maybrook and Consulate Prepetition Collateral, the Maybrook and Consulate Debtors will grant the Adequate Protection Liens (as defined in the Proposed Interim Order and as set forth therein).

### D.  Approval of the DIP Facility under Section 364(d)(1)

65.     As noted above, a trustee may only obtain post-petition credit on a priming basis under Section 364(d)(1) of the Bankruptcy Code if the trustee is otherwise unable to secure post-petition financing solely under Section 364(c) of the Bankruptcy Code (which analysis includes the ability to secure post-petition financing under Section 364(a) and (b)). As the Maybrook and Consulate Debtors will establish at the hearings to consider the relief requested in this Maybrook DIP Motion and as set forth in the Maybrook DIP Declaration, the Maybrook and Consulate Debtors could not obtain post-petition financing solely through the protections afforded under Section 364(c). Accordingly, the only viable source of post-petition financing is by way the DIP Facility in accordance with Section 364(d)(1) of the Bankruptcy Code.

> a.  *The Maybrook and Consulate Debtors could not obtain Post-Petition Financing solely on an unsecured, priority, or superpriority basis.*

66.     The statutory requirement for obtaining post-petition credit under Section 364(c) is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative

expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (opining that a debtor seeking secured credit under section 364(c) must prove that it was unable to obtain unsecured credit pursuant to § 364(b)); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b)).

67.     As set forth in the First Day Declaration and the Maybrook DIP Declaration, and as the evidence at the Final Hearing will demonstrate, the Maybrook and Consulate Debtors could not have obtained a post-petition financing facility on the terms and of the type required in these Chapter 11 Cases solely by offering the protections afforded by Section 364(c) of the Bankruptcy Code.

68.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good-faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c). *Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive

search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*,

*Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

69.     Here, the Maybrook and Consulate Debtors have engaged in extensive good faith and arm's-length negotiations with the DIP Lenders to reach an agreement on the terms of the Maybrook DIP Facility. Upon reaching an agreement on the terms of the Maybrook DIP Facility, the Maybrook and Consulate Debtors and their professionals sought out alternative financing sources that would meet or exceed the terms offered therein. Notably, two alternative financing sources were contacted and neither was willing to extend post-petition financing on an unsecured, junior secured, or *pari passu* basis.

70.     Moreover, the only alternative lender willing to consider serving as a post-petition lender required that the Maybrook and Consulate Debtors seek and obtain post-petition liens that would prime any and all prepetition liens on the Maybrook and Consulate Prepetition Collateral, of which CIBC would not consent. Given the time, expense, and uncertainty that accompanies a contested priming post-petition financing facility, the Maybrook and Consulate Debtors, in their sound business judgment, elected to advance the request for approval of the Maybrook DIP Facility set forth herein.

71.     The Maybrook and Consulate Debtors submit that the foregoing reasons demonstrate the non-availability of credit on an unsecured or priority basis.

> b.  *No Comparable Alternative to the Maybrook DIP Facility
>     is Reasonably Available.*

72.     A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by sections 364(d) of the Bankruptcy Code.

*In re Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900

(Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct such an exhaustive search for financing." *In re Sky Valley,* 100 B.R. at 113; *see*

*also In re Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior

lien by establishment of unsuccessful contact with other financial institutions in the geographic

area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the refusal of two

national banks to grant unsecured loans was sufficient to support the conclusion that the section

364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40 (debtor must show that it made

reasonable efforts to seek other sources of financing under section 364(a) and (b)).

73.     As set forth in the Maybrook DIP Declaration and First Day Declaration, given

their current financial condition, financing arrangements and capital structure, the Maybrook and

Consulate Debtors concluded that the Maybrook DIP Facility is the superior option for a number

of reasons: (i) not a single alternative financing source was willing to fund a post-petition financing

facility with the protections afforded solely under Section 364(c) of the Bankruptcy Code; (ii) the

only alternative lender that was willing to *consider* serving as a post-petition financier required

priming liens, the costs and uncertainties of which dwarfed the benefits that the estates of the

Maybrook and Consulate Debtors could or would receive, and to which the Maybrook and Consulate Prepetition Lenders refused to consent; and (iii) the Maybrook and Consulate Debtors and their professionals, on the one hand, and DIP Lenders and its professionals, on the other hand, engaged in extensive good faith and hard-fought negotiations to come to terms on an agreement by which the DIP Lenders would fund the Maybrook DIP Facility, which the Maybrook and Consulate Debtors need in order to operate and maximize the value of their estates.

74.     Accordingly, the Maybrook and Consulate Debtors submit that no reasonable alternative was available, whether under Section 364(a), (b), or (c), when faced with seeking approval of the Maybrook DIP Facility set forth herein.

> c.   *The Maybrook and Consulate Debtors Satisfy Section 364(d)(1)*

75.     The Maybrook and Consulate Debtors submit that, as discussed above, they have established that they could not obtain post-petition financing solely under Section 364(a), (b), or (c) of the Bankruptcy Code, thereby satisfying the first prong of Section 364(d)(1) – i.e., that they could not otherwise obtain post-petition financing under Section 364 of the Bankruptcy Code.

76.     Turning to the second prong of Section 364(d)(1) – adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted – the Maybrook and Consulate Debtors submit that, because: (i) the DIP Liens do not prime any lien associated with the Real Estate Taxes; and (ii) any lienholders junior

to the Maybrook and Consulate Prepetition Lenders are effectively unsecured and, therefore, not entitled to adequate protection, the satisfy Section 364(d)(1)(B).

77.     Adequate protection must be provided to protect against the decline in value to a non-debtor's interest in property of the estate resulting from the imposition of the automatic stay, 11 U.S.C. § 362(d)(1), the use, sale or lease of that property, 11 U.S.C. 363(e), or the granting of a priming lien on that property to secure post-petition financing. *In re SunEdison, Inc.*, 562 B.R. 243, 252 (Bankr. S.D.N.Y. 2017 (citing 11 U.S.C. § 364(d)(1)(B)); *In re R.F. Cunningham & Co.*, 355 B.R. 408, 412 (Bankr. E.D.N.Y. 2006) (stating, in connection with adjudicating a request for relief from the automatic stay, that there is no statutory requirement that unsecured creditors receive adequate protection).

78.     In *In re: Levitt and Sons, LLC*, the United States Bankruptcy Court for the Southern District of Florida entertained the objection of a junior lienholder to the debtor's motion to approve postpetition financing on a superpriority secured and priming basis. 384 B.R. 630, 635 (Bankr. S.D. Fl. 2008). The court concluded that the junior lienholders opposing the post-petition financing "are not entitled to adequate protection pursuant to [Section] 364(d) [of the Bankruptcy Code] because at best they have a zero value lien." *In re Levitt and Sons, LLC*, 384 B.R. at 640. *See also In re Dunckle Assocs., Inc.*, 19 B.R. 481, 485 n.10 (Bankr. E.D. Pa. 1982) ("the law is well settled that valueless junior secured positions or unsecured deficiency claims are not entitled to adequate protection.").

79. As discussed above, and subject to their rights to challenge the validity, priority, and extent of any purported security interest of U.S. Foods and the Department, the Maybrook and Consulate Debtors believe that the Maybrook and Consulate Prepetition Lenders are the first priority lienholder against all assets of the Maybrook and Consulate Debtors, subject only to potential liens arising from or relating to the Real Estate Taxes. Further, based on the executed Stalking Horse Agreement, as negotiated in good faith and at arms' length by sophisticated business parties and subject to approval by the Court, the highest and best offer that an arms' length third party is willing to pay is insufficient to satisfy the aggregate claims of the Maybrook and Consulate Prepetition Lenders.

80. Based on the extensively negotiated, arms' length Stalking Horse Agreement and the amount owed to the Maybrook and Consulate Prepetition Lenders as of the Petition Date, the Maybrook and Consulate Debtors submit that any purported lienholder that is junior to the Maybrook and Consulate Prepetition Lenders is, in all likelihood, unsecured and, therefore, not entitled to adequate protection. Thus, the Maybrook and Consulate Debtors submit that they have satisfied Section 364(d)(1) and respectfully seek the authority to enter into the Maybrook DIP Facility.

### E. The Maybrook DIP Facility is Necessary to Preserve Assets and Maximize the Value of the Debtors' Estates

81. It is essential that the Maybrook and Consulate Debtors immediately instill their workforce, vendors, service providers, and all parties in interest with confidence in their ability to

transition their business smoothly to the Chapter 11 process and to operate normally in that environment. The Maybrook DIP Facility is necessary to continue, among other things, the orderly operation of the business of the Maybrook and Consulate Debtors, the maintenance of continued relationships with their employees, vendors and service providers, and also to satisfy actual or procedurally necessary working requirements for the business units of the Maybrook and Consulate Debtors until such time as operations can be transferred to a new operator.

82. The initial success of the Chapter 11 Cases and the stabilization of the operations of Maybrook and Consulate Debtors at the outset thereof depend on the confidence of the workforce, vendors, service providers, and all parties in interest of the Maybrook and Consulate Debtors, which in turn depends on the ability to minimize the disruption to their business due to the bankruptcy filing. If the relief sought in this Maybrook DIP Motion is delayed or denied, the necessary parties' confidence may be shattered, consequently damaging the ability of the Maybrook and Consulate Debtors to preserve value for the estate. In contrast, once the Maybrook DIP Facility is approved and implemented, the ability of the Maybrook and Consulate Debtors to continue functioning normally will be reasonably assured.

83. Finally, because of the willingness of CIBC to finance Kadima's purchase of all or substantially all assets of the Maybrook and Consulate Debtors, which resulted in more than a $10 million increase compared to the competing offers, the Maybrook and Consulate Debtors believe

that approval of the Maybrook DIP Facility is imperative to maximizing the value of the Maybrook

Debtors' and Consulate Debtors' estates.

84. Thus, the Maybrook and Consulate Debtors submit that their need for approval of

the Maybrook DIP Facility is immediate.

### F. The Terms of the Maybrook DIP Facility are Fair, Reasonable, and Appropriate

85. The terms and conditions of the Maybrook DIP Facility were negotiated by the

parties in good faith and at arm's length. In the reasonable exercise of the business judgment of

the Maybrook and Consulate Debtors, the Maybrook DIP Facility is the best financing option

available under the present circumstances. The purpose of the Maybrook DIP Facility is to provide

the Maybrook and Consulate Debtors with funds required to enable them to continue normal

business operations during the Chapter 11 Cases until the transition of those operations to a new

owner is complete. Further, the Maybrook DIP Facility includes fair provisions related to the

payment of retained professionals, including a carve-out in the event the Maybrook DIP Facility

is terminated. *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for

professionals representing parties-in-interest because "absent such protection, the collective rights

and expectation of all parties-in-interest are sorely prejudiced").

86. The proposed Maybrook DIP Facility provides, generally, that the security interests

and administrative expense claims granted to the DIP Lenders as security for the obligations under

the Maybrook DIP Credit Agreement are subject to the Carve-Out, as described above. The

Maybrook DIP Facility also provides for payment of court-allowed fees and expenses of professionals up to the amount set forth in the Maybrook Budget, and the Maybrook and Consulate Debtors believe those budgeted amounts are reasonable and fair. In *Ames Dep't Stores,* the bankruptcy court found that such "carve-outs" for professional fees are not only reasonable but necessary to ensure that official committees and the debtors' estates are adequately assisted by counsel. 115 B.R. at 40.

87.    Likewise, the various fees and charges required by the DIP Lenders under the Maybrook DIP Facility are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to Section 364 of the Bankruptcy Code that included a lender "enhancement fee").

88.    The following additional factors exemplify the fairness and reasonableness of the Maybrook DIP Facility under the present circumstances:

- The DIP Lenders moved quickly to offer and negotiate the Maybrook DIP Facility, which was important in light of the current financial situation of the Maybrook and Consulate Debtors;

- The fees, interest rate, and other economics are reasonable and consistent with the Maybrook and Consulate Prepetition Credit Facilities and market rates for other postpetition financing facilities in similar circumstances;

- The proposed Roll-Up in the amount of approximately $3.2 million upon entry of the Proposed Interim Order is reasonable and the .89:1 ratio of roll-

up to new money contemplated by the Maybrook DIP Facility is necessary to avoid immediate and irreparable harm to the Maybrook and Consulate Debtors' estates;

- The proposed Roll-Up in the amount of approximately $25.5 million upon entry of the Proposed Final Order is reasonable and the 2.04:1 ratio of roll-up to new money contemplated by the Maybrook DIP Facility is within the range of other roll-up financings that have been approved in this Circuit; and,

- The milestones are reasonable, capable of satisfaction, and consistent with the desire of the Maybrook and Consulate Debtors to maximize the value of their estates and minimize the costs of administering these Chapter 11 Cases.

89.    The fairness and reasonableness of the terms of the Maybrook DIP Facility will further be demonstrated at the Final Hearing.

### G.  The DIP Lenders are Good-Faith Lenders under Section 364(e)

90.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtors to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

91. As explained herein, in the First Day Declaration, and in the Maybrook DIP Declaration, the Maybrook DIP Facility and the Proposed Orders are the result of the reasonable and informed determination of the Maybrook and Consulate Debtors that the DIP Lenders offered the most favorable terms on which to obtain critical postpetition financing and arm's-length, good-faith negotiations between the Maybrook and Consulate Debtors and the DIP Lenders. The terms and conditions of the Maybrook DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the Maybrook DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the Maybrook DIP Credit Agreement or under the Proposed Orders other than as described herein. Accordingly, the Court should find that the DIP Lenders are a "good-faith" lender within the meaning of section 364(e) of the Bankruptcy Code and entitled to all of the protections afforded by that section.

### H. The Automatic Stay Should be Modified on a Limited Basis

92. The Proposed Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Maybrook DIP Documents and the Proposed Orders. The Proposed Orders further provide that the automatic stay

is modified as necessary to permit the Maybrook and Consulate Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the DIP Documents and the Proposed Orders. Finally, the Proposed Orders provide that, following the occurrence of an event of default, and passage of a cure period, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies in accordance with the Maybrook DIP Documents. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the business judgment of the Maybrook and Consulate Debtors, are reasonable and fair under the circumstances of these bankruptcy cases.

### I.   *Application of the Business Judgment Standard*

93.   As described above, after appropriate investigation and analysis, the restructuring team and management for the Maybrook and Consulate Debtors have concluded that the Maybrook DIP Facility is the best alternative available under the circumstances of the Chapter 11 Cases of the Maybrook and Consulate Debtors. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decisions to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment, . . . [and were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re Simasko Prods. Co.*, 47 B.R. 444, 449 (D. Conn. 1985) ("[B]usiness judgments should be left to

the board room and not to this Court."). Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

94. The Maybrook and Consulate Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Maybrook DIP Credit Agreement. The terms of the Maybrook DIP Credit Agreement are in the best interests of the Maybrook and Consulate Debtors and their estates. Accordingly, the Maybrook and Consulate Debtors should be granted authority to enter into the Maybrook DIP Credit Agreement and to obtain funds from the DIP Lenders on the secured and administrative "superpriority" basis described above pursuant to Sections 364(c) and 364(d).

### J. Interim Approval Should be Granted

95. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a final hearing on approval of the Maybrook DIP Motion and the Maybrook DIP Facility may not be commenced before 14 days after service of that Motion. Fed. R. Bank. P. 4001(b)(2). This Court may, however, conduct a preliminary hearing before the expiration of that fourteen-day period and likewise authorize the incurrence of the Maybrook DIP Facility and use of Cash Collateral, if necessary, to the extent

55

necessary to avoid immediate and irreparable harm to the estates of the Maybrook and Consulate Debtors. *See* W.PA.LBR. 1002-6(c).

96.     In examining requests under this Bankruptcy Rule, courts apply the same business judgment standard as is applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Id.* at 36. The Maybrook and Consulate Debtors submit that, for the reasons set forth herein, the immediate obtaining of credit and the use of Cash Collateral on an interim basis as requested in this Maybrook DIP Motion are necessary to avert immediate and irreparable harm to their business.

97.     The Maybrook and Consulate Debtors request that the Court conduct an expedited preliminary hearing on the Maybrook DIP Motion and authorize the Maybrook and Consulate Debtors from and after the entry of the Proposed Interim Order until a Final Hearing on the relief requested herein to obtain credit under the Maybrook DIP Credit Agreement and to use Cash Collateral, if necessary. Such authorization will ensure that the Maybrook and Consulate Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

### K.  Request for Final Hearing

98.     As noted above, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Maybrook and Consulate Debtors respectfully requests that the Court set a date for the Final Hearing that is no later than thirty (30) days following the entry of the Petition Date.

## NOTICE

99.     Notice of this Maybrook DIP Motion has been provided by email, facsimile or overnight mail to: (i) the Office of the United States Trustee for the Western District of Pennsylvania; (ii) counsel to CICB Bank, U.S.A., Liz Boydston and Max Schlan, Gutnicki, LLP, 10440 N. Central Expressway, Suite 800, Dallas, TX 75231; lboydston@gutnicki.com; mschlan@gutnicki.com; (iii) counsel to Cuarzo Healthcare, LLC, Elizabeth A. Green and Andrew Layden, BakerHostetler, 200 South Orange Avenue, Suite 2300, Orlando, FL 32801; egreen@bakerlaw.com; alayden@bakerlaw.com; (iv) named Respondents to the Motion (vi) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; (vii) the list of the 30 largest unsecured creditors of the Debtors on a consolidated basis; (viii) U.S. Department of Labor, Office of the Regional Solicitor, 1835 Market Street, Mailstop SOL/22, Philadelphia, PA 19103-2968, Attn: Alejandro A. Herrera, Esq. Herrera.alejandro.a@dol.gov; facsimile (215) 861-5162.and (ix) the following governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases: (a) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346; (b) United States Attorney's Office for the Western District of Pennsylvania, Attn: Eric G. Olshan, Joseph F. Weis,

57

Jr. United States Courthouse 700 Grant Street, Suite 4000, Pittsburgh, PA 15219; and (c) Commonwealth of Pennsylvania Attorney General, Attn: Michelle A. Henry, 16th Floor, Strawberry Square, Harrisburg, PA 17120. Based on the urgency of the circumstances surrounding this Maybrook DIP Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

## NO PRIOR REQUEST

100.   No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully seeks the entry of the Proposed Orders: (i) authorizing the Maybrook and Consulate Debtors to obtain postpetition financing, (ii) authorizing the Maybrook and Consulate Debtors to use cash collateral, (iii) granting liens and providing superpriority administrative expenses status, (iv) granting adequate protection, (v) modifying automatic stay, (vi) scheduling a final hearing, and (vii) granting related relief.

[*The remainder of this page is intentionally left blank.*]

Dated  May 17, 2024
      Pittsburgh, Pennsylvania

Respectfully submitted:

WHITEFORD TAYLOR & PRESTON, LLP

*/s/ Daniel R. Schimizzi*

Daniel R. Schimizzi (PA ID No. 311869)
Michael J. Roeschenthaler (PA ID No. 87647)
Mark A. Lindsay (PA ID No. 89487)
Sarah E. Wenrich (PA ID No. 325834)
11 Stanwix Street, Suite 1400
Pittsburgh, PA 15222
Telephone: 412-275-2401
Facsimile: 412-275-2404
Email: dschimizzi@whitefordlaw.com
mroeschenthaler@whitefordlaw.com
mlindsay@whitefordlaw.com
swenrich@whitefordlaw.com
*Proposed Local Counsel to the Debtors and
Debtors in Possession*

-AND-

Glenn B. Rose (*pro hac vice* pending)
Paul G. Jennings (*pro hac vice* pending)
Gene L. Humphreys (*pro hac vice* pending)
Jordan E. Thomas (*pro hac vice* pending)
Alfonso Cuen (*pro hac vice* pending)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
grose@bassberry.com
pjennings@bassberry.com
ghumphreys@bassberry.com
jordan.thomas@bassberry.com
alfonso.cuen@bassberry.com
*Proposed Counsel to the Debtors and
Debtors in Possession*