# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In Re:** | **Case No.:** |
| **SOUTH HILLS OPERATIONS, LLC,** *et al.,*[1] | **Chapter 11** *Joint Administration Requested* |
| **Debtors.** | **Doc. No.:** |
| **SOUTH HILLS OPERATIONS, LLC,** *et al.,* | **Related to Document No.** |
| **Movant,** | **Hearing Date:** |
| **-vs -** | **Hearing Time:** |
| **CIBC BANK, USA, as Administrative Agent, US FOODS, INC., AND PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES,** | **Response Deadline:** |
| **Respondents.** | |

**DECLARATION OF CHIEF RESTRUCTURING OFFICER LOUIS E. ROBICHAUX IV, IN SUPPORT OF EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE MAYBROOK AND CONSULATE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A <u>FINAL HEARING, AND (VII) GRANTING RELATED RELIEF</u>**

---

[1]	The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835).

I, Louis E. Robichaux IV, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information and belief:

1. I am the Chief Restructuring Officer of each of the Debtors in these Chapter 11 Cases. The Debtors that are the subject of this declaration ("Declaration") are Maybrook-C Evergreen Propco, LLC; Maybrook-C Briarcliff Propco, LLC; Maybrook-C Silver Oaks Propco, LLC; Maybrook-C Overlook Propco, LLC; Maybrook-C Latrobe Propco, LLC; Maybrook-C Whitecliff Propco, LLC; Maybrook-C Kade Propco, LLC, 100 Tandem Village Road Propco, LLC , 3876 Saxonburg Boulevard Propco, LLC, Maybrook-C Briarcliff Opco, LLC, Maybrook-C Evergreen Opco, LLC, Maybrook-C Kade Opco, LLC, Maybrook-C Latrobe Opco, LLC, Maybrook-C Overlook Opco, LLC, Maybrook-C Silver Oaks Opco, LLC, Maybrook-C Whitecliff Opco, LLC, Cheswick Rehabilitation and Wellness Center, LLC, and North Strabane Rehabilitation and Wellness Center, LLC (collectively, the "Maybrook and Consulate Debtors"). I have served in this position since December 1, 2023. In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I submit this Declaration in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Maybrook and Consulate Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Super-Priority Administrative Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Maybrook DIP Motion").[2] Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and financing,

---

[2] Capitalized terms not otherwise defined in this Declaration shall have the meaning within the Maybrook DIP Motion and the First Day Declaration.

information learned from my review of relevant documents, information supplied to me from members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this Declaration.

3.      In order to provide financing needed to continue their operations, the Maybrook and Consulate Debtors seek the authority, subject to entry of the Proposed Orders to use cash collateral and gain access to the Maybrook DIP Facility, as described in more detail below.

4.      As set forth more fully above, the Maybrook and Consulate Debtors cannot transition into their Chapter 11 Cases absent immediate access to the Maybrook DIP Facility, and in my opinion, the Maybrook DIP Facility is essential to maximizing the value of the Maybrook and Consulate Debtors' estates and ensuring their ability to continue providing care to their residents pending the sale of the Maybrook and Consulate Debtors' operations to a new, third-party operator.

## I.      Incorporation of First Day Declaration

5.      Among other things, the First Day Declaration sets forth my background and experience; information relating to the Maybrook and Consulate Debtors' businesses and organizational, financial, and operational structure; and a description of the circumstances leading to the filing of these Chapter 11 Cases. I incorporate by reference these portions of my First Day Declaration into this Declaration. I also incorporate part II. A of my First Day Declaration, which describes the creditors having liens in the assets of the Maybrook and Consulate Debtors.

6.      The Maybrook DIP Motion[3] also identifies the nature and extent of the Maybrook and Consulate Loans, the security interests relating to the Maybrook and Consulate Prepetition Loans, and the outstanding obligations due and owing to the Maybrook and Consulate Prepetition Lenders as of the Petition Date. The postpetition financing contemplated in the Maybrook DIP Motion relates solely to the postpetition financing made available, subject to approval by this Court, by the Maybrook DIP Lenders and on account of the nine (9) facilities owned and operated by the Maybrook and Consulate Debtors against which the Maybrook and Consulate Prepetition Lenders hold valid and binding first-priority security interests.

7.      As explained in detail in the Maybrook DIP Motion, the Maybrook and Consulate Debtors seek the authority, subject to the entry of the Final DIP Order, to gain access to the Maybrook DIP Facility in the aggregate principal amount of up to $38,000,000.00, which consists of, and is subject to the approval of, the *Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement* (the "Maybrook DIP Credit Agreement"): (i) a new money delayed draw term loan facility (the "New Money DIP Loan") in the aggregate principal amount of up to $12,500,000.00; and (ii) a $25,500,000.00 delayed draw term loan facility to roll up a portion of the existing outstanding obligations under the Maybrook and Consulate Prepetition Loans (the "Roll Up DIP Loan").

8.      If approved on an interim basis, upon entry of the Proposed Interim Order, the Maybrook and Consulate Debtors shall have access to $3.6 million of the New Money DIP Loan, subject to satisfaction of the applicable conditions precedent set forth in the Proposed Interim

---

[3] In addition to the Maybrook DIP Motion, the Debtors have concurrently filed a motion seeking approval of another postpetition DIP financing facility, subject to approval by the Court, by Cuarzo Healthcare Capital to support operations at the four (4) facilities in which Cuarzo Healthcare Capital holds valid and binding first-priority security interests.

3

Order and the Maybrook DIP Credit Agreement, and $3,200,000.00 of the Roll Up DIP Loan shall be rolled up on entry of the Proposed Interim Order.

9.     The Roll Up DIP Loan and the cross-collateralization of the Maybrook and Consulate Prepetition Loans through the Maybrook DIP Facility were material and required components of the Maybrook DIP Facility. Both were required features and conditions to the Maybrook DIP Lenders' willingness to fund the Maybrook DIP Facility and, under the current circumstances, it is my opinion that approval of the Roll Up DIP Loan and cross-collateralization of the Maybrook and Consulate Prepetition Loans through the Maybrook DIP Facility is necessary and appropriate not only to facilitate the efficient and orderly administration of these Chapter 11 Cases, but also to enable the Maybrook and Consulate Debtors to continue providing high-quality care to their residents. Without approval of the Roll Up DIP Loan and the cross-collateralization of the Maybrook and Consulate Prepetition Loans through the Maybrook DIP Facility, the Maybrook and Consulate Debtors risk the Maybrook DIP Lenders refusing to fund the Maybrook DIP Facility, thereby sending their restructuring efforts and their ability to care for their residents into a tailspin.

**II.     The Maybrook and Consulate Debtors' need for postpetition financing.**

10.     As more fully described in the First Day Declaration and in the Maybrook DIP Motion, the Maybrook and Consulate Debtors are losing money and are in dire financial condition. Given the financial and operational struggles of the Maybrook and Consulate Debtors, upon consultation with their advisors and their secured lenders, the Maybrook and Consulate Debtors determined that it would be in the best interest of their estates and all stakeholders, including their residents, to pursue certain strategic transactions that would allow the Maybrook and Consulate Debtors to monetize their operations as a going concern, maximize recoveries to

stakeholders in their estates, and most importantly, ensure continued high-quality care for their residents.

11.     To achieve these goals and fund their Chapter 11 Cases, the Maybrook and Consulate Debtors need additional capital. As of May 15, 2024, the Maybrook and Consulate Debtors have approximately $1.43 million of cash on hand. Based on the Maybrook and Consulate Debtors' forecast, if they do not have access to the Maybrook DIP Facility, then they will be unable to: (i) generate sufficient levels of operating cash flow in the ordinary course of business to cover both their operating costs going forward and the projected restructuring costs of these Chapter 11 Cases; (ii) pursue the strategic transactions that the Maybrook and Consulate Debtors diligently and feverishly pursued in the months leading to the Petition Date; and (iii) ensure the continued and uninterrupted high-quality care for their residents.

12.     Accordingly, the Maybrook and Consulate Debtors are seeking approval to access the Maybrook DIP Facility. The Maybrook DIP Facility provides liquidity that will enable the Maybrook and Consulate Debtors to preserve and maximize the value of their estates for the benefit of all parties in interest.

**III.     The Maybrook and Consulate Debtors' Efforts to Obtain DIP Financing.**

13.     Based on my experience with numerous companies across the spectrum of healthcare sectors that file for relief under Chapter 11 of the Bankruptcy Code, one of the most challenging and expensive endeavors a debtor can undertake (especially as it attempts a seamless transaction into Chapter 11) is contested litigation over priming a senior lender's liens in connection with postpetition financing. If the senior secured lender has a perfected security interest in all of a debtor's assets and is also under-secured, which appears to be the case here with respect to the Maybrook and Consulate Prepetition Lenders, then the debtor's ability to

5

obtain a consensual priming lien is, for all intents and purposes, impossible. Unsurprisingly, the Maybrook and Consulate Prepetition Lenders would not consent to any form of third-party priming or *pari-passu* liens.

14.    Further, the uncertainty of success and the extensive distraction, time, and costs associated with contested priming litigation made such a path unavailable to the Maybrook and Consulate Debtors.

15.    Accordingly, the Maybrook and Consulate Debtors, with the assistance of their advisors, have determined that Maybrook and Consulate Prepetition Lenders are almost certain to be the only source of debtor-in-possession financing that would allow the Maybrook and Consulate Debtors to effectuate their restructuring objectives and preserve their ability to care for their residents. The Maybrook and Consulate Debtors, through both me and their advisors, engaged in extensive, arm's-length negotiations with the Maybrook and Consulate Prepetition Lenders about the terms of potential postpetition financing for several weeks leading to the Petition Date.

16.    After extensive good faith negotiations, the Maybrook and Consulate Debtors and the Maybrook and Consulate Prepetition Lenders ultimately reached an agreement on the terms and conditions upon which, with this Court's approval, the Maybrook DIP Lenders will provide the Maybrook and Consulate Debtors with access to the Maybrook DIP Facility. During negotiations, the Maybrook DIP Lenders made a number of important concessions during the negotiations, including:

(i)    agreeing to exclude Avoidance Actions from the Maybrook & Consulate DIP Collateral;

(ii)    extending the Maybrook DIP Facility's term;

(iii)    modifying the reporting requirements with respect to the Budget and variance reports;

6

(iv)     removing certain Events of Default relating to Change in Control;

(v)      extending certain milestones, which gave the Maybrook and Consulate Debtors a broader path to ensure they had adequate time pursue the best possible outcome in these Chapter 11 Cases;

(vi)     negotiating the terms of the stalking horse purchase agreement;

(vii)    agreeing to finance the purchase price that the stalking horse bidder was willing to pay for the strategic transaction relating to the facilities securing Maybrook and Consulate Prepetition Loans, which resulted in an approximately $10 million increase in the stalking horse bid; and,

(viii)   agreeing to acknowledge that the DIP Liens do not prime any unpaid real estate taxes.

17.    Ultimately, the Maybrook DIP Facility proposed under the Maybrook DIP Credit Agreement is the best and only actionable financing proposal available to the Maybrook and Consulate Debtors and provides necessary liquidity for the administration of these Chapter 11 Cases. Accordingly, in consultation with the Maybrook and Consulate Debtors' advisors, I have concluded that, given the circumstances, the Maybrook and Consulate Debtors have exercised sound business judgment in pursuing approval of the Maybrook DIP Facility.

**I.      The Milestones**

18.    The Maybrook DIP Facility contains the following milestones:

(i)      By **May 17, 2024**, the Debtors will file chapter 11 petitions for relief and various first day motions reasonably acceptable to CIBC, including an appropriate motion seeking approval of the DIP Facility on an interim and final basis;

(ii)     By **May 22, 2024**, the Borrowers will obtain approval of the Interim DIP Order acceptable to the DIP Lender on a final basis;

(iii)    By **May 24, 2024,** the Borrowers will file the Sale and Procedures Motion acceptable to the DIP Lender, together with a motion to expedite hearing on the foregoing;

(iv)     By **May 24, 2024**, the Debtors will file applications: (i) to retain the Chief Restructuring Officer as chief restructuring officer and financial advisor to the Debtors; and (ii) to retain Blueprint as the investment banker for the Borrowers, provided that such applications must be heard on the "2nd Day" hearings in these Chapter 11 Cases;

(v)  By **June 7, 2024**, the Borrowers will obtain the entry of a final order from the Bankruptcy Court (the "Procedures Order") approving the Bidding Procedures (as defined in the Sales and Procedures Motion), which shall require a sale closing by **September 16, 2024**;

(vi)  By **June 18, 2024**, the Borrowers will obtain approval of the Final DIP Order acceptable to DIP Lender;

(vii)  **July 12, 2024**, shall be the Bid Deadline (as defined in the Procedures Order);

(viii)  By **July 17, 2024**, to the extent that the Borrowers receive more than one (1) Qualified Bid (as defined in the Procedures Order) by the Bid Deadline, the Borrowers shall conduct an Auction pursuant to the Procedures Order;

(ix)  By **August 7, 2024**, the Borrowers will obtain a final order (the "Sale Order") granting the relief requested in the Sale and Procedures Motion and approving a sale of the Borrowers' assets pursuant to one or more Successful Bidder(s); and,

(x)  By **September 16, 2024**, the Borrowers shall have closed on the transactions authorized under the Sale Order.

*Maybrook DIP Credit Agreement*, Art. 11.18; Interim DIP Order, ¶ 32.

19.  Based on my experience in the relevant industries, I believe these milestones are reasonable and appropriate under the circumstances, as they provide the Maybrook and Consulate Debtors with adequate time to facilitate one or more strategic transactions for their assets while retaining access to the liquidity needed to continue providing high-quality care for their residents.

**II.    The Maybrook DIP Facility is in the best interests of the Maybrook and Consulate Debtors' Estates.**

20.  The Maybrook DIP Facility proposed under the Maybrook DIP Credit Agreement will provide the liquidity needed to stabilize and fund the Maybrook and Consulate Debtors' operations during these Chapter 11 Cases, thereby ensuring that the Maybrook and Consulate Debtors can continue to preserve the safety and well-being of their most valuable assets—their residents. The liquidity provided under the Maybrook DIP Facility is therefore necessary to facilitate the administration of these Chapter 11 Cases, fund restructuring expenses, ensure the

8

Maybrook and Consulate Debtors' pursuit and consummation of the strategic transactions, and, most importantly, continue caring for their residents.

21. If the Maybrook and Consulate Debtors do not obtain access to the Maybrook DIP Facility, their estates may be required to undertake a liquidation process. In that scenario, creditor recoveries would be materially impaired compared to anticipated recoveries available if the Maybrook and Consulate Debtors are able to access the Maybrook DIP Facility and pursue and consummate their strategic transactions. This outcome pales in comparison to the catastrophic results that would befall the Maybrook and Consulate Debtors' residents, as they would be forced to seek critical care, assistance, and residence elsewhere, without any reasonable notice, thereby putting their health and safety in grave danger.

22. For these reasons and those set forth below in the Maybrook DIP Motion and the First Day Declaration, I believe that entering into the Maybrook DIP Credit Agreement will maximize the value of the Maybrook and Consulate Debtors' estates, ensure ongoing care for their residents, and is a sound exercise of their business judgment.

## THE MAYBROOK DIP FACILITY

**I.     The Maybrook and Consulate Debtors exercised sound and reasonable business judgment in deciding to enter into the Maybrook DIP Credit Agreement.**

23. It is my understanding that to enter into debtor-in-possession financing, a debtor must demonstrate that its decision was the product of its sound business judgment and that a reasonable businessperson would make a similar decision under similar circumstances. Under the circumstances, the Maybrook and Consulate Debtors' determination, through myself and with the assistance of their advisors, to move forward with the Maybrook DIP Facility is a sound exercise of their business judgment. Most importantly, without access to the Maybrook DIP Facility, the Maybrook and Consulate Debtors will not be able to pay expenses necessary to sustain their

operations, which would irreparably impair the value of their estates during these Chapter 11 Cases and risk the quality care afforded to their residents.

24.     Further, the Maybrook DIP Facility is currently the only available and viable source of liquidity to make such payments. In addition, the Maybrook and Consulate Debtors, through me, negotiated the Maybrook DIP Credit Agreement with the Maybrook DIP Lenders in good faith, at arm's-length, and with their advisors' assistance. Based on such negotiations, I believe the terms and conditions of the Maybrook DIP Facility under the Maybrook DIP Credit Agreement are fair, reasonable, reflective of the market for financings of this type, and offer significant benefits to the Maybrook and Consulate Debtors' estates. I am confident that the Maybrook DIP Facility is the best financing available under the circumstances.

25.     Moreover, the milestones in the Maybrook DIP Credit Agreement are tailored to comport with the timeline of the process for the strategic transactions, and the pricing, fees, and covenants provided for are reasonable, particularly for severely distressed borrowers with an urgent need for liquidity and an inability to solicit any viable alternative proposals. Accordingly, I believe that the Maybrook and Consulate Debtors' request for authority to access the Maybrook DIP Facility under the Maybrook DIP Credit Agreement is a sound and reasonable exercise of the Maybrook and Consulate Debtors' business judgment.

**II.     The terms of the Maybrook DIP Facility proposed under the Maybrook DIP Credit Agreement should be approved.**

26.     It is my understanding that, pursuant to section 364(d)(1) of the Bankruptcy Code, a debtor may only obtain credit secured by a senior or equal line on property of the estate that is subject to a lien if (A) the debtor is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. Further, it is my understanding that, pursuant

to section 364(c) of the Bankruptcy Code, a debtor may obtain debtor-in-possession financing that provides the lender with super-priority claims, liens on unencumbered assets, and liens on property of the estate junior in priority to existing prepetition liens if (a) unsecured, non-super-priority financing is not available to the debtor, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the agreement are fair, reasonable and adequate. In my opinion, and for the reasons set forth in the Maybrook DIP Motion, the Maybrook and Consulate Debtors' circumstances justify their decision to seek the authority to enter into the Maybrook DIP Credit Agreement to gain access to the Maybrook DIP Facility.

**A.    The Maybrook and Consulate Debtors are unable to obtain financing on more favorable terms than the Maybrook DIP Facility.**

27.    Based on my experience in the industry, I believe that the Maybrook and Consulate Debtors reasonably concluded that postpetition financing was not available on an unsecured basis following their good faith efforts to obtain alternate funding and consummate a strategic transaction prior to the Petition Date. Given the pre-petition exploration of both out-of-court and Chapter 11 restructuring alternatives (guided by legal and financial advisors), I believe the Maybrook and Consulate Debtors have a clear understanding of the current availability of postpetition financing.

28.    Since the Maybrook and Consulate Prepetition Lenders would not consent to any form of priming postpetition financing, the Maybrook and Consulate Debtors made the reasonable and sound business decision to seek the necessary postpetition financing from sources within their existing capital structure. The Maybrook and Consulate Debtors made appropriate and sufficient efforts to confirm that postpetition financing from an unrelated third-party lender is not available solely through the protections afforded by Section 364(c) of the Bankruptcy Code.

11

29.     Accordingly, I believe that the Maybrook and Consulate Debtors reasonably determined that postpetition credit was available to them only on a secured, super-priority priming basis, understanding that the DIP Liens will not prime any unpaid real estate taxes. A condition by the Maybrook DIP Lenders of offering the Maybrook DIP Facility was that the Maybrook DIP Facility be a secured super-priority priming loan, include the Roll Up DIP Loan, and provide for the cross-collateralization of the Maybrook and Consulate Prepetition Loans through the Maybrook DIP Facility. The Maybrook and Consulate Debtors and their advisors determined that the best course of action was to enter Chapter 11 with access to the Maybrook DIP Facility in place. The Maybrook DIP Lenders would not offer the Maybrook DIP Facility without assurances that the loan would be made on a secured super-priority priming basis, including the Roll Up DIP Loan and the cross-collateralization of the Maybrook and Consulate Prepetition Loans through the Maybrook DIP Facility.

**B.      The Maybrook DIP Facility is necessary to preserve the value of the Maybrook and Consulate Debtors' estates.**

30.     I also believe that the Maybrook DIP Facility is necessary to preserve the value of the Maybrook and Consulate Debtors' estates. I understand that the Maybrook and Consulate Debtors, as debtors-in-possession, have a fiduciary duty to protect and maximize their estates' assets. The Maybrook and Consulate Debtors' access to postpetition financing is essential to their ability to effectively carry out that duty. Without the proceeds of the Maybrook DIP Facility, the Maybrook and Consulate Debtors will be unable to fund critical payments in the ordinary course of business that are essential to their operational viability, which would have irreparable consequences to their restructuring, their stakeholders, and most importantly, their residents.

31.     The Maybrook DIP Facility will provide the Maybrook and Consulate Debtors with sufficient liquidity to fund their operations and maximize the value of their assets as they work

12

toward consummation of a strategic transaction which will preserve the ongoing care of their residents. Further, since they entered these Chapter 11 Cases with an executed stalking horse agreement, the efforts of the Maybrook and Consulate Debtors, with the cooperation of the DIP Lenders, have already resulted in an increase to the stalking horse bid of approximately $10 million as compared to the other bids received by the Maybrook and Consulate Debtors prior to the Petition Date.

**C.** **The terms of the Maybrook DIP Facility are fair, reasonable, and adequate under the circumstances.**

32. I believe the terms of the Maybrook DIP Facility are fair, reasonable, and adequate under the circumstances, and in the best interests of the Maybrook and Consulate Debtors, their estates, their creditors, and their residents. The covenants and milestones included in the Maybrook DIP Credit Agreement are reasonable and are not designed to make the Maybrook and Consulate Debtors disproportionately susceptible to a breach of such terms. The terms of the Maybrook DIP Credit Agreement are also fair and reasonable under these very challenging circumstances.

33. I also believe that the fees to be paid under the Maybrook DIP Credit Agreement are consistent with the market and are appropriate, particularly considering the circumstances of these Chapter 11 Cases and market practice for debtor-in-possession financings of this size and type. All terms of the Maybrook DIP Credit Agreement were negotiated by the Maybrook and Consulate Debtors, through me and their advisors, to ensure that the terms were as favorable to the Maybrook and Consulate Debtors as possible under the circumstances. I believe that such terms represent fair consideration for the critical financing proposed to be provided by the Maybrook DIP Lenders. Accordingly, I believe the Maybrook DIP Facility's terms are fair,

13

appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Maybrook and Consulate Debtors, their estates, their creditors, and their residents.

34.     Finally, based on my experience and after consultation with the Debtors' other professionals, it is my opinion that the Maybrook DIP Facility's provisions providing for approximately 1:1 roll up on an interim basis and 2:1 roll up of the Maybrook and Consulate Prepetition Loans upon entry of the Final Maybrook DIP Order is reasonable, consistent with current industry standards for DIP financing, and appropriate in these Chapter 11 Cases. Specifically, the roll up sought on an interim basis only involves $3.2 million of those funds in the revolver facilities utilized for the sole purpose of allowing the Maybrook and Consulate Debtors the necessary funds as a bridge to enter these Chapter 11 Cases.  As a condition of this "bridge" financing, CIBC required its inclusion in the DIP Roll-UP to be approved on an interim basis.  It is my understanding that CIBC will not provide the Maybrook DIP without this condition.

[*The remainder of this page is intentionally left blank.*]

14

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date:  <u>May 17, 2024</u>

<u>/s/ Louis E. Robichaux</u>
Louis E. Robichaux IV