## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | Case No.: 24-21217-CMB |
| SOUTH HILLS OPERATIONS, LLC, *et al.,*[1] | Chapter 11<br>*Jointly Administered* |
| Debtors. | |
| | Doc. No.: |
| SOUTH HILLS OPERATIONS, LLC, *et al.,* | Related to Document No. 21 and 85 |
| Movant, | Hearing Date: June 13, 2024 |
| -vs - | Hearing Time: 10:00 AM (EST) |
| CIBC BANK, USA, as Administrative Agent; US FOODS, INC.; PENNSYLVANIA DEPARTMENT HUMAN SERVICES; NEW WILMINGTON BOROUGH TAX COLLECTOR; RICHARD L. RAPONE, LAWRENCE COUNTY TREASURES; UNITY TOWNSHIP TAX COLLECTOR; WESTMORELAND COUNTY TAX CLAIM BUREAU; ROBERT OHR, TAX | Response Deadline: 4:00 PM (EST) on June 10, 2024 ~~June 6, 2024~~ |

---

[1]The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835).

COLLECTOR; MERCER COUNTY TAX
CLAIM BUREAU; WASHINGTON COUNTY
TAX CLAIM BUREAU; DONALD J.
PROGAR, TAX COLLECTOR; KEYSTONE
COLLECTION GROUP; JULIE LEVENTRY,
TAX COLLECTOR; SHELLEY BUCHANAN,
TAX COLLECTOR; CITY OF NEW CASTLE,

Respondents.

---

**INTERIM ORDER (I) AUTHORIZING THE MAYBROOK AND CONSULATE
DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
MAYBROOK AND CONSULATE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,
AND (VII) GRANTING RELATED RELIEF**

Upon the motion dated May 17, 2024 [Doc. No. 21] (the "Maybrook DIP Motion") of the

above captioned debtors and debtors-in-possession (collectively, the "Debtors"), in the above-

captioned Chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an order (this

"Interim Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d),

364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Western

District of Pennsylvania (the "Local Rules"), *inter alia*:

       i.        authorizing the Maybrook and Consulate Debtors[2] to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of $38,000,000.00 (the "Maybrook DIP Facility") consisting of (a) the New Money DIP Loan in the amount of $12,500,000.00  available upon entry of the Final Order,[3] and (b) the Roll-Up DIP Loan in the amount of $25,500,000.00 to satisfy a portion of the Maybrook and Consulate Prepetition Loan Facilities (as defined herein), subject to the terms and conditions of this Interim Order and the Maybrook DIP Credit Agreement by and among the Maybrook and Consulate Debtors and other credit parties thereto, as Borrowers, CIBC Bank USA ("CIBC"), as Administrative Agent (in such capacity, the "DIP Agent"), and the lender parties thereto from time to time, one (1) of whom as an "Insider" (as defined in 11 U.S.C. § 101(31))[4] (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), substantially in the form of **Exhibit A-1**, attached hereto;[5]

---

[2] Capitalized terms not otherwise defined herein shall have the definitions as ascribed to them in the Maybrook DIP Motion or the *Senior Secured Super-Priority Debtor-in-Possession Loan and Secured Agreement dated May 17, 2024* (the "Maybrook DIP Credit Agreement").

[3] Of the $12.5 million new money term loan, $3.6 million will be immediately available to the Maybrook and Consulate Debtors upon the entry of the Interim Order.

[4] Of the $38 million DIP Loan, Ephram Lahasky, an Insider of the Debtors, has committed to fund $2,000,000.00. *See* Annex A to the Maybrook DIP Credit Agreement.

[5] Upon entry of this Interim Order, an aggregate amount of $3.2 million of the Maybrook and Consulate Prepetition Loan Facilities, specifically from the Maybrook Prepetition Revolving Loan Facility and Consulate Prepetition Revolving Loan Facility, shall be fully rolled into the Maybrook DIP Facility and shall constitute DIP Obligations (as defined below) hereunder.

ii.         authorizing the Maybrook and Consulate Debtors to execute and deliver the

Maybrook DIP Credit Agreement and any other agreements, instruments, pledge agreements,

guarantees, control agreements and other Loan Documents (as defined in the Maybrook DIP Credit

Agreement) and documents related thereto (including any security agreements, intellectual

property security agreements, control agreements, or notes) (as amended, restated, supplemented,

waived, and/or modified from time to time, and collectively, with the Maybrook DIP Credit

Agreement, the "Maybrook DIP Documents") and to perform such other acts as may be necessary

or desirable in connection with the Maybrook DIP Documents;

iii.        authorizing the Maybrook and Consulate Debtors to use proceeds of the

Maybrook DIP Facility as permitted in the Maybrook DIP Documents and in accordance with this

Interim Order, including, upon entry of this Interim Order, to refinance and Roll-Up a portion of

the Maybrook and Consulate Prepetition Secured Obligations (as defined below) as provided in

this Interim Order;

iv.         granting to the DIP Agent, for the benefit of itself and the DIP Lenders on

account of the Maybrook DIP Facility and all obligations owing thereunder and under, or secured

by, the Maybrook DIP Documents (collectively, and including all "Obligations" as described in

the Maybrook DIP Credit Agreement, the "DIP Obligations") allowed superpriority administrative

expense claim status in each of the Chapter 11 Cases of the Maybrook and Consulate Debtors and

4

any Successor Cases (as defined herein), subject only to the Carve Out (as defined herein) and payable solely from the Collateral of the Maybrook and Consulate Debtors;

      v.      granting to the DIP Agent, for the benefit of itself and the DIP Lenders and the other Secured Parties (as defined in the Maybrook DIP Credit Agreement) under the Maybrook DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be on the terms and subject to the relative priorities set forth in the Maybrook DIP Documents and this Interim Order;

      vi.      authorizing and directing the Maybrook and Consulate Debtors to pay the principal, interest, fees, expenses and other amounts payable under the Maybrook DIP Documents as such become earned, due and payable, including, without limitation, continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the Maybrook DIP Documents;

      vii.      authorizing the Maybrook and Consulate Debtors to use the Maybrook and Consulate Prepetition Collateral (as defined herein), including the Cash Collateral of CIBC under the Maybrook and Consulate Prepetition Loan Documents (as defined herein), and providing adequate protection to CIBC for any and all diminution in value of any Maybrook and Consulate

Prepetition Collateral (including Cash Collateral), from and after the Petition Date for any reason, including, without limitation, any such diminution resulting from (i) the use of Cash Collateral, (ii) the priming of CIBC's security interests in and liens on any Maybrook and Consulate Prepetition Collateral (including by the Carve Out) by the DIP Liens (as defined herein) pursuant to the Maybrook DIP Documents and this Interim Order, (iii) the use, sale, or lease of the Maybrook and Consulate Prepetition Collateral, including Cash Collateral, and (iv) the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code or otherwise pursuant to Sections 361(a), 363(c), 364(c), 364(d)(1), and 507(b) of the Bankruptcy Code ("Diminution in Value");

viii.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Maybrook DIP Documents and this Interim Order;

ix.     subject to and effective upon entry of the Final Order, waiving the Maybrook and Consulate Debtors' ability to surcharge any DIP Collateral or Maybrook and Consulate Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code and any right of the Maybrook and Consulate Debtors under the "equities of the case" exception in Section 552(b) of the Bankruptcy Code;

x.     scheduling a final hearing (the "Final Hearing") within twenty-eight (28) days of the Petition Date to consider the relief requested in the Maybrook DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing;

xi.    waiving any applicable stay with respect to effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

xii.    granting the Maybrook and Consulate Debtors such other and further relief as is just and proper.

The Court having considered the Maybrook DIP Motion, the exhibits attached thereto, the *Declaration of Chief Restructuring Officer Louis E. Robichaux, IV, in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing the Maybrook and Consulate Debtors to Obtain Postpetition Financing, (II) Authorizing the Maybrook and Consulate Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "DIP Declaration") and the *Declaration of Chief Restructuring Officer Louis E. Robichaux, IV, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the Maybrook DIP Documents, and the evidence submitted and argument made at the interim hearing held on May 21, 2024 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Maybrook DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Maybrook DIP Motion is necessary to avoid immediate and

irreparable harm to the Maybrook and Consulate Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Maybrook and Consulate Debtors, their estates, their creditors and equity holders, and all parties-in-interest, and is essential for the continued operation of the Maybrook and Consulate Debtors' businesses and the preservation of the value of the their assets; and it appearing that the Maybrook and Consulate Debtors' entry into the Maybrook DIP Credit Agreement is a sound and prudent exercise of the Maybrook and Consulate Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[6]**

A.    **Petition Date**. On May 17, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of Pennsylvania (the "Court").

---

[6] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

      **B.**      **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed for any Debtor.

      **C.**      **Jurisdiction and Venue**. This Court has jurisdiction over the Chapter 11 Cases, the Maybrook DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Chapter 11 Cases and proceedings on the Maybrook DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      **D.**      **Committee Formation**. As of the date hereof, the United States Trustee for the Western District of Pennsylvania (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

      **E.**      **Notice**. Notice of the Maybrook DIP Motion and Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Maybrook DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

      **F.**      **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Creditors' Committee or other parties in-interest as set forth in paragraph 42 herein, the Maybrook and Consulate Debtors, on their behalf and on

behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through

F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

        i.        Obligations.

        1.        *Maybrook Debtors Obligations*: As of the Petition Date, the

Maybrook Debtors[7] were justly and lawfully indebted and liable to CIBC under the terms of (A) a

Loan and Security Agreement dated as June 15, 2016 (as amended and restated from time to time,

the "Maybrook Prepetition Term Loan Facility"), (B) a Revolving Loan and Security Agreement

dated as of August 16, 2016 (as amended and restated from time to time, the "Maybrook

Prepetition Revolving Loan Facility" and with the Maybrook Prepetition Term Loan Facility, the

"Maybrook Prepetition Loan Facilities"), and (C) a Guaranty dated as of August 15, 2016 (as

reaffirmed from time to time, the "Maybrook Guaranty" and together with the Maybrook

Prepetition Term Loan Facility and the Maybrook Prepetition Revolving Loan Facility, the

"Maybrook Prepetition Loan Documents"). As of the Petition Date, the amount of such

indebtedness was in the aggregate principal amount of not less than $47.9 million, exclusive of (if

any) accrued and unpaid interest, escrows, reserves, prepayment premium, and fees, costs and

---

[7] The Maybrook Debtors shall include Maybrook-C Evergreen Opco, LLC, Maybrook-C Briarcliff
Opco, LLC, Maybrook-C Silver Oaks Opco, LLC, Maybrook-C Overlook Opco, LLC, Maybrook-
C Latrobe Opco, LLC, Maybrook-C Whitecliff Opco, LLC and Maybrook-C Kade Opco, Maybrook-C Evergreen Propco, LLC, Maybrook-C Briarcliff Propco, LLC, Maybrook-C Silver
Oaks Propco, LLC, Maybrook-C Overlook Propco, LLC, Maybrook-C Latrobe Propco, LLC,
Maybrook-C Whitecliff Propco, LLC and Maybrook-C Kade Propco, LLC.

expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Maybrook Prepetition Loan Documents) (collectively, the "Maybrook Prepetition Obligations").

2.      *Consulate Debtor Obligations*: As of the Petition Date, the Consulate Debtors[8] were justly and lawfully indebted and liable to CIBC under the terms of (A) a Loan and Security Agreement dated as September 15, 2017 (as amended and restated from time to time, the "Consulate Prepetition Term Loan Facility"), (B) a Revolving Loan and Security Agreement dated as of September 15, 2017 (as amended and restated from time to time, the "Consulate Prepetition Revolving Loan Facility" and with the Consulate Prepetition Term Loan Facility, the "Consulate Prepetition Loan Facilities" (the Maybrook Prepetition Loan Facilities and the Consulate Prepetition Loan Facilities, the "Maybrook and Consulate Prepetition Loan Facilities"), and (C) a Guaranty dated as of September 15, 2017 (as reaffirmed from time to time, the "Consulate Guaranty" and together with the Consulate Prepetition Term Loan Facility and the Consulate Prepetition Revolving Loan Facility, the "Consulate Prepetition Loan Documents" and with the Maybrook Prepetition Loan Documents, the "Maybrook and Consulate Prepetition Loan Documents"). As of the Petition Date, the amount of such indebtedness was in the aggregate principal amount of not less than $7.2 million, exclusive of (if any) accrued and unpaid interest,

---

[8] The Consulate Debtors shall include Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918).

escrows, reserves, prepayment premium, and fees, costs and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Consulate Prepetition Loan Documents) (collectively, the "Consulate Prepetition Obligations" and with the Maybrook Prepetition Obligations, the "Maybrook and Consulate Prepetition Obligations").

3.     *CIBC Prepetition Liens*. Pursuant to the terms of the Maybrook and Consulate Prepetition Loan Documents, each of the Maybrook and Consulate Debtors granted CIBC first-priority liens and security interests (the "CIBC Prepetition Liens") in substantially all of the Maybrook and Consulate Debtors' property as more particularly described in the applicable Loan Documents (the "Maybrook and Consulate Prepetition Collateral").

4.     No portion of the Maybrook and Consulate Prepetition Obligations, as secured by the Maybrook and Consulate Prepetition Collateral (together, the "Maybrook and Consulate Prepetition Secured Obligations"), or any payments made to CIBC or applied to or paid on account of the Maybrook and Consulate Prepetition Obligations prior to the Petition Date are subject to avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, attack, recoupment, rejection, reduction, setoff, disallowance, impairment, counterclaim, cross-claim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law.

5.      The CIBC Prepetition Liens: (a) are valid, binding, perfected, enforceable, first-priority liens on and in the Maybrook and Consulate Prepetition Collateral; and (b) are not subject to avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, attack, recoupment, rejection, reduction, set-off, disallowance, impairment, counterclaim, cross-claim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law.

ii.      <u>No Control of the Debtors</u>. CIBC does not control the Maybrook and Consulate Debtors or their respective properties or operations, does not have authority to determine the manner in which any of the Maybrook and Consulate Debtor's operations are conducted (except to the extent expressly set forth in the Maybrook and Consulate Prepetition Loan Documents), and is not a control person or insider of the Maybrook and Consulate Debtors by virtue of any of the actions taken with respect to, in connection with, relating to or arising from the any of the Maybrook and Consulate Prepetition Loan Documents.

iii.      <u>Cash Collateral</u>. The Maybrook and Consulate Prepetition Collateral, as of the Petition Date, is subject to valid, perfected, enforceable, first-priority liens under the Loan Documents, and applicable law, for the benefit of CIBC. All cash, cash equivalents and deposit accounts, whenever acquired, of Maybrook and Consulate Debtors and their estates, and all proceeds, products, offspring, rents and profits of the Maybrook and Consulate Prepetition

13

Collateral are "cash collateral" of CIBC within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

           iv.        No Claims Against CIBC. No claims or causes of action exist against, or with respect to, CIBC under any of the Loan Documents or any other documents executed in connection therewith.

           v.        Release. The Maybrook and Consulate Debtors shall forever, unconditionally and irrevocably release, discharge, and acquit CIBC, and its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, members, directors, managers, employees, attorneys, agents, and professionals, past, present, and future, and its and their respective heirs, predecessors, successors, and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever that exist on the date hereof, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Loan Documents and/or the transactions contemplated thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims or causes of action arising under the Bankruptcy Code, and (iii) any and all claims or causes of action with respect to the extent, validity, priority, perfection, or avoidability of the CIBC Prepetition Liens and the Maybrook and Consulate Prepetition Secured Obligations. The Maybrook and Consulate Debtors

further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Maybrook and Consulate Prepetition Secured Obligations that Maybrook and Consulate Debtors now has or may claim to have against the Releasees, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court entering the Interim Order.

> **G.**     **<u>Permitted Prior Liens</u>**. Excepting the findings regarding the Maybrook and Consulate Prepetition Loan Facilities, nothing herein shall constitute a finding or ruling by this Court that any alleged permitted prior lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agent, CIBC, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged permitted prior lien and/or security interests. For the purposes hereof, the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a permitted prior lien and is expressly subject to the CIBC Prepetition Liens and DIP Liens (as defined herein).

> **H.**     **<u>Findings Regarding Corporate Authority</u>**. Each Maybrook and Consulate Debtor has all requisite corporate power and authority to execute and deliver the Maybrook DIP Documents to which it is a party and to perform its obligations thereunder.

> **I.**     **<u>Findings Regarding Postpetition Financing.</u>**

*i.*          Request for Postpetition Financing. The Maybrook and Consulate Debtors seek authority to (a) use Cash Collateral on the terms described herein, and (b) enter into the Maybrook DIP Facility on the terms described herein and in the Maybrook DIP Documents to refinance the Maybrook and Consulate Prepetition Secured Obligations, to administer their Chapter 11 Cases, and to fund their operations. At the Final Hearing, the Maybrook and Consulate Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

*ii.*          Priming of the Prepetition Liens. The priming of the CIBC Prepetition Liens on the Maybrook and Consulate Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the Maybrook DIP Facility and as further described below, will enable the Maybrook and Consulate Debtors to obtain the Maybrook DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors. CIBC is entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution in Value of each of their respective interests in the Maybrook and Consulate Prepetition Collateral (including Cash Collateral). For avoidance of doubt, the priming liens granted in connection with this Interim Order apply only to the Maybrook

and Consulate Prepetition Collateral and do not prime any lien on the assets of the Cuarzo Debtors (as defined herein).

            iii.        *Need for Postpetition Financing and Use of Cash Collateral*. The Maybrook and Consulate Debtors have an immediate and ongoing need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the Maybrook DIP Facility in order to, among other things, administer and preserve the value of their estates. The ability of the Maybrook and Consulate Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, finance their operations, and maintain the high standard of care for their residents, requires the availability of working capital from the Maybrook DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Maybrook and Consulate Debtors, their estates, and parties-in-interest, including their residents. The Maybrook and Consulate Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties, or care for their residents in the ordinary course of business during the Interim Period without access to the Maybrook DIP Facility and the authority to use of Cash Collateral.

            iv.        *No Credit Available on More Favorable Terms*. Given their current financial condition, financing arrangements, and capital structure, the Maybrook and Consulate Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the Maybrook DIP Facility. The Maybrook

and Consulate Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Maybrook and Consulate Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Maybrook and Consulate Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Maybrook and Consulate Debtors and their estates that is subject to a lien. As described in the DIP Declaration, financing on a postpetition basis on better terms is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Maybrook and Consulate Debtors' existing and after-acquired assets with the priorities set forth in paragraph 6 hereof; (2) superpriority claims and liens against all assets of the Maybrook and Consulate Debtors; (3) the other protections set forth in this Interim Order; and (4) and partial refinancing of the Maybrook and Consulate Prepetition Secured Obligations through the Roll-Up DIP Loan.

> v.    *Use of Proceeds of the Maybrook DIP Facility*. As a condition to entry into the Maybrook DIP Credit Agreement, the extension of credit under the Maybrook DIP Facility and the authorization to use Cash Collateral, the DIP Agent, the DIP Lenders, CIBC, and the Maybrook and Consulate Debtors have agreed, that proceeds of the Maybrook DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim

Order and the Maybrook DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the Maybrook DIP Documents and subject to such variances as permitted in the Maybrook DIP Credit Agreement, and as set forth in paragraph 20 hereof, the "Maybrook Budget"),[9] solely for: (a) the partial replacement and refinancing of the Maybrook and Consulate Prepetition Secured Obligations into DIP Obligations to the extent provided for in this Interim Order, the Final Order and the Maybrook DIP Documents, and subject to the rights preserved in paragraph 42 of this Interim Order; (b) working capital; (c) permitted payment of costs of administering the Chapter 11 Cases; (d) payment of such other prepetition obligations as set forth in the Maybrook Budget or otherwise approved by the DIP Agent in its sole discretion, and as approved by the Court; (e) payment of interest, fees, expenses and other amounts (including legal and other professionals' fees and expenses of the DIP Agent) owed under the Maybrook DIP Documents; (f) payment of certain adequate protection amounts to CIBC, as set forth in paragraphs 16 hereof; and (g) other general corporate purposes of the Maybrook and Consulate Debtors permitted by the Maybrook Budget and the Maybrook DIP Documents. The DIP Agent and the DIP Lenders are relying upon the Maybrook Budget in entering into the Maybrook DIP Credit Agreement and the other Maybrook DIP Documents and providing the Maybrook DIP Facility, and CIBC is relying upon the Maybrook Budget in consenting to the terms of this Interim Order. All references in this Interim Order restricting the

---

[9] A copy of the Maybrook Budget is attached hereto as Exhibit A-2.

use of Loans (as defined in the Maybrook DIP Credit Agreement) to payment of amounts consistent with the Maybrook Budget shall mean the most recent approved Maybrook Budget, subject to the condition that no time shall the operational or accrued professional fee disbursements in the aggregate exceed ten percent (10%) of aggregate total disbursements for such period as set forth in the Maybrook Budget (as more fully defined in, and subject to the conditions of, the Maybrook DIP Credit Agreement, the "Permitted Variance").

    *vi.*  *Application of Proceeds of Prepetition Collateral.* As a condition to entry into the Maybrook DIP Credit Agreement, the extension of credit under the Maybrook DIP Facility and authorization to use Cash Collateral, the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, and CIBC have agreed that, as of and commencing on the date of the Interim Hearing, the Maybrook and Consulate Debtors shall apply the proceeds of DIP Collateral (as defined herein) in accordance with this Interim Order and as provided in the Maybrook DIP Documents.

    *vii.*  *Roll-up of Maybrook and Consulate Prepetition Secured Obligations.* Upon entry of the Proposed Final Order, without any further action by the Maybrook and Consulate Debtors or any other party, an aggregate amount of $17,656,191.05 million of outstanding Maybrook Prepetition Obligations and $7,843,808.95 million of outstanding Consulate Prepetition Obligations shall be repaid and refinanced with the proceeds of the Loans, to effect a roll-up (the "Roll-Up") of a portion of the Maybrook Prepetition Obligations and the entirety of the

Consulate Prepetition Obligations into DIP Obligations under and as further described in the Maybrook DIP Documents (the "<u>DIP Roll-Up Obligations</u>"). Upon entry of the Proposed Interim Order, subject to satisfaction of the applicable conditions precedent, only $3,200,00.00 of the Roll-Up shall be rolled up (the "<u>Interim Roll-Up</u>"), and the remainder of the Roll-Up shall be rolled up upon entry of the Proposed Final Order, subject to satisfaction of the applicable conditions precedent.  The Roll-Up shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of CIBC who is also a DIP Lender to fund amounts, and provide other consideration to the Maybrook and Consulate Debtors, under the Maybrook DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Maybrook and Consulate Prepetition Secured Obligations. CIBC would not otherwise consent to the use of their Cash Collateral or the subordination of the CIBC Prepetition Liens to the DIP Liens, and the DIP Lenders would not be willing to provide the Maybrook DIP Facility or extend credit to the Maybrook and Consulate Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations. Moreover, the replacement and refinancing of a portion of the Maybrook and Consulate Prepetition Secured Obligations through the Roll-Up: (a) will benefit the Maybrook and Consulate Debtors and their estates as a result of the DIP Lenders' agreement to provide "new money" availability under the Maybrook DIP Facility in a manner favorable to the Maybrook and Consulate Debtors, and (b) will enable the Maybrook and Consulate Debtors to obtain urgently needed financing that they need to administer these Chapter

11 Cases and fund their operations. Because the Roll-Up is subject to the entry of the Final Order and the reservation of rights in paragraph 42 below, it will not prejudice the right of any other party in interest.

      **J.**    **Adequate Protection**. CIBC is entitled to receive adequate protection to the extent of any Diminution in Value of its respective interests in the Maybrook and Consulate Prepetition Collateral. Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, and subject to the Carve Out and to paragraph 42 herein, as adequate protection: (i) CIBC shall receive:

      *i.*    *Prepetition Adequate Protection Liens.* To the extent of any Diminution in Value from and after the Petition Date resulting from, among other things, the use, sale or lease of the Cash Collateral of the Maybrook and Consulate Debtors, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and to the extent Maybrook and Consulate Debtors (or their estates) have assets that are not already subject to a continuing Lien in favor of CIBC in accordance with Bankruptcy Code section 552(b)(2), CIBC is hereby granted, solely to the extent of any Diminution in Value (all such Liens, the "Prepetition Adequate Protection Liens"):

      1.    valid, binding, continuing, enforceable, unavoidable and fully perfected, postpetition Liens on all of Maybrook and Consulate Debtors' rights in tangible and intangible assets, in the same order and priority as existed between CIBC as to the Maybrook and Consulate Prepetition Collateral as of the Petition Date, including, without limitation, (A) the

Maybrook and Consulate Prepetition Collateral and (B) all other prepetition and postpetition property of Maybrook and Consulate Debtors' estates, and all products and proceeds thereof, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to (y) valid, perfected, unavoidable and enforceable Liens in existence on or as of the Petition Date or (z) valid and unavoidable Liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property," and together with the Maybrook and Consulate Prepetition Collateral, the "Property"), including, without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, claims and causes of action, including commercial tort claims (other than Avoidance Actions (defined herein)) set forth on Schedule 11.21 to the Maybrook DIP Credit Agreement, and the proceeds of all of the foregoing;

2.    For the avoidance of doubt and notwithstanding subsection (i) immediately above, the Prepetition Adequate Protection Liens shall **not** include Avoidance Actions, but, subject to a Final Order, such Prepetition Adequate Protection Liens shall include the products and proceeds thereof. Such claims and causes of actions shall include those claims and causes of action arising under or permitted by Bankruptcy Code sections 502(d), 506(c), 544,

545, 547, 548, 549, and 550 and any other avoidance claims and causes of action arising under state or federal law (collectively, the "Avoidance Actions");

        3.      The Prepetition Adequate Protection Liens so granted are in addition to all security interests, liens, and rights of setoff existing in favor of CIBC on the Petition Date, and are and shall be valid, perfected, enforceable, and effective as of the Petition Date without any further action of the Maybrook and Consulate Debtors or CIBC and without the necessity of the execution, filing or recording of any financing statements, security agreements, deeds of trust, or other documents, or of obtaining control agreements over bank accounts. Notwithstanding the foregoing, CIBC is hereby authorized, but not required, to file or record any financing statements, security agreements, deeds of trust, or other documents in any jurisdiction or take any other action in order to validate and perfect the Prepetition Adequate Protection Liens granted hereunder.

        *ii.*      *Prepetition Superpriority Claim.* CIBC is hereby granted, solely to the extent of any Diminution in Value and, to the extent such claims arise, payable solely from the Collateral of the Maybrook and Consulate Debtors, allowed superpriority administrative expense claims against each of the Maybrook and Consulate Debtors under section 507(b) of the Bankruptcy Code in respect of the Adequate Protection Obligations with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition Superpriority Claim"). The Prepetition Superpriority Claim

shall be payable from all of Maybrook and Consulate Debtors' assets, but not from the assets of any other Debtor.

      **K.**     <u>**Sections 506(c) and 552(b).**</u> In light of: (i) the DIP Agent's and DIP Lenders' agreement that their DIP Liens and superpriority claims against the Maybrook and Consulate Debtors shall be subject to the Carve Out, (ii) the agreement of CIBC that the CIBC Prepetition Liens shall be subject to the Carve Out and subordinate to the DIP Liens, and (iii) the payment of expenses as set forth in the Maybrook Budget in accordance with and subject to the terms and conditions of this Interim Order and the Maybrook DIP Documents, (a) subject to entry of a Final Order, CIBC is each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Agent, the DIP Lenders, and CIBC are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

      **L.**     <u>**Good Faith of the DIP Agent and DIP Lenders**</u>.

      i.     *Willingness to Provide Financing*.   The DIP Lenders have indicated a willingness to provide financing to the Maybrook and Consulate Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the Maybrook DIP Facility and the Maybrook DIP Documents; (c) satisfaction of the closing conditions set forth in the Maybrook DIP Documents; and (d) findings by this Court that the Maybrook DIP Facility is essential to the Maybrook and Consulate Debtors' estates, that the DIP

Lenders are extending credit to the Maybrook and Consulate Debtors pursuant to the Maybrook DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the Maybrook DIP Documents will have the protections provided by Section 364(e) of the Bankruptcy Code. Based upon the record presented at the Interim Hearing, the Maybrook DIP Facility has been negotiated in good faith and at arm's length between the Maybrook and Consulate Debtors, on the one hand, and the DIP Agent and the DIP Lenders, on the other. All of the DIP Obligations and all other liabilities and obligations of the Maybrook and Consulate Debtors under this Interim Order and the Maybrook DIP Documents or in respect of credit card debt, overdrafts and other liabilities arising from treasury, depository, credit card, and cash management services, or in connection with any automated clearinghouse transfers of funds owing to the DIP Agent or the DIP Lenders shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith," as such term is used in Section364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code. The DIP Agent and the DIP Lenders shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

ii. *Business Judgment and Good Faith Pursuant to Section 364(e)*. For purposes of this Interim Order, the terms and conditions of the Maybrook DIP Facility

and the Maybrook DIP Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Maybrook and Consulate Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Maybrook and Consulate Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the Maybrook DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, and CIBC, with the assistance and counsel of their respective advisors. Use of Cash Collateral and credit to be extended under the Maybrook DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agent, the DIP Lenders, and CIBC within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders, and CIBC are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

    **M.**  **<u>Jurisdiction and Venue; Core Proceeding</u>**. This Court has jurisdiction over these Chapter 11 Cases, the Maybrook DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Maybrook DIP Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for

the relief sought herein are sections 105, 361, 362, 263, 364, 503, and 507 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and the applicable Local Rules.

**N.**    **Immediate Entry**. Sufficient cause exists for immediate entry of this

Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Absent the immediate grant by the Court

of the interim relief sought by the Maybrook DIP Motion, the Maybrook and Consulate Debtors'

estates will be immediately and irreparably harmed pending the Final Hearing. The Maybrook and

Consulate Debtors' obtaining the Maybrook DIP Facility in accordance with the terms of this

Interim Order and the Maybrook DIP Documents is in the best interests of the Maybrook and

Consulate Debtors' estates and is consistent with the exercise of their fiduciary duties.

**O.**    **Interplay Between Maybrook DIP Motion and Cuarzo DIP Motion**.

Contemporaneously with the filing of the Maybrook DIP Motion, Monroeville Operations, LLC,

South Hills Operations, LLC, Murrysville Operations, LLC and Mt. Lebanon Operations, LLC

(the "Cuarzo Debtors"), each of whom are not included as a Maybrook and Consulate Debtor but

are certain of the above-captioned Debtors, have also sought approval of post-petition debtor-in-

possession financing, the terms and conditions of which are set forth in the *Emergency Motion For*

*Entry Of Interim And Final Orders (I) Authorizing The Cuarzo Debtors To Obtain Postpetition*

*Financing, (II) Authorizing The Cuarzo Debtors To Use Cash Collateral, (III) Granting Liens And*

*Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V)*

*Modifying Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief*

[Doc. No. 28] (the "Cuarzo DIP Motion").  All terms and conditions of this Interim Order, the Maybrook DIP Credit Agreement, and the Maybrook DIP Documents, are intended to apply exclusively to the Maybrook and Consulate Debtors, and not to the Cuarzo Debtors.  The relief sought by the Cuarzo Debtors is set forth in the *Interim Order (I) Authorizing the Cuarzo Debtors to Obtain Postpetition Financing, (II) Authorizing the Cuarzo Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Cuarzo Interim DIP Order").

       **P.**    **Interim Hearing**. As set forth in the Maybrook DIP Motion, notice of the Interim Hearing and the relief requested in the Maybrook DIP Motion has been provided by the Maybrook and Consulate Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the Office of the United States Trustee; (ii) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; (iii) the list of the 30 largest unsecured creditors of the Debtors; (iv) the named Respondents in the Motion; and (v) the notice recipients identified in the Motion.. The Maybrook and Consulate Debtors have made reasonable efforts to afford the best notice possible under the circumstances in compliance with Bankruptcy Rules 4001(b) and (c) and applicable Local Rules and no other notice is required in connection with the relief set forth in this Interim Order. Based upon the foregoing findings and conclusions, the Maybrook DIP Motion, the

DIP Declaration, the First Day Declaration, and the record before the Court with respect to the Maybrook DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      <u>Interim Financing Approved</u>. The Maybrook DIP Motion is granted as set forth herein, the interim financing as set forth in this Interim Order is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the Maybrook DIP Documents and this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits in their entirety. Subject to the terms of this Interim Order, the rights of all parties in interest to object to the final relief sought by the Maybrook DIP Motion are reserved in full.

<u>**Authorization of the Maybrook DIP Facility**</u>

2.      <u>Authorization of the Maybrook DIP Facility</u>. The Maybrook DIP Facility, including the Roll-Up, is hereby approved as set forth herein. The Maybrook and Consulate Debtors are expressly and immediately authorized and empowered to execute and deliver the Maybrook DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the Maybrook DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for

30

the performance by the Maybrook and Consulate Debtors under the Maybrook DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the Maybrook DIP Documents, including each of Maybrook and Consulate Debtors providing its joint and several guarantee of all of the DIP Obligations and such acts as shall be necessary or desirable in order to effect the Roll-Up and replacement and refinancing of the DIP Roll-Up Obligations. The Maybrook and Consulate Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts all to the extent provided in this Interim Order or the Maybrook DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the Maybrook DIP Documents. Upon execution and delivery, the Maybrook DIP Documents shall represent valid and binding obligations of the Maybrook and Consulate Debtors, enforceable against each of the Maybrook and Consulate Debtors and their estates in accordance with their terms.

    i.    Notwithstanding anything to the contrary in the Maybrook DIP Documents, the satisfaction of outstanding real estate taxes due and owing by the Maybrook and Consulate Debtors as of the Petition Date shall not be a condition precedent to funding on an interim basis, but shall be paid upon the earlier of (a) approval by this Court, after notice and

hearing, or (b) upon the sale or disposition of all or substantially all of the DIP Collateral or the Prepetition Collateral.

       3.    <u>Authorization to Borrow</u>. To prevent immediate and irreparable harm to the Maybrook and Consulate Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined below), and subject to the terms, conditions, limitations on availability and reserves (as applicable) set forth in the Maybrook DIP Documents and this Interim Order, the Maybrook and Consulate Debtors shall be deemed to have requested, and the DIP Agent and the DIP Lenders are hereby authorized to make, Loans (as defined in the Maybrook DIP Credit Agreement), the proceeds of which shall be used to effect the Roll-Up and for general corporate purposes in accordance with the Maybrook DIP Credit Agreement and the provisions of this Interim Order. Loans (as defined in the Maybrook DIP Credit Agreement) made to effect the Roll-Up shall be included in the DIP Obligations, and $3,200,000 of the Maybrook and Consulate Prepetition Secured Obligations shall be converted and "rolled up" into DIP Obligations as provided in this Interim Order, provided that the Roll-Up shall be subject to the reservation of rights set forth in paragraph 42 of this Interim Order.

       4.    <u>DIP Obligations</u>. The Maybrook DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Maybrook and Consulate Debtors' DIP Obligations, which shall be enforceable against the Maybrook and Consulate Debtors,

their estates and any successors thereto, including any trustee appointed in the Chapter 11 Cases of

the Maybrook and Consulate Debtors, or in any case under Chapter 7 of the Bankruptcy Code upon

the conversion of any of the Chapter 11 Cases of the Maybrook and Consulate Debtors, or in any

other proceedings superseding or related to any of the foregoing (collectively, the "Successor

Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, and any other

indebtedness or obligations, contingent or absolute, which may now or from time to time be owing

by any of the Maybrook and Consulate Debtors to the DIP Agent or any of the DIP Lenders, in each

case, under, or secured by, the Maybrook DIP Documents or this Interim Order, including all

principal, accrued interest, costs, fees, expenses and other amounts under the Maybrook DIP

Documents. The Maybrook and Consulate Debtors shall be jointly and severally liable for the DIP

Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use

of Cash Collateral shall automatically cease on the Termination Date (as defined herein), except as

provided in paragraph 33 herein. No obligation, payment, transfer, or grant of collateral security

hereunder or under the Maybrook DIP Documents (including any DIP Obligation or DIP Liens (as

defined below), and including in connection with any adequate protection provided to CIBC

hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy

Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the

Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law),

or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 42 below.

        5.     DIP Liens. In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property and other assets, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Maybrook and Consulate Debtors and their bankruptcy estates (collectively, the "DIP Collateral"), including, without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of

money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Maybrook and Consulate Debtors, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests, leased real property (including, for the avoidance of doubt, any ground leases), and all proceeds of all of such real property or other interests; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and the proceeds thereof; (d) subject to entry of a Final Order, the proceeds (the "Avoidance Proceeds") of any Avoidance Actions (other than actions brought pursuant to section 549 of the Bankruptcy Code), but not the Avoidance Actions themselves; (e) subject to entry of a Final Order, the Maybrook and Consulate Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof; (f) all Maybrook and Consulate Prepetition Collateral; (g) all other DIP Collateral whether or not subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (h) to the extent not otherwise included, all proceeds, commercial tort claims set forth on Schedule 11.21 to the Maybrook DIP Credit Agreement, insurance claims and other rights to payments not otherwise included in the foregoing and proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rent and profits of, each of the foregoing.

6.      <u>DIP Lien Priority</u>. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim Order. The DIP Liens shall consist of:

i.      <u>Priming DIP Liens on Maybrook and Consulate Prepetition Collateral</u>. Valid, binding, continuing, enforceable, and fully perfected, first priority (subject to permitted prior liens but only to the extent such permitted prior liens are senior by operation of law to CIBC's Liens, security interests and liens upon all DIP Collateral which is Maybrook and Consulate Prepetition Collateral, which security interests in and liens upon, pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be prior and senior in all respects to (i) the security interests and liens in favor of CIBC with respect to DIP Collateral, (ii) the Adequate Protection Liens with respect to the DIP Collateral, and (iii) any security interest in, or other lien upon, any DIP Collateral that on the Petition Date was not a properly perfected, valid, enforceable and unavoidable security interest or lien.  For avoidance of doubt, the DIP Liens shall not prime any lien arising from or relating to the Real Estate Taxes.

ii.      <u>Liens Junior to Certain Other Liens</u>. Valid, binding, continuing, enforceable, and fully perfected, first priority security interests and liens upon all DIP Collateral that is not Maybrook and Consulate Prepetition Collateral (whether such DIP Collateral is in existence on, or created, acquired, arising after, the Petition Date), which security interests in and

liens upon, pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be junior to (but only to) any properly perfected, valid, unavoidable, and enforceable permitted prior liens.

iii.      Unencumbered Property. Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, and fully perfected, first priority security interests and liens upon all prepetition and postpetition Unencumbered Property of the Maybrook and Consulate Debtors whether existing on the Petition Date or thereafter acquired (other than Avoidance Actions), that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to a properly perfected, valid, enforceable and unavoidable lien.

iv.      First Lien on Avoidance Proceeds. Subject to the entry of the Final Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on Avoidance Proceeds of any Maybrook and Consulate Debtor's Avoidance Actions.

v.      DIP Liens Not Subordinate. Other than as set forth herein or in the Maybrook DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a

case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to Sections 506(c) (subject to entry of a Final Order), 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. In no event shall any person who pays (or through the extension of credit to any Maybrook and Consulate Debtor, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or priorities granted to or in favor of, or conferred upon, the DIP Agent or any DIP Lender by the terms of any DIP Documents or this Interim Order unless and until the DIP Obligations owed to the DIP Lenders and the Maybrook and Consulate Prepetition Secured Obligations owed to CIBC have been indefeasibly paid in full in cash.

7.    DIP Superpriority Claims. Upon entry of this Interim Order, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases of the Maybrook and Consulate Debtors and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations: (a) subject only to the Carve Out, having priority over any and all administrative expense claims and unsecured claims against the Maybrook and Consulate Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of

the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; (b) which shall at all times be senior to the rights of the Maybrook and Consulate Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law; and (c) shall be payable, to the extent such DIP Superpriority Claims arise, solely from the assets of the Maybrook and Consulate Debtors. The DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from all prepetition and postpetition property of the Maybrook and Consulate Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

8.    No Obligation to Extend Credit. The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance, or to issue, amend, renew or extend any letters of credit or bankers' acceptance under the Maybrook DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance under the Maybrook DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and in accordance with the terms of the Maybrook DIP Credit Agreement.

9.     <u>Use of Proceeds of DIP Facility</u>. From and after the Petition Date, the Maybrook and Consulate Debtors shall use advances of credit under the Maybrook DIP Facility, in accordance with the Maybrook Budget (subject to such variances as are permitted under the Maybrook DIP Credit Agreement), only for the purposes specifically set forth in this Interim Order and the Maybrook DIP Documents, and in compliance with the terms and conditions in this Interim Order and the Maybrook DIP Documents.

10.     <u>DIP Roll-Up Obligations</u>. Upon entry of this Interim Order, without any further action by the Maybrook and Consulate Debtors or any other party, and as a condition to the provision of liquidity under the Maybrook DIP Facility, all DIP Roll-Up Obligations to the extent of the Interim Roll-Up shall be deemed to have replaced and refinanced the corresponding portion of the Maybrook and Consulate Prepetition Secured Obligations and shall automatically constitute DIP Obligations, subject to the reservation of rights set forth in paragraph 42 of this Interim Order.  Notwithstanding anything to the contrary contained in this Interim Order or the Maybrook DIP Documents, for the avoidance of doubt, any release hereunder, or any payment or satisfaction of any or all of the DIP Obligations, DIP Roll-Up Obligations, or the Maybrook and Consulate Prepetition Obligations, shall not have any effect on any obligations of any Borrower or any guarantor with respect to any of the Maybrook and Consulate Prepetition Obligations, except, and to the extent, that such Maybrook and Consulate Prepetition Obligations constitute DIP Roll-Up Obligations.

### Authorization to Use Cash Collateral

11.    Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order, the Maybrook DIP Facility, and the Maybrook DIP Documents and in accordance with the Maybrook Budget (subject to such variances as permitted in the Maybrook DIP Credit Agreement), the Maybrook and Consulate Debtors are authorized to use Cash Collateral until the Termination Date (as defined herein); *provided, however*, that during the Remedies Notice Period (as defined herein), the Maybrook and Consulate Debtors may use Cash Collateral in accordance with the terms and provisions of the Maybrook Budget or as otherwise agreed by the DIP Agent in its sole discretion, and the Carve Out Account shall be funded following delivery of the Carve Out Trigger Notice (as defined herein) as provided in paragraph 39 of this Interim Order. Nothing in this Interim Order shall authorize the disposition of any assets of the Maybrook and Consulate Debtors or their estates outside the ordinary course of business, or any Maybrook and Consulate Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the Maybrook DIP Facility, the Maybrook DIP Documents, and in accordance with the Maybrook Budget or by subsequent order of this Court.

12.    Prepetition Adequate Protection Liens.

i.    *Prepetition Adequate Protection Liens*. Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of CIBC against any Diminution in Value of such interests in the Maybrook and Consulate Prepetition Collateral,

41

the Maybrook and Consulate Debtors hereby grant to CIBC, continuing, valid, binding, enforceable, non-avoidable and automatically perfected Prepetition Adequate Protection Liens; provided that the Prepetition Adequate Protection Liens will attach to Avoidance Proceeds only upon entry of the Final Order. The Prepetition Adequate Protection Liens are subject to the reservation of rights set forth in paragraph 42 of this Interim Order.

> 13.    Priority of Prepetition Adequate Protection Liens.

i.    The Prepetition Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to the DIP Liens and DIP Superpriority Claims. The Prepetition Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Property.

ii.    Except as provided herein or in the Maybrook DIP Credit Agreement, the Prepetition Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee or other estate representative appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The Prepetition Adequate Protection Liens shall not be subject to sections 506(c) (subject to entry of a Final Order), 510, 549, 552(b) (subject to entry of a Final Order) or 550 of the Bankruptcy Code. No lien or interest avoided and preserved

for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens or the Prepetition Adequate Protection Liens.

14.   Adequate Protection Superpriority Claims. As further adequate protection of the interests of CIBC in the Maybrook and Consulate Prepetition Collateral securing the Maybrook and Consulate Prepetition Secured Obligations against any Diminution in Value of such interests in such Maybrook and Consulate Prepetition Collateral, CIBC is hereby granted an allowed Prepetition Superpriority Claim. The Prepetition Superpriority Claim shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code and shall be payable from all prepetition and postpetition property of the Maybrook and Consulate Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

15.   Priority of the Adequate Protection Superpriority Claims. The Prepetition Superpriority Claim shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to the DIP Superpriority Claims. The Prepetition Superpriority Claim shall have priority over all other administrative expense claims and unsecured claims against the Maybrook and Consulate Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

16.      Adequate Protection Payments and Protections.

i.      As further adequate protection (the "Prepetition Adequate Protection Payments"), the Maybrook and Consulate Debtors are authorized and directed to provide adequate protection to CIBC in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) immediately upon entry of this Interim Order, payment of any unpaid interest, reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by or owed to CIBC arising prior to or after the Petition Date, and (ii) the reasonable and documented interest, fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by or owed to CIBC arising subsequent to the Petition Date. Solely to the extent provided for in the Maybrook and Consulate Prepetition Loan Documents, until the earlier to occur of (a) receipt by CIBC of releases and discharges of claims and liabilities in form and substance satisfactory CIBC, in its sole discretion, or (b) the expiration of the Challenge Deadline (as defined below) without the commencement of a Challenge (as defined below), as part of the adequate protection provided under this paragraph 16, CIBC shall be entitled to current payment of all interest, costs, expenses, and other amounts (including reasonable and documented

attorneys' fees) incurred in connection with contingent indemnification, reimbursement or similar continuing obligations arising under the Maybrook and Consulate Prepetition Loan Documents or otherwise in respect of the Maybrook and Consulate Prepetition Secured Obligations, including in connection with or responding to:

   a.  formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 42 hereof, or

   b.  any Challenge against CIBC related to the Maybrook and Consulate Prepetition Loan Documents and the Maybrook and Consulate Prepetition Secured Obligations, or the Liens granted to CIBC, as applicable, whether in these Chapter 11 Cases or independently in another forum, court, or venue. Subject to compliance with the procedures set forth in paragraph 35 of this Interim Order, payment of costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred in connection with prepetition indemnification obligations under the Maybrook and Consulate Prepetition Loan Documents shall be made as and when they arise (and may be paid with the proceeds of the Maybrook DIP Facility and/or from the proceeds of DIP Collateral), without further notice to or consent from the Maybrook and Consulate Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to the terms of the Maybrook and Consulate Prepetition Loan Documents (including with

respect to application of proceeds), (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with paragraph 42 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s). For the avoidance of doubt, the Maybrook and Consulate Debtors shall not indemnify the DIP Lenders and/or DIP Agent from and against any successful challenge.

17.      <u>Adequate Protection Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to CIBC hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Maybrook and Consulate Prepetition Collateral during the Chapter 11 Cases or any Successor Cases. The receipt by CIBC of the adequate protection provided herein shall not be deemed an admission that the interests of CIBC are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of CIBC to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection in a manner consistent with the Maybrook and Consulate Prepetition Loan Documents, and all parties-in-interests' rights are reserved with respect thereto.

<div align="center"><b><u>Provisions Common to DIP Financing and use of Cash Collateral</u></b></div>

18.      <u>Amendment of the Maybrook DIP Documents</u>. The Maybrook DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court if the amendment, modification, or supplement is (a) non-

material or non-adverse to the Maybrook and Consulate Debtors and (b) in accordance with the

Maybrook DIP Documents. In the case of a material amendment, modification, or supplement to

the Maybrook DIP Documents that is adverse to the Maybrook and Consulate Debtors' estates,

the Maybrook and Consulate Debtors shall provide notice (which shall be provided through

electronic mail) to counsel to a Committee (if appointed) and the U.S. Trustee (collectively, the

"Notice Parties"), each of whom shall have five (5) days from the date of such notice to object in

writing to such amendment, modification or supplement. If all Notice Parties indicate that they

have no objection to the amendment, modification or supplement (or if no objections are timely

received), the Maybrook and Consulate Debtors may proceed to execute the amendment,

modification or supplement, which shall become effective immediately upon execution. If a Notice

Party timely objects to such amendment, modification or supplement, approval of the Court (which

may be sought on an expedited basis) will be necessary to effectuate the amendment, modification

or supplement; *provided* that such amendment, modification or supplement shall be without

prejudice to the right of any party in interest to be heard. Any material modification, amendment

or supplement that becomes effective in accordance with this paragraph 18 shall be filed with the

Court.

19.    Maybrook Budget. All borrowings under the Maybrook DIP Facility and all

use of Cash Collateral shall be in compliance with the approved Maybrook Budget, subject to the

Permitted Variance, and the Maybrook and Consulate Debtors shall not use any portion of the

proceeds of the Maybrook DIP Facility or any Cash Collateral, directly or indirectly, in excess of the amounts set forth in the Maybrook Budget, except (and solely to the extent of) any variance permitted under the Maybrook DIP Credit Agreement. The Maybrook Budget may be updated and amended from time to time in accordance with the Maybrook DIP Credit Agreement, provided that (i) such updated or amended Maybrook Budget shall be provided promptly to counsel for CIBC and any Committee; (ii) the Maybrook and Consulate Debtors shall not make any payments on account of any prepetition claim except in accordance with the Maybrook Budget or as otherwise permitted or required by an order of this Court; and (iii) the Maybrook and Consulate Debtors shall be required always to comply with the Maybrook Budget as set forth in Maybrook DIP Credit Agreement, subject to the Permitted Variance.[10]

        i.      With respect to the Allowed Professional Fees (as defined herein) incurred by Case Professionals (as defined herein), each Cash Professional shall use commercially reasonable efforts to record time entries, in accordance with the requirements of the Bankruptcy Code, in such a manner that will allow for the identification of whether services rendered were primarily in relation to the Maybrook and Consulate Debtors, the Cuarzo Debtors, or for general services applicable to all Debtors in the Chapter 11 Cases.  Services rendered: (i) by Case Professionals to and for the benefit of the Maybrook and Consulate Debtors shall be subject to the

---

[10] The Maybrook Budget attached to this Interim Order as Exhibit A-1 has been approved by and is satisfactory to the DIP Lenders.

Maybrook Budget; (ii) for the benefit of the Cuarzo Debtors shall be subject to the budget identified in the Cuarzo Interim DIP Order; and (iii) for general case administration for the benefit of all Debtors in these Chapter 11 Cases shall be allocated as follows: (y) four-thirteenths (4/13) shall be allocated to the Cuarzo Debtors and be subject to the budget identified in the Cuarzo Interim DIP Order; and (z) nine-thirteenths (9/13) shall be allocated to the Maybrook and Consulate Debtors and be subject to the Maybrook Budget.

20.    <u>Maybrook Budget Compliance</u>. The Maybrook and Consulate Debtors shall at all times comply with the Maybrook Budget, on the terms and subject to the variances set forth in the Maybrook DIP Credit Agreement. The Maybrook and Consulate Debtors shall provide all reports and other information as required in the Maybrook DIP Credit Agreement (subject to the grace periods provided therein). The Maybrook and Consulate Debtors' failure to comply with the Maybrook Budget (on the terms and subject to the variances set forth in the Maybrook DIP Credit Agreement) or to provide the reports and other information required in the Maybrook DIP Credit Agreement shall constitute an Event of Default (as defined herein), following the expiration of any applicable grace period set forth in the Maybrook DIP Credit Agreement.

21.    <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to: (a) permit the Maybrook and Consulate Debtors to grant the DIP Liens, Prepetition Adequate Protection Liens, DIP Superpriority Claims, and

Prepetition Adequate Protection Superpriority Claims; (b) permit the Maybrook and Consulate Debtors to perform such acts as the DIP Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit CIBC to file, in the applicable registries of deeds and other appropriate public records, as prepetition lender in its sole discretion deems necessary or advisable, the assignments of UCC financing statements, mortgage assignments and related documents to reflect the transfer of the agency provisions pursuant to related documents; (d) permit the Maybrook and Consulate Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and CIBC under the Maybrook DIP Documents, the Maybrook DIP Facility, and this Interim Order, as applicable; and (e) authorize the Maybrook and Consulate Debtors to pay, and the DIP Agent, the DIP Lenders, and CIBC to retain and apply, payments made in accordance with the terms of this Interim Order and the Maybrook DIP Documents or the Maybrook and Consulate Prepetition Loan Documents, as applicable.

22.    Perfection of DIP Liens and Prepetition Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Prepetition Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage) to validate or perfect (in accordance with

applicable non-bankruptcy law) the DIP Liens and the Prepetition Adequate Protection Liens, or to evidence or entitle the DIP Agent, the DIP Lenders, and CIBC to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent and CIBC is authorized to file, in the applicable registries of deeds and other appropriate public records, as it in its sole discretion deems necessary or advisable, (i) notice of this Interim Order, and (ii) such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Prepetition Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Prepetition Adequate Protection Liens. The Maybrook and Consulate Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and CIBC all such financing statements, mortgages, notices, and other documents as the DIP Agent and CIBC may reasonably request. Each of the DIP Agent and CIBC, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.. To the extent CIBC is listed as lender loss payee, loss payable, or additional insured under any of the Maybrook and Consulate Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party under such documents or to

be the lender loss payee or additional insured, as applicable. CIBC shall serve as agent for the DIP

Agent for purposes of perfecting the DIP Agent's liens on all DIP Collateral that, without giving

effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien

therein may be accomplished only by possession or control by a secured party.

23.    Application of Proceeds of Collateral/Non-Ordinary Course Proceeds. As a

condition to the entry of the Maybrook DIP Documents, the extension of credit under the

Maybrook DIP Facility and the authorization to use Cash Collateral, the Maybrook and Consulate

Debtors have agreed that, as of and commencing on the date of the Interim Hearing, all proceeds

of any Dispositions (as defined in the Maybrook DIP Credit Agreement) of DIP Collateral received

by the DIP Agent or any Lender (as defined in the Maybrook DIP Credit Agreement), and all net

proceeds (as applicable) realized from the Maybrook and Consulate Debtors on account of the DIP

Collateral (whether pursuant to cash dominion or arising from realization on DIP Collateral, setoff

or otherwise), will be presumed to constitute and arise from DIP Collateral existing on the Petition

Date and shall be promptly following their receipt transferred to the DIP Agent and applied (or,

despite any prior application, reapplied) to pay, or in the case of contingent obligations, to cash

collateralize, the DIP Obligations or the Maybrook and Consulate Prepetition Secured Obligations

until indefeasible payment in full in cash of the DIP Obligations and the Maybrook and Consulate

Prepetition Secured Obligations. Not unless and until all DIP Obligations and Maybrook and

Consulate Prepetition Secured Obligations are paid in full in cash, may proceeds of Dispositions be

applied to pay any other claim against the Maybrook and Consulate Debtors or their estates. If proceeds of Dispositions are applied to the Maybrook and Consulate Prepetition Secured Obligations, then such application shall be as provided in Maybrook and Consulate Prepetition Loan Documents; if proceeds of Dispositions are applied to the DIP Obligations, then such application shall be as provided in the Maybrook DIP Credit Agreement.

24.     Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured Parties.

i.     Unless the DIP Agent, and CIBC, as applicable, shall have provided their prior written consent, or all DIP Obligations and all Maybrook and Consulate Prepetition Secured Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash and the lending commitments under the Maybrook DIP Facility have terminated, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims; (ii) the use of Cash Collateral for any purpose other

than as permitted in the Maybrook DIP Documents and this Interim Order; (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Maybrook and Consulate Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the DIP Agent's, the DIP Lenders', or CIBC's rights under this Interim Order, the Maybrook DIP Documents, the Maybrook Prepeption Loan Documents, or the Consulate Prepetition Loan Documents, as applicable, with respect any DIP Obligations or Maybrook and Consulate Prepetition Secured Obligations.

ii.      Until the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, the Maybrook and Consulate Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Maybrook DIP Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the DIP Agent all such information and documents that any or all of the Maybrook and Consulate Debtors are obligated (including upon reasonable request by any of the DIP Agent) to provide under the Maybrook DIP Documents or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the DIP Agent and the advisors of each of the DIP Agent and CIBC to visit and inspect any of the Maybrook and Consulate Debtors' respective properties, to examine and make abstracts or copies

54

from any of their respective books and records, to tour the Maybrook and Consulate Debtors'

business premises and other properties, and to discuss, and provide advice with respect to, their

respective affairs, finances, properties, business operations, and accounts with their respective

officers, employees, independent public accountants, and other professional advisors (other than

legal counsel) as and to the extent required by the Maybrook DIP Documents and/or the

Maybrook Loan Documents and Buckey Loan Documents; (iv) permit the DIP Agent, CIBC and

their respective advisors to consult with the Maybrook and Consulate Debtors' management and

advisors on matters concerning the Maybrook and Consulate Debtors' businesses, financial

condition, operations, and assets; and (v) upon reasonable advance notice, permit the DIP Agent

and CIBC to conduct, at their discretion and at the Maybrook and Consulate Debtors' cost and

expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at

reasonable times in respect of any or all of the DIP Collateral and Prepetition Collateral in

accordance with the Maybrook DIP Documents, the Maybrook Prepetition Loan Documents, and

the Consulate Prepetition Loan Documents.

25.    Credit Bidding. Subject to entry of the Final Order and subject to Section

363(k) of the Bankruptcy Code, in connection with any sale process authorized by the Court, the

DIP Agent (by or through an acquisition vehicle, and in accordance with the terms of the Maybrook

DIP Credit Agreement), the DIP Lenders, and CIBC (by or through an acquisition vehicle, and in

accordance with the terms of the Maybrook Prepetition Loan Documents and Consulate

Prepetition Loan Documents), may credit bid up to the full amount of the applicable outstanding DIP Obligations and/or Maybrook and Consulate Prepetition Secured Obligations, in each case including any accrued and unpaid interest and expenses (each a "Credit Bid") in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through section 363 or section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to the rights and duties of the parties under the Maybrook DIP Documents, the Maybrook Prepetition Loan Documents and the Consulate Prepetition Loan Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid including, but not limited to, payment in full and in cash of all Maybrook and Consulate Prepetition Secured Obligations. Each of the DIP Agent, the DIP Lenders, and CIBC shall be considered a "Qualified Bidder" with respect to its rights to acquire all or any of the assets by Credit Bid.

26.    Proceeds of Subsequent Financing. If the Maybrook and Consulate Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c), or 364(d) or in violation of the Maybrook DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and Maybrook and Consulate Prepetition Secured Obligations, and the termination of the DIP Lenders' obligation to extend credit under the Maybrook DIP Facility, including

subsequent to the confirmation of any plan with respect to any or all of the Maybrook and Consulate Debtors and their estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations and following indefeasible payment in full in cash of the DIP Obligations, to CIBC for application against the Maybrook and Consulate Prepetition Secured Obligations and following indefeasible payment in full in cash of the DIP Obligations and Maybrook and Consulate Prepetition Secured Obligations, in accordance with this Interim Order and the Maybrook DIP Documents, Maybrook Prepetition Loan Documents or Consulate Prepetition Loan Documents, as applicable.

27.    Cash Collection. Unless otherwise agreed to in writing by the DIP Agent, or otherwise provided for herein, the Maybrook and Consulate Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). Following the occurrence and during the continuance of an Event of Default, the Maybrook and Consulate Debtors and the financial institutions where the Maybrook and Consulate Debtors' Cash Collection Accounts are maintained (a those accounts are defined and identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent.

28.    <u>Maintenance of DIP Collateral</u>. Until the indefeasible payment in full in cash of all DIP Obligations, all Maybrook and Consulate Prepetition Secured Obligations, and the termination of the DIP Lenders' obligation to extend credit under the Maybrook DIP Facility, the Maybrook and Consulate Debtors shall: (a) insure the DIP Collateral as required under the Maybrook DIP Facility, the Maybrook Prepetition Loan Documents or the Consulate Prepetition Loan Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any Cash Management Order, or as otherwise required by the Maybrook DIP Documents or this Interim Order.

29.    <u>Disposition of DIP Collateral</u>. Until the indefeasible payment in full in cash of all DIP Obligations and the Maybrook and Consulate Prepetition Secured Obligations, the Maybrook and Consulate Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Maybrook and Consulate Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent and CIBC, as applicable (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, DIP Lenders, CIBC, or from any order of this Court), except as otherwise provided for in the Maybrook DIP Documents or otherwise ordered by the Court.

30.    <u>DIP Termination Date</u>. On the DIP Termination Date: (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facility will terminate, other than as required in paragraph 39 with respect to the

Carve Out, all treasury, hedging obligations, such cash collateral shall not be subject to or subordinate to the Carve Out; (b) all authority to use Cash Collateral shall cease, *provided, however*, that during the Remedies Notice Period (as defined herein), the Maybrook and Consulate Debtors may use Cash Collateral to pay payroll and other expenses that the DIP Agent approves as critical to keeping the Maybrook and Consulate Debtors' business operating in accordance with the Maybrook Budget; *provided further* that following delivery of the Carve Out Trigger Notice (as defined herein), the Maybrook and Consulate Debtors shall fund the Carve Out Account (as defined herein) in accordance with paragraph 39 of this Interim Order; and (c) upon the expiration of the Remedies Notice Period, the DIP Agent shall be entitled to exercise rights and remedies under the Maybrook DIP Documents in accordance with this Interim Order (including paragraph 33). For the purposes of this Interim Order, "DIP Termination Date" shall mean the "Termination Date" as defined in the Maybrook DIP Credit Agreement.  Notwithstanding anything to the contrary in this Interim Order or the Maybrook DIP Credit Agreement, in the event the Maybrook and Consulate Debtors consummate a sale of all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code, upon entry of a Final Order, then notwithstanding the occurrence of the Termination Date (as defined in the Maybrook DIP Credit Agreement), the Maybrook and Consulate Debtors shall have the authority to continue using, and CIBC consents to the continued use of, Cash Collateral in accordance with the Maybrook Budget for a period of

60 days after closing, with the ability to seek additional time either by CIBC's consent or approval by the Court.

31.     Events of Default. The occurrence of any of the following events, unless waived by the DIP Agent  in writing and in accordance with the terms of the Maybrook DIP Credit Agreement, shall constitute an event of default (an "Event of Default"): (a) the failure of the Maybrook and Consulate Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, including the failure to comply with the Case Milestones (as defined herein), or (b) the occurrence of an "Event of Default" under the Maybrook DIP Credit Agreement.

32.     Case Milestones. As a condition to the Maybrook DIP Facility and the use of Cash Collateral, the Maybrook and Consulate Debtors shall comply with the Required Milestones (as defined in the Maybrook DIP Credit Agreement, attached as Schedule 11.18 to the Maybrook DIP Credit Agreement (as may be amended from time to time in accordance with the Maybrook DIP Documents, the "Case Milestones")). For the avoidance of doubt, the failure of the Maybrook and Consulate Debtors to comply with any of the Case Milestones shall (a) constitute an immediate Event of Default under the Maybrook DIP Credit Agreement and this Interim Order; (b) subject to the expiration of the Remedies Notice Period (as defined below), result in the automatic termination of the Maybrook and Consulate Debtors' authority to use Cash Collateral

under this Interim Order; and (c) permit the DIP Agent, subject to paragraph 33, to exercise the rights and remedies provided for in this Interim Order and the Maybrook DIP Documents.

33.    <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default under the Maybrook DIP Documents or this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period) (a) the DIP Agent may declare (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Maybrook and Consulate Debtors to the extent any such commitment remains under the Maybrook DIP Facility, (iii) termination of the Maybrook DIP Facility and the Maybrook DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery by the DIP Agent of the Carve Out Trigger Notice (as defined herein) to the Maybrook and Consulate Debtors, the U.S. Trustee, and counsel to a Committee (if appointed); and (b) the DIP Agent may declare a termination, reduction or restriction on the ability of the Maybrook and Consulate Debtors to use Cash Collateral (the date which is the earliest to occur of any such date a Termination Declaration is delivered and the DIP Termination Date shall be referred to herein

as the ("Termination Date")). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Maybrook and Consulate Debtors, counsel to a Committee (if appointed), and the U.S. Trustee. The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and CIBC is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), subject to first funding the Carve Out (as defined herein), the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the Maybrook DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens; *provided* that upon the repayment in full in cash of the DIP Obligations, CIBC shall be entitled to exercise its rights and remedies in accordance with the Maybrook and Consulate Prepetition Loan Documents and this Interim Order to satisfy the Maybrook and Consulate Prepetition Secured Obligations, the Prepetition Adequate Protection Liens, and the Prepetition Superpriority Claims. During the Remedies Notice Period, the Maybrook and Consulate Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period; *provided* that the sole issue that the Maybrook and Consulate Debtors may bring before the Court at any such emergency hearing is whether an Event of Default has occurred and/or is continuing, and the Maybrook and Consulate Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or

CIBC. Unless the Court orders otherwise, the automatic stay, as to DIP Agent, the DIP Lenders, and CIBC, as applicable, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Unless the Court orders otherwise, upon expiration of the Remedies Notice Period, the DIP Agent, the DIP Lenders, and CIBC, shall be permitted to exercise all remedies set forth herein, in the Maybrook DIP Documents, the Maybrook and Consulate Prepetition Loan Documents, as applicable, and as otherwise available at law without further order of or application or motion to the Court consistent with paragraph 30 of this Interim Order. Upon the occurrence and during the continuation of an Event of Default and the expiration of the Remedies Notice Period, the DIP Agent and any liquidator or other professional will have the right to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights or other intellectual property to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral, including pursuant to any Court approved sale process.

34.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. The DIP Agent, the DIP Lenders, and CIBC have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reargued, reconsidered, reversed, modified, amended, or vacated by a subsequent order

of this Court or any other court, the DIP Agent, the DIP Lenders, and CIBC are entitled to the protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth therein. Any such modification, amendment or vacatur shall not affect the extent, validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority granted, perfected, authorized or created hereby, unless modification, amendment or vacatur pertains to an authorization to obtain credit or incur debt, or to the granting of a priority lien, that is stayed pending appeal. Any liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including to all rights, remedies, privileges and benefits granted herein.

35.    <u>DIP and Other Expenses</u>. In addition to the Adequate Protection Payments, the Maybrook and Consulate Debtors are authorized and directed to pay (a) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses due and outstanding as of the Petition Date of the DIP Agent and DIP Lenders in accordance with the Maybrook DIP Documents and (b) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, in connection with the Maybrook DIP Facility, as provided in the Maybrook DIP Documents, including attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and

indemnification and reimbursement of fees and expenses. Without limitation of the generality of the foregoing, pursuant and subject to the DIP Orders and the Maybrook DIP Documents, the Loan Parties shall timely pay the reasonable and documented prepetition and postpetition fees and expenses Gutnicki LLP and Campbell & Levine, LLC, as counsel to the DIP Agent and CIBC. Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the DIP Agent, the DIP Lenders, and CIBC in respect to the Adequate Protection Payments shall not be required to submit invoices in any particular format, however any time that such professionals seek payment of fees and expenses from the Maybrook and Consulate Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries but such time entries may be reasonably requested by the U.S. Trustee, subject to objection by the professional subject to the request, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Maybrook and Consulate Debtors. Any objections raised by the Maybrook and Consulate Debtors, the U.S. Trustee or a Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within

ten (10) days of the receipt of such invoice; if after ten (10) days such objection remains unresolved, it will be subject to resolution by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Maybrook and Consulate Debtors. Notwithstanding the foregoing, the Maybrook and Consulate Debtors are authorized and directed to pay on the Interim Facility Effective Date (as defined in the Maybrook DIP Credit Agreement) all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agent, the DIP Lenders, and CIBC (in respect to the Prepetition Adequate Protection Payments) incurred on or prior to such date without the need for any professional engaged by the DIP Agent, the DIP Lenders, or CIBC to first deliver a copy of its invoice to any other party as provided for herein. No attorney or advisor to the DIP Agent, the DIP Lenders, or CIBC shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Maybrook and Consulate Debtors to the (i) DIP Agent or DIP Lenders in connection with or with respect to the Maybrook DIP Facility; and (ii) subject to the reservation of rights in paragraph 42, CIBC in connection or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Maybrook and Consulate Debtors.

36.    Indemnification. The Maybrook and Consulate Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lenders and their respective shareholders, partners, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and

professional advisors, in their respective capacities as such, in accordance with and only if and to the extent provided pursuant to the terms and conditions of the Maybrook DIP Credit Agreement; _provided_, _however_, the Maybrook and Consulate Debtors shall not indemnify the DIP Agent and DIP Lenders for any successful Challenge to the Interim Roll-Up.

37.    <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, and CIBC will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, CIBC is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases with respect to the Maybrook and Consulate Prepetition Secured Obligations. Any proof of claim filed by CIBC will also be deemed to constitute the filing of such proof of claim in the Chapter 11 Cases of all other Debtors against which a claim may be asserted under the Maybrook and Consulate Prepetition Loan Documents, as applicable. Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of the DIP Agent, the DIP Lenders, CIBC arising under, or in connection with, the Maybrook DIP Documents or the Maybrook and Consulate Prepetition Loan Documents, as applicable.

38.    <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the DIP Agent and the DIP Lenders under the Maybrook DIP Documents, the Maybrook and Consulate Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and CIBC reasonable access to the Maybrook and Consulate Debtors' premises and their books and records in accordance with the Maybrook DIP Documents and the Maybrook and Consulate Prepetition Loan Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. The DIP Lenders may participate in any such visit or inspection at the expense of the Maybrook and Consulate Debtors as set forth in the Maybrook DIP Documents. In addition, the Maybrook and Consulate Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants, who are not Case Professionals (defined herein), to cooperate, consult with, and provide to the DIP Agent and CIBC all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Maybrook and Consulate Debtors.

39.    <u>Carve Out</u>.

i.    As used in this Interim Order, the "<u>Carve Out</u>" means, subject, in each case, to application of any retainers that may be held by the applicable professionals, without duplication: (i) the payment of all allowed and unpaid professional fees and disbursements incurred by the Maybrook and Consulate Debtors and any statutory committees appointed in the

Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for any of their respective professionals retained by final order of the Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "Case Professionals") at any time prior to the delivery of the Carve Out Trigger Notice (as defined below) allowed by this Court (the "Allowed Professional Fees"), in an aggregate amount not to exceed those amounts that are reflected as a reserve for estimated professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to the delivery of a Carve Out Trigger Notice (the "Professional Fee Carve Out Cap"); (ii) after delivery of a notice by the DIP Agent to the Maybrook and Consulate Debtors that an Event of Default has occurred and is continuing and the DIP Agent has delivered notice to the Maybrook and Consulate Debtors to the effect that the application of the Carve Out has occurred (the "Carve Out Trigger Notice"), the payment of allowed and unpaid professional fees and disbursements incurred by the Case Professionals following the delivery of the Carve Out Trigger Notice in an aggregate amount not in excess of $300,000 (the "Wind-Down Carve Out Amount"), *plus* (iii) the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk of the Court, which fees shall not be limited to amounts that may be set forth in the Maybrook Budget.  Notwithstanding anything to the contrary in this Order, the Maybrook DIP Motion, the Maybrook DIP Documents or the Maybrook and Consulate Prepetition Loan Documents, the Carve Out is, and shall be, senior and shall be funded before payment of any obligations arising

from or relating to the DIP Obligations and the Maybrook and Consulate Prepetition Obligations including, without limitation: (w) the DIP Liens; (x) the DIP Superpriority Claims; (y) the Prepetition Adequate Protection Liens; and (z) Prepetition Superpriority Claims.

ii.       Notwithstanding the foregoing, so long as no Carve Out Trigger Notice has been issued by the DIP Agent, the Maybrook and Consulate Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code but solely to the extent the same are reflected as estimated professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to the delivery of a Carve Out Trigger Notice, as the same may be due and payable and otherwise allowed and payable by order of the Court. The Carve Out shall not be deemed increased if actual fees of Case Professionals are higher in fact than the estimates provided on the Maybrook Budget. No portion of the Carve-Out may be used in contravention of the restrictions or the limitations on the use of the Carve-Out set forth in this Interim Order.

iii.       *No Direct Obligation to Pay Professional Fees*. The DIP Agent, the DIP Lenders and CIBC shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or CIBC in any way to

pay compensation to or to reimburse expenses of any Case Professional or to guarantee that the Maybrook and Consulate Debtors have sufficient funds to pay such compensation or reimbursement.

iv.    *Funding of Carve Out Following Delivery of Carve Out Trigger Notice.* Delivery of the Carve Out Trigger Notice by the DIP Agent to the Maybrook and Consulate Debtors shall be deemed a draw request and notice of borrowing by the Maybrook and Consulate Debtors for New Money DIP Loans under the Maybrook DIP Credit Agreement (as defined therein) in an amount equal to the sum of (i) the amount of the Professional Fee Carve Out Cap, (ii) the Wind Down Carve Out Amount, and (iii) the amounts contemplated under paragraph (a)(iii) above. To the extent the amounts contemplated in the immediately preceding sentence are reflected as a reserve for professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to delivery of a Carve Out Trigger Notice, the DIP Agent shall make available to the Maybrook and Consulate Debtors such amounts (which shall constitute New Money DIP Loans, as defined in the Maybrook DIP Credit Agreement). The Maybrook and Consulate Debtors shall deposit and hold such amounts in a segregated account (the "Carve Out Account") designated by the DIP Lenders in trust exclusively to pay the amounts described in this paragraph 39. The funds in the Carve Out Account shall remain subject to the DIP Liens and Prepetition Adequate Protection Liens and any amounts or funds in the Carve Out Account that are not required to be used to pay Allowed Professional Fees

shall be returned to the DIP Agent, for application to the DIP Obligations in accordance with the Maybrook DIP Credit Agreement and following payment in full of the DIP Obligations, CIBC for distribution in accordance with the Maybrook and Consulate Prepetition Loan Documents.

v.       *Payment of Carve Out After Carve Out Trigger Notice*. Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the Maybrook DIP Documents, the Bankruptcy Code and applicable law.

40.       <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out</u>. The Maybrook DIP Facility, the DIP Collateral, the Maybrook and Consulate Prepetition Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', or CIBC's enforcement or realization upon any of the DIP Collateral or Maybrook and Consulate Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order and the Maybrook DIP Documents; (c) except as permitted in the Maybrook DIP Documents, selling or otherwise disposing of DIP Collateral without the consent of the DIP Agent; (d) except as permitted in the Maybrook DIP Documents, using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (e) except as permitted in the Maybrook DIP Documents, incurring Debt (as defined in the Maybrook DIP Credit Agreement) from any person other than the DIP Lender without the prior consent of

the DIP Agent; (f) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP

Lenders, or CIBC under this Interim Order, the Maybrook DIP Documents, or the Maybrook and

Consulate Prepetition Loan Documents, including seeking to use Cash Collateral and/or DIP

Collateral on a contested basis; (g) objecting to or challenging in any way the DIP Liens, the DIP

Obligations, the CIBC Prepetition Liens, the Maybrook and Consulate Prepetition Secured

Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Maybrook and

Consulate Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the

DIP Agent, the DIP Lenders, or CIBC, respectively; (h) asserting, commencing, or prosecuting

any claims or causes of action whatsoever, including any actions under Chapter 5 of the

Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments,

against any of the DIP Agent, the DIP Lenders, CIBC, or any of their respective affiliates, agents,

attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to,

challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount,

perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the CIBC

Prepetition Liens, the Maybrook and Consulate Prepetition Secured Obligations, or any other

rights or interests of any of the DIP Agent, the DIP Lenders, or CIBC; or (j) seeking to subordinate,

recharacterize, disallow or avoid the DIP Obligations or the Maybrook and Consulate Prepetition

Secured Obligations; *provided, however*, that the Carve Out and such collateral proceeds and loans

under the Maybrook DIP Documents may be used for allowed fees and expenses, in an amount

not to exceed, subject to the Final Order, $25,000 in the aggregate (the "Investigation Budget

Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or

challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens and

the Maybrook and Consulate Prepetition Secured Obligations, in accordance with paragraph 42 of

this Interim Order.

41.    Payment of Compensation. Nothing herein shall be construed as a consent

to the allowance of any professional fees or expenses or shall affect the right of the DIP Agent, the

DIP Lenders, or CIBC to object to the allowance and payment of such fees and expenses. So long

as an unwaived Event of Default has not occurred, the Maybrook and Consulate Debtors shall be

permitted to pay fees and expenses allowed and payable by final order (that has not been vacated

or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the

Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Maybrook

Budget provided by the Maybrook and Consulate Debtors to the DIP Agent.

42.    Effect of Stipulations on Third Parties.

i.    *Generally*. The admissions, stipulations, agreements, releases, and

waivers set forth in this Interim Order, including without limitation Paragraph F (collectively, the

"Prepetition Lien and Claim Stipulations"), are and shall be binding on the Maybrook and

Consulate Debtors. In addition, the Prepetition Lien and Claim Stipulations shall be binding on

any subsequent trustee, responsible person, examiner with expanded powers, any other estate

74

representative, and all creditors and parties in interest and all of their successors in interest and

assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in

interest with standing and requisite authority (other than the Maybrook and Consulate Debtors, as

to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely

filed the appropriate pleadings, and timely commenced the appropriate proceeding required under

the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the

Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 42) challenging

the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading

commencing a proceeding or other contested matter, a "Challenge") by no later than ninety (90)

days after the entry of this Interim Order unless otherwise reduced to not less than sixty (60) days

by agreement by and among the Maybrook and Consulate Debtors, the DIP Agent, and a

Committee (if appointed) or upon further order of the Court (the "Challenge Deadline"); *provided*

that if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to

the expiration of the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee, as applicable,

shall have until the later of (1) the Challenge Deadline or (2) the fifteenth (15th)) day after the

appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to chapter 7, as

applicable, to commence a Challenge, subject to any further extension by order of the Court; and

(ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly

commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

ii.      *Binding Effect*. To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Maybrook and Consulate Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (i) above except to the extent that any of such Prepetition Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (i) above. To the extent any such Challenge proceeding is timely and properly commenced, CIBC shall be entitled to payment of the related costs and expenses,

including, but not limited to, reasonable attorneys' fees, incurred under the Maybrook and Consulate Prepetition Loan Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 42, the Court may fashion any appropriate remedy.

43.     No Third-Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

44.     Section 506(c) Claims. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, CIBC, or any of their respective claims, the DIP Collateral, or the Maybrook and Consulate Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the DIP Lenders, or CIBC, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

45.     No Marshaling/Applications of Proceeds. Subject to entry of a Final Order, the DIP Agent, the DIP Lenders, and CIBC shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Maybrook and Consulate Prepetition Collateral, as the case may be, and proceeds shall be received

and applied pursuant to this Interim Order and the Maybrook DIP Documents notwithstanding any other agreement or provision to the contrary.

46.     Section 552(b). Subject to entry of a Final Order, CIBC shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to CIBC with respect to proceeds, product, offspring or profits of any of the Maybrook and Consulate Prepetition Collateral.

47.     Limits on Lender Liability. Nothing in this Interim Order, any of the Maybrook DIP Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or CIBC of any liability for any claims arising from any activities by the Maybrook and Consulate Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases. The DIP Agent and the DIP Lenders shall not, solely by reason of having made loans under the Maybrook DIP Facility, be deemed in control of the operations of the Maybrook and Consulate Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Maybrook and Consulate Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order or the Maybrook DIP Documents, shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or CIBC of any liability for any claims arising from the prepetition or postpetition activities of any of the Maybrook and Consulate Debtors. As of the date of entry of this Interim Order, neither the DIP Agent or CIBC are control persons or insiders of the Maybrook and Consulate Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Maybrook DIP Facility, the Maybrook DIP Documents, and/or the Maybrook and Consulate Prepetition Loan Documents.

48.    <u>Insurance Proceeds and Policies</u>. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the DIP Lenders) and CIBC shall be, and shall be deemed to be, without any further action or notice, named as additional insured and lender loss payee on each insurance policy maintained by the Maybrook and Consulate Debtors that in any way relates to the DIP Collateral.

49.    <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that Maybrook and Consulate Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the Maybrook DIP Facility and the Maybrook DIP Documents.

50.    <u>No Superior Rights of Reclamation</u>. Based on the findings and rulings herein regarding the integrated nature of the Maybrook DIP Facility and the Maybrook and

Consulate Prepetition Loan Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

51.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Maybrook DIP Documents and the Maybrook and Consulate Prepetition Loan Documents, as applicable: (a) the DIP Agent's, the DIP Lenders', and CIBC's right to seek any other or supplemental relief in respect of the Maybrook and Consulate Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, and CIBC under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, the DIP Lenders, or CIBC. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Maybrook and Consulate Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set

forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order.

52.     No Waiver by Failure to Seek Relief. The failure of the DIP Agent, the DIP Lenders, or CIBC to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Maybrook DIP Documents, the Maybrook and Consulate Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, CIBC, a Committee (if appointed), or any party in interest.

53.     Binding Effect of Interim Order. Immediately upon entry by this Court, and except as expressly provided herein, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, CIBC, all other creditors of any of the Maybrook and Consulate Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

54.     No Modification of Interim Order. Until and unless the DIP Obligations and the Maybrook and Consulate Prepetition Secured Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the Maybrook DIP Facility have been

terminated, the Maybrook and Consulate Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent or CIBC, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Maybrook and Consulate Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or junior Prepetition Superpriority Claim, other than the Carve Out; (b) without the prior written consent of the DIP Agent or CIBC for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Maybrook and Consulate Prepetition Collateral; (c) without the prior written consent of the DIP Agent, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the Maybrook DIP Documents; or (d) without the prior written consent of CIBC, any lien on any of the DIP Collateral with priority equal or superior to the CIBC Prepetition Liens or junior Prepetition Adequate Protection Liens (other than the DIP Liens). The Maybrook and Consulate Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent or CIBC, as applicable and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or CIBC.

55.     Interim Order Controls. In the event of any inconsistency between the terms and conditions of the Maybrook DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

56.     Discharge. The DIP Obligations and, subject to paragraph 42 herein, the obligations of the Maybrook and Consulate Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such confirmed plan of reorganization, unless each of the DIP Agent, the DIP Lenders, and CIBC, as applicable, has otherwise agreed in writing.

57.     Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, DIP Lenders, and CIBC granted pursuant to this Interim Order and/or the Maybrook DIP Documents, notwithstanding the

entry of any such orders described in (a)-(d), above, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the Maybrook DIP Facility, all the DIP Obligations, pursuant to the Maybrook DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (other than contingent obligations with respect to then unasserted claims), and all commitments to extend credit under the Maybrook DIP Facility are terminated, and (ii) in respect of the Maybrook and Consulate Prepetition Loan Documents, all of the Maybrook and Consulate Prepetition Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and the Challenge Deadline has passed without a Challenge being asserted. The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the Maybrook DIP Documents and/or the indefeasible repayment of the DIP Obligations.

58.    Final Hearing. The Final Hearing to consider entry of the Final Order and final approval of the Maybrook DIP Facility is scheduled for **June 13, 2024, at 10:00 A.M. (Prevailing Eastern time)** before the Honorable Judge Carlota M. Bohm, United States Bankruptcy Judge at the United States Bankruptcy Court for the Western District of Pennsylvania. On or before **May 24, 2024**, the Maybrook and Consulate Debtors shall serve, in accordance with

the *Order Establishing Certain Notice, Case Management, and Administrative Procedures as Well as Granting Related Relief* (the "Case Management Order"), notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Maybrook DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) counsel for a Committee (if appointed); and (c) any party which has filed prior to such date a request for notices with this Court. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than ~~June 6, 2024~~ June 10, 2024 **at 4:00 PM (Prevailing Eastern time)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Bass Berry & Simms, PLC, 150 Third Avenue South, Suite 2800, Nashville, Tennessee, 37201, Attn: Glenn B. Rose, Esq., and Whiteford Taylor & Preston, LLP, 11 Stanwix Street, Suite 1400, Pittsburgh, Pennsylvania, 15222, Attn: Daniel R. Schimizzi; (ii) counsel for the DIP Agent and the Prepetition Secured Lender, Gutnicki, LLP, 10440 N. Central Expressway, Suite 800, Dallas, Texas, 75231, Attn: Liz Boydston, Esq., and Max Schlan, Esq.; (iii) counsel to the Committee (if appointed); and (iv) the U.S. Trustee.

59.    *Nunc Pro Tunc* Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

85

60.    Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the Maybrook DIP Facility, and/or this Interim Order.

BY THE COURT:

Dated:  May 22, 2024

Carlota M. Böhm, Judge
United States Bankruptcy Court

FILED
5/22/24 11:58 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

86

## **Exhibit A-1**

Maybrook DIP Credit Agreement

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**dated May 17, 2024**

**by and among**

**MAYBROOK-C EVERGREEN PROPCO, LLC; MAYBROOK-C BRIARCLIFF
PROPCO, LLC; MAYBROOK-C SILVER OAKS PROPCO, LLC; MAYBROOK-C
OVERLOOK PROPCO, LLC; MAYBROOK-C LATROBE PROPCO, LLC;
MAYBROOK-C WHITECLIFF PROPCO, LLC; MAYBROOK-C KADE PROPCO,
LLC; MAYBROOK-C EVERGREEN OPCO, LLC; MAYBROOK-C BRIARCLIFF
OPCO, LLC; MAYBROOK-C SILVER OAKS OPCO, LLC; MAYBROOK-C
OVERLOOK OPCO, LLC; MAYBROOK-C LATROBE OPCO, LLC; MAYBROOK-C
WHITECLIFF OPCO, LLC;  MAYBROOK-C KADE OPCO, LLC; 100 TANDEM
VILLAGE ROAD PROPCO, LLC; 3876 SAXONBURG BOULEVARD PROPCO, LLC;
CHESWICK REHABILITATION AND WELLNESS CENTER, LLC;** and **NORTH
STRABANE REHABILITATION AND WELLNESS CENTER, LLC**, each a Delaware
limited liability company

**Borrowers**

**and**

**THE VARIOUS FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,**

**and**

**CIBC BANK USA,
as Administrative Agent and Lead Arranger**

**$38,000,000.00 TERM LOAN**

**Chicago, Illinois**

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** ("Agreement"), is made and entered into as of May 17, 2024 by and among **MAYBROOK-C EVERGREEN PROPCO, LLC** ("Evergreen Owner Borrower"), **MAYBROOK-C BRIARCLIFF PROPCO, LLC** ("Briarcliff Owner Borrower"), **MAYBROOK-C SILVER OAKS PROPCO, LLC** ("Silver Oaks Owner Borrower"), **MAYBROOK-C OVERLOOK PROPCO, LLC** ("Overlook Owner Borrower"), **MAYBROOK-C LATROBE PROPCO, LLC** ("Latrobe Owner Borrower"), **MAYBROOK-C WHITECLIFF PROPCO, LLC** ("Whitecliff Owner Borrower"), **MAYBROOK-C KADE PROPCO, LLC** ("Kade Owner Borrower"), **3876 SAXONBURG BOULEVARD PROPCO, LLC** ("Cheswick Owner Borrower"), **100 TANDEM VILLAGE ROAD PROPCO, LLC** ("North Strabane Owner Borrower" and, collectively with Evergreen Owner Borrower, Briarcliff Owner Borrower, Silver Oaks Owner Borrower, Overlook Owner Borrower, Latrobe Owner Borrower, Whitecliff Owner Borrower, Kade Owner Borrower and Cheswick Owner Borrower, "Owner Borrowers" and each an "Owner Borrower"), and **MAYBROOK-C EVERGREEN OPCO, LLC** ("Evergreen Operator Borrower"), **MAYBROOK-C BRIARCLIFF OPCO, LLC** ("Briarcliff Operator Borrower"), **MAYBROOK-C SILVER OAKS OPCO, LLC** ("Silver Oaks Operator Borrower"), **MAYBROOK-C OVERLOOK OPCO, LLC** ("Overlook Operator Borrower"), **MAYBROOK-C LATROBE OPCO, LLC** ("Latrobe Operator Borrower"), **MAYBROOK-C WHITECLIFF OPCO, LLC** ("Whitecliff Operator Borrower"), and **MAYBROOK-C KADE OPCO, LLC** ("Kade Operator Borrower") **CHESWICK REHABILITATION AND WELLNESS CENTER, LLC** ("Cheswick Operator Borrower"), and **NORTH STRABANE REHABILITATION AND WELLNESS CENTER, LLC** ("North Strabane Operator Borrower" and, collectively with Evergreen Operator Borrower, Briarcliff Operator Borrower, Silver Oaks Operator Borrower, Overlook Operator Borrower, Latrobe Operator Borrower, Whitecliff Operator Borrower, Kade Operator Borrower and Cheswick Operator Borrower, "Operator Borrowers" and each an "Operator Borrower," and, collectively with Owner Borrowers, "Borrowers" and each a "Borrower"), each a Delaware limited liability company, and the financial institutions that are or may from time to time become parties hereto (together with their respective successors and assigns, collectively, the "Lender") and **CIBC BANK USA**, an Illinois banking corporation (in its individual capacity, "CIBC"), as administrative agent for the Lenders (the "Administrative Agent").

## R E C I T A L S:

A.    Evergreen Owner Borrower holds fee simple title to the real property located at 191 Evergreen Mill Road, Harmony, Butler County, Pennsylvania, as legally described in **Exhibit A-1** attached hereto (the "Evergreen Land"), which is improved with a 115 bed skilled nursing home commonly known as The Grove at Harmony operated by Evergreen Operator Borrower (the "Evergreen Facility", and the Evergreen Land and the improvements thereon collectively referred to herein as the "Evergreen Real Property") and any and all easements and other rights appurtenant thereto (the "Evergreen Appurtenances"; the Evergreen Land, the Evergreen Facility, the Evergreen Appurtenances, all other improvements presently located upon the Evergreen Land, and

2

other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Evergreen Property");

B.      Briarcliff Owner Borrower holds fee simple title to the real property located at 249 Maus Drive, Irwin, Westmoreland County, Pennsylvania, as legally described in **Exhibit A-2** attached hereto (the "Briarcliff Land"), which is improved with a 120 bed skilled nursing home commonly known as The Grove at Irwin operated by Briarcliff Operator Borrower (the "Briarcliff Facility", and the Briarcliff Land and the improvements thereon collectively referred to herein as the "Briarcliff Real Property") and any and all easements and other rights appurtenant thereto (the "Briarcliff Appurtenances"; the Briarcliff Land, the Briarcliff Facility, the Briarcliff Appurtenances, all other improvements presently located upon the Briarcliff Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Briarcliff Property");

C.      Silver Oaks Owner Borrower holds fee simple title to the real property located at 715 Harbor Street, New Castle, Lawrence County, Pennsylvania, as legally described in **Exhibit A-3** attached hereto (the "Silver Oaks Land"), which is improved with a 62 bed skilled nursing home commonly known as The Grove at New Castle operated by Silver Oaks Operator Borrower (the "Silver Oaks Facility", and the Silver Oaks Land and the improvements thereon collectively referred to herein as the "Silver Oaks Real Property") and any and all easements and other rights appurtenant thereto (the "Silver Oaks Appurtenances"; the Silver Oaks Land, the Silver Oaks Facility, the Silver Oaks Appurtenances, all other improvements presently located upon the Silver Oaks Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Silver Oaks Property");

D.      Overlook Owner Borrower holds fee simple title to the real property located at 520 New Castle Street, New Wilmington, Lawrence County, Pennsylvania, as legally described in **Exhibit A-4** attached hereto (the "Overlook Land"), which is improved with a 115 bed skilled nursing home commonly known as The Gardens at New Wilmington operated by Overlook Operator Borrower (the "Overlook Facility", and the Overlook Land and the improvements thereon collectively referred to herein as the "Overlook Real Property") and any and all easements and other rights appurtenant thereto (the "Overlook Appurtenances"; the Overlook Land, the Overlook Facility, the Overlook Appurtenances, all other improvements presently located upon the Overlook Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Overlook Property");

E.      Latrobe Owner Borrower holds fee simple title to the real property located at 576 Fred Rogers Drive, Latrobe, Westmoreland County, Pennsylvania, as legally described in **Exhibit A-5** attached hereto (the "Latrobe Land"), which is improved with a 107 bed skilled nursing home commonly known as Latrobe Health and Rehabilitation Center operated by Latrobe Operator Borrower (the "Latrobe Facility", and the Latrobe Land and the improvements thereon collectively referred to herein as the "Latrobe Real Property") and any and all easements and other rights appurtenant thereto (the "Latrobe Appurtenances"; the Latrobe Land, the Latrobe Facility, the Latrobe Appurtenances, all other improvements presently located upon the Latrobe Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Latrobe Property");

3

F.      Whitecliff Owner Borrower holds fee simple title to the real property located at 110 Fredonia Road, Greenville, Mercer County, Pennsylvania, as legally described in **Exhibit A-6** attached hereto (the "Whitecliff Land"), which is improved with a 154 bed skilled nursing home commonly known as The Gardens at Greenville operated by Whitecliff Operator Borrower (the "Whitecliff Facility", and the Whitecliff Land and the improvements thereon collectively referred to herein as the "Whitecliff Real Property") and any and all easements and other rights appurtenant thereto (the "Whitecliff Appurtenances"; the Whitecliff Land, the Whitecliff Facility, the Whitecliff Appurtenances, all other improvements presently located upon the Whitecliff Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Whitecliff Property");

G.      Kade Owner Borrower holds fee simple title to the real property located at 1198 W. Wylie Avenue, Washington, Washington County, Pennsylvania, as legally described in **Exhibit A-7** attached hereto (the "Kade Land"), which is improved with a 74 bed skilled nursing home commonly known as The Grove at Washington operated by Kade Operator Borrower (the "Kade Facility", and the Kade Land and the improvements thereon collectively referred to herein as the "Kade Real Property") and any and all easements and other rights appurtenant thereto (the "Kade Appurtenances"; the Kade Land, the Kade Facility, the Kade Appurtenances, all other improvements presently located upon the Kade Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "Kade Property");

H.      Cheswick Owner Borrower holds fee simple title to the real property located at 3876 Saxonburg Boulevard, Cheswick, Allegheny County, Pennsylvania 15024, as legally described in **Exhibit A-8** attached hereto (the "Cheswick Land"), which is improved with a 121 bed skilled nursing home commonly known as Cheswick Rehabilitation and Wellness Center operated by Cheswick Operator Borrower (the "Cheswick Facility", and the Cheswick Land and the improvements thereon collectively referred to herein as the "Cheswick Real Property") and any and all easements and other rights appurtenant thereto (the "Cheswick Appurtenances"; the Cheswick Land, the Cheswick Facility, the Cheswick Appurtenances, all other improvements presently located upon the Cheswick Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the Cheswick Property"); and

I.      North Strabane Owner Borrower holds fee simple title to the real property located at 100 Tandem Village Road, Canonsburg, Washington County, Pennsylvania 15317, as legally described in **Exhibit A-9** attached hereto (the "North Strabane Land" and, collectively with the Evergreen Land, Briarcliff Land, Silver Oaks Land, Overlook Land, Latrobe Land, Whitecliff Land, Kade Land and Cheswick Land, the "Land"), which is improved with a 62 bed skilled nursing home commonly known as North Strabane Rehabilitation and Wellness Center operated by North Strabane Operator Borrower (the "North Strabane Facility" and, collectively with the Evergreen Facility, Briarcliff Facility, Silver Oaks Facility, Overlook Facility, Latrobe Facility, Whitecliff Facility, Kade Facility and Cheswick Facility, the "Facility", and the North Strabane Land and the improvements thereon collectively referred to herein as the "North Strabane Real Property" and, collectively with the Evergreen Real Property, Briarcliff Real Property, Silver Oaks Real Property, Overlook Real Property, Latrobe Real Property, Whitecliff Real Property, Kade Real Property and Cheswick Real Property, the "Real Property") and any and all easements and other rights appurtenant thereto (the "North Strabane Appurtenances" and, collectively with the Evergreen Appurtenances, Briarcliff Appurtenances, Silver Oaks Appurtenances, Overlook

4

Appurtenances, Latrobe Appurtenances, Whitecliff Appurtenances, Kade Appurtenances and Cheswick Appurtenances, the "Appurtenances"; the North Strabane Land, the North Strabane Facility, the North Strabane Appurtenances, all other improvements presently located upon the North Strabane Land, and other Collateral (hereinafter defined) related thereto are collectively referred to herein as the "North Strabane Property" and, collectively with the Evergreen Property, Briarcliff Property, Silver Oaks Property, Overlook Property, Latrobe Property, Whitecliff Property, Kade Property and Cheswick Property, the "Property");

J.      Certain Borrowers are a party to that certain Loan and Security Agreement, dated as of August 15, 2016 (as amended and in effect immediately prior to the effectiveness of this Agreement, the "Maybrook Prepetition Term Loan Credit Agreement") among certain Borrowers, as borrower, the lenders party thereto, and CIBC, as administrative agent, pursuant to which certain loans to and extensions of credit on behalf of those certain Borrowers were made for certain purposes as set forth therein, certain other Borrowers are a party to that certain Revolving Loan and Security Agreement, dated as of August 15, 2016 (as amended and in effect immediately prior to the effectiveness of this Agreement, the "Maybrook Prepetition Revolving Loan Credit Agreement" and, collectively, together with the Maybrook Prepetition Term Loan Credit Agreement, the "Maybrook Prepetition Credit Agreement"), certain other Borrowers are a party to that certain Loan and Security Agreement, dated as of September 15, 2017 (as amended and in effect immediately prior to the effectiveness of this Agreement, the "Buckeye Prepetition Term Loan Credit Agreement") and certain other Borrowers are a party to that certain Revolving Loan and Security Agreement, dated as of September 15, 2017 (as amended and in effect immediately prior to the effectiveness of this Agreement, the "Buckeye Prepetition Revolving Loan Credit Agreement", and, collectively, together with the Buckeye Prepetition Term Loan Credit Agreement, the "Buckeye Prepetition Credit Agreement," and, collectively, together with the Maybrook Prepetition Credit Agreement, the "Prepetition Credit Agreement") among certain Borrowers, as borrower, the lenders party thereto, and CIBC, as administrative agent, pursuant to which certain loans to and extensions of credit on behalf of those certain Borrowers were made (collectively, the "Prepetition Loans") for certain purposes as set forth therein;

K.      On May 17, 2024 (the "Petition Date"), the Borrowers each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing the "Chapter 11 Cases". The Borrowers are continuing in the possession of their assets and continuing to operate their businesses and manage their properties as debtors and each as a debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

L.      The Borrowers have requested that the Lenders provide a senior secured super-priority debtor-in-possession credit facility in an aggregate principal amount of up to Thirty-Eight Million and 00/100 Dollars ($38,000,000.00) (the "DIP Facility") in commitments and loans from the Lenders, which shall consist of (a) a new money delayed draw term loan facility ("New Money Dip Loan") in an aggregate principal amount of up to Twelve Million Five Hundred Thousand and 00/100 Dollars $12,500,000 ("New Money Dip Ceiling"), and (b) Twenty-Five Million Five Hundred Thousand and 00/100 Dollars ($25,500,000.00) delayed draw term loan facility to roll up a portion of the existing outstanding obligations under the Prepetition Credit Agreement (the "Roll Up Dip Loan", and collectively with the New Money Dip Loan, the "Loan") effective immediately upon entry of the Interim DIP Order by the Bankruptcy Court (the "Interim DIP Order"), in each

case to be afforded the liens and priority set forth in the DIP Orders (as hereinafter defined) and as set forth in the other Loan Documents (as hereinafter defined);

M.    The Roll Up Dip Loan shall roll up the entire amount of outstanding obligations of Borrowers under the Buckeye Prepetition Credit Agreement and the Maybrook Prepetition Revolving Loan Credit Agreement and any remaining amount of the Roll Up Dip Loan shall roll up a corresponding amount of the outstanding obligations of Borrowers under the Maybrook Prepetition Term Loan Credit Agreement.

N.    The Loan is evidenced by that certain Promissory Note made by Borrowers payable to the order of Administrative Agent dated as of May 17, 2024 in the original principal amount of the Loan (as the same may be further amended, restated and/or replaced from time to time, collectively, the "Note"), which are secured by, among other things, the Mortgage (as hereinafter defined), and the Assignment of Rents (as hereinafter defined);

O.    $3,600,000.00 of the New Money DIP Loan shall be available upon entry of the Interim DIP Order by the Bankruptcy Court, subject to satisfaction of the applicable conditions precedent, and the remainder shall become available to be drawn upon entry of the Final DIP Order (the "Final DIP Order", and together with the Interim DIP Order, collectively, the "DIP Orders"), subject to satisfaction of the applicable conditions precedent; and

P.    $3,200,000.00 of the Roll Up DIP Loan, shall be rolled up upon entry of the Interim DIP Order by the Bankruptcy Court, subject to satisfaction of the applicable conditions precedent, and the remainder of the Roll Up Dip shall be rolled up upon entry of the Final DIP Order, subject to satisfaction of the applicable conditions precedent.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are hereby incorporated as if fully set forth herein, and in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties hereto represent and agree as follows:

## ARTICLE 1

### INCORPORATION AND DEFINITIONS

1.1    **Incorporation and Definitions**.  The foregoing recitals and all exhibits hereto are hereby made a part of this Agreement.  The following terms shall have the following meanings in this Agreement:

**Accounting Changes**:  As defined in Section 1.2 hereof.

**Accounts**:    All accounts receivable, contract rights, chattel paper, instruments and documents, whether now owned or hereafter created or acquired or in which a party now has or hereafter may acquire any interest.

**Administrative Agent**: CIBC in its capacity as administrative agent for the Lenders hereunder and any successor thereto in such capacity and in its capacity as a Lender.

6

**Affiliate(s)**:  For any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person and (c) with respect to any Lender, any entity administered or managed by such Lender or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Unless expressly stated otherwise herein, Lenders shall not be deemed an Affiliate of any Credit Party.

**Approved Budget**: shall mean the budget prepared by the Borrowers in the form of <u>Exhibit H</u> and initially furnished to the Administrative Agent and the Lenders on the Closing Date and which is approved by, and in form and substance satisfactory to, the Administrative Agent in its sole discretion, as the same may be updated, modified or supplemented from time to time as provided in <u>Section 11.19</u>.

**Approved Plan**: means, a plan of reorganization in form and substance satisfactory to the Administrative Agent in all respects and consented to by the Administrative Agent, confirmed by an order (in form and substance satisfactory to the Administrative Agent in all respects) of the Bankruptcy Court under the Chapter 11 Cases; provided that a plan of reorganization that is a feasible plan which provides for the payment in full in cash of the Loan (including the Roll-up Loans) on the effective date thereof shall be deemed to be an "Acceptable Plan", and such Approved Plan shall be in full force and effect and shall not have been modified, altered, amended, or otherwise changed or supplemented without the prior written consent of the Administrative Agent.

**Assignment of Rents:**  Those certain Assignments of Leases and Rents dated as of the date hereof by each Owner Borrower to Administrative Agent, for its benefit and for the benefit of Lenders, as the same may be amended and/or restated from time to time.

**Authorized Officer**:  With respect to each Borrower, any authorized manager or member or the chief financial officer of a limited liability company, the president or chief financial officer of a corporation, or the general partner of a partnership.

**Available Tenor(s)**: means, as of any date of determination with respect to the then-current Benchmark, **(a)** if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Amendment or **(b)** otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" or similar term pursuant to this Agreement.

**Bank Product Agreements**.  Those certain cash management service agreements and any other agreements entered into from time to time between a Borrower and Lender or its Affiliates in connection with any Bank Products (hereinafter defined).

**Bank Product Obligations**.  All obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by a Borrower to Lender or its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Borrower is obligated to reimburse to Lender as a result of Lender purchasing participations or executing indemnities or reimbursement obligations with respect to the Bank Products provided to a Borrower pursuant to the Bank Product Agreements.

**Bank Products**:  Any service or facility extended to a Borrower by Lender or its Affiliates, including, without limitation, (a) deposit accounts, (b) cash management services, including, without limitation, controlled disbursement, lockbox, electronic funds transfers (including, without limitation, book transfers, fedwire transfers, ACH transfers), online reporting and other services relating to accounts maintained with Lender or its Affiliates, (c) debit cards and (d) Rate Management Transactions.

**Bankruptcy Code**: Means, Title 11 of the United States Code.

**Benchmark**: Means, initially, Term SOFR; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to this Agreement.

**Benchmark Conforming Changes**: Means, with respect to Term SOFR or any Benchmark Replacement, any modifications, supplements, amendments, technical, administrative or operational changes or other conforming changes that Lenders decide may be appropriate to reflect the adoption and implementation of Term SOFR or such Benchmark Replacement and to permit the administration thereof by Lenders in a manner substantially consistent with market practice (or, if Lenders decide that adoption of any portion of such market practice is not administratively feasible or determines that no such market practice exists, in such other manner as Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

**Benchmark Replacement**:  Means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by Lenders for the applicable Benchmark Replacement Date:

(a)      Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by Lenders in their discretion giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body

8

or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of the Agreement and the other Loan Documents.

**Benchmark Replacement Adjustment**:  Means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by Lenders giving due consideration to any selection or recommendation by the Relevant Governmental Body, or any evolving or then-prevailing market convention at such time, for determining a spread adjustment, or method for calculating or determining such spread adjustment, for such type of replacement for U.S. dollar-denominated syndicated credit facilities at such time.

**Benchmark Replacement Date**:  Means a date and time determined by Lenders, which date shall be no later than the earlier to occur of the following events with respect to the then-current Benchmark: **(a)** in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of **(i)** the date of the public statement or publication of information referenced therein and **(ii)** the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or **(b)** in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.  For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

**Benchmark Transition Event**:  Means the occurrence of one or more of the following events with respect to the then-current Benchmark: **(a)** a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); **(b)** a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official or resolution authority with jurisdiction over the administrator for such

9

Benchmark (or such component), or a court or an entity with similar insolvency or resolution authority, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or **(c)** a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative. For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

**Benchmark Unavailability Period**: Means, the period (if any) **(a)** beginning at the time that a Benchmark Replacement Date pursuant to clauses (a) or (b) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Agreement and **(b)** ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document accordance with this Agreement.

**Borrowers' Liabilities**:  All obligations of any nature (monetary (including post-petition interest, allowed or not) or otherwise) of any Borrower under the Note, this Agreement and all of the other Loan Documents, including principal, interest, fees, costs, expenses, reasonable attorneys' fees of Administrative Agent, Lenders, all Rate Management Obligations permitted hereunder which are owed to Lenders or their Affiliates, and all other Bank Product Obligations, all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

**Borrowing or Borrowings**: Loans made on the same date.

**Business Day**:  Any day on which Administrative Agent is open for commercial banking business in Chicago, Illinois.

**Capital Lease**.  With respect to any Person, any lease of (or other agreement conveying the right to use) any real or personal property by such Person that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person.

**Capital Securities**.  With respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Effective Date, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations or any other equivalent of such ownership interest.

**Carve Out**: The meaning is assigned to such term in the applicable DIP Order which shall provide that the Carve Out shall, at all times, be senior to the payment of any obligations under this Agreement.

**Cash Equivalent Investment**:  At any time, (a) any evidence of debt, maturing not more than one year after such time, issued or guaranteed by the United States Government or any agency thereof, (b) commercial paper, maturing not more than one year from the date of issue, or corporate demand notes, in each case (unless issued by Lender or its holding company) rated at least A-l by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or P-l by Moody's Investors Service, Inc., (c) any certificate of deposit, time deposit or banker's acceptance, maturing not more than one year after such time, or any overnight Federal Funds transaction that is issued or sold by Lender or its holding company (or by a commercial banking institution that is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000), (d) any repurchase agreement entered into with Lender (or commercial banking institution of the nature referred to in clause (c)) which (i) is secured by a fully-perfected security interest in any obligation of the type described in any of clauses (a) through (c) above and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of Lender (or other commercial banking institution) thereunder, (e) money market accounts or mutual funds which invest exclusively in assets satisfying the foregoing requirements, and (f) other short term liquid investments approved in writing by Lender.

**Chief Restructuring Officer**:  Louis Robichaux of Ankura Consulting, who was retained by Borrowers on December 31, 2023.

**Closing**:  The date that all of the conditions set forth in Articles 4 and 5 hereof have been satisfied.

**CMS:**  Centers for Medicare and Medicaid Services.

**Code**:  The Internal Revenue Code of 1986, as amended.

**Collateral**:  The "DIP Collateral" as defined in the DIP Orders and, for the avoidance of doubt, which shall include all property or assets of any nature, kind or description of the Borrowers, now owned or hereafter acquired by the Borrowers, except for Excluded Property.

**Collateral Documents**:  Collectively, the DIP Orders, the Mortgage and any other agreement or instrument pursuant to which any Borrower, any Subsidiary or any other Person grants or purports to grant collateral to Administrative Agent, for its benefit and for the benefit of Lenders, or otherwise relates to such collateral.

**Commitment**:  As to any Lender, such Lenders' commitment to make Loans under this Agreement.  The initial amount of each Lenders' Commitment is set forth on Annex A.

**Confirmation Order**:  A final, non-appealable order, reasonably satisfactory to the Administrative Agent, confirming an Approved Plan in accordance with section 1129 of the Bankruptcy Code, which order shall be in full force and effect and without the prior written consent of the Administrative Agent shall not have been vacated or reversed, subject to a stay, amended,

supplemented or otherwise modified in any manner that could reasonably be expected to materially adversely affect the interests of the Administrative Agent or the Lenders, and shall not discharge or otherwise affect in any way any of the Borrowers' Liabilities under the DIP Facility other than by the payment in full in cash or such other treatment as may be satisfactory to the Administrative Agent.

**Contingent Liability**.  With respect to any Person, each obligation and liability of such Person and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person:  (a) guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, dividend, obligation or other liability of any other Person in any manner (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person; (c) undertakes or agrees (whether contingently or otherwise):  (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from another Person with the purpose or intent of assuring the owner of any indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) induces the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss.  The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

**Control**:  Possession by a person or an entity, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether by contract, ownership of voting securities, membership or partnership interests or otherwise.

**Control Agreements:** The Deposit Account Control Agreements and the Deposit Account Instructions and Service Agreements, which are in a form satisfactory to the Administrative Agent and cover all of the Borrowers' Deposit Accounts.

**Credit Extension**: Means any loan, advance, borrowing, letter of credit or other financial accommodation or extension of credit of any type by Lenders from time to time made or permitted to be made under the Loan Documents.

**Credit Parties**:  Collectively, any Borrower, and any of the foregoing, individually, a "Credit Party".

**Daily Simple SOFR**: Means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by Administrative Agent in accordance with the

conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if Administrative Agent decides that any such convention is not administratively feasible for Administrative Agent, then Administrative Agent may establish another convention in its reasonable discretion.

**Debt**:  For any Person, any and all obligations, liabilities and indebtedness to any other Person of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (including, without limitation, obligations of performance), including, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person as lessee under any Capital Lease which have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (d) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (e) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; provided that if such Person has not assumed or otherwise become liable for such indebtedness, such indebtedness shall be measured at the lesser of (i) the amount of such indebtedness (including any and all interest, costs and expenses related thereto) and (ii) the fair market value of such property securing such indebtedness at the time of determination, (f) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person (including the letters of credit), (g) all Rate Management Obligations of such Person, (h) all Contingent Liabilities of such Person, (i) all debt of any partnership of which such Person is a general partner, (j) all non-compete payment obligations, earn-outs and similar obligations and (k) any Capital Securities or other equity instrument, whether or not mandatorily redeemable, that under GAAP is characterized as debt, all of the foregoing whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

**Default**:  Any event that, if it continues uncured, will, with the lapse of time or notice or both, constitute an Event of Default.

**Default Rate**:  As defined in Section 3.7 of this Agreement.

**Disbursement Request**:  As defined in Section 6.3 of this Agreement.

**Disposition**: The sale, assignment, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any Property by any Person, including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith and also including any unwind or other monetization of any commodity Rate Management Agreement. The term "Dispose" has a meaning correlative thereto.

**Distributions**: Any loans, advances, dividends or other distributions to the members, managers, shareholders, partners, officers, directors, Affiliates of any Borrower or to any other Person of any revenue received by or on behalf of such Person.

**Effective Date**:  means the date on which the conditions specified in <u>Section 5.1</u> are satisfied.

**Environmental Laws**:  As defined in the Environmental Indemnity Agreement.

**Event of Default**:  One or more of the events or occurrences referred to in <u>Article 14</u> of this Agreement.

**Excluded Property**:  Pursuant to the DIP Orders, Avoidance Actions (as defined in the DIP Orders), but not Avoidance Proceeds (as defined in the DIP Orders).

**Excluded Taxes**:  Taxes based upon, or measured by, Lenders' (or a branch of Lenders') overall revenue or net income, overall net receipts, or overall net profits (including franchise or other taxes imposed in lieu of such taxes).

**Facility**:  As defined in the recitals hereto.

**Floor:** A rate of interest equal to 0%.

**GAAP**:  Generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or any successor authority) that are applicable to the circumstances as of the date of determination.

**Governmental Authority**:  Any federal, state or local governmental office, any political subdivision thereof, and any agency, department or Person or other governmental or quasigovernmental authority (including any fiscal intermediary) exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or any corporation or other Person owned or Controlled by any of the foregoing, including, but not limited to, CMS, and the Pennsylvania Department of Health.

**Governmental Authorization**:  Any permit, license, certification, authorization, plan, directive, consent order or consent decree of or from any Federal, state or local governmental authority, agency or court having jurisdiction over any Borrower and/or the Property, and/or the continuing operations of any Facility, including, but not limited to, licensure of any Facility by the Pennsylvania Department of Health as a skilled nursing care facility with respect to the number of licensed skilled nursing beds indicated in the recitals and currently offered for occupancy.

**Hazardous Materials**:  As defined in the Environmental Indemnity Agreement.

**Inventory**:  The meaning ascribed to such term in the UCC, and shall include, without limitation, all of Borrowers' goods held or being processed for sale or lease including all materials, work-in-process, finished goods, supplies and other goods customarily classified as Inventory.

**Investment**: With respect to any Person, any investment in another Person, whether by acquisition of any debt or capital security, by making any loan or advance, by becoming obligated with respect to a Contingent Liability in respect of obligations of such other Person (other than

14

travel and similar advances to employees in the ordinary course of business) or by making an acquisition.

**Land**:  As defined in the Recitals.

**Lease(s)**:  Any and all leases, licenses, or agreements for use of any part of the Property, including the Operating Leases, except for those agreements with nursing home, assisted living or independent living residents of any Facility.

**Lien(s)**:  With respect to the Property, the Collateral or any asset of any Borrower, any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code in effect in any jurisdiction), whether arising by contract, as a matter of law, by judicial process or otherwise.

**Loan(s)**: As described and defined in the Recitals.

**Loan Amount**:  The amount of THIRTY EIGHT MILLION AND NO/100 DOLLARS ($38,000,000.00).

**Loan Documents**:  This Agreement, the Other Agreements, the documents specified in Article 4 hereof, and any other agreements, instruments or other documents evidencing, securing or guarantying obligations of any party under the Loan.

**Loan Expenses**: As defined in Section 6.2(c) hereof.

**Loan Proceeds**:  All amounts advanced as part of the Loan, whether advanced directly to Borrowers or otherwise.

**Management Agreement**:  Any Management Agreement with respect to the management of any Facility operated by any Operator Borrower, pursuant to which such Operator Borrower pays a Management Fee.

**Management Fee**:  Any management, administrative, service or related or similar fee paid by any Borrower to any Person with respect to any facility owned, operated or leased by any Borrower.

**Material Adverse Effect**: (a) a material adverse change in, or a material adverse effect upon, the financial condition, operations, assets, business, or properties of any Borrower, (b) a material impairment of the ability of the Credit Parties to pay or perform any of the obligations under any Loan Document, (c) a material adverse effect upon any substantial portion of the Collateral under this Agreement or the other Loan Documents or upon the legality, validity, binding effect or enforceability against the Credit Parties of any Loan Document or (d) any change, event, action, condition or effect that impairs the fully perfected first priority status of the Liens granted in this Agreement or any Loan Document.

**Material Contract(s)**: any agreements including (a) employment agreements covering the management of Borrowers, (b) collective bargaining agreements or other labor agreements covering any employees of Borrowers, (c) agreements for managerial, consulting or similar services to which Borrowers are a party or by which it is bound, (d) agreements regarding either Borrowers, their assets or operations or any investment therein to which any of their equity holders is a party or by which it is bound, (e) real estate leases, intellectual property licenses or other lease or license agreements to which Borrowers are a party, either as lessor or lessee, or as licensor or licensee, (f) customer, distribution, marketing or supply agreements to which Borrowers are a party, (g) partnership agreements to which Borrowers are a general partner or joint venture agreements to which Borrowers are a party, (h) third party billing arrangements to which either Borrowers are a party, or (i) any other agreements or instruments to which Borrowers are a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect on the Borrowers.

**Maturity Date**: One Hundred Sixty (160) days after the Petition Date.

**Mortgage**: Those certain Open-End Mortgage, Assignment of Leases and Rents and Fixture Filings dated as of the date hereof, by each Borrower as "Grantor" or "Borrower" thereunder in favor of Administrative Agent, for its benefit and for the benefit of Lender, as the same may be amended and/or restated from time to time.

**Note**: As defined in the Recitals.

**Obligor**: Any Person who is and/or may become obligated to any Borrower under or on account of any of the Accounts.

**Operating Leases**: Collectively, (1) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Evergreen Facility by and between Evergreen Owner Borrower, as landlord, and Evergreen Operator Borrower, as tenant; (2) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Briarcliff Facility by and between Briarcliff Owner Borrower, as landlord, and Briarcliff Operator Borrower, as tenant; (3) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Silver Oaks Facility by and between Silver Oaks Owner Borrower, as landlord, and Silver Oaks Operator Borrower, as tenant; (4) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Overlook Facility by and between Overlook Owner Borrower, as landlord, and Overlook Operator Borrower, as tenant; (5) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Latrobe Facility by and between Latrobe Owner Borrower, as landlord, and Latrobe Operator Borrower, as tenant; (6) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Whitecliff Facility by and between Whitecliff Owner Borrower, as landlord, and Whitecliff Operator Borrower, as tenant; and (7) that certain Lease Agreement dated as of August 15, 2016, for the lease of the Kade Facility by and between Kade Owner Borrower, as landlord, and Kade Operator Borrower, as tenant, (8) that certain Lease Agreement dated as of September 15, 2017, for the lease of the Cheswick Facility and the North Strabane Facility by and between Cheswick Owner Borrower, North Strabane Owner Borrower and 200 Tandem Village Road Propco, LLC, collectively, as lessor, and Cheswick Operator Borrower, North Strabane Operator Borrower and North Strabane Retirement Village, LLC, collectively as lessee, collectively as lessee.

**Other Agreements**: All agreements, instruments and documents, including, without limitation, guaranties, mortgages, deeds of trust, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements, Bank Product Agreements, Rate Management Agreements, as well as any amendments, restatements and/or replacements of the foregoing, and all other written matter heretofore, now and/or from time to time hereafter executed by and/or on behalf of any Borrower or any other Credit Party and delivered to Administrative Agent or any Lender in connection with the Loan including, without limitation, the Note, the Mortgage, and the Assignment of Rents.

**Payor**:  any individual, corporation, limited liability company, partnership or other entity, or any governmental or quasi-governmental authority, including without limitation, CMS, any fiscal intermediary disbursing payments on behalf of CMS or the federal Medicaid program, as administered in the Commonwealth of Pennsylvania, that is responsible for payment of all or any portion of any Account.

**Pension Plan**: A "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA or the minimum funding standards of ERISA (other than a Multiemployer Pension Plan), and as to which any Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

**Permitted Exceptions**:  The title exceptions specified in Exhibit B attached to the Mortgage.

**Permitted Variance**:  The meaning set forth in Section 11.19 of this Agreement.

**Person**:  An individual, sole proprietorship, association, partnership, joint venture, corporation (whether or not for profit), limited liability company, trust, institution, unincorporated organization, government or any department or agency thereof or any other entity or organization.

**Prepetition Agent**: means, CIBC, in its capacity as "Administrative Agent" under and as defined in the Maybrook Prepetition Credit Agreement and the Buckeye Prepetition Credit Agreement.

**Prepetition Credit Agreements**: The meaning set forth in the recitals hereto.

**Prepetition Lenders**: means, the "Lenders" under and as defined in the Maybrook Prepetition Credit Agreement and the Buckeye Prepetition Credit Agreement.

**Prepetition Loan Documents**: Collectively, the Prepetition Credit Agreement, and all other "Loan Documents" as defined in the Prepetition Credit Agreement as each document may be amended, restated, supplemented, replaced or otherwise modified from time to time.

**Prepetition Loans:** the "Loans" as defined in the Prepetition Credit Agreements.

**Prepetition Obligation**: Any and all liabilities, obligations and indebtedness to Lenders of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or

payable and howsoever evidenced, created, incurred, acquired, or owing, whether primary, secondary, direct, indirect, contingent, absolute, fixed or otherwise (including, without limitation, payments of or for principal, interest, default interest, fees, costs, expenses, and/or indemnification, and obligations of performance, and any interest that accrues after commencement of any insolvency or bankruptcy proceeding regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency or bankruptcy proceeding) arising under or evidenced by the Prepetition Loan Documents, and any refinancings, substitutions, extensions, renewals, replacements and modifications for or of any or all of the foregoing.

**Pro Rata Share**: With respect to a Lenders' obligation to make a Loan and receive payments of interest, fees, and principal with respect thereto, (x) prior to the making of the Loans, the percentage obtained by dividing (i) such Lenders' Loan Commitment, by (ii) the aggregate amount of all Lenders' Loan Commitments, and (y) from and after the making of the Loans, the percentage obtained by dividing (i) the principal amount of such Lenders' Loan by (ii) the principal amount of all Loans of all Lenders.

**Prime Rate**: The floating per annum rate of interest most recently announced by the Lenders at Chicago, Illinois as its prime or base rate. A certificate made by an officer of the Lenders stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day. The Prime Rate is a base reference rate of interest adopted by the Lenders as a general benchmark from which the Lenders determine the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and the Borrowers acknowledge and agree that the Lenders have made no representations whatsoever that the Prime Rate is the interest rate actually offered by the Lenders to borrowers of any particular creditworthiness.

**Prohibited Transfer**:  As defined in Section 11.33 herein.

**Property**: As defined in the Recitals to this Agreement.

**Rate Management Transaction(s)**:  Any transaction including an agreement with respect thereto now or hereafter entered into by any Borrower and Lender, or any of the Lenders' subsidiaries or Affiliates or their successors, which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

**Rate Management Agreement**:  Any agreement with respect to any Rate Management Transaction entered into now or hereafter by any Borrower and Lender or any of Lenders' subsidiaries or Affiliates or their successors.

**Rate Management Obligations**.  Any liability of Borrowers under any Rate Management Agreement, including any and all cancellations, buy backs, reversals, terminations or assignments under any Rate Management Agreement.

18

**Relevant Governmental Body**: means the Federal Reserve Board, the Federal Reserve Bank of New York, a committee officially endorsed or convened by either thereof, or any successor thereto.

**Reserves**: As defined in Article 7 of this Agreement.

**Revolving Loan**: The loans made by Lenders to Operator Borrowers as contemplated by the Revolving Loan Documents.

**Revolving Loan Agreement**: Those certain Revolving Loan and Security Agreements dated as of August 15, 2016 and September 15, 2017 by and between the applicable Operator Borrowers and Lenders, as the same may be amended, modified or supplemented from time to time.

**Revolving Loan Documents**: Collectively, the Revolving Loan Agreement and the "Loan Documents" (as such term is defined in the Revolving Loan Agreement), as the same may be amended, modified or supplemented from time to time.

**Revolving Loan Obligations**: Any and all of Operator Borrowers' liabilities, obligations and indebtedness to Lenders of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable and howsoever evidenced, created, incurred, acquired, or owing, whether primary, secondary, direct, indirect, contingent, absolute, fixed or otherwise (including, without limitation, payments of or for principal, interest, default interest, fees, costs, expenses, and/or indemnification, and obligations of performance, and any interest that accrues after commencement of any insolvency or bankruptcy proceeding regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency or bankruptcy proceeding) arising under or evidenced by the Revolving Loan Documents, and any refinancings, substitutions, extensions, renewals, replacements and modifications for or of any or all of the foregoing.

**Sale and Procedures Motion**: means the *Maybrook and Consulate Debtors' Motion for Entry of Orders (A) Approving Sale of Substantially All of the Maybrook and Consulate Debtors' Assets, Other Than Accounts, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bid Procedures for Sale of Substantially All of the Maybrook and Consulate Debtors' Assets, Other Than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction For and Hearing to Approve the Sale of the Maybrook and Consulate Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief*.

**Secured Parties**: means, collectively, the Administrative Agent, each Lender, each Indemnitee, each other Agent, and any other Person owed Obligations and "Secured Party" means any of them individually.

**SFF**: A Special Focus Facility.

**SOFR**: With respect to any SOFR Business Day, a rate per annum equal to the secured overnight financing rate for such SOFR Business Day.

**SOFR Borrowing**: The SOFR Loans comprising a borrowing of Loans.

**SOFR Business Day**: Any day other than a Saturday, a Sunday or a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**SOFR Credit Extensions**: Any Credit Extension bearing interest or incurring fees, commissions, or other amounts based on Term SOFR.

**SOFR Interest Rate**: With respect to each day during which interest accrues on any portion of a SOFR Loan, subject to the terms and conditions of the Loan Agreement, the rate per annum (expressed as a percentage) equal to (i) Term SOFR for the applicable Term SOFR Interest Period for such day, plus the SOFR Margin; or (ii) if the then-current Benchmark has been replaced with a Benchmark Replacement pursuant to Section 3.13(c), such Benchmark Replacement for such day plus the SOFR Margin; provided that if Lenders shall exercise their rights under the applicable provisions of the Loan Agreement relating to the payment of default rate interest, inability to determine rates or illegality of making SOFR loans, the Adjusted Base Rate, plus the Default Rate if applicable, shall apply for such day.

**SOFR Loan** means a Loan that bears interest at a rate based on Term SOFR.

**SOFR Margin** means 6 and 00/100 percent (6.00%) per annum for a Term SOFR Interest Period of one month for a SOFR Loan for the relevant Interest Period.

**Subordination and Attornment Agreement**: As defined in Article 4.

**Subsidiary or Subsidiaries**: With respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding Capital Securities as have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of any Borrower.

**Taxes**: Any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing, but excluding Excluded Taxes.

**Term SOFR**: means, with respect to each day of any applicable SOFR Loan for any Term SOFR Interest Period, the greater of (a) the forward-looking term rate based on SOFR for a tenor comparable to such Term SOFR Interest Period that is published by the Term SOFR Administrator two (2) SOFR Business Days prior to the first day of such Term SOFR Interest Period; provided, however, that if as of 5:00 pm (New York City time) on any interest lookback day, Term SOFR for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respct to Term SOFR has not occurred, then Term SOFR will be Term SOFR as published by the Term SOFR Adminstrator on the first preceding SOFR Business Day for which Term SOFR for such tenor was published by the Term SOFR Administrator so long as

such first preceding SOFR Business Day is not more than three (3) SOFR Business Days prior to such interest lookback day;  and (b) the Floor. Unless otherwise specified in any amendment to this Loan Agreement entered into in connection with Benchmark Replacement, in the event that a Benchmark Replacement with respect to Term SOFR is implemented, then all references herein to Term SOFR shall be deemed references to such Benchmark Replacement.

**Term SOFR Administrator**: CME Group Benchmark Administration Limited (CBA) (or a successor administrator of Term SOFR selected by Lenders in their reasonable discretion).

**Term SOFR Interest Period**: With respect to that portion of the Loan bearing interest based on Term SOFR, a period of one (1) month to the extent such tenor is an Available Tenor, commencing on a SOFR Business Day as selected by Borrower in accordance with this Amendment, or on such other SOFR Business Day as is acceptable to Lender and Borrower; provided, however, that **(a)** if any Term SOFR Interest Period would end on a day other than a Business Day, such Term SOFR Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Term SOFR Interest Period shall end on the next preceding Business Day, **(b)** any Term SOFR Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Term SOFR Interest Period) shall end on the last Business Day of the last calendar month of such Term SOFR Interest Period, **(c)** no Term SOFR Interest Period shall extend beyond the Maturity Date and **(d)** no tenor that has been removed from this definition pursuant to the applicable provisions of the Loan Documents shall be available for specification in any Disbursement Request.  For purposes hereof, the date of a Loan or SOFR Borrowing initially shall be the date on which such Loan or SOFR Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or SOFR Borrowing.

**Termination Date**: means, the earliest of (a) Maturity Date, (b) the date of consummation of a sale of all or substantially all of the Credit Parties' assets under Section 363 or a plan under Section 1129 of the Bankruptcy Code, (c) the effective date of an Approved Plan, (d) the date on which the Loan obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, and (e) the date which the Administrative Agent delivers written notice to the Borrowers of its election, on account of the occurrence of an Event of Default, to accelerate all Loan obligations.

**Title Company**:  Mid-Penn Abstract Co.

**UCC**:  The Uniform Commercial Code as in effect on the date hereof and from time to time in the state of Illinois, provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

**Unadjusted Benchmark Replacement**: The applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

21

1.2    **Certain UCC and Accounting Terms**.  Except as otherwise defined in this Agreement or the other Loan Documents, all words, terms and/or phrases used herein and therein shall be defined by the applicable definition therefore (if any) in the UCC.  Notwithstanding the foregoing, any accounting terms used in this Agreement which are not specifically defined herein shall have the meaning customarily given to them in accordance with GAAP.  All financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP, consistently applied.  No Accounting Changes (as defined below) shall affect financial covenants, standards or terms in this Agreement; provided, however, each Borrower shall prepare footnotes to the financial statements required to be delivered hereunder that show the differences between the financial statements delivered (which reflect such Accounting Changes) and the basis for calculating financial covenant compliance (without reflecting such Accounting Changes).  "Accounting Changes" means changes in accounting principles required by GAAP and implemented by any Borrower.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1    **Representations and Warranties**.  To induce Lenders to execute and perform this Agreement, Borrowers hereby represent, covenant and warrant to Lenders as follows:

(a)    Fee Simple Title.  At the Closing and at all times thereafter until the Loan is paid in full, each Borrower will have good and merchantable fee simple title to the Land, subject only to the Permitted Exceptions.

(b)    Organization.  Subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, each Borrower is a limited liability company, duly organized, validly existing and in good standing under the laws of the state of Delaware and is qualified to conduct business in the Commonwealth of Pennsylvania. To the Chief Restructuring Officer's actual knowledge, without investigation (the "CRO's Knowledge"), each Borrower has full power and authority to conduct its business as presently conducted, to enter into this Agreement and to perform all of its duties and obligations under this Agreement and under the Loan Documents, such execution and performance have been duly authorized by all necessary manager, member, partner and/or shareholder approval, no Borrower has been convicted of a felony, and there are no proceedings involving criminal activities of any Borrower.

(c)    Authority.  Subject to entry of the DIP Orders and subject to any restrictions arising on account of the Borrowers' statuses as "debtors" under the Bankruptcy Code, this Agreement, the Note, the Mortgage, the other Loan Documents and any other documents and instruments executed and delivered or required to be executed and delivered by any Borrowers in connection with this Loan, when executed and delivered, and upon entry of the Interim DIP Order or the Final DIP Order, as applicable, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and will be enforceable strictly in accordance with their

4890-4151-2374, v. 18

respective terms (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally); no basis presently exists for any claim against Lenders under this Agreement, under the Loan Documents or with respect to the Loan; and enforcement of this Agreement and the Loan Documents are subject to no defenses of any kind.

(d)      No Conflicts.  The execution, delivery and performance of this Agreement, the Note, the Mortgage, the other Loan Documents and any other documents or instruments, executed and delivered or to be executed and delivered by any Borrowers pursuant to this Agreement or in connection with this Loan and the ownership, occupancy and use of the Property will not: (i) violate any provisions of law or any applicable regulation, order, writ, injunction or decree of any court or Governmental Authority, (ii) conflict with the provisions of the certificates of formation, articles of organization, partnership agreements, operating agreements or similar documents of the Borrowers, as applicable, or (iii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which any Borrower is a party or by which any of them may be bound.

(e)      Financial Condition; No Material Adverse Effect.

(i)      The Borrowers have furnished to the Lenders a consolidated balance sheet and statements of income, members' equity and cash flows for the month ending January 31, 2024, certified by an Authorized Officer of each Borrower. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrowers as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes.

(ii)      Other than the Chapter 11 Cases, since January 31, 2024, to the CRO's Knowledge, there has been no event, development or circumstance relating to the Borrowers that has had, or could reasonably be expected to have, a Material Adverse Effect.

(iii)      To the CRO's Knowledge and except as may be otherwise identified in the Borrowers' schedules, as may be amended from time to time, filed in the Chapter 11 Cases, no Borrower has on the date of this Agreement, after giving effect to the transactions contemplated by this Agreement, any indebtedness other than the Borrowers' Liabilities and other indebtedness permitted in Section 11.20, or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, or unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as reflected in the financial statements referred to in Section 11.5 and in accordance with the Approved Budget.

(f)      Use and Occupancy of the Facility.  To the CRO's Knowledge, the present use and occupancy of the Land and the Property do not violate or conflict with any

23

applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, Environmental Laws, zoning, building, land use, noise abatement, occupational health and safety or other laws, any building permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not, and if a third party is required under any covenants, conditions and restrictions of record or any other agreement to consent to the use and/or operation of any Property, the respective Borrower has obtained such approval from such party. Each Borrower has obtained, and maintained in good standing, all licenses, permits, authorizations, registrations and other approvals required under any Environmental Law and required for their respective ordinary course operations, and for their reasonably anticipated future operations, and, to the CRO's Knowledge, is in compliance with all terms and conditions thereof, except where the failure to do so could not reasonably be expected to result in material liability to any Borrower and could not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

(g)    Environmental Compliance.  The Property will not be used, and, to the CRO's Knowledge,, the Property has never been used, for any activities which, directly or indirectly, involve the use, generation, treatment, storage, transportation or disposal of any Hazardous Materials, except as used in the ordinary course of the businesses of Borrowers, in such quantities as customarily used and reasonably necessary for the operations of the Property, including the Facilities, but in all events in accordance with all applicable Environmental Laws.  To the CRO's Knowledge, no Hazardous Materials exist now on or under the Property or in any surface waters or groundwaters on or under the Property, except in accordance with all applicable Environmental Laws.  To the CRO's Knowledge, the Property and its existing and prior uses have at all times complied with and will comply with all Environmental Laws, and no Borrower has violated any Environmental Laws.

(h)    Reserved.

(i)    Underground Storage Tanks.  To the CRO's Knowledge, the Property does not contain any underground storage tanks.

(j)    Litigation.

(i)    Except as set forth on Schedule 2.1(j) and the Chapter 11 Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the CRO's Knowledge, threatened in writing against or affecting any Borrowers (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) that assert the invalidity or lack of enforceability of any Loan Document or the transactions contemplated by this Agreement, or the invalidity or lack of perfection or priority of any Lien on any Collateral created under any Loan Document or (iii) which is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

(k)     Patriot Act:

(i)     As of the date of this Agreement, each Borrower is, and during the term of this Agreement shall remain, in full compliance with all the applicable laws and regulations of the United States of America that prohibit, regulate or restrict financial transactions, including but not limited to, conducting any activity or failing to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under the Money Laundering Control Act, 18 U.S.C. 1956, 1957, or the Bank Secrecy Act, 31 U.S.C. 5311 *et seq.* and any amendments or successors thereto and any applicable regulations promulgated thereunder.

(ii)     Each Borrower represents and warrants that: (a) neither it, nor any of its owners, officers, directors, managers, members, partners or employees is named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism;  (b) it is not owned or controlled, directly or indirectly, by the government of any country that is subject to a United States Embargo; and (c) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person," or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that it is not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

(iii)     Each Borrower acknowledges that it understands and has been advised by legal counsel on the requirements of the applicable laws referred to above, including the Money Laundering Control Act, 18 U.S.C. 1956, 1957, the Bank Secrecy Act, 31 U.S.C. 5311 *et seq.,* the applicable regulations promulgated thereunder, and the Foreign Assets Control Regulations, 31 C.F.R. Section 500 *et seq.*

(iv)     Each Lender (for itself and not on behalf of any other party) hereby notifies the Borrowers that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow Lenders, as applicable, to identify the Borrowers in accordance with the Patriot Act.  No Borrower (and, to the CRO's Knowledge, no joint venture or Subsidiary thereof) is in violation in any material respects of the Patriot Act.

(l)     Licensure/Certification:

(i)       To the CRO's Knowledge, all permits, licenses, certifications, certificates of waiver, and governmental approvals required by applicable law to use, occupy, and operate the Property, including each Facility and all personal property and equipment thereon, and to conduct all activities thereon, have been validly issued to the proper party(ies), and are in full force and effect.

(ii)       Each Operator Borrower is licensed by the Commonwealth of Pennsylvania as a skilled nursing care facility with the number of beds indicated in the Recitals, and, to the CRO's Knowledge, complies with all current requirements for continued licensure.  All licensed beds and units at each Facility are certified for participation in the federal Medicaid program, as administered in the Commonwealth of Pennsylvania, and are certified for participation in the federal Medicare program, and, to the CRO's Knowledge, each Facility complies with all federal, state, commonwealth and local laws, rules, ordinances and requirements for participation in such programs.    To the CRO's Knowledge, no Borrower has notice or knowledge of any claims for overpayments, paybacks, disallowances, offsets, rate adjustments, recapture liability, or penalties or interest in connection with such claims, in connection with the Medicaid or Medicare programs in which any Facility has participated.  In addition to the foregoing and to the CRO's Knowledge, each Operator Borrower has obtained all regulatory approvals that are required by any governmental or quasi-governmental authority in order to operate its Facility under applicable law and to bill the Medicare and Medicaid reimbursement programs for the services rendered at such Facility.

(iii)       No Certificate of Need is required for any Borrower's intended use and operation of its respective Facility.

(m)       Permits and Easements.  To the CRO's Knowledge, all utility, parking, access (including curb-cuts and highway access), operational, recreational and other permits and easements required for the use of the Property have been granted and issued.

(n)       Encroachments.  To the CRO's Knowledge, except as set forth on the ALTA title surveys certified to Administrative Agent, no portion of the Property or any Facility encroaches upon any building line, setback line, sideyard line, or any recorded or visible easement (or other easement of which any Borrower is aware or has reason to believe may exist) which exists with respect to the Property.

(o)       Truth in Lending Act; Usury.  The Loan, including the interest rate, fees and charges as contemplated hereby, is a business loan.

(p)       Leases.  Except for the Operating Leases and the Leases described on Schedule 2.1(p), there are no Leases for use or occupancy of any part of the Property, other than those previously delivered and approved by Administrative Agent.

26

(q)    <u>Operating Leases</u>.  The Operating Leases and all other Leases approved by Administrative Agent, if any, are in full force and effect; To the CRO's Knowledge: (i) no defaults have occurred thereunder; (ii) no tenant under any such Lease has a right of set-off against payment of rent due thereunder; (iii) no events or circumstances exist which, with the passage of time or the giving of notice, or both, would constitute a default under such Leases; and (iv) enforcement of such Leases by Borrowers or by Administrative Agent pursuant to an exercise of Administrative Agent's rights under the Assignment of Rents would be subject to no defenses of any kind.

(r)    <u>Broker</u>.  Borrowers have not engaged any broker with respect to the Loan or the Property, other than Blueprint HCRE.

(s)    Reserved.

(t)    <u>Labor</u>.  Except as shown on <u>Schedule 2.1(t)</u> attached hereto and made a part hereof, none of the employees of any Borrower is subject to any labor or collective bargaining agreement, and, to the CRO's Knowledge, there are no existing or threatened strikes, lockouts, work stoppages, election or decertification petitions or proceedings, unfair labor charges, equal employment opportunity proceedings, wage payment or material unemployment compensation proceedings, material workmen's compensation proceedings or other material labor or employee-related controversies pending or threatened involving any Borrower and any of their employees.

(u)    <u>Reserved</u>.

(v)    <u>Title; Assets</u>. Each Borrower owns good title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights). Each Borrower owns, possesses or otherwise has rights and assets necessary for the conduct of its business.

(w)    <u>Names</u>.  To the CRO's Knowledge, no Borrower has any assumed names, and no Borrower is doing business under any names other than its company name as set forth in the preamble to this Agreement and the name by which the Facility is commonly known as described in the Recitals.

(x)    <u>Subsidiaries</u>.  No Borrower has any Subsidiaries.

(y)    <u>Managers</u>. There is no manager, consultant or similar service provider in connection with the Facility that receives a Management Fee from any Borrower other than CHMS Group, LLC.

(z)    Reserved.

(aa)    <u>Investment Company</u>.  No Borrower is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," within the meaning of the Investment Company Act of 1940.

(bb)   Margin Stock.  No Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System or any successor thereto.

(cc)   Compliance with Applicable Laws.  To the CRO's Knowledge, and except for the civil action filed by the United States Department of Labor ("DOL") alleging violations of federal wage and hour laws, case number 2:18-cv-01608-WSS, United States District Court for the Western District of Pennsylvania (the "DOL Action") and the purported unpaid nursing assessments(the "Department Assessments") by the Pennsylvania Department of Human Services (the "Department") for which the Borrowers may be liable, , each Borrower is in compliance in all material respects with the requirements of all applicable requirements of the United States of America, the Commonwealth of Pennsylvania, and all applicable local governments, and their agencies and instrumentalities, and all other laws and all orders, writs, injunctions and decrees applicable to it or to its operations or properties, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(dd)   Tax Returns.  To the CRO's Knowledge, each Borrower has each timely filed (including within any filing extensions granted) all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such return, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.  To the CRO's Knowledge, each Borrower has made adequate reserves on its books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.  To the CRO's Knowledge, no Borrower has participated in any transaction that relates to a year of the taxpayer (which is still open under the applicable statute of limitations) which is a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2) (irrespective of the date when the transaction was entered into).

(ee)   Insurance.  The Borrowers' Facilities are insured with financially sound and reputable insurance companies which are not Affiliates of any Borrower in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where each Borrower operates, no notice of cancellation has been received with respect to the current policies, and each Borrower is in compliance with all conditions contained in such current policies.

(ff)   Locations.  Set forth on Schedule 2.1(ff) is the address of the Land.  On the date hereof, Schedule 2.1(ff) sets forth (a) each place of business of each Borrower (including its chief executive office), (b) all locations where all Inventory and the equipment owned by each Borrower is kept and (c) whether each such Collateral location

28

and place of business (including Borrowers' chief executive office) is owned or leased (and if leased, specifies the complete name and notice address of each lessor).  To the CRO's Knowledge, no Collateral is located outside the United States or in the possession of any lessor, bailee, warehouseman or consignee, except as indicated on Schedule 2.1(ff).

(gg)    Default.  To the CRO's Knowledge, no Default or Event of Default exists or would result from the incurrence by any Borrower of any Debt hereunder or under any other Loan Document.

(hh)    Accuracy of Information.  To the CRO's Knowledge, all information heretofore or contemporaneously herewith furnished in writing by or on behalf of each Borrower to Administrative Agent for purposes of or in connection with this Agreement and the transactions contemplated hereby is, and all information hereafter furnished by or on behalf of each Borrower to Administrative Agent pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Administrative Agent that any projections and forecasts provided by Borrowers are based on good faith estimates and assumptions believed by Borrowers to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).  To the CRO's Knowledge, Borrowers have disclosed to Administrative Agent, in writing, all facts which Borrowers believe might materially and adversely affect the business, credit, operations, financial condition or prospects of Borrowers or any Affiliate of Borrowers or which Borrowers believe might materially and adversely affect any material portion of Borrowers' properties, or Borrowers' ability to perform their obligations under this Agreement or the other Loan Documents to which any Borrower is a named party.

(ii)    Pensions Plans. The Borrowers do not participate in any Pension Plan(s), either single or multi-employer, are not fiduciaries of any Pension Plans, either single or multi-employer, and are not responsible for any required contributions pursuant to the terms of any Pension Plan, either single or multi-employer.

(kk)    Intellectual Property.  To the CRO's Knowledge, each Borrower owns and possesses or has a license or other right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights and copyrights as are necessary for the conduct of the businesses of Borrowers, as applicable, without any infringement upon rights of others which could reasonably be expected to have a Material Adverse Effect.

(ll)    DIP Orders. After entry of the DIP Orders, the applicable DIP Order is in full force and effect and has not been vacated, stayed, reversed, modified or amended without the prior written consent of the Administrative Agent.

(mm)    <u>Rate Management Transactions</u>. To the CRO's Knowledge, no Borrower is a party to any Rate Management Transactions other than in favor of Lenders or their Affiliates.

(nn)    <u>Material Contracts</u>. <u>Schedule 2.1(nn)</u> is, as of the Effective Date and to the CRO's Knowledge, a true, correct and complete listing of all Material Contracts. Except on account of any Borrowers' status as a "debtor" in the Chapter 11 Cases, to the CRO's Knowledge, each of the Borrowers that is party to any Material Contract has performed and is in compliance in all material respects with all of the terms of such Material Contract, and no default or event of default, or event or condition which with the giving of notice, the lapse of time, or both, would constitute such a default or event of default, exists with respect to any such Material Contract.

(oo)    <u>Reserved</u>.

(pp)    <u>Borrower Certification</u>. On the date hereof, <u>Schedule 2.1(pp)</u> sets forth (a) each Borrower's jurisdiction of organization, (b) the location of Borrowers' chief executive office, (c) each Borrower's exact legal name as it appears on its organizational documents and (d) each Borrower's organizational identification number (to the extent such Borrower is organized in a jurisdiction which assigns such numbers) and federal employer identification number.

(qq)    <u>Deposit Accounts</u>. All depositary and other accounts in the name of each Borrower, other than those maintained with Administrative Agent, are described on <u>Schedule 2.1(qq)</u> hereto (the "<u>Deposit Accounts</u>"), which description includes for each such account the name of the account holder, the name, address, telephone and fax numbers of the financial institution at which such account is maintained, the account number and the account officer, if any, of such account.

(rr)    <u>Other Debt</u>. To the CRO's Knowledge, no Borrower has other obligations for borrowed money or other Debt from any Person other than Lenders, intercompany or affiliate loans which are subordinated to the Borrowers' Liabilities (and permitted pursuant to <u>Section 11.20</u>), liabilities identified in the Borrowers' schedules, as may be amended from time to time, filed in the Chapter 11 Cases, or such loans as may be approved in writing by Administrative Agent..

(ss)    <u>Capital Securities</u>. A list of the holders of the Capital Securities of each Borrower is set forth in <u>Schedule 2.1(ss)</u> attached hereto and incorporated herein by reference.

(tt)    <u>Healthcare Representations and Warranties</u>:

(i)    To the CRO's Knowledge, Operator Borrowers have obtained all Medicare, Medicaid and related agency certifications and private organization accreditations and Governmental Authorizations necessary to operate each Facility, and currently is in material compliance with all Medicare and Medicaid statutory and regulatory requirements, including, but not limited to:

(1)   the Medicare Program Integrity Requirements of 42 C.F.R. §420 *et seq.;*

(2)   the requirements under the Conditions for Medicare Payment as described in 42 C.F.R. §424 *et seq.,* as applicable;

(3)   the requirements under the Medicare conditions for Participation for States and Long Term Care Facilities as described in 42 C.F.R. §483 *et seq.;*

(4)   the requirements for Medicare Provider Agreements and Supplier Approval, as described in 42 C.F.R. §489 *et seq.;*

(5)   the Medicaid Program Integrity requirements of 42 C.F.R. §455 *et seq.,* as implemented by the state Medicaid agency in each state in which Operator Borrowers conduct business; and

(6)   the requirements for Medicaid provider agreements required by 42 C.F.R. §431.107 as implemented by the state Medicaid agency in each state in which Operator Borrowers conduct business.

(ii)   Operator Borrowers have all Medicare, Medicaid and related agency provider number(s), supplier billing number(s) and Medicare and/or Medicaid provider and/or participation agreements necessary to submit reimbursement claims to Medicare and/or Medicaid for any healthcare activity in which it is currently engaged, and has not allowed or permitted or authorized any Person to use any such number or agreement, except on Operator Borrowers' behalf.

(iii)   The Medicare and/or Medicaid certification, provider number, supplier billing number and Medicare and/or Medicaid provider and/or participation agreement(s) of Operator Borrowers are currently in good standing and are not now suspended, revoked, denied renewal or terminated.

(iv)   Except for the DOL Action, the Department Assessments and as otherwise identified on Schedule 2.1(j) to the CRO's Knowledge, Operator Borrowers are not currently subject to:

(1)   any federal, state, commonwealth, local governmental or private Payor civil or criminal investigations, inquiries or audits involving and/or related to any federal, state, commonwealth or private Payor healthcare fraud and abuse provisions or contractual prohibition of healthcare fraud and abuse; or

(2)   any federal, state, commonwealth or private Payor inquiry, investigation, inspection or audit regarding its activities (except in the

31

ordinary course), including without limitation, any federal, state, commonwealth or private Payor inquiry or investigation of any Person having "ownership, financial or control interest" in Operator Borrowers (as that term is defined in 42 C.F.R. §420.201 *et seq.)* involving and/or related to healthcare fraud and abuse, false claims under 31 U.S.C. §§3729-3731 or any similar contractual prohibition, or any *qui tam* action brought pursuant to 31 U.S.C. §3729 *et seq.*

(v)     To the CRO's Knowledge, no Borrower:

(1)     has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a;

(2)     has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b);

(3)     has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518, including without limitation any of the following categories of offenses:

(A)     criminal offenses relating to the delivery of an item or service under any Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. §24(b));

(B)     criminal offenses under federal or state or commonwealth law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service;

(C)     criminal offenses under federal or state or commonwealth law relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state, commonwealth or local governmental agency;

(D)     federal or state or commonwealth laws relating to the interference with or obstruction of any investigations into any criminal offenses described in (A) through (C) above; or

(E)     criminal offenses under federal or state or commonwealth law relating to the unlawful manufacturing,

32

distribution, prescription or dispensing of a controlled substance; or

(4)      has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or *qui tam* action brought pursuant to 31 U.S.C. §3729 *et seq.*

(vi)      To the CRO's Knowledge, Operator Borrowers are in compliance with applicable laws relating to its relationships with physicians.

(vii)      To the CRO's Knowledge, Operator Borrowers are in compliance with all laws, rules, regulations, orders, decrees and directions of any governmental or quasi-governmental authority (including without limitation, the Social Security Act, as amended (42 U.S.C. §301 *et seq.*)) and the rules and regulations promulgated thereunder by CMS, the Pennsylvania Department of Health, the Commonwealth of Pennsylvania Department of Aging and Disability Services and all other statutes, rules and regulations applicable to skilled nursing facilities in the Commonwealth of Pennsylvania, and any state or commonwealth laws applicable to the Accounts, any contracts relating thereto or any other Collateral, or otherwise applicable to its business and properties, a violation of which could materially adversely affect its ability to collect its Accounts or repay the Borrowers' Liabilities.

(viii)      Each Operator Borrower (A) has all material permits, licenses, accreditations, registrations, certifications, authorizations, approvals, consents and agreements of all Payors, accreditation agencies, providers and any other Person, necessary or required for Operator Borrowers to own the assets that it now owns, to carry on its business as now conducted, to execute, deliver and perform under this Agreement and the other Loan Documents, and to receive payments on Accounts from the applicable Payors; and (B) has not been notified by any such Payor, accreditation agency, provider or any other Person, during the 24-month period immediately preceding the date of this Agreement, that such Person has suspended, revoked or denied renewal with respect to any such permit, license, accreditation, certification, authorization, approval, consent or provider agreement or other contract granted by it to Operator Borrowers or to which it and Operator Borrowers are parties.

(ix)      To the CRO's Knowledge, Operator Borrowers are in good standing with the respective governmental, quasi-governmental and other third party Payors and regulatory agencies that now or hereafter are expected to be involved in such healthcare activities;

(x)      To the CRO's Knowledge, Operator Borrowers maintain in good standing all state, commonwealth and local licenses, permits, registrations, certifications or other approvals required to be secured by Operator Borrowers in

order to conduct any healthcare activity in which it is currently engaged, including without limitation, a current license to operate a nursing home facility in every jurisdiction in which Operator Borrowers operate a long term care facility;

(xi)    To the CRO's Knowledge, none of Operator Borrowers' state, commonwealth and local licenses, permits, registrations, certifications and other approvals relating to providing healthcare services and other services provided by Operator Borrowers have been suspended, revoked, limited or denied renewal; and,

(xii)    To the CRO's Knowledge, neither Borrowers nor any Facility are subject to a corporate integrity agreement with CMS, Pennsylvania Department of Health, or any other federal or state or commonwealth governmental or quasi-governmental authority.

2.2    **Continuation of Representations and Warranties**.    Each Borrower hereby covenants, warrants and agrees that the representations and warranties made in <u>Section 2.1</u> hereof shall be and shall remain true and correct at the Effective Date and each date of any Borrowing and at all times thereafter so long as any part of the Loan shall remain outstanding.

## ARTICLE 3

## THE LOAN

3.1    **Agreement to Borrow and Lend**.

(a)    <u>Commitments</u>.

(i)    Borrowers agree to borrow from Lenders, and Lenders agree to lend to Borrowers, an amount equal to such Lenders' Pro Rata Share of the principal amount of the New Money DIP Loan on the terms of and subject to the conditions of this Agreement.  Any New Money DIP Loans made under this <u>Section 3.1</u> may be repaid, prepaid or reborrowed in accordance with the provisions hereof; provided, however, that at no time may the aggregate outstanding principal amount of New Money DIP Loans made hereunder exceed the New Money DIP Ceiling.

(ii)    Subject to the terms and conditions set forth herein, upon entry of the Interim DIP Order, (i) an aggregate principal amount of $3,200,000.00 of the Prepetition Loans outstanding under the Prepetition Credit Agreement held by Administrative Agent equal to such Lenders' Roll Up DIP Loan Commitment shall be deemed to have automatically, without notice or any other action, rolled up into, be substituted and exchanged for and be deemed to be Roll Up DIP Loans of such Lenders hereunder and (ii) the Roll Up DIP Loans shall be deemed made on the Effective Date and shall constitute Loans for all purposes hereunder and under the Loan Documents in the principal amount for each Lender set forth on <u>Annex A</u> hereto. Any Roll Up DIP Loans deemed made pursuant to this <u>Section 3.1(a)(ii)</u> and subsequently repaid or prepaid may not be reborrowed; provided that, for the avoidance of doubt, until any Prepetition Loans have been designated

34

as a Roll Up DIP Loan hereunder and approved by the applicable DIP Order, the Roll Up DIP Loans shall continue to constitute a Prepetition Obligation secured by and entitled to the benefits of all Liens and security interests created and arising under the Prepetition Loan Documents, which Liens and security interests shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority (until such Prepetition Loans have been designated as a Roll Up DIP Loan hereunder and approved by the applicable DIP Orders). In connection with the foregoing, the parties hereto that are parties to the Prepetition Loan Documents hereby agree that, subject to the terms and conditions set forth in the DIP Orders, the Prepetition Loans being substituted and exchanged for Roll Up DIP Loans shall automatically be deemed paid in full upon such Prepetition Loans becoming Roll Up DIP Loans hereunder, without any further action on the part of any party to such Prepetition Loan Documents.

(b)    Availability Period. Subject to the terms and conditions set forth herein, during the period commencing on the Interim Facility Effective Date but prior to the entry of the Final DIP Order (the "Interim Period"), the maximum amount of New Money DIP Loans to be drawn by any Borrower under the DIP Facility shall be limited to $12,500,000 in the aggregate in conformity with the Approved Budget and as approved by the Bankruptcy Court in the Interim DIP Order, subject to compliance with the terms, conditions and covenants of this Agreement and the other Loan Documents, provided that that the Borrowers and Administrative Agent will work together to coordinate an immediate draw on the New Money DIP Loan immediately after entry of the Interim DIP Order. All New Money DIP Loans made available to the Borrowers during the Interim Period will be due and payable on the date that is thirty-five (35) days after the entry of the Interim DIP Order unless either (i) the Final DIP Order shall have been entered by the Bankruptcy Court on or before such date, or (ii) such payment date is extended by written agreement by and among the Borrowers and the Administrative Agent. Subject to the terms and conditions set forth herein, upon the Bankruptcy Court's entry of the Final DIP Order until the Termination Date (the "Final Period") and satisfaction of any other conditions precedent, the full remaining amount of the New Money DIP Loans shall be available to the Borrowers in accordance with the terms of this Agreement.

3.2    **Loans and Borrowings**.  Subject to the terms and conditions hereof, each Lender severally agrees to make one or more New Money DIP Loans as part of one or more Borrowings to the Borrowers from time to time prior to the Termination Date in an aggregate amount not to exceed such Lenders' Commitment. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided, however, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

3.3    **Borrowings**. To request a Borrowing, the Borrowers shall give the Administrative Agent a Disbursement Request, which must be given in writing and which shall be irrevocable once given, not later than 12:00 p.m., Chicago time, three (3) Business Days before the date of the proposed Borrowing (a "Disbursement Request"). The Borrowers may not submit a Disbursement Request more frequently than once per week. Each such Disbursement Request shall be signed by the Borrowers and shall specify the following information in compliance with Section 3.2:

(i)    the aggregate principal amount of the requested Borrowing;

35

(ii)     the date of such Borrowing, which shall be a Business Day; and

(iii)    the location and number of the Borrowers' account to which funds are to be disbursed.

Promptly following receipt of a Disbursement Request in accordance with this Section 3.3, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lenders' Loan to be made as part of the requested Borrowing.

3.4    **Funding of Borrowings**.

(a)     Funding by the Lenders. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof solely by wire transfer of immediately available funds by 2:00 P.M., Chicago time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrowers by promptly crediting the funds so received in the aforesaid account of the Administrative Agent to an account of the Borrowers designated by the Borrowers in the applicable Disbursement Request. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)     Presumption of Funding by the Lenders. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lenders' share of such Borrowing, the Administrative Agent may assume that such Lenders have made such share available on such date in accordance with Section 3.4(a) and may (without obligation), in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if Lenders have not in fact made their share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at the greater of the SOFR Interest Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lenders' Loan included in such Borrowing.

3.5    **Termination of Commitments**. The Commitments shall terminate on the Termination Date.

3.6    **Interest**.  Interest on funds advanced under the Loan shall:

(a)     from the Effective Date until the Maturity Date, accrue at the SOFR Interest Rate; provided, however, if the Administrative Agent reasonably determines:

(i)     that maintenance of the Loan accruing interest based on the interest rate applicable to SOFR Loans would violate any applicable law, rule, regulation

36

or directive of any government or any division, agency, body or department thereof, whether or not having the force of law, or

(ii)     that by reason of circumstances affecting SOFR Loans and reasonable means do not exist for ascertaining the applicable SOFR Interest Rate, or

(iii)    the SOFR Interest Rate as determined by Administrative Agent will not adequately and fairly reflect the cost to Lenders of maintaining or funding the Loan at the SOFR Interest Rate accruing interest based on the SOFR Interest Rate has become impracticable as a result of an event occurring after the date of this Agreement which in the opinion of Administrative Agent materially affects the Loan,

then Administrative Agent shall promptly notify Borrowers, and Lenders shall suspend the availability of such rate option and require the Loan to be converted to an interest rate that accurately reflects the amount of interest charged under the Note, which amount will not exceed the prime rate of interest (as listed as such under current practice under the heading "Money Rates" in the Eastern Edition of *The Wall Street Journal*), plus 5%;

(b)     be computed upon advances of the Loan from and including the date of such advance by Lenders to or for the account of Borrowers (whether to an escrow or otherwise), on the basis of a three hundred sixty (360)-day year and the actual number of days elapsed in any portion of a month in which interest is due; and

(c)     Accrued interest on each New Money DIP Loan and each Roll Up DIP Loan shall be payable in arrears on each applicable Interest Payment Date for such Loan and on the Termination Date.

3.7     **Post-Default Rate**. Notwithstanding the foregoing, (i) if any principal of, or interest on, any Loan or any fee or other amount payable by the Borrowers hereunder or under any of the other Loan Documents is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to in the case of overdue principal of any Loan outstanding hereunder, 5% plus the SOFR Interest Rate (such rate, plus the SOFR Interest Rate, the "Default Rate") but in no event to exceed the Highest Lawful Rate (hereinafter defined); and (ii) during the occurrence and continuance of an Event of Default other than an Event of Default resulting from the circumstances described in clause (i) of this subsection (c), the Administrative Agent may, at its option, by notice to the Borrowers (which notice may be revoked at the option of the Administrative Agent), declare that all Loans any other amounts outstanding hereunder shall bear interest at the Default Rate as provided in the preceding paragraphs of this Section, but in no event to exceed the Highest Lawful Rate. "Highest Lawful Rate" shall mean the maximum rate of interest which Lenders are allowed to contract for, charge, take, reserve or received under applicable law after taking into account, to the extent required by applicable law, any and all relevant payments or charges hereunder.

3.8     **Increased Costs; Special Provisions for SOFR**.

(a)      If, after the date hereof, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lenders with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:  (i) shall impose, modify or deem applicable any reserve (including any reserve imposed by the Board of Governors of the Federal Reserve System (or any successor thereto), but excluding any reserve included in the determination of the SOFR Interest Rate), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Lenders; or (ii) shall impose on Lenders any other condition affecting the Loans, the Note, or Lenders' obligation to make SOFR Loans, and the result of anything described in clauses (i) and (ii) above is to increase the cost to (or to impose a cost on) Lenders of making or maintaining any SOFR Loan, or to reduce the amount of any sum received or receivable by Lenders under this Agreement or under the Note with respect thereto, then upon demand by Administrative Agent (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), Borrowers shall pay directly to Lenders such additional amount as will compensate Lenders for such increased cost or such reduction.

(b)      If Administrative Agent shall reasonably determine that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or the compliance by Lenders or any Person controlling Lenders with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Lenders' or such controlling Person's capital as a consequence of Lenders' obligations hereunder to a level below that which Lenders or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration Lenders' or such controlling Person's policies with respect to capital adequacy) by an amount deemed by Lenders or such controlling Person to be material, then from time to time, upon demand by Lenders (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), Borrowers shall pay to Lenders such additional amount as will compensate Lenders or such controlling Person for such reduction.  If such reduction affects Lenders in a manner that is materially different than the manner in which such reduction affects other, similarly situated banks, then Borrowers shall have the right to prepay the Loan without penalty.

3.9    **Loan Fees**.  Borrower shall pay the following loan fees:

(a)      Commitment Fee. The Borrowers agree to pay to the Administrative Agent a commitment fee (the "Commitment Fee") equal to $190,000, which shall be due and payable in full as a condition precedent to first disbursement of proceeds.

(b)     Administrative Agent Fee.  The Borrowers agree to pay to the Administrative Agent for its own account and amount equal to $10,000 per month beginning on the date hereof (pro rated for the month) and every first of the month thereafter until the Termination Date.

(c)     All fees payable hereunder shall be paid, in cash on the dates due, in immediately available funds, to the Administrative Agent. Fees paid hereunder shall not be refundable under any circumstances. Notwithstanding anything to the contrary in this Agreement, the Commitment Fee payable hereunder and Administrative Agent Fee shall be paid free and clear of any withholding.

3.10     **Prepayments**.

(a)     Optional Prepayments. The Borrowers shall have the right at any time and from time to time to prepay the Loans in whole or in part, subject to prior notice in accordance with Section 3.10(b).

(b)     Notice and Terms of Optional Prepayment. The Borrowers shall notify the Administrative Agent of any prepayment hereunder not later than 12:00 p.m., Chicago time, five (5) Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing as provided in Section 3.2.

(c)     Mandatory Prepayments.

(i)     Upon Disposition of Assets. The Borrowers shall prepay the Loans in an aggregate principal amount equal to 100% of Net Proceeds of all Dispositions and Casualty Events unless consented to by the Administrative Agent, as the case may be, on the first Business Day following receipt of such amount.

(ii)     Upon Incurrence of Indebtedness: If any Credit Party, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c), or 364(d) or in violation of the Loan Documents at any time prior to payment in full of all Loans and all other obligations of Borrowers hereunder and the termination of the Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Loan Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Administrative Agent to be applied in accordance with the Interim DIP Order and the Loan Documents.

(d)     No Premium or Penalty. Prepayments permitted or required under this Section 3.10 shall be without premium or penalty.

(e)     Application of Prepayments. Any voluntary or mandatory prepayment of the Loans pursuant to this Section 3.10 shall be applied to prepay the Loans as follows: *first*, to pay any unpaid fees or expense reimbursement due to the Administrative Agent or Lenders, *second*, to pay all accrued and unpaid interest in cash as of the date of such

39

prepayment; *third*, to prepay the New Money DIP Loans; and *fourth,* to prepay the Roll Up DIP Loans.

3.11    **Taxes**.

(a)    All payments made by Borrowers hereunder, under the Note or under any Loan Documents shall be made without set-off, counterclaim, or other defense.  To the extent permitted by applicable law, all payments hereunder or under the Loan Documents (including any payment of principal, interest, or fees) to or for the benefit of any person shall be made by Borrowers free and clear of and without deduction or withholding for, or account of, any Taxes now or hereinafter imposed by any taxing authority.

(b)    If Borrowers make any payment hereunder or under any Loan Documents in respect of which it is required by applicable law to deduct or withhold any Taxes, Borrowers shall increase the payment hereunder or under any other Loan Documents such that after the reduction for the amount of Taxes withheld (and any taxes withheld or imposed with respect to the additional payments required under this Section 3.11(b)), the amount paid to Lenders equals the amount that was payable hereunder or under any other Loan Documents without regard to this Section 3.11(b).  To the extent Borrowers withhold any Taxes on payments hereunder or under any other Loan Documents, Borrowers shall pay the full amount deducted to the relevant taxing authority within the time allowed for payment under applicable law and shall deliver to Administrative Agent within 30 days after it has made payment to such authority a receipt issued by such authority (or other evidence satisfactory to Administrative Agent) evidencing the payment of all amounts so required to be deducted or withheld from such payment.

(c)    If Lenders or Administrative Agent are required by law to make any payments of any Taxes on or in relation to any amounts received or receivable hereunder or under any other Loan Documents, or any Tax is assessed against Lenders with respect to amounts received or receivable hereunder or under any other Loan Documents, Borrowers will indemnify Lenders against (i) such Tax (and any reasonable counsel fees and expenses associated with such Tax) and (ii) any taxes imposed as a result of the receipt of the payment under this Section 3.11(c).  A certificate prepared in good faith as to the amount of such payment by Lenders shall, absent manifest error, be final, conclusive, and binding on all parties.

(d)    Each Lender agrees to indemnify Administrative Agent and hold Administrative Agent harmless for the full amount of any and all present or future Taxes and related liabilities (including penalties, interest, additions to tax and expenses, and any Taxes imposed by any jurisdiction on amounts payable to Administrative Agent under this Section 3.11) which are imposed on or with respect to principal, interest or fees payable to such Lender hereunder and which are not paid by Borrowers pursuant to this Section 3.11, whether or not such Taxes or related liabilities were correctly or legally asserted.  This indemnification shall be made within 30 days from the date Administrative Agent makes written demand therefor.

40

(e)    If such Taxes are being applied against Lenders in a manner that is materially different than the manner in which such Taxes are being applied to other, similarly situated banks, then Borrowers shall have the right to prepay the Loan without penalty.

3.12    **Limitation on Charges**.  It being the intent of the parties that the rate of interest and all other charges to Borrowers be lawful, if for any reason the payment of a portion of the interest or other charges otherwise required to be paid under this Agreement would exceed the limit which Lenders may lawfully charge Borrowers, then the obligation to pay interest or other charges shall automatically be reduced to such limit and, if any amounts in excess of such limit shall have been paid, then such amounts shall at the sole option of Lenders either be refunded to Borrowers or credited to the principal amount of the Borrowers' Liabilities (or any combination of the foregoing) so that under no circumstances shall the interest or other charges required to be paid by Borrowers hereunder exceed the maximum rate allowed by applicable law, and Borrowers shall not have any action against Lenders for any damages arising out of the payment or collection of any such excess interest.

3.13    **Provisions Relating to SOFR Credit Extensions**. SOFR Credit Extensions shall be subject to the following terms and provisions. To the extent that any provision of the Loan Agreement or any other applicable Loan Documents directly conflicts with any provision set forth below, the provision below shall prevail.

(a)    **Rates**. Lenders do not warrant or accept responsibility for, and shall not have any liability with respect to, **(i)**  the continuation, administration, submission or calculation of or any other matter related to the Benchmark, any component definition thereof or rates referenced in the definition thereof or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Benchmark or any other Benchmark prior to its discontinuance or unavailability, or **(ii)** the effect, implementation or composition of any Benchmark Conforming Changes. Lenders and their affiliates or other related entities may engage in transactions that affect the calculation of the Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers. Lenders may select information sources or services in their reasonable discretion to ascertain the Benchmark pursuant to the terms of this Agreement and shall have no liability to the Borrowers or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

(b)    **Interest Rate and Interest Payment Dates For SOFR Loans**. Borrowers promise to pay to Lenders, interest on the unpaid principal amount of each SOFR Loan

made by Lenders for the period from and including the date of the making of such SOFR Loan, to (but excluding) the date such SOFR Loan shall be paid in full, at the SOFR Interest Rate, subject to the applicable provisions of the Agreement relating to the payment of default rate interest, types and groups of loans, continuation of loans, inability to determine rates and illegality of making SOFR loans.  Accrued interest on each SOFR Loan shall be payable on the last day of each Term SOFR Interest Period relating to such SOFR Loan, upon a prepayment of such SOFR Loan, and at maturity.

(c)      **Benchmark Replacement Setting; Benchmark Conforming Changes**. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document (other than any Rate Management Agreement) in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to,  this Agreement or any other Loan Document.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis on the first day of the month. In connection with the use, administration, adoption or implementation of Term SOFR or a Benchmark Replacement, Lenders will have the right to make Benchmark Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Lenders will promptly notify Borrowers of the implementation of any Benchmark Replacement and the effectiveness of any Benchmark Conforming Changes.  Lenders will promptly notify Borrowers of the removal or reinstatement of any tenor of a Benchmark pursuant to this Section.  Any determination, decision or election that may be made by Lenders pursuant to this Section will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section. Notwithstanding anything to the contrary herein or in any other Loan Document (other than any Rate Management Agreement), at any time, **(a)** if the then-current Benchmark is a term rate (including Term SOFR) and either **(i)** any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lenders in their reasonable discretion or **(ii)** the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then Lenders may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor, and if such tenor is the only tenor specified in such definition, Lenders may, in their sole discretion, add an Available Tenor to such definition and implement a Benchmark Replacement Adjustment with respect thereto, and **(b)** if a tenor that was removed pursuant to clause (a) above either **(i)** is subsequently displayed on a screen or information service for a Benchmark or **(ii)** is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark, then Lenders may modify the definition of "Interest Period" (or any similar

or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor. Upon Borrowers' receipt of notice of the commencement of a Benchmark Unavailability Period, Borrowers may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to a loan that bears interest at the Base Rate plus 1.00%, and any outstanding affected SOFR Loans will be deemed to have been converted into such a loan at the end of the applicable Term SOFR Interest Period. "Base Rate" means for any day, the greater of (a) the Federal Funds Rate for such day plus 0.5%, and (b) the rate of interest in effect for such day as announced from time to time by Lenders as their prime rate (whether or not such rate is actually charged by Lenders).

## ARTICLE 4

## LOAN DOCUMENTS

4.1    **Loan Documents**.  As a condition precedent to this Agreement and the obligations of the Lenders to make Loans hereunder pursuant to the terms of this Agreement and the Loan Documents, Borrowers agree that they will deliver this Agreement and the following Loan Documents to Administrative Agent prior to the Effective Date, all of which must be satisfactory to Administrative Agent and Administrative Agent's counsel in form, substance and execution:

(a)    **Note**.  The Note, executed by Borrowers payable to the order of Lender, as defined in Section 1.1.

(b)    **Mortgage**.  The Mortgage, as defined in Section 1.1.

(c)    **Assignment of Rents**.  The Assignment of Rents, as defined in Section 1.1.

(d)    **Control Agreements**.

(e)    **Environmental Indemnity Agreement**.  The Environmental Indemnity Agreement, dated as of even date herewith, from each Borrower in favor of Administrative Agent.

(f)    **Subordination and Attornment Agreement**.  Subordination and Attornment Agreements, dated as of even date herewith, by and between each Borrower and Administrative Agent (as the same may be amended and/or restated from time to time, the "Subordination and Attornment Agreement").

(g)    **Tenant Estoppel Certificate**.  Tenant Estoppel Certificates, dated as of even date herewith, from each Operator Borrower in favor of Administrative Agent.

(h)    **Financing Statements**.  Uniform Commercial Code Financing Statements as required by Administrative Agent to perfect the security interests granted hereunder.

43

(i)    **Subordination of Management Agreement**.

(j)    **Pledge Agreements**. Pledge Agreements, dated as of even date herewith, by and between the members of Borrowers and Administrative Agent, as the same may be amended and/or restated from time to time.

(k)    **Other Loan Documents**.  Such other documents and instruments as further security for the Loan as Lenders or Administrative Agent may reasonably require.

## ARTICLE 5

## CONDITIONS PRECEDENT

5.1    **Conditions to Effective Date**.  This Agreement and the obligations of the Lenders to make Loans hereunder during the Interim Period shall not become effective until the date (the "Interim Facility Effective Date") on which each of the following conditions is satisfied (or waived), in each case in form and substance reasonably satisfactory to the Administrative Agent:

(a)    **Reserved.**

(b)    **Insurance Policies**.

(i)    During the term of this Agreement, Borrowers shall procure, at their expense, and keep in force such insurance coverages required by Administrative Agent (including a flood insurance policy concerning the Property if required by the Flood Disaster Protection Act of 1973).  All insurance shall be in form, content and amounts approved by Administrative Agent and written by an insurance company or companies licensed to do business in the state or commonwealth in which the Real Property is located and domiciled in the United States.  The policies for such property insurance shall have attached thereto standard mortgagee clauses in favor of and permitting Administrative Agent to collect any and all proceeds payable thereunder, and the policies for such general liability insurance shall include Administrative Agent as an additional insured, and the required policies shall include a 30 day notice of cancellation clause in favor of Administrative Agent.  All policies or certificates of insurance shall be delivered to and held by Administrative Agent as further security for the payment of the Note and any other obligations arising under the Loan Documents, with evidence of renewal coverage delivered to Administrative Agent at least 30 days before the expiration date of any policy.  Nothing in this section shall prohibit the Borrowers, as Debtors in the Chapter 11 Cases, from complying with the requirements of the Office of the United States Trustee for the Western District of Pennsylvania (the "UST") with respect to procuring and maintaining required insurance policies.

(ii)    **UNLESS BORROWERS PROVIDE ADMINISTRATIVE AGENT WITH EVIDENCE OF THE INSURANCE COVERAGE**

44

**REQUIRED BY THIS AGREEMENT, ADMINISTRATIVE AGENT MAY PURCHASE INSURANCE AT BORROWERS' EXPENSE TO PROTECT LENDERS' INTERESTS IN THE PROPERTY AND THE COLLATERAL. THIS INSURANCE MAY, BUT NEED NOT, PROTECT BORROWERS' INTERESTS. THE COVERAGE THAT ADMINISTRATIVE AGENT PURCHASES MAY NOT PAY ANY CLAIM THAT IS MADE AGAINST ANY BORROWER IN CONNECTION WITH THE PROPERTY AND THE COLLATERAL. BORROWERS MAY LATER CANCEL ANY INSURANCE PURCHASED BY ADMINISTRATIVE AGENT, BUT ONLY AFTER PROVIDING ADMINISTRATIVE AGENT WITH EVIDENCE THAT BORROWERS HAVE OBTAINED INSURANCE AS REQUIRED BY THIS AGREEMENT. IF ADMINISTRATIVE AGENT PURCHASES INSURANCE FOR THE PROPERTY AND THE COLLATERAL, BORROWERS WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AND ANY OTHER CHARGES THAT MAY BE IMPOSED WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE PRINCIPAL AMOUNT OF THE LOAN OWING HEREUNDER. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF THE INSURANCE BORROWERS MAY BE ABLE TO OBTAIN ON THEIR OWN.**

(c)     **Licenses; Permits; Utilities**.  Evidence satisfactory to Administrative Agent that:

(i)     All permits, licenses, certifications, certificates of waiver, and governmental approvals ("Permits") required by applicable law to use, occupy, and operate the Property, including each Facility, and all personal property and equipment thereon, and to conduct all activities thereon, have been validly issued to the proper party(ies), and are in full force and effect, and in connection therewith, on or prior to the Effective Date:

(A)     Operator Borrowers shall have all Medicare, Medicaid and related agency certifications and private organization accreditations necessary to operate each Facility, and shall be in material compliance with all Medicare and Medicaid statutory and regulatory requirements;

(B)     Operator Borrowers shall have all Medicare, Medicaid and related agency provider number(s), supplier billing number(s) and Medicare and/or Medicaid provider and/or participation agreements necessary to submit reimbursement claims to Medicare and/or Medicaid in connection with the operations of each Facility; and

(C)    Operator Borrowers shall have (A) a nursing home facility license from Pennsylvania Department of Health, effective on the Effective Date, with a licensed bed capacity equal to the number of each Facility's nursing home beds, and (B) all other regulatory approvals that are required by any governmental or quasi-governmental authority in order to operate each Facility under applicable law and to bill the Medicare and Medicaid reimbursement programs for the services rendered at each Facility;

(ii)    the storm and sanitary sewage disposal system, the water system and all mechanical systems serving the Property comply with all applicable laws, ordinances, rules and regulations, including Environmental Laws; and

(iii)    all utility, parking, access (including curb-cuts and highway access), recreational and other easements and permits required or necessary for the ownership, occupancy, and use of the Property have been granted or issued.

(d)    **Operating Approvals**. Evidence satisfactory to Administrative Agent that each Borrower has obtained all other applicable licenses, certifications, permits, approvals, regulatory consents, and Governmental Authorization for the ownership, operation, and use of each Facility and the other Property.

(e)    Evidence reasonably satisfactory to the Administrative Agent that all Borrowers' Liabilities shall be secured by a perfected lien and security interest on all Collateral of the Borrowers pursuant to, and such Lien and security interest shall have the priorities set forth in, the Interim DIP Order, subject only to Permitted Prior Liens and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Interim Facility Effective Date shall have been duly paid.

(f)    The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrowers in form and substance reasonably satisfactory to the Administrative Agent certifying that:

(i)    all government and third party approvals necessary or, in the reasonable discretion of the Administrative Agent, advisable (other than entry of the Interim DIP Order by the Bankruptcy Court), in connection with the financing and transactions contemplated under this Agreement, including the transactions contemplated by this Agreement, have been obtained on satisfactory terms and are in full force and effect;

(ii)    other than the DOL Action, no action or proceeding against any of the Credit Parties or their properties is pending or threatened in any court or before any Governmental Authority seeking to enjoin or prevent the consummation of the transactions contemplated by this Agreement;

(iii)    the representations and warranties of the Credit Parties set forth in this Agreement and the other Loan Documents are true and correct in all material respects (or, in the case of any such representations and warranties that are qualified

as to materiality or reference to Material Adverse Effect in the text thereof, that such representations and warranties are true and correct in all respects) on and as of the Interim Facility Effective Date, except to the extent made as of a specific date, which representations and warranties shall be true and correct in all material respects as of such specific date (or, in the case of any such representation and warranties that are qualified as to materiality or Material Adverse Effect in the text thereof, such representations and warranties being true and correct in all respects as of such specific date); and

(iv)    that at the time of and immediately after giving effect to the Loans to be made on the Interim Facility Effective Date, no Default or Event of Default has occurred and is continuing.

(g)    The Administrative Agent shall have received and shall be satisfied with the initial budget for the 13-week period following the Effective Date (the "Initial Budget"), as attached hereto as Exhibit H.

(h)    The Chapter 11 Cases shall have been commenced by the Debtors, and the Administrative Agent shall be reasonably satisfied with (x) the form and substance of the "first day" orders sought by the Debtors and entered on or promptly following the Effective Date (including the cash management order) and (y) the motions to approve the DIP Facility and the "first day" orders.

(i)    (i) The Interim DIP Order shall have been entered by the Court in substantially the form of Exhibit J, which shall be satisfactory in form and substance to the Administrative Agent and shall not have been (A) vacated, stayed or reversed or (B) modified or amended in any respect without the prior written consent of the Administrative Agent in its reasonable discretion, and (ii) the Debtors shall be in compliance with the terms of the Interim DIP Order in all respects.

(j)    All Borrower's Liabilities shall be secured by a perfected lien and security interest on all Collateral of the Credit Parties pursuant to, and such Lien and security interest shall have the priorities set forth in, the Interim DIP Order (subject to the Carve Out).

(k)    The Debtors shall have filed motions, in form and substance satisfactory to the Administrative Agent, with the Bankruptcy Court seeking approval to retain the Chief Restructuring Officer and broker on economic terms reasonably satisfactory to the Administrative Agent.

(k)    **Organizational/Corporate Documents**.  From each Borrower, (i) a copy of its operating agreement, certified by the manager of such Borrower, as being a true and correct copy and as otherwise unmodified and in full force and effect as of the Effective Date, (ii) Certificates of Good Standing from the state of Delaware and the Commonwealth of Pennsylvania, issued not more than 30 days before the Effective Date, (iii) a recently certified copy of the Articles of Organization, including all amendments thereto, (iv) a certificate from the manager of such Borrower dated as of the Effective Date, providing that no certificate of dissolution has been filed, (v) an incumbency certificate showing specimen signatures for the manager of such Borrower authorized to execute any Loan

47

Documents and (vii) certified copies of resolutions from the members or managers, as applicable, authorizing execution and delivery of the Loan Documents.

(l)    **Leases**.  Certified copies of any Leases and such evidence as to the validity thereof, absence of defaults thereunder, good standing and financial ability of the parties thereto to perform, and such subordination and attornment agreements and estoppel letters from tenants under Leases and holders of concessions or encumbrances with respect to any portion of the Property, all as Administrative Agent may require.

(m)    **Real Estate Taxes**.  Copies of the most recent real estate tax bills (or other evidence satisfactory to Administrative Agent of the amount of such taxes for the most recent bills) for the Land, evidence satisfactory to Administrative Agent that there are no outstanding real estate tax bills that are unpaid beyond their due dates, and evidence satisfactory to Administrative Agent that the Land is separately assessed for real estate taxing purposes.

(n)    **Broker**.  Evidence satisfactory to Administrative Agent that all brokers' commissions or fees due with respect to the Loan or the Property, if any, have been paid in full in cash.

(o)    **Payment of Fees**.  Evidence of payment by each Borrower of all accrued and unpaid fees, costs and expenses to the extent then due and payable on the Effective Date, together with all reasonable attorneys' costs of Lenders to the extent invoiced prior to the Effective Date, plus such additional amounts of reasonable attorneys' costs as shall constitute Lenders' reasonable estimate of attorneys' costs incurred or to be incurred by Lenders through the closing proceedings (provided that thereafter there shall be a final settling of accounts between each Borrower and Lender).

(p)    **Additional Documents**.  Such other papers and documents regarding Borrowers or the Property as Administrative Agent may require.

5.2    **Each Credit Event**.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding), is subject to the satisfaction of the following conditions:

(a)    At the time of and immediately after giving effect to such Borrowing no Default or Event of Default shall have occurred and be continuing;

(b)    The representations and warranties of the Borrowers set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except to the extent qualified by materiality or reference to Material Adverse Effect in the text thereof, in which case such applicable representation and warranty shall be true and correct in all respects) on and as of the date of such Borrowing, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing such representations and warranties shall continue to be true and correct in all material respects (except to the extent qualified by materiality or reference to Material Adverse Effect in the text thereof, in which case

48

such applicable representation and warranty shall be true and correct in all respects) as of such specified earlier date;

(c)    The Borrowers shall be in compliance in all respects with (i) the DIP Orders and (ii) subject to the application of the Permitted Variance, the Approved Budget;

(d)    The Lenders shall have received the most recent updated Budget required to be delivered under Sections 11.19(a), (b) and/or (c) and the Administrative Agent shall be satisfied with such Budget;

(e)    At the time of such Borrowing, no trustee or examiner with expanded powers (other than a fee examiner) shall have been appointed with respect to the Debtors or their property;

(f)    Borrower shall have received no notice and has no knowledge of any liens or claims of lien either filed or threatened against the Property except the liens of Administrative Agent, for its benefit and for the benefit of Lenders,  and those which are specifically identified in writing to Administrative Agent, along with any documents or certificates, executed by Borrowers, that Lenders or Administrative Agent may reasonably require.

(g)    The receipt by the Administrative Agent of a Disbursement Request in accordance with Section 3.3;

(h)    All fees and expenses payable in accordance and all previously invoiced, prepetition and postpetition fees and expenses invoiced as of the most recently ended calendar month of Gutnicki LLP, as counsel to the Administrative Agent and the Prepetition Agent and Campbell & Levine, LLC, as local counsel representing both the Administrative Agent shall have been paid.

Each request for a Borrowing shall be deemed to constitute a representation and warranty by the Borrowers and the other Credit Parties on the date thereof as to the matters specified in Section 6.3(a), (b) and (c).

## **ARTICLE 6**

## **DISBURSEMENTS**

6.1    **Reserved.**

6.2    **Loan Disbursement**.  Subject to the satisfaction of the terms and conditions herein contained, the Loan Proceeds shall be disbursed as follows:

(a)    Intentionally omitted.

(b)    If any disbursement of Loan Proceeds is made by Lenders into an escrow, those Loan Proceeds shall be considered to be disbursed to Borrowers from the date of deposit into that escrow, and interest shall accrue on those Loan Proceeds from that date.

49

(c)    Borrowers hereby request and authorize each Lender to make advances directly to itself, or to deduct from any Borrower's account with Administrative Agent, for payment and reimbursement of all interest, charges, costs and expenses incurred by Lenders in connection with the Loan (to the extent not otherwise paid by Borrowers), including, but not limited to, (i) interest due on the Loan and any points, loan fees, service charges, commitment fees or other fees due to Lenders in connection with the Loan; (ii) all title examination, survey, escrow, filing, search, recording and registration fees and charges; (iii) all documentary stamp and other taxes and charges imposed by law on the issuance or recording of any of the Loan Documents; (iv) all appraisal fees; (v) all title insurance premiums; (vi) all fees and disbursements of legal counsel engaged by Lenders in connection with the Loan, including, without limitation, counsel engaged in connection with the enforcement or administration of this Agreement or any of the Loan Documents; and (vii) any amounts required to be paid by Borrowers under this Agreement, the Note, the Mortgage or any Loan Document after the occurrence of an Event of Default (all of which are herein referred to as "<u>Loan Expenses</u>").

6.3    <u>**Documents Required for Disbursement**</u>.  Prior to, and as a condition of, the disbursement of any Loan Proceeds of the Loan, Borrowers shall furnish to Administrative Agent Borrowers' written disbursement request ("<u>Disbursement Request</u>"), which shall direct Lenders to disburse such funds in accordance with this Agreement and certifies to Lenders, as of the date of the applicable request for disbursement, that:

(a)    no Event of Default, or condition or event which, with the giving of notice or passage of time, or both, would constitute an Event of Default, exists under this Agreement;

(b)    the representations and warranties contained in <u>Article 2</u> of this Agreement are true and correct; and

(c)    Borrower has received no notice and has no knowledge of any liens or claims of lien either filed or threatened against the Property except the liens of Administrative Agent, for its benefit and for the benefit of Lenders, and those which are specifically identified in writing to Administrative Agent;

along with any documents or certificates, executed by Borrowers, that Lenders or Administrative Agent may reasonably require.

6.4    <u>**Expenses and Advances Secured by Mortgage**</u>.  Any and all advances or payments made by Lenders hereunder, from time to time, and any amounts expended by  Lenders pursuant to this Agreement, together with reasonable attorneys' fees, if any, and all other Loan Expenses, as and when advanced or incurred, shall be deemed to have been disbursed as part of the Loan and be and become secured and guaranteed by the Loan Documents to the same extent and effect as if the terms and provisions of this Agreement were set forth therein, whether or not the aggregate of such indebtedness shall exceed the face amount of the Note.

50

6.5 **Post-Closing Items**. Borrowers agree to promptly deliver any documents, certificates or other items, if any, after the Effective Date as set forth on Schedule 6.5 in form and substance satisfactory to Administrative Agent, and such items shall not be deemed waived by Lenders.

6.6 **Administrative Agent's Action for Lenders' Protection Only**. The authority herein conferred upon Administrative Agent and any action taken by Administrative Agent or its agents or employees in making inspections of the Property will be taken by Administrative Agent and by its agents or employees for Lenders' protection only, and neither Lenders nor their agents or employees shall be deemed to have assumed any responsibility to Borrowers or any other person or entity with respect to the Property.

# ARTICLE 7

# RESERVES

7.1 **Setting Up and Adjusting Reserves**. At the Closing, Administrative Agent may demand from Borrowers or deduct from any Borrower's account with Administrative Agent all Loan Expenses, to the extent the same have not been previously paid. After the occurrence of an Event of Default, Administrative Agent may also designate reserves ("Reserves"), and thereafter from time to time shall in its reasonable discretion adjust the amount of such Reserves as circumstances may, in the reasonable judgment of Administrative Agent, require for any or all of the following purposes to cover the actual or estimated amounts required for such purposes until the Maturity Date of the Loan:

(a) All unpaid Loan Expenses and fees of Lenders' consultants and Lenders' counsel;

(b) An amount, as estimated by Administrative Agent, to provide for the payment of interest on the Loan prior to the Maturity Date;

(c) An amount, as estimated by Administrative Agent, for real estate taxes which will accrue prior to the Maturity Date and for tax deposits, if any, required by the Mortgage;

(d) An amount, as estimated by Administrative Agent, for premiums on insurance policies required to be furnished by Borrowers hereunder, payable prior to the Maturity Date and for insurance deposits, if any, required by the Mortgage;

(e) Funds to pay any license fees, mortgage or lease guaranty insurance premiums, permits and other charges and fees; and

(f) An amount, as estimated by Administrative Agent, to provide for any tenant improvement holdbacks, leasing commissions, rent abatements under or pursuant to any leases of any part of the Property, if any.

7.2    **Disbursement of Reserves**.  Provided that (i) no Event of Default hereunder has occurred and is continuing, and (ii) no event or circumstance has occurred which, with the passage of time, the giving of notice, or both, could constitute an Event of Default, Administrative Agent may, and at the request of Borrowers shall, disburse the Reserves for the respective purposes for which they have been set aside, either by payment of items for which the Reserves have been set aside, or by reimbursement to Borrowers for payments so made by Borrowers.

7.3    **No Interest Payable on Reserves**.  No interest shall accrue upon Reserves held by Administrative Agent until disbursement thereof.  Payments by Lenders into an escrow or title indemnity or otherwise for the benefit of Borrowers or to satisfy any requirements of the Title Company shall be deemed a disbursement.

7.4    **Application of Reserves in Case of Event of Default**.  In case of an Event of Default, Administrative Agent may use and apply Reserves or any monies deposited by Borrowers with Administrative Agent, regardless of the purpose for which deposited, to cure such Event of Default or to apply as a prepayment of the Loan.

## ARTICLE 8

## COLLATERAL:  GENERAL TERMS

8.1    **Grant of Security Interest**.  To secure the prompt payment of Borrowers' Liabilities, the prompt, full and faithful performance by Borrowers of all of the provisions to be kept, observed or performed by Borrowers under this Agreement and/or the other Loan Documents and/or the Prepetition Credit Agreements, Borrowers do hereby pledge, assign, transfer and deliver to Administrative Agent, for its benefit and for the benefit of Lenders, and grants to Administrative Agent, for its benefit and for the benefit of Lenders, a security interest in and to and a first lien (subject only to the Permitted Exceptions) on, all of Borrowers' Collateral.  This Agreement shall constitute a security agreement, creating a security interest in such Collateral, as collateral, in Administrative Agent, for its benefit and for the benefit of Lenders, as a secured party, and any Borrower, as Debtor, all in accordance with the UCC.  Each Borrower shall make appropriate entries upon its financial statements and books and records disclosing Administrative Agent's security interest (for its benefit and for the benefit of Lenders) in the Collateral.

8.2    **Perfection of Security Interests**.  Borrowers shall execute and/or deliver to Administrative Agent, at Borrowers' expense, at any time and from time to time hereafter at the request of Administrative Agent, all agreements, instruments, financing statements, authorizations, documents and other written documents (sometimes hereinafter individually and collectively referred to as "Supplemental Documentation") that Administrative Agent reasonably may request, in form and substance acceptable to Administrative Agent, to perfect and maintain as perfected Administrative Agent's security interest (for its benefit and for the benefit of Lenders) in the Collateral and to consummate the transactions contemplated in or by this Agreement and the other Loan Documents.  Each Borrower irrevocably hereby makes, constitutes and appoints Administrative Agent (and all Persons designated by Administrative Agent for that purpose) as such Borrower's true and lawful attorney and agent-in-fact to sign the names of such Borrower on the Supplemental Documentation and to deliver the Supplemental Documentation to such Persons as

Administrative Agent may reasonably elect in the event that any Borrower shall fail promptly to provide the same upon request of Administrative Agent, and to file in any jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral as all assets of Borrowers (or words of similar effect), regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, or as being of an equal or lesser scope or within greater detail, and (ii) contain any other information required by Section 5 of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including whether any Borrower is an organization, the type of organization, and any organization identification number issued to each Borrower, and in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Borrowers agree that a carbon, photographic or photostatic copy or other reproduction of this Agreement or of any financing statement shall be sufficient as a financing statement.

8.3     **Inspection of Collateral**.  Administrative Agent (by any of its officers, employees and/or agents) shall have the right, at reasonable times and upon reasonable notice to an Authorized Officer prior to the occurrence of an Event of Default, and after the occurrence of an Event of Default, at any time or times, to inspect the Property and the Collateral; and to visit any or all of Borrowers' offices to discuss its financial matters with its officers and its independent auditors (and each Borrower hereby authorizes such independent auditors to discuss such financial matters with Administrative Agent or any representative thereof), and to examine (and, at the expense of Borrowers, photocopy extracts from) any of its books or other records; to perform appraisals of the tangible assets of Borrowers, and to inspect, audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to Inventory, Accounts and any other Collateral.  All such inspections or audits by Administrative Agent shall be at Borrowers' expense, provided that so long as no Default or Event of Default exists, Borrowers shall not be required to reimburse Administrative Agent for inspections or audits more frequently than twice each fiscal year.  Borrowers' obligation to pay such costs shall constitute part of Borrowers' Liabilities, payable by Borrowers to Administrative Agent on demand.

8.4     **First Lien and Locations of Collateral**.  Each Borrower warrants and represents to, and covenants with, Lenders that: (a) as of the Effective Date, Administrative Agent's security interest (for its benefit and for the benefit of Lenders) in the Collateral is, and at all times thereafter shall be, perfected and have a first priority; (b) the offices and/or locations where each Borrower keeps the Collateral consisting of personal property and books and records concerning the Collateral are located solely at the Real Property and at each Borrower's office as listed in Section 16.9 hereof, and Borrowers shall not remove such books and records and/or the Collateral therefrom and shall not keep any of such books and records and/or the Collateral at any other office or location without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld; provided, however, that the Borrowers' counsel may keep copies of the Borrowers' books and records for purposes of administering the Chapter 11 Cases, and (c) as of the Effective Date, Borrower's sole office and place of business is the Real Property and at those locations as set forth in Section 16.9.  An Authorized Officer, by written notice delivered to Administrative Agent at least

thirty (30) days prior thereto, shall advise Administrative Agent of each Borrower's opening of any new office or place of business or its closing of any existing office or place of business and any new office or place of business shall be within the continental United States of America.  Except as provided in the DIP Orders, there are no senior Liens on the Collateral of the Borrowers other than the Liens of Administrative Agent, for its benefit and for the benefit of Lenders, pursuant hereto, and any Permitted Exceptions.

8.5    **Leases**.  To the extent permitted by applicable law, the security interest created hereby is specifically intended to cover all Leases between any Borrower or its agents as lessor, and various tenants named therein, as lessee, including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of said Leases, together with all of the right, title and interest of such Borrower, as lessor thereunder.

8.6    **Ownership; Authority; Use**.  Borrowers are and will be the true and lawful owner of the Collateral and has rights in, and the power to transfer, the Collateral, subject to no senior liens, charges or encumbrances other than the lien hereof or otherwise provided in the DIP Orders, other liens and encumbrances benefiting Administrative Agent (for its benefit and for the benefit of Lenders)  and no other party, and liens and encumbrances, if any, expressly permitted by the other Loan Documents.  The Collateral is to be used by Borrowers solely for business purposes.

8.7    **Third Parties; Control**.  Borrowers agree that where Collateral is in possession of a third party, Borrowers will join with Administrative Agent in notifying the third party of Administrative Agent's interest (for its benefit and for the benefit of Lenders) and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Administrative Agent, for its benefit and for the benefit of Lenders.  Borrowers will cooperate with Administrative Agent in obtaining control with respect to Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper.

8.8    **Constructive Trust**.  After the occurrence of an Event of Default, subject to the terms of the DIP Orders and the Carve Out, Borrowers shall receive, as the sole and exclusive property of Administrative Agent (for its benefit and for the benefit of Lenders), and as trustee for Administrative Agent (for its benefit and for the benefit of Lenders), all monies, checks, drafts and all other payment for and/or proceeds of Collateral which come into the possession or under the control of Borrowers (or any of its managers, owners, partners, shareholders, directors, officers, employees, agents or those Persons acting for or in concert with Borrowers) and upon Administrative Agent's election, immediately upon receipt thereof, Borrowers shall remit the same (or cause the same to be remitted), in kind, to Administrative Agent at Administrative Agent's office listed in Section 16.9 below.

8.9    **Application of Proceeds of Collateral**.  Upon the occurrence of an Event of Default, subject to the terms of the DIP Orders, Administrative Agent, at any time or times in its sole and absolute discretion, may take control of, in any manner, and may endorse any Borrower's name, as appropriate, on, any of the items of payment or proceeds described in Section 8.8 above and, pursuant to the provisions of this Agreement, Administrative Agent may, in its sole and absolute discretion, apply the same to and on account of Borrowers' Liabilities. For the purposes of this Section 8.9, each Borrower hereby irrevocably makes, constitutes and appoints Administrative Agent (and all persons

4890-4151-2374, v. 18

designated by Administrative Agent for such purpose) as such Borrower's true and lawful attorney and agent-in-fact with power, without notice to such Borrower, to take any such actions.

8.10    **Application of Payments**.  Notwithstanding any contrary provision contained in this Agreement or in any of the other Loan Documents, after the occurrence of a Default or an Event of Default, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by Administrative Agent or Lenders from any Borrower, any guarantor, or with to any of the Collateral and Borrowers and Lenders do hereby irrevocably agree that any and all payments or proceeds so received shall be applied in the following manner:

Finally, the <u>First</u>, to the payment of all fees, costs, expenses and indemnities of Administrative Agent (in its capacity as such), including attorneys' fees of Administrative Agent, and any other Borrowers' Liabilities owing to Administrative Agent in respect of sums advanced by Administrative Agent to preserve the Collateral or to preserve its security interest in the Collateral (or any other collateral provided pursuant to any other Loan Document);

<u>Second</u>, to payment of that portion of Borrowers' Liabilities constituting fees, costs, expenses and indemnities of Administrative Agent;

<u>Third</u>, to payment of that portion of the Borrowers' Liabilities constituting fees, costs, expenses and indemnities of each Lender as provided herein, pro rata among them in proportion to the respective amounts described in this clause <u>Third</u> payable to it;

<u>Fourth</u>, to the payment of all of the Borrowers' Liabilities consisting of accrued and unpaid interest owing to each Lender, pro rata among them in proportion to the respective amounts described in this clause <u>Fourth</u> payable to it;

<u>Fifth</u>, to the payment of all of the Borrowers' Liabilities consisting of principal owing to each Lender, pro rata among them in proportion to the respective amounts described in this clause <u>Fifth</u> payable to it;

<u>Sixth</u>, to the payment of all Bank Product Obligations owing to the applicable Lender or its Affiliates, pro rata among them in proportion to the respective amounts described in this clause <u>Sixth</u> payable to it;

<u>Seventh</u>, to the payment of all other Borrowers' Liabilities owing to each Lender, including, without limitation, pursuant to the Prepetition Loan Documents; and

<u>Last</u>, the payment of any remaining proceeds, if any, to whomever may be lawfully entitled to receive such amounts, including, if applicable, Borrower.

All amounts owing under this Agreement in respect of Liabilities including fees, interest, default interest, interest on interest, expense reimbursements and indemnities, shall be payable in accordance with the foregoing waterfall provisions irrespective of whether a claim in respect of such amounts is allowed or allowable in any insolvency proceeding.

8.11    **Possession and Sale of Collateral**.   Upon an Event of Default hereunder, subject to the DIP Orders, Administrative Agent shall have the remedies of a "Secured Party" under the UCC, including, without limitation, the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose, so far as Borrowers can give authority therefor, with or without judicial process, may enter (if this can be done without breach of the peace) upon any place on which the Collateral or any part thereof may be situated and remove the same therefrom (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Uniform Commercial Code); and Administrative Agent shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to Borrowers' right of redemption, if any, in satisfaction of Borrowers' obligations, as provided in the UCC.  Administrative Agent may render the Collateral unusable without removal and may dispose of the Collateral on the Real Property.

8.12    **Waiver; Deficiency**.   Borrowers waive and agree not to assert any rights or privileges which they may acquire under Section 9-626 of the UCC.  Borrowers shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Borrowers' Liabilities in full and the fees and disbursements of any attorneys employed by Administrative Agent to collect such deficiency.

8.13    **Third Party Collateral Claims**. After the occurrence of an Event of Default, subject to the DIP Orders, Administrative Agent, in its sole and absolute discretion, without waiving or releasing any Event of Default or obligation, liability, or duty of Borrowers under this Agreement or the other Loan Documents, may at any time or times hereafter, but shall be under no obligation to, pay, acquire and/or accept an assignment of any security interest, lien, encumbrance, or claim asserted by any Person against the Collateral.  All sums paid by Administrative Agent in respect thereof and all costs, fees and expenses, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto that are incurred by Administrative Agent on account thereof shall be part of Borrowers' Liabilities payable by Borrowers to Administrative Agent on demand.

8.14    **Additional Collateral**.  Upon the occurrence of an Event of Default, subject to the DIP Orders, Administrative Agent may, in its sole and absolute discretion, retain as additional Collateral or release to Borrowers, from time to time, such portion of the monies, reserves and/or proceeds received by Administrative Agent with respect to the Collateral as Administrative Agent may determine.  All such monies, reserves, proceeds and other property of Borrowers in the possession of Administrative Agent at any time or times hereafter are hereby pledged by Borrowers to Administrative Agent, for its benefit and for the benefit of Lenders, as additional Collateral hereunder and may be applied by Administrative Agent on account of Borrowers' Liabilities.

8.15    **No Custom or Waiver**.  No authorization given by Administrative Agent pursuant to this Agreement or the other Loan Documents to sell any specified portion of Collateral or any items thereof, and no waiver by Administrative Agent in connection therewith shall establish a custom or constitute a waiver of the limitation contained in this Agreement against such sales, with respect to any of the Collateral or any item thereof not covered by said authorization.

8.16    **Appointment as Attorney-in-Fact.** Each Borrower hereby irrevocably designates, makes, constitutes and appoints Administrative Agent (and all Persons designated by Administrative Agent), upon the occurrence of an Event of Default, subject to the DIP Orders, as such Borrower's true and lawful attorney and agent-in-fact, with power, without notice to Borrowers and at such time or times hereafter as Administrative Agent, in its sole and absolute discretion may determine, in any Borrower's or Administrative Agent's name: (a) to demand or enforce payment with respect to any of the Collateral by legal proceedings or otherwise; (b) to exercise all of each Borrower's rights and remedies with respect to the Collateral; (c) to settle, adjust, compromise, extend or renew the Collateral; (d) to settle, adjust or compromise any legal proceedings brought to collect the Collateral; (e) to sell or assign the Collateral upon such terms, for such amounts, and at such time or times as Administrative Agent deems advisable; (f) to discharge and release the Collateral; (g) to take control, in any manner, of any item of payment or proceeds referred to in <u>Section 8.8</u> above; (h) to prepare, file and sign any Borrower's name on any notice of lien, assignment, satisfaction of lien or similar document in connection with the Collateral; (i) to prepare, file and sign any Borrower's name on any proof of claim in bankruptcy or similar document against any Obligor; (j) to do all acts and things necessary, in Administrative Agent's sole discretion, to fulfill all of Borrowers' obligations under this Agreement; (k) to endorse the name of any Borrower upon any of the items of payment or proceeds referred to in <u>Section 8.8</u> above and to deposit the same to the account of Administrative Agent on account of Borrowers' Liabilities; (l) to endorse the name of any Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Collateral; and (m) to sign the name of any Borrower to verifications of the Collateral and notices thereof to Obligor.

8.17    **Duty of Administrative Agent.**  Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as Administrative Agent deals with similar property for its own account.  Neither Administrative Agent nor any of its respective officers, directors, employees or agents shall be liable for any failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Borrowers or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on Administrative Agent hereunder are solely to protect Administrative Agent's interests (for its benefit and for the benefit of Lenders) in the Collateral and shall not impose any duty upon Administrative Agent to exercise any such powers.  Administrative Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrowers for any act (except to the extent any such acts constitute gross negligence or willful misconduct on the part of Administrative Agent) or failure to act hereunder.

8.18    **Releases**.

(a)    At such time as the Borrowers' Liabilities (including, without limitation, under the Prepetition Loan Documents) have been paid and performed in full, the Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of Lenders and Borrowers

hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to Borrowers. At the request and sole expense of Borrowers following any such termination, Administrative Agent shall deliver to Borrowers any Collateral held by Administrative Agent hereunder, and execute and deliver to Borrowers such documents as Borrowers shall reasonably request to evidence such termination.

(b)     If any of the Collateral shall be sold, transferred or otherwise disposed of by Borrowers in a transaction permitted by this Agreement, then Administrative Agent, at the request and sole expense of Borrowers, shall execute and deliver to Borrowers all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.

(c)     Notwithstanding the foregoing or anything to the contrary contained herein, for the avoidance of doubt, no release hereunder, nor shall any payment or satisfaction of any or all of Borrowers' Liabilities, have any effect on any obligations of any Borrower or any guarantor with respect to any Prepetition Loans, except, and to the extent, that such Prepetition Loans constitute the Roll Up Dip Loan.

## ARTICLE 9

**Intentionally omitted.**

## ARTICLE 10

## THE AGENT

10.1  **Appointment and Authorization**.  Each Lender hereby irrevocably (subject to Section 10.10) appoints, designates and authorizes Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, Administrative Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in other Loan Documents with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely

58

as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

10.2 **Reserved**.

10.3 **Delegation of Duties**. Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct.

10.4 **Exculpation of Administrative Agent**. None of Administrative Agent nor any of its directors, officers, employees or agents shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except to the extent resulting from its own gross negligence or willful misconduct in connection with its duties expressly set forth herein as determined by a final, nonappealable judgment by a court of competent jurisdiction), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Credit Party or Affiliate of any Borrower, or any officer thereof, contained in this Agreement or in any other Loan Documents, or in any certificate, report, statement or other document referred to or provided for in, or received by Administrative Agent under or in connection with, this Agreement or any other Loan Documents, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Documents (or the creation, perfection or priority of any Lien or security interest therein), or for any failure of Borrowers or any other party to any Loan Documents to perform its obligations or Borrowers' Liabilities hereunder or thereunder. Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Documents, or to inspect the properties, books or records of any Borrower or any Borrower's Subsidiaries or Affiliates. Each Lender represents and warrants to Administrative Agent that, none of the execution, delivery or performance by Administrative Agent of any Loan Documents nor compliance by it with the terms and provisions hereof or thereof: (A) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (B) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of such Lender pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement, loan agreement, partnership agreement or any other agreement, contract or instrument to which such Lender is a party or by which it or any of its property or assets is bound or to which it may be subject, or (C) will violate any provision of the organizational documents of such Lender.

10.5 **Reliance by Administrative Agent**. Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, electronic mail message, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons,

and upon advice and statements of legal counsel, independent accountants and other experts selected by Administrative Agent.  Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Documents and, if it so requests, confirmation from the Lenders of their obligation to indemnify Administrative Agent against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Documents.  For purposes of determining compliance with the conditions specified in Article 4, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender.

10.6    **Notice of Default**.  Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default or Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of the Lenders, unless Administrative Agent shall have received written notice from a Lenders or Borrowers referring to this Agreement, describing such Event of Default or Default and stating that such notice is a "notice of default".  Administrative Agent will notify the Lenders of its receipt of any such notice.  Administrative Agent shall take such action with respect to such Event of Default or Default in accordance with Section 14; provided that, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default or Default as it shall deem advisable or in the best interest of the Lenders.

10.7    **Credit Decision**.  Each Lender acknowledges that Administrative Agent has not made any representation or warranty to it, and that no act by Administrative Agent hereafter taken, including any consent and acceptance of any assignment or review of the affairs of the Credit Parties, shall be deemed to constitute any representation or warranty by Administrative Agent to any Lender as to any matter, including whether Administrative Agent has disclosed material information in its possession.  Each Lender represents to Administrative Agent that it has, independently and without reliance upon Administrative Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Credit Parties, and made its own decision to enter into this Agreement and to extend credit to Borrowers hereunder.  Each Lender also represents that it will, independently and without reliance upon Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers.  Except for notices, reports and other documents expressly herein required to be furnished to the Lenders by Administrative Agent, Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of Borrowers which may come into the possession of Administrative Agent.

10.8    **Indemnification**.  Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand Administrative Agent and its directors,

officers, employees and agents (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to its applicable Pro Rata Share, from and against any and all Indemnified Liabilities (as hereinafter defined). Without limitation of the foregoing, each Lender shall reimburse Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorney costs and Taxes) incurred by Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Documents, or any document contemplated by or referred to herein, to the extent that Administrative Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive repayment of the Loans, cancellation of the Note(s), any foreclosure under, or modification, release or discharge of, any or all of the Collateral Documents, termination of this Agreement and the resignation or replacement of Administrative Agent.

10.9    **Administrative Agent in Individual Capacity**. CIBC and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Credit Parties and Affiliates as though CIBC were not Administrative Agent hereunder and without notice to or consent of any Lender. Each Lender acknowledges that, pursuant to such activities, CIBC or its Affiliates may receive information regarding Borrowers or their Affiliates (including information that may be subject to confidentiality obligations in favor of Borrowers or such Affiliate) and acknowledge that Administrative Agent shall be under no obligation to provide such information to them. With respect to their Loans (if any), CIBC and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though CIBC were not Administrative Agent, and the terms "Lender" and "Lenders" include CIBC and its Affiliates, to the extent applicable, in their individual capacities.

10.10    **Successor Administrative Agent**.    Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders. If Administrative Agent resigns under this Agreement, the Administrative Agent shall, with (so long as no Event of Default exists) the consent of Borrowers (which shall not be unreasonably withheld or delayed), appoint from among the Lenders a successor agent for the Lenders. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor agent, and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 10 and Sections 11.39 and 16.5 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

10.11    **Collateral Matters**. Each Lender authorizes and directs Administrative Agent to enter into the other Loan Documents for the benefit of Lenders. Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by Lenders in accordance with the provisions of this Agreement or the other Loan Documents, and the exercise by the Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all Lenders. Administrative Agent is hereby authorized on behalf

61

of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or Loan Documents which may be necessary to perfect and maintain perfected the Liens upon the Collateral granted pursuant to this Agreement and the other Loan Documents.  The Lenders irrevocably authorize Administrative Agent, at its option and in its discretion, (a) to release any Lien granted to or held by Administrative Agent under any Collateral Document (i) upon termination of the Commitments and payment in full of all Loans and all other obligations of Borrowers hereunder; or (ii) constituting property sold or to be sold or disposed of as part of or in connection with any disposition permitted hereunder (including the release of any guarantor); or (b) to subordinate its interest in any Collateral to any holder of a Lien on such Collateral which is permitted by this Agreement (it being understood that Administrative Agent may conclusively rely on a certificate from Borrowers in determining whether the Debt secured by any such Lien is permitted under this Agreement).  Upon request by Administrative Agent at any time, the Lenders will confirm in writing Administrative Agent's authority to release, or subordinate its interest in, particular types or items of Collateral pursuant to this <u>Section 10.11</u>.

  10.12  **<u>Restriction on Actions by Lenders</u>**.  Each Lender agrees that it shall not, without the express written consent of Administrative Agent, and shall, upon the written request of Administrative Agent (to the extent it is lawfully entitled to do so), set off against the Borrowers' Liabilities, any amounts owing by such Lender to a Credit Party or any deposit accounts of any Credit Party now or hereafter maintained with such Lender.  Each Lender further agrees that it shall not, unless specifically requested to do so in writing by Administrative Agent, take or cause to be taken, any action, including the a commencement of any legal or equitable proceedings to foreclose any loan or otherwise enforce any security interest in any of the Collateral or to enforce all or any part of this Agreement or the other Loan Documents.  All enforcement actions under this Agreement and the other Loan Documents against the Credit Parties or any third party with respect to the Borrowers' Liabilities or the Collateral may only be taken by Administrative Agent or by its agents at the direction of Administrative Agent.

  10.13  **<u>Administrative Agent May File Proofs of Claim</u>**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

    (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Borrowers' Liabilities that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of each Lender and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders and Administrative Agent) allowed in such judicial proceedings; and

    (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to Lender, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 3.6, 11.39 and 16.5.

Each Lender hereby authorizes Administrative Agent to authorize or consent to or accept or adopt on behalf of such Lender any plan of reorganization, arrangement, adjustment or composition affecting the Borrowers' Liabilities and/or the rights of such Lender and authorizes Administrative Agent to vote in respect of the claim of such Lender in any such proceeding.

10.14   **Other Agents; Arrangers and Managers**.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "documentation agent," "co-agent," "book manager," "lead manager," "arranger," "lead arranger" or "co-arranger", if any, shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, in the case of such Lenders, those applicable to all Lenders as such.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

10.15   **Reserved**.

# ARTICLE 11

# FURTHER AGREEMENTS OF BORROWERS

11.1   **Maintenance of Existence, etc**.  Each Borrower shall maintain and preserve (a) its existence and good standing in the jurisdiction of its organization and (b) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be qualified or in good standing could not reasonably be expected to have a Material Adverse Effect).

11.2   **Mechanics' Liens, Taxes and Contest Thereof**.  Borrowers agree that they will not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against the Property, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, and will pay all special assessments which have been placed in collection and all real estate taxes and assessments of every kind (regardless of whether the same are payable in installments) upon the Property, before the same become delinquent; provided, however, that Borrowers shall have the right to contest in good faith and with reasonable diligence the validity of any such lien, claim, tax or assessment if the right to contest such matters is expressly granted in the Mortgage.  If Borrowers shall fail promptly either to discharge or to contest claims, taxes or assessments asserted or give security or indemnity in the manner provided in the Mortgage, or having commenced to contest the same, and having given such security or indemnity, shall fail to prosecute such contest with diligence, or to maintain such indemnity or security so required by the Mortgage, or upon the adverse conclusion of any such contest, to cause

any judgment or decree to be satisfied and lien to be released, then and in any such event Administrative Agent may, at its election (but shall not be required to), procure the release and discharge of any such claim and any judgment or decree thereon and, further, in its sole discretion, effect any settlement or compromise of the same.  Any amounts so expended by Administrative Agent, including premiums paid or security furnished in connection with the issuance of any surety bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder.  In settling, compromising, discharging or providing indemnity or security for any claim for lien, tax or assessment, Administrative Agent shall not be required to inquire into the validity or amount thereof.

11.3    **Fixtures and Personal Property**.  Subject to the rights of Administrative Agent as the holder of the first mortgage on the Property (for its benefit and for the benefit of Lenders) and the Permitted Exceptions, and except for the security interest granted to Administrative Agent, for its benefit and for the benefit of Lenders, Borrowers agree that all of the personal property, fixtures, attachments, furnishings and equipment delivered in connection with the use, operation, ownership of the Property will be kept, from and after the commencement of the Chapter 11 Cases, free and clear of all chattel mortgages, vendor's liens, and all other liens, claims, encumbrances and security interests whatsoever, and that Borrowers will be the absolute owner of said personal property, fixtures, attachments and equipment.  Borrowers, on request, will furnish Administrative Agent with satisfactory evidence of such ownership, and of the terms of purchase and payment therefor.

11.4    **Proceedings to Enjoin or Prevent Use**.  If any proceedings are filed or are threatened to be filed seeking to (a) enjoin or otherwise prevent or declare invalid or unlawful the use, occupancy, maintenance or operation of the Property or any portion thereof; (b) adversely affect the validity or priority of the liens and security interests granted Administrative Agent, for its benefit and for the benefit of Lenders,  hereby; or (c) adversely affect the financial condition of any Borrower or the ability of any Borrower to own, or the ability of any Borrower to operate, the Property, then Borrowers will immediately notify Administrative Agent of such proceedings, and within two (2) Business Days following Borrowers' notice of such proceedings, Borrowers will cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom.  Without limiting the generality of the foregoing, Borrowers will resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such proceedings.

11.5    **Furnishing Information**.  Borrowers shall:

(a)    cooperate with Administrative Agent in arranging for inspections by representatives of Administrative Agent of the Property as may, from time to time, be requested in accordance with this Agreement;

(b)    promptly supply Administrative Agent with such information concerning its assets, liabilities and affairs, and the assets, liabilities and affairs of each Borrower, as Administrative Agent may reasonably request from time to time hereafter; which shall specifically include, without need for request from Administrative Agent, as soon as available and in no event later than 120 days after fiscal year-end, independent certified

public accountant-prepared and audited consolidated and consolidating financial statements for Operator Borrowers and internally prepared consolidated and consolidating financial statements for Owner Borrowers, prepared in accordance with GAAP, including therein balance sheets and statements of earnings, payor mix and cash flows of Borrowers as at the end of such fiscal year, and clearly delineating amounts paid by Owner Borrowers to Operator Borrowers for the purpose of Management Fees and rent paid or payments, certified without adverse reference to going-concern value and, with respect to Operator Borrowers, without qualification by an independent certified public accountant firm of recognized standing, selected by Borrowers and reasonably acceptable to Administrative Agent, beginning with the financial statements for the fiscal year ending December 31, 2023.

(c)    promptly supply to Administrative Agent, as soon as available and in any event within forty five (45) days after the end of each month, internally prepared consolidated and consolidating financial statements of Operator Borrowers as of the end of such month, including balance sheets together with statements of earnings, payor mix and cash flows for such month and for the period beginning with the first day of such Fiscal Year and ending on the last day of such month, prepared in accordance with GAAP and clearly delineating amounts paid by Owner Borrowers to Operator Borrowers for the purpose of Management Fees and rent paid or payments, certified by an Authorized Officer of Operator Borrowers, beginning with the financial statements for the month ending February 29, 2024.  Notwithstanding anything herein to the contrary, all financial statements shall include an allowance for doubtful accounts which shall be equal to total receivables aged more than 210 days.

(d)    accompanying each set of annual statements delivered pursuant to Section 11.5(b) and each set of monthly or quarterly statements, as applicable, delivered pursuant to Section 11.5(c), that is also the end of a fiscal quarter, a duly completed quarterly compliance certificate in the form and substance of Administrative Agent's customary form or such other form acceptable to Administrative Agent in its reasonable discretion, dated the date of such annual statements or such monthly statements, which certificate shall state that (i) each Borrower is in compliance in all material respects with all covenants contained in this Agreement, (ii) that no Default or Event of Default has occurred or is continuing, or, if there is any such event, describing such event, the steps, if any, that are being taken to cure it, and the time within which such cure will occur and (iii) except for actions taken as permitted by this Agreement, all representations and warranties made by the Borrowers herein continue to be true as of the date of such certificate, except as set forth therein, and such certificate shall be signed by an Authorized Officer and shall also contain, in a form and with such specificity as is reasonably satisfactory to Administrative Agent, a calculation of each of the financial covenants described on Schedule 11.18 of this Agreement, and such additional information as Administrative Agent shall have reasonably requested from the Borrowers prior to the submission thereof;

(e)    within 30 days after the required filing date with the appropriate taxing authority or any extensions thereof, if Administrative Agent, requests, copies of all federal tax returns of each Borrower;

(f)      as soon as available and in no event later than thirty (30) days after receipt by any Borrower, provide Administrative Agent with a true and correct copy of every annual survey of each Facility, with explanations of all deficiencies indicated on such survey;

(g)      as soon as available and in no event later than ten (10) days after receipt by any Borrower, provide Administrative Agent with a true and correct copy of (i) every annual or life safety code survey of each Facility, (ii) every complaint survey of each Facility alleging a violation with a Substandard Quality of Care, as defined by federal regulations (i.e., deficiencies under 42 CFR 483.13 or 42 CFR 483.25 with scope and severity levels of F, G, H, I, J, K or L), along with any plans of correction submitted by any Operator Borrower in connection therewith, and correct or cause to be corrected any such deficiency or violation within the time period required for cure by such agency, subject to such agency's normal appeal process, if any such deficiency or violation is reasonably likely to adversely affect either the right to continue participation in Medicare, Medicaid or other reimbursement programs for existing patients or the right to admit new Medicare patients, Medicaid patients or other reimbursement program patients or result in the loss or suspension of any of any Borrower's licenses and permits to operate such Borrower's business;  (iii) any fines assessed by the Pennsylvania Department of Health, (iv) any notice from the Pennsylvania Department of Health, the Medicaid program as administered in the Commonwealth of Pennsylvania, Centers for Medicare and Medicaid Services or any other federal or state or commonwealth governmental or quasi-governmental authority terminating or revoking or threatening to terminate or revoke any Facility's nursing home license, or any other material license, certification, waiver or accreditation of any Borrower; and (v) any notice from the Medicaid program, as administered in the Commonwealth of Pennsylvania, CMS, or any other governmental, quasi-governmental or other Payor source alleging that overpayments have been made to any Operator Borrower or that any Operator Borrower has overbilled such Payor source, and/or demanding repayment or recoupment of monies previously paid to such Operator Borrower;

(h)      within thirty (30) Business Days of the required date of filing or within thirty (30) Business Days of the date of actual filing, whichever is earlier, provide Administrative Agent with complete and accurate copies of any annual or interim cost reports filed with Medicaid, as administered in the Commonwealth of Pennsylvania, Medicare, CMS or other applicable program or any other governmental or quasi-governmental agency by or on behalf of each Borrower, which reports will be prepared by an independent certified public accountant or by an experienced cost report preparer reasonably acceptable to Administrative Agent, and promptly furnish to Administrative Agent any amendments filed with respect to such reports and all responses, audit reports or inquiries with respect to such reports;

(i)      as soon as available and in no event later than five (5) days after receipt by any Borrower, provide Administrative Agent with a true and correct copy of any and all notices from any governmental or quasi-governmental agency terminating, suspending, revoking or downgrading to a substandard category, or threatening termination,

suspension, revocation or downgrade to a substandard category, of any Medicare or Medicaid certification or other entitlement to payments pursuant to any program, or any license or certification relating to the Property or any Facility;

(j)    promptly notify Administrative Agent of:

(i)    any condition or event which constitutes (or which, with the giving of notice or lapse of time, or both, would constitute) an Event of Default, and the steps being taken by Borrowers with respect thereto;

(ii)    other than the Chapter 11 Cases or otherwise in connection therewith, any material adverse change in the financial condition or operations of any Borrower;

(iii)    any litigation, arbitration or governmental investigation or proceeding not previously disclosed by Borrowers to Administrative Agent which has been instituted or, to the knowledge of any Borrower, is threatened against any Borrower or to which any of the properties of any thereof is subject which could reasonably be expected to have a Material Adverse Effect;

(iv)    any notice, whether in writing or threatened, that it is contemplated to be filed against any Credit Party asserting a *qui tam* action brought pursuant to 31 U.S.C. §3729 *et seq.* which could reasonably be expected to have a Material Adverse Effect;

(v)    any cancellation or material adverse change in any insurance maintained by the Borrowers;

(vi)    any other event (including (i) any violation of any Environmental Law or the assertion of any Environmental Claim or (ii) the enactment or effectiveness of any law, rule or regulation) which could reasonably be expected to have a Material Adverse Effect;

(vii)    any Lien on any of the Collateral not permitted under this Agreement or which would adversely affect the ability of Administrative Agent to exercise any of its remedies hereunder;

(viii)    Reserved; or,

(ix)    other than general market conditions beyond the reasonable control of Borrowers, the occurrence of any other event which could reasonably be expected to have a Material Adverse Effect on the aggregate value of the Collateral or on the Liens created hereby.

(k)    At least two (2) days, to the extent practicable, prior to their being filed with the Bankruptcy Court, the filing thereof, copies of all monthly reports, pleadings, motions,

applications, judicial information or other information, in each such case, to filed by or on behalf of the Debtors with the Bankruptcy Court or to be served by a Debtor to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or any committee formed, appointed, or approved in any Chapter 11 Cases, to the extent such document has not otherwise been served pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise;

(l)     maintain a standard and modern system of accounting in accordance with GAAP. Borrowers expressly grant Administrative Agent the right to communicate directly with Borrowers' accountants and hereby authorizes such accountants to communicate directly with Administrative Agent;

(m)     immediately after notice to any Borrower of the commencement thereof, notify Administrative Agent, in writing, of any action, suit, arbitration or other proceeding instituted, commenced against or affecting any Borrower or any Facility with an amount in controversy in excess of Fifty Thousand and No/100 Dollars ($50,000.00);

(n)     subject to all applicable laws, permit Administrative Agent or any of its agents or representatives to have access to and to examine all books and records regarding the Property in accordance with this Agreement;

(o)     in the event any Facility shall be designated or identified as a SFF by CMS, or otherwise becomes subject to the SFF initiative maintained by CMS, Borrowers shall provide written notice thereof to the Administrative Agent within one (1) business day of such Facility being designated or identified a SFF by the CMS, or otherwise becoming subject to the SFF initiative maintained by CMS; and

(p)     permit Administrative Agent to copy and make abstracts from any and all of said books and records.

11.6    **Excess Indebtedness**. Other than accrued interest on the Loan not yet due and payable, Borrowers agree to pay to Lenders on demand the amount by which the indebtedness hereunder, at any time, may exceed the Loan Amount.

11.7    **Compliance with Covenants; Prohibition Against Additional Recordings**. Each Borrower will comply with all recorded or other covenants affecting the Property. No Borrower will record or permit to be recorded any document, instrument, agreement or other writing against the Land or any Facility without the prior written consent of Administrative Agent.

11.8    **Operating Accounts; Cash Management**. Borrowers will maintain all operating accounts and other accounts related to the Property with Administrative Agent, and all revenue of Borrowers shall be received in accounts of Borrowers maintained with Administrative Agent. Borrowers shall also maintain all cash management business with Administrative Agent. Notwithstanding the foregoing provisions of this Section 11.8 to the contrary, Borrowers may set up and maintain a patient trust account and/or a petty cash account and/or a payroll account with

4890-4151-2374, v. 18

a bank other than Administrative Agent satisfactory to Administrative Agent in its reasonable discretion.

11.9    **Distributions**.  No Distributions by Borrower shall be made without prior written consent of Administrative Agent.

11.10    **Further Assurances**.  Borrowers, on request of Administrative Agent, from time to time, will execute and deliver such documents as may be necessary to perfect and maintain as perfected the liens upon the Property and the Collateral granted to Administrative Agent, for its benefit and for the benefit of Lenders,  pursuant to this Agreement, and to fully consummate the transactions contemplated by this Agreement.

11.11    **Books, Records and Inspections**.  Each Borrower will keep its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP.

11.12    **Maintenance, Repair, Restoration, Prior Liens, Parking**.  Borrowers will:

(a)    promptly repair, restore or rebuild any Improvements (as defined in the Mortgage) now or hereafter on the Property which may become damaged or be destroyed to a condition substantially similar to the condition immediately prior to such damage or destruction, whether or not proceeds of insurance are available or sufficient for such purpose;

(b)    keep the Property in good condition and repair, without waste;

(c)    complete within a reasonable time any Improvements now or at any time in the process of erection upon the Property;

(d)    obtain and maintain in full force and effect, and abide by and satisfy the material terms and conditions of, all material permits, licenses, registrations and other authorizations with or granted by any Governmental Authority that may be required from time to time with respect to the performance of its obligations under the Loan Documents;

(e)    make no material alterations in the Property or demolish any portion of the Property without Administrative Agent's prior written consent, which consent shall not be unreasonably withheld or delayed, except as required by law or municipal ordinance upon prior written notice to Administrative Agent;

(f)    not suffer nor permit any change in the use or general nature of the occupancy of the Property, without Administrative Agent's prior written consent;

(g)    pay when due all operating costs of the Property;

(h)    not initiate or acquiesce in any zoning reclassification with respect to the Property without Administrative Agent's prior written consent, which consent shall not be unreasonably withheld or delayed, except as required by law or municipal ordinance upon

69

prior written notice to Administrative Agent; and

     (i)    provide and thereafter maintain adequate parking areas within the Property as may be required by law, ordinance or regulation (whichever may be greater), together with any sidewalks, aisles, streets, driveways and sidewalk cuts and sufficient paved areas for ingress, egress and right-of-way to and from the adjacent public thoroughfares necessary or desirable for the use thereof.

    11.13  **Compliance with Laws; Payment of Taxes**.  Borrowers shall (a) comply in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses, certifications and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect; (b) without limiting clause (a) above, comply with all applicable Bank Secrecy Act ("BSA") and anti-money laundering laws and regulations; (c) without limiting clause (a) above, ensure, and cause each other Credit Party to ensure, that no Credit Party, and no person who owns a controlling interest in or otherwise Controls a Credit Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (d) pay, prior to delinquency, all general and special taxes, assessments, water charges, sewer charges, and other fees, taxes, charges and assessments of every kind and nature whatsoever and other governmental charges against it or any of its property, whether or not assessed against any Borrower, if applicable to the Property or any interest therein, or any obligation or agreement secured hereby, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require Borrowers to pay any such tax or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a claim which could become a Lien on any collateral, such contest proceedings shall stay the foreclosure of such Lien or the sale of any portion of the collateral to satisfy such claim.

    11.14  **Tax Monitoring.**  Borrowers shall remain in Administrative Agent's tax monitoring program with respect to the payment of real estate taxes.

    11.15  **Environmental Matters.**  If any release or threatened release or other disposal of Hazardous Materials shall occur or shall have occurred on the Property or any other assets of Borrowers, Borrowers shall cause the prompt containment and removal of such Hazardous Materials and the remediation of such Property or other assets as necessary to comply with all Environmental Laws and to preserve the value of such Property or other assets.  Without limiting the generality of the foregoing, Borrowers shall comply with any Federal or state judicial or administrative order requiring the performance at any Property of any Borrower of activities in response to the release or threatened release of a Hazardous Material.  To the extent that the transportation of Hazardous Materials is permitted by this Agreement, Borrowers shall transport and dispose of such Hazardous Materials or of any other wastes in compliance with Environmental Laws, and only at licensed disposal facilities operating in compliance with Environmental Laws.

11.16  **Use of Proceeds**.  The proceeds of the Loans shall be used (a) to pay fees and expenses required hereunder or in the DIP Orders, (b) for general working capital purposes of Borrowers in accordance with the Approved Budget or (c) as otherwise permitted under the DIP Orders and the Approved Budget. No Borrower is engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of any Loan have been used or will be used, whether directly or indirectly, (a) for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X or (b) for any purpose that would violate any Anti-Corruption Laws or applicable Sanctions.

11.17  **Reserved**.

11.18  **Milestones**. The milestones set forth on Schedule 11.18, (the "Required Milestones") shall have been taken or completed by the Debtors or the Bankruptcy Court, as applicable, by the dates set forth on Schedule 11.18.

11.19      **Approved Budget**.

(a)      Commencing every Friday after the Effective Date, on or before 12:00 pm (Chicago time) on such Friday, Borrower shall have prepared and delivered to the Administrative Agent an updated 13-week operating budget for the then subsequent 13-week period (each a "Budget" and, once approved as set forth below, the "Approved Budget"), which shall reflect Borrower's good faith projection of (a) all weekly receipts (including from asset sales) and disbursements (including ordinary court operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals and advisors) and any other fees and expenses related to the Loan Documents) in connection with the operation of its business for the preceding week, and (b) projected net cash flow, which projections shall include one (1) additional week added to the end of the previous Budget. Together with delivery of the Budget, Borrower shall provide on every other Friday the Administrative Agent (for subsequent delivery to the Lenders) a variance report ("Variance Report"), comparing Borrower's actual cash receipts and/or disbursements for the immediately preceding cumulative two week period compared to the Approved Budget, with the first Variance Report coming due on the second (2nd) Friday after the Effective Date. Each Variance Report shall include a summary of the receipt and disbursement variances on a cumulative basis, both in dollar ($) and percentage (%) figures and an explanation of the variance. The Lenders shall have two (2) Business Days following the Business Day that the Budget is delivered to the Administrative Agent and the Lenders to review any Budget after which time such Budget shall become an Approved Budget for all purposes hereunder; provided, no such Budget shall become an Approved Budget if reasonably objected to in writing (which may include e-mail) during the review period by the Administrative Agent; provided further, that in the event of any dispute as to reasonableness, the previously delivered Approved Budget shall remain in full force and effect until such dispute is resolved. If the Administrative Agent objects to any such Budget, the previously delivered Approved Budget shall remain in full force and effect until such time as a subsequently delivered Budget becomes an Approved Budget. For the avoidance of doubt, the Credit Parties shall not be permitted to

71

make any incentive or other payment to management or any employees other than payroll obligations made in the ordinary course of business and consistent with the Budget.

(b)     In the event that an event or circumstance occurs in between the bi-weekly dates on which the Budgets are otherwise due pursuant to Section 11.19(a) which would make the then current Budget materially inaccurate, within two (2) Business Days of becoming aware of such event or circumstance, the Borrowers shall provide notice of such event or circumstance to the Administrative Agent and promptly deliver a revised Budget reflecting the impact thereof. Without limiting the foregoing, the Budget shall be updated, modified or supplemented by the Borrowers with the written consent of the Administrative Agent and upon the request of the Administrative Agent from time to time (which request may, without limitation, be made in connection with any non-ordinary course transaction).

(c)     Each Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent and shall be prepared in good faith, with due care and based upon assumptions the Borrowers believe to be reasonable.

(d)     Within one (1) Business Day of Borrower's having knowledge of their occurrence or existence, Borrower shall provide the Administrative Agent and Lenders with written notice of any event or condition which is reasonably likely to entail expenditures of more than $50,000 which is not included in the Approved Budget (including, but not limited, on account of an accident, environmental event or other unanticipated occurrence) or which would otherwise be reasonably likely to have a negative impact on the value of the Borrowers' assets of future business prospects to a similar event.

(e)     Borrowers shall ensure that at no time shall the operational or accrued professional fee disbursements in the aggregate exceed 10% of aggregate total disbursements for such period as set forth in the Approved Budget (the "Permitted Variance").

11.20   **Additional Indebtedness**.  Other than as provided in Section 2.1(rr) herein or as permitted under the Approved Budget, no Borrower shall incur any Debt from any Person other than Lenders (or, with respect to Rate Management Obligations, Affiliates of Lenders).

11.21   **Commercial Tort Claims**.  If any Borrower shall at any time, acquire a "commercial tort claim" (as such term is defined in the UCC) in excess of $50,000, it shall promptly notify Administrative Agent thereof in writing and supplement Schedule 11.21, therein providing a reasonable description and summary thereof, and upon delivery thereof to Administrative Agent, such Borrower shall be deemed to thereby grant to Administrative Agent, for its benefit and for the benefit of Lenders,  a security interest and Lien in and to such commercial tort claim and all proceeds thereof, all upon the terms of and governed by this Agreement.

11.22   **Real Estate Tax Escrow**.  Borrowers shall make such Tax Deposits (as described in the Mortgage) with Administrative Agent as and to the extent required under the Mortgage.

11.23    **Operator Borrowers' Continuing Operation**.  During the term of the Loan, each Operator Borrower shall continuously lease, operate and occupy its respective Facility and the Property, and no Owner Borrower shall, without Administrative Agent's written consent, terminate or modify the Operating Leases, nor shall any Owner Borrower consent to any assignment or transfer of the Operating Leases, or sublease agreement, license agreement or other use and occupancy agreement for the operation, use or occupancy of any Facility or of all or any other portion of the Property.

11.24    **Modification of Organizational Documents**.  No Borrower will amend or modify the charter, partnership agreement, by-laws, operating agreement or other organizational documents of such Borrower in any way which could reasonably be expected to adversely affect the interests of Lenders; nor change, or allow such Borrower to change, its state of formation or its organizational form.

11.25    **Transactions with Affiliates**.  Excluding intercompany transactions approved by the Bankruptcy Court in the Chapter 11 Cases, no Borrower will enter into, or cause, suffer or permit to exist any transaction, arrangement or contract with any of its Affiliates except upon terms that are no less favorable to such Borrower than would be obtained in a comparable arm's-length transaction with a third party who is not an Affiliate.

11.26    **Unconditional Purchase Obligations**.  No Borrower will enter into or be a party to any contract for the purchase of materials, supplies or other property or services if such contract requires that payment be made by it regardless of whether delivery is ever made of such materials, supplies or other property or services.

11.27    **Inconsistent Agreements**.  No Borrower will enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by any Borrower hereunder or by the performance by any Borrower of any of its obligations hereunder or under any other Loan Documents, (b) prohibit any Borrower from granting to Administrative Agent, for its benefit and for the benefit of Lenders,  a Lien on any of its assets.

11.28    **Business Activities; Issuance of Equity**.  No Borrower will engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto.  No Borrower will issue any ownership interests or other shares in its capital other than any such issuance pursuant to any employee or director option program, benefit plan or compensation program.

11.29    **Investments**.  No Borrower will make or permit to exist any Investment in any other Person, except the following:

(a)    Cash Equivalent Investments; and

(b)    bank deposits in the ordinary course of business.

11.30    **Restriction of Amendments to Certain Documents**.  No Borrower may make any amendments to, or waiver of, any agreements to which any Borrower is a party which amendments

73

or waivers would have a material adverse effect on any Borrower's ability to perform its obligations under the Loan Documents. Borrower will not amend, modify, waive or otherwise change any provision of any Prepetition Credit Document except for the provisions of this Agreement concerning the Roll Up DIP Loans and the provisions of the DIP Orders concerning the Prepetition Loans. No Borrower will create or permit to exist any Superpriority Claim other than Superpriority Claims permitted by the DIP Orders (including the Carve Out) payable from the Collateral of the Borrowers.

11.31 **Mergers, Consolidations, Sales**. No Borrower will (a) be a party to any merger or consolidation, (b) sell, transfer, dispose of, convey or lease any of its Capital Securities, or (c) sell or assign with or without recourse any receivables.

11.32 **Fiscal Year.** No Borrower will change its fiscal year without thirty (30) days prior written notice to Administrative Agent.

11.33 **Restrictions on Transfer**.

(a) Borrowers shall not, without the prior written consent of Administrative Agent, effect, suffer or permit any Prohibited Transfer (as defined herein). Any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation (or any agreement to do any of the foregoing) of any of the following properties or interests shall constitute a "Prohibited Transfer":

(i) The Property and the other Collateral or any part thereof or interest therein, excepting only sales or other dispositions of Collateral (herein called "Obsolete Collateral") no longer useful in connection with the operation of the Property or other dispositions in the ordinary course of any Borrower's business, provided that prior to or concurrently with the sale or other disposition thereof, such Obsolete Collateral has been replaced with Collateral of at least equal value and utility which is subject to the lien hereof with the same priority as with respect to the Obsolete Collateral;

(ii) (1) any shares of capital stock of any Borrower that is a corporation, (2) any membership interests of any Borrower that is a limited liability company, (3) any partnership interests of any general partner of any Borrower that is a general or limited partnership, or (4) any shares of a corporation or membership interests of a limited liability company that is a general partner or managing member/manager of any Borrower except to immediate family members or family trusts for customary estate planning purposes and then only provided the Administrative Agent is given prior notice and provided that no Control is transferred in connection therewith; or

(iii) Intentionally omitted;

in each case whether any such conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrance or alienation is effected directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise; provided, however, that the

4890-4151-2374, v. 18

foregoing provisions of this paragraph shall not apply (i) to liens securing the indebtedness hereunder or any other existing indebtedness by Borrowers to Lenders, (ii) to the lien of current taxes and assessments not in default or being contested in accordance with the provisions of the Mortgage, (iii) to any transfers of the shares of stock or membership, partnership or joint venture interests, as the case may be, by or on behalf of an owner thereof who is deceased or declared judicially incompetent, to such owner's heirs, legatees, devisees, executors, administrators, estate or personal representatives, or (iv) to Leases permitted by the terms of the Loan Documents, if any.

(b)　　In determining whether or not to make the Loan, Lenders evaluated the background and experience of Borrowers and their partners/members/officers in owning and operating property such as the Property, found it acceptable and relied and continues to rely upon same as the means of maintaining the value of the Property and the other Collateral which is Lenders' security for the Note. Borrowers and their partners/members/officers individually and/or in their entirety are well-experienced in borrowing money and owning and operating property such as the Property, were ably represented by a licensed attorney at law in the negotiation and documentation of the Loan and bargained at arm's-length and without duress of any kind for all of the terms and conditions of the Loan, including this provision. Borrowers further recognize that any secondary junior financing placed upon the Property or other Collateral (a) may divert funds which would otherwise be used to pay the Note; (b) could result in acceleration and foreclosure by any such junior encumbrance which would force Administrative Agent to take measures and incur expenses to protect its security; (c) would detract from the value of the Property and other Collateral should Administrative Agent come into possession thereof with the intention of selling same; and (d) would impair Administrative Agent's right to accept a deed in lieu of foreclosure, as a foreclosure by Administrative Agent would be necessary to clear the title to the Real Property. In accordance with the foregoing and for the purposes of (i) protecting Administrative Agent's security (for its benefit and for the benefit of Lenders), both of repayment and of value of the Property and other Collateral; (ii) giving Lenders the full benefit of its bargain and contract with Borrowers; and (iii) keeping the Property and other Collateral free of subordinate financing liens, Borrowers agree that if this paragraph is deemed a restraint on alienation, that it is a reasonable one.

11.34  **Payment of Obligations**. Each Borrower will pay its obligations, including all Taxes, assessments and other governmental charges that may be levied or assessed upon it or any Facility, before the same shall become delinquent or in default, except (a) in accordance with the Approved Budget or where (b) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings and the applicable Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (ii) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any material property of any Borrower or (iii) such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court.

11.35  **Interest Rate Protection**.

(a)    Any and all obligations, contingent or otherwise, whether now existing or thereafter arising, of Borrowers arising under or in connection with all Rate Management Transactions shall be secured by all of the Collateral for the Loan.

(b)    As additional security for the payment and performance of all of the obligations of Borrowers under this Agreement and the other Loan Documents, each Borrower hereby pledges and assigns to Administrative Agent, for its benefit and for the benefit of Lenders, and grants to Administrative Agent, for its benefit and for the benefit of Lenders,  a first lien on and a first priority security interest in, (i) all Rate Management Transactions from time to time entered into by such Borrower with Lender or any other provider, (ii) all contracts from time to time entered into by such Borrower with Lender or any other provider with respect to such Rate Management Transactions, (iii) all amounts from time to time payable to such Borrower under such Rate Management Transactions and contracts and (iv) all proceeds of the foregoing.

11.36  **Management Fees**.  During such time that any indebtedness is outstanding in connection with the Loan, Borrowers may pay Management Fees in accordance with the Approved Budget, in an amount not to exceed the lesser of (a) the actual, out-of-pocket costs and expenses of the recipient of such Management Fee, or (b) three and one half percent (3.5%) of the net revenues of Operator Borrowers, so long as there shall not then exist, and/or the paying of such Management Fees shall not cause there to exist, a Default or Event of Default (including, without limitation, any Default or Event of Default arising from a breach of the financial covenants described in <u>Section 11.18</u>).    Upon the occurrence of an Event of Default, Borrowers shall not pay Management Fees unless or until the Event of Default has been waived by Administrative Agent or the Loan and all interest accrued thereon and other amounts due and owing to Lenders under the Loan Documents have been repaid in full.  Upon the occurrence of an Event of Default, Operator Borrowers shall not pay any Management Fee unless or until the Event of Default has been waived by Administrative Agent or the Loan and all interest accrued thereon and other amounts due and owing to Lenders under the Loan Documents have been repaid in full.

11.37  **Maintenance of Perfected Security Interest; Further Documentation**.

(a)    Each Borrower hereby covenants, represents and warrants that upon the entry of each DIP Order, the Borrowers' Liabilities of such Borrower hereunder and under the Loan Documents:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code and subject and subordinate only to the Carve Out, shall at all times constitute allowed Superpriority Claims payable from the Collateral of the Borrowers;

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code and subject and subordinate only to the Carve Out, shall at all times be secured by first priority, valid, binding, enforceable and perfected security interests in, and Liens upon, all unencumbered tangible and intangible property of such Borrower including any such property that is subject to valid and perfected Liens in existence on the Petition Date, which Liens are thereafter released or otherwise extinguished in connection with the satisfaction of the obligations secured by such Liens

(including, without limitation, subject to the entry of the Final DIP Order, the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code and subject only to the Carve Out, shall at all times be secured by junior, valid, binding, enforceable and perfected security interests in, and Liens upon, all property of each of the Debtors' estates that, on the Petition Date, was subject to a valid and perfected Lien or becomes subject to a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of prepetition claims is expressly permitted under section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"); provided that the Liens granted under the Loan Documents shall not be subject or subordinate to (1) notwithstanding anything to the contrary in the Loan Documents or the DIP Orders, any security interest that is avoided and preserved for the benefit of the Debtors and their estates, (2) any Liens arising after the Petition Date including, any Liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or court for any liability of the Debtors; or (3) any intercompany or affiliate Liens of the Debtors; and

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve Out, shall at all times be secured by first priority, priming, valid, binding, enforceable and perfected security interests in, and Liens upon, all the Prepetition Collateral (as defined in the DIP Orders) of the Borrowers.

(b)    The Secured Parties' Liens and DIP Superpriority Claims (as defined in the DIP Orders) shall have priority over any claims, charges or liens arising under section 105, 326, 328, 330, 331, 503(b), 507(a), 726, 1113 or 1114 of the Bankruptcy Code, and shall be subject and subordinate only to the Carve Out. Except as set forth herein, in the DIP Orders, no other claim having a priority superior to that granted to the Secured Parties by the Interim DIP Order and Final DIP Order, whichever is then in effect, shall be granted or approved while any Borrowers' Liabilities under this Agreement remain outstanding.

(c)    Except for the Carve Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, any other Secured Party or any of the Collateral under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and, subject to entry of the Final DIP Order, each of the Debtors hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Administrative Agent, the Lenders or any other Secured Party.

(d)    Except for the Carve Out, the Superpriority Claims shall at all times be senior to the rights of each Borrower, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Borrower's cases are converted to cases under chapter 7 of the Bankruptcy Code).

(e)    Borrowers will furnish to Administrative Agent from time to time statements and schedules further identifying and describing the assets and property of

4890-4151-2374, v. 18

Borrowers maintained in its ordinary course of business and such other reports in connection therewith as Administrative Agent may reasonably request, all in reasonable detail.

(f)    Borrowers shall not, except upon 30 days' prior written notice to Administrative Agent and delivery to Administrative Agent of (a) all additional financing statements and other documents reasonably requested by Administrative Agent as to the validity, perfection and priority of the security interests provided for herein and (b) if applicable, a written supplement to Schedule 2.1(ff) showing any additional location at which Inventory or equipment shall be kept:

(i)    permit any of the Inventory or equipment to be kept at a location other than those listed on Schedule 2.1(ff);

(ii)    change its jurisdiction of organization or the location of its chief executive office from that specified on Schedule 2.1(ff) or in any subsequent notice delivered pursuant to this Section 11.37; or

(iii)    change its name, identity or corporate structure.

11.38    **Other Matters**.    Each Borrower authorizes Administrative Agent to, at any time and from time to time, file financing statements, continuation statements, and amendments thereto that describe the Collateral, and which contain any other information required pursuant to the UCC for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment, and each Borrower agrees to furnish any such information to Administrative Agent promptly upon request.  Any such financing statement, continuation statement, or amendment may be signed by Administrative Agent on behalf of any Borrower and may be filed at any time in any jurisdiction.

11.39    **Costs; Attorneys' Fees**.

(a)    Borrowers will pay Administrative Agent's reasonable out-of-pocket costs and expenses including reasonable attorneys' fees and costs in connection with the negotiation, preparation, syndication, administration and enforcement (including perfection and protection of the Collateral and the costs of Intralinks (or other similar service), if applicable) of this Agreement and the other Loan Documents, whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable out-of-pocket costs and expenses (including attorneys' fees and costs) incurred by Administrative Agent after an Event of Default in connection with the collection of the Borrowers' Liabilities or the enforcement of this Agreement or the other Loan Documents or during any workout, restructuring or negotiations in respect thereof.  In addition, Borrowers agree to pay, and to save Lenders harmless from all liability for, any fees of Borrowers' auditors in connection with any reasonable exercise by Lenders of their rights pursuant to, and to the extent provided for in, Section 8.3.  All obligations provided for in this Section 11.39 shall survive repayment of the Loan, cancellation of the Note and termination of this Agreement.  Without limiting the generality of the foregoing, if at any time or times hereafter Lenders employ counsel for advice or other representation with

78

respect to any matter concerning Borrowers, this Agreement, the Property or the Loan Documents, or to protect, collect, lease, sell, take possession of, or liquidate any of the Property, or to attempt to enforce or protect any security interest or lien or other right in any of the Property or under any of the Loan Documents, or to enforce any rights of Lenders or obligations of Borrowers or any other person, firm or corporation which may be obligated to Lenders by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Administrative Agent in furtherance hereof, then in any such event, all of the reasonable attorneys' fees arising from such services, and any reasonable expenses, costs and charges relating thereto, shall constitute additional indebtedness owing by Borrowers to Lenders payable on demand and evidenced and secured by the Loan Documents.

(b)    Borrowers agree to pay, and to save Administrative Agent harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes (other than Excluded Taxes) which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)    The agreements in this <u>Section 11.39</u> shall survive repayment of all (and shall be) Borrowers' Liabilities (and termination of all commitments under this Agreement), any foreclosure under, or any modification, release or discharge of, any or all of the Loan Documents and termination of this Agreement.

11.40    <u>**Reinstatement**</u>.  This Agreement shall remain in full force and effect and continue to be effective (i) if, prior to the Borrowers' Liabilities having been paid and performed in full, any petition is filed by or against any Borrower for liquidation or reorganization, (ii) should any Borrower become insolvent or make an assignment for the benefit of creditors or (iii) should a receiver or trustee be appointed for all or any significant part of any Borrower's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Borrowers' Liabilities, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Borrowers' Liabilities, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Borrowers' Liabilities shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.41    <u>**Further Assurances**</u>.  At any time and from time to time, upon the written request of Administrative Agent, and at the sole expense of Borrowers, Borrowers will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Administrative Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby and (ii) in the case of any other relevant Collateral, taking any actions necessary to enable Administrative Agent to obtain "control" (within the meaning of the applicable UCC) with respect thereto.

11.42  **Obligations and Liens Absolute and Unconditional**.  The obligations of each Credit Party under this Agreement shall be construed as continuing, absolute and unconditional without regard to (a) the validity or enforceability of any Loan Document or any other collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by Administrative Agent, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Credit Party or any other Person against Lenders, or (c) any other circumstance whatsoever (with or without notice to or knowledge of any Credit Party) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Credit Party for the Borrowers' Liabilities, in bankruptcy or in any other instance.  When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Credit Party, Administrative Agent may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against any other Credit Party or any other Person or against any collateral security or guaranty for the Borrowers' Liabilities or any right of offset with respect thereto, and any failure by Administrative Agent to make any such demand, to pursue such other rights or remedies or to collect any payments from any other Credit Party or any other Person or to realize upon any such collateral security or guaranty or to exercise any such right of offset, or any release of any other Credit Party or any other Person or any such collateral security, guaranty or right of offset, shall not relieve any Credit Party of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Administrative Agent against any Credit Party.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

11.43  **Chief Restructuring Officer/Broker**. The Borrowers shall not terminate the Chief Restructuring Officer or broker or materially amend or diminish the role of such Chief Restructuring Officer or broker or revoke or rescind any authority provided to it, in each case, without prior written notice to the Administrative Agent and the designation by the Borrowers and acceptance by the Administrative Agent of a successor Chief Restructuring Officer and/or broker.

11.44  **Other Matters.** Without the prior written consent of the Administrative Agent, except as otherwise permitted under the Loan Documents, the Loan Parties shall not:

(a)    enter into an agreement or arrangement for any new Debt or equity capital;

(b)    adopt any change to their respective limited liability company agreements or other organizational documents;

(c)    acquire or sell, lease or otherwise transfer or Dispose of any assets or properties outside the ordinary course of business;

(d)    Subject to the Carve Out, create or permit any Superpriority Claim payable from the Collateral of the Borrowers that is *pari passu* with or senior to the Superpriority Claim of the Lenders and the other Secured Parties; or

(e)     (i) obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Administrative Agent's or any Lender's remedies hereunder or under any other Loan Document, except as specifically provided in the DIP Orders or (ii) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility without the prior written approval of the Administrative Agent.

## ARTICLE 12
## CASUALTIES AND CONDEMNATION

12.1    **Application of Insurance Proceeds and Condemnation Awards**.  The proceeds of any insurance policies collected or claims as a result of any loss or damage to any portion of the Property resulting from fire, vandalism, malicious mischief or any other casualty or physical harm and any awards, judgments or claims resulting from the exercise of the power of condemnation or eminent domain shall be applied to reduce the outstanding balances of the Loan or to rebuild and restore the Property, as provided in the Mortgage.  No Borrower shall settle and adjust any claims under policies of insurance without Administrative Agent's prior written consent, except as provided in the Mortgage.

## ARTICLE 13

## ASSIGNMENTS, PARTICIPATIONS, SALE AND ENCUMBRANCES

13.1    **Lenders' Right to Assign**.  Subject to Section 13.2 below, any Lender may at any time assign, negotiate, pledge or otherwise hypothecate this Agreement or any of its rights and security hereunder, including the Note, Mortgage, and other Loan Documents to any bank, participant, financial institution, or any other person or entity, and in case of such assignment, Borrowers will accord full recognition thereto and agree that all rights and remedies of such Lender in connection with the interest so assigned shall be enforceable against Borrowers by such bank, participant, financial institution or any other person or entity with the same force and effect and to the same extent as the same would have been enforceable by Lenders but for such assignment. From and after the date of such assignment, such Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, shall be released from its rights (other than its indemnification rights) and obligations hereunder.

13.2    **Assignments**.

(a)    Any Lender may at any time assign to one or more Persons other than any Credit Party or any Affiliate thereof (any such Person, an "Assignee") all or any portion of such Lenders' Loans and Commitments, with the prior written consent of Administrative Agent and, so long as no Event of Default exists, Borrower (which consents shall not be unreasonably withheld or delayed and shall not be required for an assignment by a Lender to a Lender or an Affiliate of a Lender).  Except as Administrative Agent may otherwise agree, any such assignment shall be in a minimum aggregate amount equal to $5,000,000 or, if less, the remaining Commitment and Loans held by the assigning Lender.  Borrower and Administrative Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Assignee until Administrative Agent shall have received and accepted an effective

81

assignment agreement in substantially the form of **Exhibit B** hereto (an "Assignment Agreement") executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500.00.  No assignment may be made to any Person if at the time of such assignment Borrowers would be obligated to pay any greater amount under Sections 3.3 or 3.9 to the Assignee than Borrowers are then obligated to pay to the assigning Lender under such Sections (and if any assignment is made in violation of the foregoing, Borrowers will not be required to pay such greater amounts).  Any attempted assignment not made in accordance with this Section 13.2 shall be treated as the sale of a participation under Section 13.3.  Borrowers shall be deemed to have granted their consent to any assignment requiring its consent hereunder unless Borrowers have expressly objected to such assignment within three Business Days after notice thereof.

(b)    From and after the date on which the conditions described above have been met, (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights (other than its indemnification rights) and obligations hereunder.  Upon the request of the Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrowers shall execute and deliver to Administrative Agent for delivery to the Assignee (and, as applicable, the assigning Lender) a Note in the principal amount of Assignee's Loans (and, as applicable, a Note in the principal amount of the Pro Rata Share of principal amount of the Loan retained by the assigning Lender).  Each such Note shall be dated the effective date of such assignment.  Upon receipt by Administrative Agent of such Note(s), the assigning Lender shall return to Borrowers any prior Note held by it.

(c)    Any  Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

13.3    **Participations.**  Any Lender may at any time, without prior or subsequent notice to Borrowers, sell to one or more Persons participating interests or Commitments in the Loan or other interests hereunder (any such Person, a "Participant").  In the event of a sale by Lenders of a participating interest to a Participant, (a) Lenders' obligations hereunder shall remain unchanged for all purposes, (b) Borrowers and Administrative Agent  shall continue to deal solely and directly with Lenders in connection with Lenders' rights and obligations hereunder and (c) all amounts payable by Borrowers shall be determined as if Lenders had not sold such participation and shall be paid directly to Lenders.  No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 15.3 expressly requiring the unanimous vote of all Lenders or, as applicable, all affected Lenders.  Lenders agree to incorporate the requirements of the preceding sentence into each participation agreement which such Lender enters into with

82

any Participant.  Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as Lenders under this Agreement; provided that such right of set-off shall be subject to the obligation of each Participant to share with the Lenders, and the Lenders agree to share with each Participant, as provided in Section 3.13.  Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement; provided that such right of set-off shall be subject to the obligation of each Participant to share with Lenders, and Lenders agree to share with each Participant, on a pro rata basis.  Borrowers also agree that each Participant shall be entitled to the benefits of Section 3.8 or Section 3.11 as if it were Lenders (provided that on the date of the participation no Participant shall be entitled to any greater compensation pursuant to Section 3.8 or Section 3.11 than would have been paid to Lenders on such date if no participation had been sold and that each Participant complies with Section 3.8 or Section 3.11 as if it were a direct assignee).

13.4    **Prohibition of Assignments and Encumbrances by Borrowers**.  Neither any Borrower nor any other Credit Party may assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.  Except as expressly provided in the Mortgage, no Borrower, without the prior written consent of Administrative Agent, shall create, effect, consent to, attempt, contract for, agree to make, suffer or permit any Prohibited Transfer.

13.5    **Lenders' Assignment to Federal Reserve Banks**.  In addition to the assignments and participation permitted under the foregoing provisions of this Section 13, any Lender may assign and pledge all or any portion of the Loan and the Note to any Federal Reserve Bank as collateral security pursuant to Regulation A and any Operating Circular issued by such Federal Reserve Bank, and such Loans and Note shall be fully transferrable as provided therein.  No such assignment shall release the assigning Lender from its obligations hereunder.

# ARTICLE 14

# EVENTS OF DEFAULT BY BORROWERS

14.1    **Event of Default Defined**.  The occurrence of any one or more of the following shall constitute an "Event of Default" as said term is used herein, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a)    Borrowers fail to pay (i) any installment of principal or interest payable on the date when due, or (ii) any other amount payable to Lenders under the Note, this Agreement or any of the other Loan Documents within three (3) Business Days after the date when any such payment is due in accordance with the terms hereof or thereof;

(b)    Any default shall occur under the terms applicable to any Debt of any Credit Party in an aggregate amount exceeding $50,000 and such default shall accelerate the maturity of such obligations or permit the holder or holders thereof, or any trustee or agent

for such holder or holders, to cause such Debt to become due and payable (or require such Credit Party to purchase or redeem such Debt or post cash collateral in respect thereof) prior to its expressed maturity;

(c)    Default in the payment when due, or in the performance or observance of, any material obligation of, or condition agreed to by, any Credit Party with respect to any material purchase or lease of goods or services where such default, singly or in the aggregate with all other such defaults, might reasonably be expected to have a Material Adverse Effect;

(d)    Reserved;

(e)    Any Loan Document or Prepetition Loan Document shall cease to be in full force and effect; or any Credit Party (or any Person by, through or on behalf of any Credit Party) shall contest in any manner the validity, binding nature or enforceability of any Loan Document or Prepetition Loan Document;

(f)    (i) Borrowers fail to comply with or perform any covenant or agreement set forth in Sections 5.1(c)(i), 11.1, 11.4 through 11.11, 11.15, 11.15, 11.16, 11.18 through 11.20, 11.22 through 11.25, 11.27 through 11.33, 11.36, 11.37, 11.43, 11.44; *provided, however*, that if Borrowers failure described in clause (i) is with respect to 11.5(b) through (e), Borrowers shall have a cure period of ten (10) days after any Borrower receives notice of such failure to cure the same, and an Event of Default shall not be deemed to exist during the cure period; *provided, further*, that if Borrowers fail to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrowers under the Note, this Agreement or any of the other Loan Documents and not otherwise addressed in this Section 14.1, and if such failure by its nature can be cured, then so long as the continued operation and safety of the Property, and the priority, validity and enforceability of the liens created by the Mortgage or any of the other Loan Documents and the value of the Property are not materially impaired, threatened or jeopardized, then Borrowers shall have a cure period of thirty (30) days after any Borrower obtains knowledge of such failure or receives written notice of such failure to cure the same, and an Event of Default shall not be deemed to exist during the cure period; provided further that if a Borrower commences to cure such failure during such cure period and is diligently and in good faith attempting to effect such cure, the cure period shall be extended for thirty (30) additional days, but in no event shall such cure period be longer than sixty (60) days in the aggregate;

(g)    (i) Failure of any Borrower to maintain all federal, state, commonwealth or local permits, licenses, certifications, accreditations or other governmental or quasi-governmental authorizations that are necessary in order to own and operate any Facility (collectively "Licenses"), including, but not limited to, a nursing home license issued to any Facility by the Pennsylvania Department of Health, or (ii) the institution of any proceedings against any Borrower by any governmental or quasi-governmental authority either to (A) revoke any of the Licenses, or (B) decertify any Facility from participation in the Medicare or Medicaid reimbursement programs;

(h)    There shall occur with respect to any Operator Borrower or any Facility any Medicare or Medicaid survey deficiencies at Level F, G, H, I, J, K, L or worse (i) which deficiencies are not cured within the amount of time permitted by the applicable reviewing agency or, if a deficiency is appealed in accordance with governing law, within the time period after an unsuccessful appeal or (ii) which result in the imposition by any government authority or the applicable state or commonwealth survey agency of sanctions in the form of either a program termination, temporary management, denial of payment for new admission (which, if not appealed under governing law, continues for thirty (30) days or more or beyond any time period granted after an unsuccessful appeal or more than one denial of payment for new admission is imposed at any time) or facility closure;

(i)    Any representation or warranty made or deemed made by or for any Credit Party herein or any other Loan Document is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice or other writing furnished by any Credit Party to Lenders in connection herewith is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified or deemed made;

(j)    The occurrence of a Prohibited Transfer;

(k)    Reserved;

(l)    The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of any Borrower which in any way relates to or affects this Loan or the Property;

(m)    Any material provision of any Loan Document for any reason ceases to valid, binding and enforceable in accordance with its terms, any Borrower or any other Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(n)    If there occurs, in Administrative Agent's good faith credit judgment and reasonable discretion, a material adverse change in the financial condition of any Credit Party;

(o)    This Agreement or any security instrument shall for any reason fail to create a valid and perfected superpriority Lien in any material portion of the Collateral purported to be covered thereby, except as permitted by the terms of any Loan Document;

(p)    Breach of the representation made in Section 2.1(tt)(xii) of this Agreement, such that any Borrower or any Facility becomes subject to a corporate integrity agreement;

4890-4151-2374, v. 18

(q)     the entry of an order dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(r)     appointment of a Chapter 11 trustee, a responsible officer or an examiner (in the case of both a responsible officer or an examiner, with enlarged powers (other than a fee examiner)) beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code relating to the operation of the business of any Debtor in the Chapter 11 Cases;

(s)     (i) the Bankruptcy Court's granting of any Superpriority Claim or Lien on the Collateral of the Borrowers which is *pari passu* with or senior to the Superpriority Claims or Liens of the Lenders in the Chapter 11 Cases, in each case other than with respect to the Carve Out, or (ii) after the entry of the Final DIP Order, the entry of any final order in the Chapter 11 Cases;

(t)     (i) failure of any material provision of the Interim DIP Order or Final DIP Order to be in full force and effect, (ii) the Interim DIP Order or Final DIP Order being (A) vacated, stayed or reversed, or (B) modified or amended in any respect without the prior written consent of the Administrative Agent in its reasonable discretion, or (iii) the entry of any order in the Chapter 11 Cases charging any of the Collateral, including under Section 506(c) or Section 552(b) of the Bankruptcy Code;

(u)     failure of any Credit Party to comply with any material provisions of the Interim DIP Order or Final DIP Order;

(v)     failure of the Bankruptcy Court to enter the Interim DIP Order within four (4) Business Days after the Debtors' Chapter 11 Cases commence or to enter the Final DIP Order within thirty-five (35) days after the Debtors' Chapter 11 Cases commence.

(w)     payment by any Debtor (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition Debt, payables or other prepetition claim (other than as agreed herein, or as described in the Interim DIP Order, the Final DIP Order or pursuant to any orders approving any "first day" motions);

(x)     entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay resulting from the Chapter 11 Cases) without the consent of Lender;

(y)     A default by any Borrower under any agreements relating to judgments, settlements or other resolution of litigation;

(z)     The dissolution or termination of any Borrower or the merger of any Borrower into or with another entity, including a merger of any Borrower, or the acquisition of any Borrower by the other;

(aa)     The occurrence of any event having a Material Adverse Effect as determined by Administrative Agent's good faith credit judgment and reasonable

discretion;

(bb)    Intentionally omitted;

(cc)    If any Operating Lease or Management Agreement is modified or terminated without the prior written consent of Administrative Agent;

(dd)    If the articles of organization, operating agreement or other organizational documents of any Borrower are materially modified;

(ee)    The occurrence of a "Default" or an "Event of Default" under the Note, the Mortgage, or any of the other Loan Documents;

(ff)    Intentionally omitted;

(gg)    If any Facility is designated or identified as a SFF by CMS, or otherwise becomes subject to the SFF initiative maintained by CMS;

(hh)    Any Borrower pays any Management Fee in violation of Section 11.36 hereof;

(ii)    (i) an amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of an Approved Plan, in each case, such that such plan of reorganization no longer provides for an Acceptable Plan (ii) an Approved Plan is withdrawn without the consent of the Administrative Agent, (iii) the Bankruptcy Court shall terminate or reduce the period pursuant to Section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof, (iv) the Bankruptcy Court shall grant relief that is inconsistent with an Approved Plan in any material respect and that is adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the Loan Documents or (vi) any of the Credit Parties or any of their affiliates shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with an Approved Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) three business days of the Borrowers receiving notice from the Administrative Agent, and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(jj)    the filing by the Debtors, the solicitation or participation by the Debtors of, or the entry of an order by the Bankruptcy Court confirming, a plan of reorganization that does not provide for an Acceptable Plan or an Approved Plan;

(kk)    the entry of an order in the Chapter 11 Cases denying or terminating the use of cash collateral by the Credit Parties;

(ll)    failure to satisfy any of the Required Milestones in accordance with the terms relating to such Required Milestone;

(mm)   the entry of any post-petition judgment against any Credit Party or any judgment that would constitute an administrative expense in the Chapter 11 Cases, in either case in excess of $50,000;

(nn)   the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Facility or as otherwise permitted under the Loan Documents or the DIP Orders, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the DIP Facility, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (ii) subject to the any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted  as security for the DIP Facility, except as expressly provided in this Agreement or in the Interim DIP Order or the Final DIP Order (but only in the event the applicable provisions of either such DIP Order have been specifically consented to by the Administrative Agent), whichever is in effect;

(oo)   Excluding the Debtors complying with any lawfully issued subpoena or formal request for information authorized by the Bankruptcy Code, or other order of the Bankruptcy Court, the Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the Loan Documents, the Prepetition Loan Documents or the Liens on or security interest in the assets of the Debtors securing the Borrowers' Liabilities, including without limitation seeking to equitably subordinate or avoid the Liens securing the such indebtedness or (B) the Debtors engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lender contesting the validity or enforceability of any of the Loan Documents or the Prepetition Loan Documents or denying that it has any further liability thereunder;

(pp)   any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other Disposition of all or substantially all of the Collateral without the prior written consent of the Administrative Agent;

(qq)   after the entry thereof by the Bankruptcy Court, the Confirmation Order shall cease to be in full force and effect, or any Credit Party shall fail to satisfy in full all obligations under the DIP Facility on or prior to the effective date of an Approved Plan or fail to comply in any material respect with the Confirmation Order, or the Confirmation Order shall have been revoked, remanded, vacated, reversed, rescinded or modified or amended in any manner that is adverse to the Administrative Agent's or the Lenders' interests or inconsistent with the Loan Documents;

(rr)   the Loan Documents shall not have been executed and delivered by the Credit Parties and the Administrative Agent within three (3) Business Days after the date of entry of the Interim DIP Order (or shall not have been filed with, and approved by, the

Bankruptcy Court within the times specified and otherwise in accordance with the Interim DIP Order);

(ss)     any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the Liens securing the Loans without the consent of the Administrative Agent (other than the Carve Out), unless such additional financing will, immediately upon the closing thereof, provide for the payment in full of all Borrowers' Liabilities;

(tt)     the entry of an order by the Bankruptcy Court in favor of the statutory committee of unsecured creditors (the "Creditors' Committee"), if any, appointed in the Chapter 11 Cases, any ad hoc committee, or any other party in interest (i) sustaining an objection to claims of the Administrative Agent or any of the Lenders or the Prepetition Agent or Prepetition Lenders, (ii) avoiding any Liens held by the Administrative Agent or any Lender or the Prepetition Agent or Prepetition Lenders, (iii) sustaining an objection to claims of administrative agent or lenders under the Prepetition Credit Agreement or (iv) avoiding any Liens held by the administrative agent or the lenders under the Prepetition Credit Agreement, except as agreed to by the administrative agent under the Prepetition Credit Agreement in writing;

(uu)     any reversal or modification of the Roll Up DIP Loans provided for hereunder by the Bankruptcy Court without the Administrative Agent's consent; or

(vv)     filing of any pleading by any Debtor seeking, supporting or otherwise consenting to, any of the matters set forth in subsections (q), (r), (s), (t), (u), (w), (x), (ii), (jj), (kk), (nn), (oo), (qq), (ss), (tt), or (uu) above in this Section.

14.2     Effect of Event of Default.  If any Event of Default shall occur and be continuing, Administrative Agent may declare Lenders' commitment to make the Loan hereunder to be terminated in whole or in part and/or declare all or any part of the Loan and all other of Borrowers' Liabilities hereunder to be due and payable, whereupon Lenders' commitment to make the Loan hereunder  shall immediately terminate (or be reduced, as applicable) and/or the Loan and other of Borrowers' Liabilities hereunder shall become immediately due and payable (in whole or in part, as applicable) without presentment, demand, protest or notice of any kind.  Administrative Agent shall promptly advise Borrowers of any such declaration, but failure to do so shall not impair the effect of such declaration.

## **ARTICLE 15**

## **ADMINISTRATIVE AGENT'S REMEDIES UPON EVENT OF DEFAULT**

15.1

(a)     Subject to the DIP Orders, in the case of an Event of Default, and at any time thereafter during the continuance of such Event of Default, the Administrative Agent shall take either or both of the following actions, at the same or different times (a

"Termination Declaration"): (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Credit Parties accrued hereunder and under the Note and the other Loan Documents, shall become due and payable immediately, without presentment, demand (other than written notice), protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Credit Party, (iii) declare that the application of the Carve Out has occurred through the delivery by the Administrative Agent of the Carve Out Trigger Notice (as defined in the DIP Orders) to the Debtors, the U.S. Trustee, and counsel to a Committee (if appointed), (iv) declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (as defined in the DIP Orders) and (v) exercise any and all of its rights and remedies in respect to the Collateral including those set forth in Section 15.1(b) below, but subject to the terms and conditions of that Section and the DIP Orders. Any Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Creditor's Committee (if appointed), and the U.S. Trustee.

(b)

(i)       Subject to Section 15.1(b)(ii) and the DIP Orders, in the case of the occurrence of an Event of Default, in addition to any other rights and remedies granted to the Administrative Agent in the Loan Documents, the Administrative Agent may exercise all rights and remedies of a secured party under the UCC, the DIP Orders or any other applicable law, including, for the avoidance of doubt, state foreclosure proceedings. Without limiting the generality of the foregoing but subject to clause (ii) of this subsection (b), the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Credit Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by the relevant Credit Party of any cash collateral arising in respect of the Collateral on such terms as the Administrative Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of (or direct any or all of the Debtors to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Administrative Agent pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code) and deliver, or acquire by credit bid the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk. The Administrative Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Credit Party, which right or equity is hereby waived and released. Each Credit Party further agrees, at the Administrative Agent's

request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Credit Party's premises or elsewhere. The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Article XV, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any other way relating to the Collateral or the rights of the Administrative Agent and the Secured Parties hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Borrowers' Liabilities of the Credit Parties under the Loan Documents pursuant to Section 15.1(b), and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including Section 9-615(a)(3) of the UCC, need the Administrative Agent account for the surplus, if any, to any Credit Party. To the extent permitted by applicable law, each Credit Party waives all claims, damages and demands it may acquire against the Administrative Agent arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(ii)     Except as expressly provided in the DIP Orders and hereunder, the Administrative Agent and the Lenders shall not exercise any of the rights and remedies under Section 15.1(b)(i) or as otherwise provided in the other Loan Documents until the date that is five (5) Business Days after delivery of a Termination Declaration (the "Remedies Notice Period"), subject to first funding the Carve Out. During the Remedies Notice Period, the Debtors and/or a Creditor's Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period; *provided* that the sole issue that the Debtors may bring before the Bankruptcy Court at any such emergency hearing is whether an Event of Default has occurred and/or is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Administrative Agent and the Lenders. Unless the Court orders otherwise, the automatic stay, as to Administrative Agent and the Lenders, as applicable, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the Administrative Agent and the Lenders shall be permitted to exercise all remedies set forth herein, in the Loan Documents or the Prepetition Loan Documents, as applicable, and as otherwise available at law without further order of or application or motion to the Bankruptcy Court consistent with the Intercreditor Agreement and the applicable DIP Order.

(c)     All proceeds realized from the liquidation or other disposition of Collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall, be applied:

(i)     *first*, to payment or reimbursement of that portion of the Borrowers' Liabilities constituting fees, expenses, indemnities and other amounts payable to the Administrative Agent in its capacity as such;

(ii)     *second*, pro rata to payment of accrued interest on the New Money DIP Loans;

(iii)    *third*, pro rata to payment of that portion of the Borrowers' Liabilities constituting unpaid principal of the New Money DIP Loans;

(iv)    *fourth,* pro rata to payment of accrued interest on the Roll Up DIP Loans;

(v)    *fifth,* pro rata to the payment of that portion of the Borrowers' Liabilities constituting unpaid principal of the Roll Up DIP Loans;

(vi)    *sixth*, pro rata to any other Borrowers' Liabilities; and

(vii)    *seventh*, any excess, after all of the Borrowers' Liabilities shall have been indefeasibly paid in full in cash, shall be paid to the Borrowers or their successors or assigns or to whomever may be lawfully entitled to receive the same or as the Bankruptcy Court or the Bankruptcy Court or another a court of competent jurisdiction may award.

(d)    Take possession of the Property and do anything required, necessary or advisable in Administrative Agent's sole judgment to fulfill the obligations of Borrowers hereunder.  Without restricting the generality of the foregoing and for the purposes aforesaid, each Borrower hereby appoints and constitutes Administrative Agent as such Borrower's lawful attorney-in-fact with full power of substitution, such appointment being irrevocable and coupled with an interest, in the premises to perform the following actions:

(i)    without inquiring into and without respect to the validity thereof, to pay, settle or compromise all existing bills and claims which may be liens, or to avoid such bills and claims becoming liens, against the Property or any portion of the Property or as may be necessary or desirable for the clearance of title to the Property;

(ii)    to prosecute and defend actions or proceedings in connection with any Facility;

(iii)    to do any and every act which any Borrower might do in its own behalf with respect to any Facility, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(e)    Without limiting the generality of the foregoing, Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice referred to below) to or upon Borrowers or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances, to the extent permitted by law, forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Administrative Agent or elsewhere upon such terms and conditions as it may deem advisable, for cash or on credit or for future delivery with assumption of any credit risk.

92

Administrative Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales of the Collateral, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Borrowers, which right or equity is hereby waived and released.  Borrowers further agree, at Administrative Agent's request, to assemble the Collateral and make it available to Administrative Agent at places which Administrative Agent shall reasonably select, whether at Borrowers' premises or elsewhere.  Any such sale may be held in conjunction with any foreclosure sale of the Property pursuant to the Mortgage.  If Administrative Agent so elects, the sale of the Property (pursuant to the Mortgage) and the other Collateral may be sold as one lot.  Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this <u>Section 15.1(e)</u>, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Administrative Agent hereunder, including reasonable attorneys' costs, to the payment in whole or in part of the Borrowers' Liabilities, in such order as Administrative Agent may elect, and only after such application and after the payment by Administrative Agent of any other amount required by any provision of law need Lenders account for the surplus, if any, to Borrowers.  To the extent permitted by applicable law, each Credit Party waives all claims, damages and demands it may acquire against Lender arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(f)     Withhold further disbursement of the proceeds of the Loan and terminate any of its obligations to Borrowers;

(g)     Declare the Note to be due and payable forthwith, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived;

(h)     In addition to any rights of set-off that Lenders may have under applicable law, Administrative Agent, without notice of any kind to Borrowers, may appropriate and apply to the payment of the Note or of any sums due under this Agreement any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrowers then or thereafter in the possession of Administrative Agent; and

(i)     Exercise or pursue any other remedy or cause of action permitted at law or in equity or under this Agreement or any other Loan Document, including, but not limited to, foreclosure of the Mortgage and enforcement of all Loan Documents.

To the extent permitted by applicable law, Borrowers waive all claims, damages and demands it may acquire against Lenders arising out of the exercise by them of any rights hereunder.

15.2     <u>**Right of Administrative Agent to Make Advances to Cure Event of Default; Obligatory Advances**</u>.  If any Borrower shall fail to perform any of its covenants or agreements contained herein or in any of the other Loan Documents, Administrative Agent may (but shall not

be required to) perform any of such covenants and agreements, and any amounts expended by Administrative Agent in so doing shall be deemed advanced by Lenders under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed. Amounts advanced by Lenders in the exercise of Administrative Agent's judgment that the same are needed to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand and evidenced and secured by the Loan Documents.

15.3    **Waiver; Amendments**.    No delay on the part of Administrative Agent or any Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.  No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by Administrative Agent, and then any such amendment, modification, waiver or consent  shall be effective only in the specific instance and for the specific purpose for which given.  None of the undertakings, agreements, warranties, covenants and representations of the Borrowers contained in this Agreement or any of the other Loan Documents and no Event of Default under this Agreement or default under any of the other Loan Documents shall be deemed to have been suspended or waived by the Administrative Agent or the Lenders unless such suspension or waiver is in writing signed by an officer of the Administrative Agent, and delivered to the Borrowers specifying such suspension or waiver.  No amendment, modification, waiver or consent shall (a) extend or increase the Commitment of any Lender without the written consent of such Lender, or (b) reduce the principal amount of any Loan, the rate of interest thereon or any fees payable hereunder, without the consent of each Lender directly affected thereby (except for periodic adjustments of interest rates and fees resulting from a change in the SOFR Interest Rate as provided for in this Agreement).

15.4    **Default Rate**.    From and after the date of any Event of Default until the date on which such Event of Default is waived, interest on funds outstanding hereunder shall accrue at the Default Rate and be payable on demand.  The failure of Administrative Agent to charge interest at the Default Rate shall not be evidence of the absence of an Event of Default or waiver of an Event of Default by Administrative Agent.

## ARTICLE 16

## MISCELLANEOUS

16.1    **Time is of the Essence**.  Borrowers agree that time is of the essence with respect to all of their covenants under this Agreement.

16.2    **Administrative Agent's Determination of Facts**.  Administrative Agent at all times shall be free to establish independently to its satisfaction and in its sole and absolute discretion the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

16.3    **Prior Agreements**.  This Agreement and the other Loan Documents, and any other

documents or instruments executed pursuant thereto or contemplated thereby, shall represent the entire, integrated agreement between the parties hereto with respect to the Loan and shall supersede all prior negotiations, representations or agreements pertaining thereto, either oral or written.  This Agreement and any provision hereof shall not be modified, amended, waived or discharged in any manner other than by a written amendment executed by all parties to this Agreement.

16.4    **Disclaimer by Lenders**.  The relationship between Borrowers on the one hand and Lenders on the other hand shall be solely that of borrower and lender.  Lenders have no fiduciary relationship with or duty to any Credit Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Credit Parties, on the one hand, and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.  Lenders undertake no responsibility to any Credit Party to review or inform any Credit Party of any matter in connection with any phase of any Credit Party's business or operations.  Each Credit Party agrees that Lenders shall have no liability to any Credit Party (whether sounding in tort, contract or otherwise) for losses suffered by any Credit Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  **NEITHER LENDERS NOR ANY OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES OR AGENTS OF LENDERS (EACH OF THE FOREGOING, A "LENDER PARTY" AND COLLECTIVELY "LENDER PARTIES") SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND BORROWERS HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE FOR, ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE EFFECTIVE DATE).**  Borrowers acknowledge that they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party.  Lenders shall not be liable for any debts or claims accruing in favor of any parties against any Credit Party or against the Property.  Each Credit Party is not, and shall not be, an agent of Lenders for any purposes, and Lenders are not a venture partner with any Credit Party in any manner whatsoever.  Approvals granted by Lenders for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any written approval.

16.5    **INDEMNIFICATION BY BORROWERS.  TO THE FULLEST EXTENT PERMITTED BY LAW, IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDERS AND THE AGREEMENT TO EXTEND THE LOAN PROVIDED FOR HEREUNDER, EACH BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE LENDERS AND LENDER PARTIES FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION,**

**SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING REASONABLE ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY PURCHASE OF ASSETS TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF THE LOAN, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS MATERIALS AT ANY PROPERTY OWNED OR LEASED BY ANY CREDIT PARTY, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY CREDIT PARTY OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY CREDIT PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS MATERIALS OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. THIS INDEMNITY IS NOT INTENDED TO EXCUSE LENDERS FROM PERFORMING HEREUNDER.  THIS OBLIGATION ON THE PART OF BORROWERS SHALL SURVIVE THE CLOSING OF THE LOAN, THE REPAYMENT THEREOF AND ANY CANCELLATION OF THIS AGREEMENT.  BORROWERS SHALL PAY, AND HOLD LENDERS HARMLESS FROM, ANY AND ALL CLAIMS OF ANY BROKERS, FINDERS OR AGENTS CLAIMING A RIGHT TO ANY FEES IN CONNECTION WITH ARRANGING THE FINANCING CONTEMPLATED HEREBY.  LENDERS HEREBY REPRESENTS THAT THEY HAVE NOT EMPLOYED A BROKER OR OTHER FINDER IN CONNECTION WITH THE LOAN.  EACH BORROWER REPRESENTS AND WARRANTS THAT NO BROKERAGE COMMISSIONS OR FINDER'S FEES ARE TO BE PAID IN CONNECTION WITH THE LOAN.  IF AND TO THE EXTENT THAT ANY OF THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH BORROWER HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 16.5</u> SHALL SURVIVE REPAYMENT OF THE LOAN, CANCELLATION OF THE NOTE, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE LOAN DOCUMENTS AND TERMINATION OF THIS AGREEMENT.**

16.6    **<u>Captions</u>**.  The captions and headings of various Articles and Sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

16.7    **<u>Inconsistent Terms and Partial Invalidity</u>**.  The language used in this Agreement

is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.  In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, Administrative Agent may elect which terms shall govern and prevail. If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

16.8    **Gender and Number**.  Any word herein which is expressed in the masculine, feminine, or neuter gender shall be deemed to include the masculine, feminine and neuter genders. Any word herein which is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and the plural.

16.9    **Notices**.  Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, (iii) by overnight express carrier, or (iv) by facsimile or email transmission, addressed in each case as follows:

| | |
|---|---|
| To Administrative Agent: | CIBC Bank USA |
| | 120 South LaSalle Street |
| | Chicago, Illinois 60603 |
| | Attention: Matthew Tyler |
| | Facsimile:  312-564-6889 |
| | Email: mtyler@cibc.com |
| | |
| With a copy to: | Gutnicki LLP |
| | 4711 Golf Road, Suite 200 |
| | Skokie, Illinois 60076 |
| | Attn:   Liz Boydston, Esq. |
| | Stacy J. Flanigan, Esq. |
| | |
| | Facsimile:  847-933-9285 |
| | Email: lboydston@gutnicki.com |
| | sflanigan@gutnicki.com |
| | |
| To Borrowers: | 600 Broadway, Suite E |
| | Lynbrook, New York 11563 |
| | Attn: Mordy Lahasky |
| | Facsimile:  516-593-4830 |
| | Email:   mordyeph@gmail.com |
| | |
| With a copy to: | Whiteford Taylor & Preston, LLP |
| | 11 Stanwix Street, Suite 1400 |
| | Pittsburgh, PA 15222 |
| | Attn:   Michael J. Roeschenthaler, Esq. |
| | Daniel R. Schimizzi, Esq. |

-AND-

Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Attn:  Glenn Rose, Esq.

or to any other address as to any of the parties hereto as such party shall designate in a written notice to the other party hereto.  All notices sent pursuant to the terms of this paragraph shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight express carrier, then on the next federal banking day immediately following the day sent, (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received, or (iv) if sent by facsimile or email, as evidenced by receipt of a successful transmission report (followed by delivery by one of the other means identified in (i)-(iii)); provided, however, that if any notice is tendered to an addressee and delivery thereof is refused by such addressee, such notice shall be effective upon such tender unless expressly set forth in such notice.

16.10    **Effect of Agreement**.  The submission of this Agreement and the Loan Documents to Borrowers for examination does not constitute a commitment or an offer by Lenders to make a commitment to lend money to Borrowers.  This Agreement shall become effective only upon execution and delivery hereof by Lenders to Borrowers.

16.11    **Governing Law**.  This Agreement has been negotiated, executed and delivered in Chicago, Illinois, and shall be construed and enforced in accordance with the laws of the state of Illinois, without reference to the choice of law or conflicts of law principles of the state of Illinois.

16.12    **Confirmations**.  Borrowers and each holder of the Note agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loan then outstanding under such Note.

16.13    **Computations**.  Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement, such determination or calculation shall, to the extent applicable and except as otherwise specified in this Agreement, be made in accordance with GAAP, consistently applied.  Any changes in accounting principles or practices from those used in the preparation of the financial statements hereafter mandated by the promulgation of rules, regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board which results in a change in the method of accounting in the financial statements required to be furnished to Administrative Agent hereunder or in making determinations or calculations provided for in the preceding sentence shall be addressed by the parties hereto in accordance with the procedures described in Section 1.2 of this Agreement.

16.14    **Consent to Jurisdiction**.  TO INDUCE LENDERS TO ACCEPT THE NOTE, EACH BORROWER IRREVOCABLY AGREES THAT ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS

AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL: (I) FOR SO LONG AS THE CHAPTER 11 CASES REMAIN OPEN, BE BROUGH AND MAINTAINED EXCLUSIVELY IN THE BANKRUPTCY COURT; AND (II) AFTER THE TERMINATION OF THE CHAPTER 11 CASES, BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; <u>PROVIDED</u> THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ADMINISTRATIVE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION.   EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF EITHER THE BANKRUPTCY COURT OR THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.   EACH BORROWER FURTHER WAIVES PERSONAL SERVICE OF PROCESS UPON ANY BORROWER AND IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID (AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED), OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS.  EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

16.15 **Waiver of Jury Trial**.   **EACH BORROWER AND LENDER, BY ACCEPTANCE HEREOF, HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDERS OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

16.16 **Subsequent Amendments**. Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

16.17  **Reviewed by Counsel**.  This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lenders, Borrowers and the other parties thereto and are the products of all parties.  Accordingly, they shall not be construed against Administrative Agent merely because of Administrative Agent's involvement in their preparation.

16.18  **Confidentiality.**  As required by federal law and Lenders' policies and practices, Lenders may need to obtain, verify, and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.  Lenders agree to use commercially reasonable efforts (equivalent to the efforts Lenders apply to maintain the confidentiality of their own confidential information) to maintain as confidential all information provided to them by Borrowers and designated as confidential, except that Lenders may disclose such information (a) to Persons employed or engaged by Lenders in evaluating, approving, structuring or administering the Loan; (b) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 16.18 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by it as described in clause (a) above); (c) as required or requested by any federal or state or commonwealth regulatory authority or examiner, or any insurance industry association, or as reasonably believed by Lenders to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Lenders' counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which Lenders are a party; (f) to any nationally recognized rating agency that requires access to information about Lenders' investment portfolio in connection with ratings issued with respect to Lenders; (g) to any Affiliate of Lenders or any other Person that provides (or anticipates providing) Bank Products to any Borrower; (h) to Lenders' independent auditors and other professional advisors as to which such information has been identified as confidential; or (i) that ceases to be confidential through no fault of Lenders.  Notwithstanding the foregoing, Borrowers consent to the publication by Lenders of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.  If any provision of any confidentiality agreement, non-disclosure agreement or other similar agreement between Borrowers and Lenders conflicts with or contradicts this Section 16.18 with respect to the treatment of confidential information, this section shall supersede all such prior or contemporaneous agreements and understandings between the parties.

16.19  **Binding Effect**.  This Agreement and all rights and obligations hereunder shall be binding upon Borrowers and their successors and assigns, and shall inure to the benefit of Lenders and their successors and assigns.

16.20  **Counterparts.**  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed

100

Loan Documents maintained by Administrative Agent shall deemed to be originals.

[Signature Page Follows]

**IN WITNESS WHEREOF**, Borrowers have caused this Loan and Security Agreement to be executed the day and year first above written.

<div align="center">

**BORROWERS**:

**MAYBROOK-C EVERGREEN PROPCO, LLC,**
**MAYBROOK-C BRIARCLIFF PROPCO, LLC,**
**MAYBROOK-C SILVER OAKS PROPCO, LLC,**
**MAYBROOK-C OVERLOOK PROPCO, LLC,**
**MAYBROOK-C LATROBE PROPCO, LLC,**
**MAYBROOK-C WHITECLIFF PROPCO, LLC,**
**MAYBROOK-C KADE PROPCO, LLC,**
**MAYBROOK-C EVERGREEN OPCO, LLC,**
**MAYBROOK-C BRIARCLIFF OPCO, LLC,**
**MAYBROOK-C SILVER OAKS OPCO, LLC,**
**MAYBROOK-C OVERLOOK OPCO, LLC,**
**MAYBROOK-C LATROBE OPCO, LLC,**
**MAYBROOK-C WHITECLIFF OPCO, LLC,**
**MAYBROOK-C KADE OPCO, LLC,**
**100 TANDEM VILLAGE ROAD PROPCO, LLC,**
**3876 SAXONBURG BOULEVARD PROPCO, LLC,**
**CHESWICK REHABILITATION AND WELLNESS CENTER, LLC,** and
**NORTH STRABANE REHABILITATION AND WELLNESS CENTER, LLC,**
each a Delaware limited liability company

By:_____
Name:  Louis E. Robichaux IV
Title:   Chief Restructuring Officer

</div>

**IN WITNESS WHEREOF**, Lenders have caused this Loan and Security Agreement to be executed the day and year first above written.

**LENDER**:

CIBC BANK USA,
an Illinois banking corporation

By: _____
Name: Matthew Tyler
Its:    Managing Director

**ANNEX A**

**LENDERS AND PRO RATA SHARES**

| Lender | Loan Commitment | Pro Rata Share* |
|---|---|---|
| CIBC Bank USA | $36,000,000.00 (of which, $10,500,000 is the New Money DIP Loan and $25,500,000 is the Roll Up DIP Loan) | 94.736842105% |
| Ephram Lahasky | $2,000,000.00 | 5.263157895% |
| **TOTALS** | **$38,000,000.00** | **100.000000000%** |

<u>*</u>    Carry out to nine decimal places.

## EXHIBIT A-1

## LEGAL DESCRIPTION

EVERGREEN LAND

All those certain pieces, parcels or tracts of land situate in the Township of Jackson, County of Butler and Commonwealth of Pennsylvania, being bounded and described as follows:

Parcel 1

Beginning at a point in the centerline of Evergreen Mill Road, T-323, a thirty-three foot (33') right-of-way, at line of lands of now or formerly Schwan's Sales Ent. Inc.; thence by lands of now or formerly Schwan's Sales Ent., Inc., J. Rosenberger and M.B. Ebner, North 23°36'00" East a distance of 592.00 feet to a point in the Little Connoquenessing Creek; thence along the Little Connoquenessing Creek and by lands of now or formerly Southwest Butler County School District, South 74°00'00" East a distance of 450.00 feet to a point; thence by same, South 63°16'00" East a distance of 218.72 feet to a point; thence by same, South 73°30'00" East a distance of 108.00 feet to a point; thence along Parcel 2 herein described, South 30°38'00" West a distance of 687.43 feet to a point in Evergreen Mill Road; thence along Evergreen Mill Road, North 59°15'00" West a distance of 460.00 feet to a point; thence by same, North 73°17'17" West a distance of 232.69 feet to the point of beginning.

Parcel 2

Beginning at a point in the centerline of Evergreen Mill Road, T-323, a thirty-three foot (33') right-of-way, said point being the southeast corner of Parcel No. 1 as described above; thence along the centerline of Evergreen Mill Road, South 59°15'00" East a distance of 539.90 feet to a point; thence along Parcel No. 3 as herein described, North 28°49'00" East a distance of 818.36 feet to a point in the Little Connoquenessing Creek; thence along the Little Connoquenessing Creek and lands now or formerly Southwest Butler County School District, North 73°30'00" West a distance of 112.58 feet to a point; thence along Parcel No. E as herein described, South 28°49'00" West a distance of 197.30 feet to a point; thence by same, North 59°15'00" West a distance of 109.99 feet to a point; thence by same, North 28°49'00" East a distance of 169.59 feet to a point in the Little Connoquenessing Creek; thence along the Little Connoquenessing Creek and lands of now or formerly Southwest Butler County School District, North 73°30'00" West a distance of 304.90 feet to a point; thence along Parcel No. 1 as described above, South 30°38'00" West a distance of 687.43 feet to the point of beginning.

Parcel 3

Beginning at a point in the centerline of Evergreen Mill Road, T -323, a thirty-three foot (33') right-of-way, said point being located on a bridge over the Little Connoquenessing Creek at lands of now or formerly G. Hartmann; thence along Evergreen Mill Road, North 57°24'30" West a distance of 877.75 feet to a point; thence by same, North 57°24'49" West a distance of 238.69 feet to a point; thence along Parcel No. 2 as described above, North 28°49'00" East a

distance of 818.36 feet to a point in the Little Connoquenessing Creek; thence along the Connoquenessing Creek and lands of now or formerly Southwest Butler School District, South 73°30'00" East a distance of 122.01 feet to a point; thence by same, South 66°00'00" East a distance of 600.00 feet to a point; thence by same, South 55°00'00" East a distance of 190.00 feet to a point; thence by same, South 69°00'00" East a distance of 350.00 feet to a point; thence along the Little Connoquenessing Creek and lands of now or formerly G. Hartmann, South 36°45'00" West a distance of 1005.00 feet to the point of beginning.

Parcel 4

Beginning at a point in the centerline of Evergreen Mill Road, T-323, a thirty-three foot (33') right-of-way, said point being on a line common to lands of now or formerly T. Grech, said point also being the point of beginning of Parcel No. 1 as described above; thence along Evergreen Mill Road, South 73°17'l7" East a distance of 232.69 feet to a point; thence by same, South 59°15'00" East a distance of 999.90 feet to a point; thence by same South 57°24'49" East a distance of 238.69 feet to a point; thence by lands of now or formerly R.W. McConnell, Jr. and M.A. Crawford, South 35°01'00" West a distance of 861.30 feet to a point in the Connoquenessing Creek; thence along the Connoquenessing Creek North 46°29'00" West a distance of 1033.30 feet to a point; thence by same, North 39°30'00" West a distance of 528.12 feet to a point; thence by same North 55°50'00" West a distance of 153.94 feet to a point; thence by lands of now or formerly T. Grech, North 17°20'00" East a distance of 138.63 feet to a point; thence by same, North 79°00'00" East a distance of 389.40 feet to the point of beginning.

Parcel 5

Commencing at a point in the centerline of Evergreen Mill Road, T-323, a thirty-three foot (33') right-of-way, said point being common to Parcel No. 2 and Parcel No. 3 as described above and being on the westerly edge of a twenty-five foot (25') right-of-way; thence along the boundary between Parcel No. 2 and Parcel No. 3 and the westerly line of a twenty-five foot (25') right-of-way, North 28°49'00" East a distance of 593.33 feet to a point; thence along the southerly line of said twenty-five foot (25') right-of-way, North 59°15'00" West a distance of 110.05 feet to the point of beginning of the tract herein described; thence along Parcel No. 2 as described above, North 59°15'00" West a distance of 109.99 feet to a point; thence by same, North 28°49'00" East a distance of 169.59 feet to a point in the Little Connoquenessing Creek; thence along the Little Connoquenessing Creek and lands of now or formerly Southwest Butler School District, South 73°30'00" East a distance of 112.52 feet to a point; thence along Parcel No. 2 as described above, South 28°49'00" West a distance of 197.30 feet to the point of beginning.

PARCEL NOS. 180-4F102-2; 180-4F102-2M; & 180-4F102-2MA

BEING the same premises which Lawrence County Industrial Development Authority, an instrumentality of the Commonwealth of Pennsylvania and a public body corporate and politic, by Deed dated 04/12/1983 and recorded 10/03/1986 in the Office of the Recorder of Deeds in and for the County of Butler in Record Book 1305 Page 708, granted and conveyed unto Overlook Nursing Center Associates, a Pennsylvania Limited Partnership.

**EXHIBIT A-2**

**LEGAL DESCRIPTION**

BRIARCLIFF LAND

Parcel 1

ALL THAT certain piece, parcel or tract of land situate in North Huntingdon Township, Westmoreland County, Pennsylvania, bounded and described as follows:

BEGINNING at a point in the centerline of Daily Drive, SK 3055 said point being N 04°-27' W, a distance of 358.35 feet from the Southwesterly corner of lands formerly Alice Gahagan and also being the South West corner of Lot #4 of the Alice Gahagan Plan of Lots, as recorded in Deed Book 74, Page 175, thence continuing along the Centerline of Daily Drive N 04°-27' W, a distance of 54.23 feet, thence along lands of Richard Wood, S 89°-30' E, a distance of 150.00 feet to a point, thence continuing along lands of Richard Wood and lands of George D. Badanich N 04°-27'-00" W, a distance of 200.00 feet to a point, thence along lands of the Calvin Presbyterian Church and lands of Long Run Presbyterian Church and lands of James W. and Jennie S. Shirley S 89°-30' E, a distance of 517.86 feet to a point, said point being the Northeasterly corner of this tract described, thence along lands of Briarcliff Nursing Center Associates, being Lot #1 of the James W. Shirley Plan and other lands of John M. & Dorothea M. Shirley, being Lot #4 of the James W. Shirley Plan, S 00°-30' E, a distance of 385.00 feet to a point, thence continuing along lands of John M. & Dorothea M. Shirley, being Lot #4 of the James W. Shirley Plan and other lands of Ronald R. & Marilyn Webberking, being Lot #8 of the James W. Shirley Plan, N 89°-30' W, a distance of 491.24 feet to a point, thence along lands of William Stash and lands of John Pacerucha, N 04°-27'-00" W, a distance of 132.15 feet to a point, said point being the Northeast corner of Lot #1 of the Alice Gahagan Plan of Lots, thence continuing along lands of Pacerucha N 89°-30' W, a distance of 150.00 feet to a point in the centerline of Daily Drive, said point being the place of beginning of this parcel described.

Parcel 2:

Being Lot #1 of the James W. Shirley Plan, as recorded in Plan Book Volume 90, Page 1645.

BEGINNING at the Northwest corner of Lot #1 of the James W. Shirley Plan as it adjoins the Northeasterly corner of lands of the Briarcliff Nursing Center Associates as located in the above described Parcel #1, thence along lands of James W. Shirley S 89°-30' E, a distance of 50.00 feet, thence along other lands of James W. Shirley, being Lot #5 of the James W. Shirley Plan, S 00°-30' E, a distance of 200.00 feet to a point, thence along lands of John M. Shirley, being Lot #4 of the James W. Shirley Plan, N 89°-30' W, a distance of 50,00 feet to a point, thence continuing along the line of lands of Briarcliff Nursing Center Associates, N 00°-30' W, a distance of 200.00 feet to the point of BEGINNING.

4890-4151-2374, v. 18

Parcel 3: GRANT OF RIGHT-OF-WAY AND EASEMENT

BEGINNING at a point in the Centerline of Daily Drive, at the Northwest corner of lands now or formerly of George D. Badanich thence by a line through Maus Drive, N 64°-30' E, a distance of 161.09 feet to a point in Maus Drive, thence along line of lands of Calvin Presbyterian Church, S 48°-40' E, a distance of 108.00 feet to a point on line of Parcel #1, aforesaid, thence extending partly along same and along lands of George D. Badanich, N 89°-30'W, a distance of 226.50 feet to a point in the centerline of Daily Drive, said point being the point of beginning of parcel described.

PARCEL NO. 54-07-09-0-120-00-000

BEING the same premises which Westmoreland County Industrial Development Authority, a body politic and corporate, by Deed dated 12/30/1983 and recorded 12/30/1983 in the Office of the Recorder of Deeds in and for the County of Westmoreland in Deed Book Volume 2523 Page 234, granted and conveyed unto Briarcliff Nursing Center Associates, a Pennsylvania Limited Partnership.

AND ALSO BEING the same premises which James W. Shirley and Jennie S. Shirley, his wife, by Deed dated 05/24/1994 and recorded 06/02/1994 in the Office of the Recorder of Deeds in and for the County of Westmoreland in Deed Book Volume 3254 Page 315, granted and conveyed unto Briarcliff Nursing Center Associates, a Pennsylvania Limited Partnership.

**EXHIBIT A-3**

**LEGAL DESCRIPTION**

SILVER OAKS LAND

ALL that certain piece, parcel or tract of land situate in the 6th Ward, City of New Castle, County of Lawrence, Commonwealth of Pennsylvania, being bounded and described as follows: BEGINNING at a monument at the Southeast corner of the tract herein described, said monument being located on the West side of Harbor Street, a fifty (50) foot right of way, said point being common to lands of now or formerly the Housing Authority of Lawrence County and lands of the Grantor herein; thence by lands of now or formerly the Housing Authority of Lawrence County South 89° 54' 00" West a distance of 320.15 feet to a point; thence by same North 08° 55' 00" West a distance of 293.47 feet to a monument; thence by lands of now or formerly Joseph Wyza, Jr., South 89° 34' 00" East a distance of 319.04 feet to a point; thence along the Westerly right of way line of Harbor Street South 09° 13' 30" East a distance of 290.71 feet to a point of beginning.


PARCEL NO. 06-041000


BEING the same premises which Lawrence County Industrial Development Authority, an instrumentality of the Commonwealth of Pennsylvania and a public body, corporate and politic, by Deed dated 04/12/1983 and recorded 04/12/1983 in the Office of the Recorder of Deeds in and for the County of Lawrence in Deed Book Volume 657 Page 401, granted and conveyed unto Overlook Nursing Center Associates, a Pennsylvania Limited Partnership.

EXHIBIT A-4

## **LEGAL DESCRIPTION**

### OVERLOOK LAND

ALL THAT CERTAIN piece, parcel or tract of land situate in the Borough of New Wilmington, County of Lawrence and Commonwealth of Pennsylvania, being bounded and described as follows:

BEGINNING at the Northeast corner of the tract herein described, said point being located in the Centerline of New Castle Street, a forty-six (46) foot right-of-way, and being common to Lot 2 of the Overlook Subdivision as recorded in Plan Book 18, Page 37; thence along the Centerline of New Castle Street, South 0 degrees 15 minutes 30 seconds East, a distance of 203.38 feet to a point; thence by same along a curve to the right having a radius of 319.61 feet, an arc distance of 225.925 feet to a point, said curve having a chord of South 19 degrees 59 minutes 32 seconds West, a distance of 221.25 feet; thence by same, South 40 degrees 14 minutes 30 seconds West, a distance of 31.46 feet to a point; thence by lands of now or formerly Beechwood Partners, North 66 degrees 49 minutes 00 seconds West, a distance of 278.13 feet to a point; thence by same, South 37 degrees 07 minutes 15 seconds West, a distance of 148.73 feet to a point; thence by lands of now or formerly Beechwood Partners, North 56 degrees 40 minutes 00 seconds West, a distance of 224.93 feet to a point; thence by Lot 2 of the Overlook Subdivision, North 8 degrees 20 minutes 00 seconds East, a distance of 261.65 feet to a point; thence by same, South 71 degrees 36 minutes 00 seconds East, a distance of 65.00 feet to an iron pin; thence by same, North 38 degrees 52 minutes 00 seconds East, a distance of 96.12 feet to an iron pin; thence by same, North 89 degrees 04 minutes 15 seconds East, a distance of 468.55 feet to the point of beginning.

Together with an easement for parking which is recorded in the office for the recording of deeds in and for Lawrence County, Pennsylvania in Record Book 657 Page 563 and an easement for access to and use of sheds which encroach upon adjacent property, which easement is to be recorded.

## EXHIBIT A-5

## LEGAL DESCRIPTION

### LATROBE LAND

ALL THAT CERTAIN piece or parcel of land, situate in the Township of Unity, County of Westmoreland, and Commonwealth of Pennsylvania, being more specifically bounded and described as follows:

BEGINNING at a point on the Old Lincoln Highway leading from Youngstown to U.S. Route 30 at a point where the Northerly boundary line of the property now or formerly of L.V. Planinsek intersects with the property herein described; thence from said point of beginning and by lands now or formerly of Planinsek North 49° West 303.64 feet to an iron pin at line of lands now or formerly of Joseph Misko; thence along lands now or formerly of said Misko and lands of the Edgewater Terrace Plan of Lots North 61° 21' 40" East, a distance of 872.70 feet to a point in the center line of the aforementioned Old Lincoln Highway; thence from said point and through the Old Lincoln Highway South 41° West 818.18 feet to a point the place of BEGINNING.

### AS SURVEYED LEGAL DESCRIPTION

ALSO BEING that same Premises described in that certain ALTA/NSPS Land Title Survey OLH PA Project being B&C Project No 201700041,001 dated January 24, 2017 for 576 Fred Rogers Drive in the Township of Unity, County of Westmoreland, Commonwealth of Pennsylvania being more specifically bounded and described as follows:

BEGINNING at a Mag Nail(Set) on Fred Rogers Drive (formerly Old Lincoln Highway), thence North 49°001'01"West, 303.64 feet to a pipe(FD); thence along line of Edgewater Terrace Plan of Lots, North 61°21'39" East, 872.70 feet to a Mag Nail(Set) in center line of Fred Rogers Drive; thence through Fred Rogers Drive South 41°00'West, 818.17 feet to a Mag Nail, being place of BEGINNING.

BEING designated as Tax Map No. 61-14-16-0-117-000-000 in the Tax Assessment Office of Westmoreland County, Pennsylvania.

BEING the same premises which Extendicare Health Facilities, Inc., by deed dated March 26, 2010, to be effective April 1, 2010 and recorded April 7, 2010 in the Office of the Recorder of Deeds in and for the County of Westmoreland, Pennsylvania in Instrument Number 201004070011133, granted and conveyed unto 576 Latrobe LLC, a Delaware Limited Liability Company.

ALSO BEING THE SAME PREMISES which 576 Latrobe LLC, a Delaware Limited Liability Company, by deed dated the 14th day of February, 2017 and to be recorded simultaneously herewith, granted and conveyed unto Maybrook-C Latrobe Propco, LLC, a Pennsylvania Limited Liability Company, MORTGAGOR herein.

## EXHIBIT A-6

## LEGAL DESCRIPTION

### WHITECLIFF LAND

Parcel 1:

ALL that certain tract or parcel of ground with the improvements thereon erected, situate in Hempfield Township, Mercer County, Pennsylvania, and bounded and described in accordance with a site plan made for Gilmore's White Cliff Nursing Home by Ronald P. Bittler, PE, dated December 27, 1977, and last revised March 24, 1983, as follows, to-wit:
BEGINNING at a point set on the centerline of Legislative Route No. 43044, commonly known as the Fredonia Road (forty [40] feet wide), at a corner of lands of Stephen and Margaret Zawistowski (as shown on said plan); thence extending from said beginning point and measured along lands of Stephen and Margaret Zawistowski the two (2) following courses and distances: (1) North three (3) degrees ten (10) minutes East, four hundred forty eight and eighty one hundredths (448.80) feet to an iron pin; and (2) South eighty six (86) degrees fifty (50) minutes East, four hundred eighty (480) feet to an iron pin at a corner of lands of Lot No. 20, lands of Ralph and Ruth Woodworth (as shown on said plan); thence extending along said lands South three (3) degrees ten (10) minutes West four hundred seventy four and forty one hundredths (474.40) feet to a point set on the centerline of Fredonia Road (L.R. No. 43044), aforesaid; thence extending along said centerline North eighty three (83) degrees forty seven (47) minutes West four hundred eighty and eighty one hundredths (480.80) feet to the first mentioned point and place of beginning.

PARCEL NO. 09-057-134

Parcel 2:

ALL that certain piece or parcel of land situate in Township of Hempfield, County of Mercer, more commonly known as Lot 20 in the Troy Estates Plan of Lots recorded in Plan Book 1, Page 98.

BEING the same premises which Francis A. Hayman, Jr., John J. Hayman, Drury J. Gallagher, William H. Miller, Timothy F. Nicholson, Robert N. Elkins, George L. Ryan and Howard G. Seitz, as tenants in common in the undivided portion or shares as follows: Francis A. Hayman, Jr. 15.34%; John J. Hayman - 15.33%; Drury J. Gallagher - 15.33%; William H. Miller - 18.4%; Timothy F. Nicholson - 18.4%; Robert N. Elkins - 9.2%; George L. Ryan - 4.0%; and Howard G. Seitz - 4.0%, by Deed dated 05/12/1983 and recorded 05/16/1983 in the Office of the Recorder of Deeds in and for the County of Mercer in Deed Book 83 DR Page 1242, granted and conveyed unto White Cliff Nursing Center Associates, a Pennsylvania Limited Partnership.

PARCEL NO. 09-057-139

The foregoing Parcels 1 & 2 being further described as follows:

Beginning at a point in the centerline of Fredonia Road (a.k.a. L.R. 43044-40"ROW) said point being distant 1440 feet more or less westerly along said centerline from its intersection with Maple Avenue and from said beginning point necessary; thence

1) along lands now or formally of Stephan Zawistowski North 03 degrees 10 minutes seconds East a distance of 448.80 feet to a point and corner; thence

2) still along said lands of Stephan Zawistowski, South 86 degrees 50 minutes 00 seconds East a distance of 540.00 feet to a point and corner; thence

3) along lands of Ralph R. Woodworth, South 03 degrees 10 minutes 00 seconds West a distance of 477.60 feet to a point in the said centerline of Fredonia Road; thence

4) along said centerline North 83 degrees 47 minutes 00 seconds West a distance of 540.89 feet to the point and place of beginning.

AND BEING the same premises which Ruth Louise Woodworth, widow, by Deed dated 12/18/2009 and recorded 12/22/2009 in the Office of the Recorder of Deeds in and for the County of Mercer as Instrument No. 2009-00013726, granted and conveyed unto White Cliff Nursing Center Associates.

## EXHIBIT A-7

## LEGAL DESCRIPTION

### KADE LAND

All that certain tract or parcel of ground with the buildings and improvements thereon erected, situate in the Township of Canton, County of Washington and Commonwealth of Pennsylvania, which is bounded and described in accordance with a survey and plan made by Engelhardt-Power and Associates, Incorporated, Washington, Pennsylvania, dated 1 December 1983, Job No. 457-6-83, as follows, to wit:

BEGINNING at a point in Township Public Road 563, also known as West Wylie Avenue Extension, which point is the Northwest corner of the land herein conveyed and the Northeast corner of land now or formerly of Joseph Lepowsky and which point is further located North thirteen (13) degrees twenty-two (22) minutes zero (00) seconds West, a distance of eight and seventy one-hundredths (8.70) feet from a pipe on the Southerly side of said road; thence in said road South eighty-one (81) degrees thirty (30) minutes zero (00) seconds East, a distance of eighty-nine and eighty-two one-hundredths (89.82) feet to a point in said road; thence continuing in said road, North seventy-two (72) degrees thirty-two (32) minutes zero (00) seconds East, four hundred thirty-nine and sixty-eight one-hundredths (439.68) feet to a point in said road which is the Northwesterly corner of land now or formerly of Edward Steffek; thence by line of land now or formerly of Steffek and land now or formerly of William E. Kieth, South twelve (12) degrees twelve (12) minutes forty (40) seconds East, three hundred thirty-four and four one-hundredths (334.04) feet to a point in the Northerly side of a forty (40) foot wide street; thence extending along said Northerly side of said street and land of Stanley & Hollie R. Sams Plan of record in the Recorder's Office of Washington County, Pennsylvania, in Plan Book 9, Page 130, South seventy-seven (77) degrees thirty-six (36) minutes zero (00) seconds West, a distance of one hundred seventy-four and seven one-hundredths (174.07) feet to a point; thence by the same South twenty-two (22) degrees forty-one (41) minutes zero (00) seconds East, a distance of forty and eighty-two one-hundredths (40.82) feet to a point; thence by the same, South seven (7) degrees fifty-one (51) minutes forty (40) seconds East, a distance of four hundred forty-nine and sixty-six one-hundredths (449.66) feet to an angle iron; thence by land now or formerly of Herbert R. and Renee Ackron the three (3) following courses and distances: (1) South forty (40) degrees six (06) minutes ten (10) seconds West, three hundred and eighty-five one-hundredths (300.85) feet to a point, (2) South seventy-six (76) degrees thirty-eight (38) minutes zero (00) seconds West, two hundred sixty-two and ninety-one one-hundredths (262.91 ) feet to a point, and (3) north thirteen (13) degrees twenty-two (22) minutes zero (00) seconds West, five hundred and no one-hundredths (500.00) feet to a point in line of lands now or formerly of Joseph Lepowsky; thence extending along said lands the two (2) following courses and distances: (1) North seventy-six (76) degrees thirty-eight (38) minutes zero (00) seconds East, two hundred and no one-hundredths (200.00) feet to a pipe, and (2) North thirteen (13) degrees twenty-two (22) minutes zero (00) seconds West, five hundred and no one-hundredths (500.00) feet to a point in the Township Public Road 563, the first mentioned point and place of BEGINNING

CONTAINING an area of 10.4825 acres, more or less.

Being further described according to a survey prepared by Bock & Clark's National Surveyors Network dated 01-26-16 as follows:

Beginning at a point in or near the centerline of West Wylie Avenue (33 foot wide public right of way) said point being located at the northeast corner of lands N/F of Joseph Samida as described in Deed Book 766 Page 494 and from said beginning point running; thence
1) Along said centerline South 81 degrees 30 minutes 00 seconds East a distance of 89.82 feet to a point in same; thence
2) Still along said centerline North 72 degrees 23 minutes 00 seconds East a distance of 439.83 feet to a point in same; thence
3) Leaving said West Wylie Avenue and along lands N/F of Carl R. Claypoole and John Meyers South 12 degrees 12 minutes 40 seconds East a distance of 335.19 feet to a point in the northerly sideline of Kimberly Drive (50 foot wide public right of way); thence
4) Along said sideline and lands N/F of William Sams South 77 degrees 36 minutes 00 seconds West a distance of 174.07 feet to a point; thence
5) Still along said William Sams South 23 degrees 55 minutes 00 seconds East a distance of 40.82 feet to a point; thence
6) Along the rear of parcels located on Kimberly Drive South 07 degrees 40 minutes 00 seconds East a distance of 450.00 feet to a point; thence
7) Along land N/F of Margaret L. Breck and Donald York South 40 degrees 01 minutes 40 seconds West a distance of 300.26 feet to a point; thence
8) Still along said Breck and York South 76 degrees 38 minutes 00 seconds West a distance of 262.91 feet to a point; thence
9) Still along Breck and York and lands N/F Foley Selvaggi North 13 degrees 22 minutes 00 seconds West a distance of 500.00 feet to a point; thence
10) Along lands N/F of Joseph Samida North 76 degrees 38 minutes 00 seconds East a distance of 200.00 feet to a point; thence
11) Still along said Joseph Samida North 13 degrees 22 minutes 00 seconds West a distance of 500.00 feet to the point and place of beginning.

PARCEL NO. 120-011-00-00-0038-00

BEING the same premises which Westmoreland County Industrial Development Authority, a body politic and corporate, by Deed dated 12/30/1983 and recorded 12/30/1983 in the Office of the Recorder of Deeds in and for the County of Washington in Deed Book 2136 Page 215, granted and conveyed unto Briarcliff Nursing Center Associates, a Pennsylvania Limited Partnership.

## EXHIBIT A-8

## LEGAL DESCRIPTION

3876 Saxonburg Boulevard, Cheswick, Pennsylvania 15024

ALL THAT certain piece or parcel of land situate in the Township of Indiana, County of Allegheny and Commonwealth of Pennsylvania, being more particularly described to witt.

BEGINNING at the intersection of the dividing line between West Deer Township and Indiana Township, Allegheny County, Pennsylvania, with the easterly line of Saxonburg Boulevard as widened to a width of 60 feet; thence in a southerly direction along the easterly line of said Saxonburg Boulevard by the arc of a circle curving to the right having a radius of 830.00 feet an arc distance of 161.54 feet; thence continuing along said easterly line of said Boulevard, South 36 degrees 34 minutes West, a distance of 14.00 feet to a point on the southerly line of lands now or formerly of George R. Roncevich and being the true point of beginning of the within described parcel; thence from said true point of beginning and along said easterly line of said Saxonburg Boulevard, South 36 degrees 34 minutes West, a distance of 84.94 feet to a point; thence in a southerly direction along said easterly line of Saxonburg Boulevard by an arc of a circle bearing to the left having a radius of 770.00 feet an arc distance of 266.98 feet to a point on the northerly line of lands now or formerly of John Rees; thence along said lands now or formerly of John Rees, South 67 degrees 26 minutes 32 seconds East, a distance of 543.65 feet to a point on the westerly line of lands now or formerly of M. Kish, Jr.; thence along line of land of Kish, North 0 degrees 15 minutes East, a distance of 500.41 feet to a point on the said southerly line of land of George R. Roncevich; thence along said line of land of Roncevich, North 87 degrees 38 minutes West, a distance of 334.83 feet to a point on the easterly line of Saxonburg Boulevard being the true point of BEGINNING.

BEING the same property conveyed by HCRI Pennsylvania Properties, Inc., a Pennsylvania corporation, to FC-THC Leasing III, LLC, a Delaware limited liability company, by Special Warranty Deed dated September 29, 2009, effective as of October 1, 2009, and recorded November 2, 2009, in Deed Book Volume 14092, Page 115 of the Alleghany County Records.

BEING designated as Bock 1081-C, Lot 10 in the Records of the Deed Registry Office of Allegheny County, Pennsylvania.

NOTE FOR INFORMATIONAL PURPOSES ONLY:
Tax Parcel ID. No. 1080-C-00010-0000-00

## <u>EXHIBIT A-9</u>

## <u>LEGAL DESCRIPTION</u>

100 Tandem Village Road, Canonsburg, PA 15317

ALL THAT certain tract of land situate in the Township of North Strabane, County of Washington and Commonwealth of Pennsylvania, being Lot No. 301 in the Grandvue Plan of Lots, Phase 3, as recorded in the Office of the Recorder of Deeds of Washington County, Pennsylvania on March 4, 1999, in Plan Book Volume 39, Pages 41 and 42.

BEING the same property conveyed to Tandem Health Care of North Strabane, LLC, a Pennsylvania limited liability company, by Indenture recorded March 29, 1999, in the Washington County Clerk's Office as Instrument No. 199946146.

NOTE FOR INFORMATIONAL PURPOSES ONLY:
Tax Parcel ID. No. 520-001-15-00-0011-00

<u>**EXHIBIT B**</u>

**<u>ASSIGNMENT AND ASSUMPTION</u>**

This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][2] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][3] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][4] hereunder are several and not joint.][5]  Capitalized terms used but not defined herein shall have the meanings given to them in the Loan and Security Agreement identified below (the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Loan and Security Agreement, as of the Effective Date inserted by Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Loan and Security Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.]

1.       <u>Assignor[s]</u>:      _____

_____

---

[2]     For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[3]     For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[4]     Select as appropriate.

[5]     Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.     <u>Assignee[s]</u>:   _____

            _____

            [for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.     <u>Borrower(s)</u>:   _____

4.     <u>Administrative Agent</u>: The CIBC BANK USA, as the administrative agent under the Credit Agreement

5.     <u>Loan and Security Agreement</u>:   [Loan and Security Agreement, dated as of [_____, _____], among [_____], the Lenders from time to time party thereto, and CIBC BANK USA, as Administrative Agent

6.     Assigned Interest:

| <u>Assignor[s]</u>[6] | <u>Assignee[s]</u>[7] | Facility <u>Assigned</u>[8] | Aggregate Amount of Commitment/Loans <u>for all Lenders</u>[9] | Amount of Commitment/Loans <u>Assigned</u> | Percentage Assigned of Commitment/ <u>Loans</u>[10] | CUSIP <u>Number</u> |
|---|---|---|---|---|---|---|
| | | _____ | $_____ | $_____ | _____ % | |
| | | _____ | $_____ | $_____ | _____ % | |
| | | _____ | $_____ | $_____ | _____ % | |

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNOR</u>
[NAME OF ASSIGNOR]

By: _____
       Title:

<u>ASSIGNEE</u>
[NAME OF ASSIGNEE]

By: _____
       Title:

---

[6]    List each Assignor, as appropriate.
[7]    List each Assignee, as appropriate.
[8]    Fill in the appropriate terminology for the types of facilities under the Loan and Security Agreement that are being assigned under this Assignment (e.g. "Revolving Commitment", "Term Commitment", etc.).
[9]    Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.
[10]   Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

Consented to and Accepted:

CIBC BANK USA.,
as Administrative Agent

By: _____
        Title:

*ANNEX 1 TO ASSIGNMENT AND ASSUMPTION*

[_____]¹¹

<u>STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION</u>

1.    <u>Representations and Warranties</u>.

1.1.    <u>Assignor</u>.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan and Security Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan and Security Agreement, (ii) it meets all the requirements to be an assignee under the Loan and Security Agreement (subject to such consents, if any, as may be required under the Loan and Security Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan and Security Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan and Security Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section __ thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest; and (b) agrees that (i) it will, independently and without reliance upon Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective

---

¹¹    Describe Loan Agreement at option of Administrative Agent.

Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of Illinois.

# EXHIBIT H

# BUDGET

**CHMS - Weekly Cash Flow Forecast**
**Privileged and Confidential**
*Draft - Subject to Material Change*

| ($ in millions) | F | F | F | F | F | Total Interim |
| | 1 | 2 | 3 | 4 | 5 | Period |
| # Description | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | |
|---|---|---|---|---|---|---|
| 1 **CIBC Combined** | | | | | | |
| 2 **Receipts** | | | | | | |
| 3 Census % | 76.6% | 76.6% | 76.6% | 76.6% | 76.6% | 76.6% |
| 4 Receipts | 0.1 | 0.3 | 1.6 | 0.9 | 2.5 | 5.3 |
| 5 Total Room & Board | 0.1 | 0.3 | 1.6 | 0.9 | 2.5 | 5.3 |
| 6 Misc. Receipts | - | - | - | - | - | - |
| 7 **Total Receipts** | **0.1** | **0.3** | **1.6** | **0.9** | **2.5** | **5.3** |
| 8 **Operating Disbursements** | | | | | | |
| 9 Payroll | 0.4 | 0.7 | 0.4 | 0.7 | 0.4 | 2.6 |
| 10 Payroll - Checks | - | - | - | - | - | - |
| 11 Payroll Taxes | 0.1 | 0.2 | 0.1 | 0.2 | 0.1 | 0.8 |
| 12 Employee Benefits | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
| 13 Employee Reimbursements | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 Health Insurance | - | - | - | - | 0.2 | 0.2 |
| 15 Workers Compensation | - | - | - | - | 0.1 | 0.1 |
| 16 Total Employee Expenses | 0.5 | 1.0 | 0.5 | 1.0 | 0.9 | 3.8 |
| 17 Contractor / Agency | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 1.6 |
| 18 Medical Director | - | 0.0 | - | - | - | 0.0 |
| 19 Operating Expenses | 0.2 | 0.3 | 0.2 | 0.3 | 0.2 | 1.3 |
| 20 Provider Taxes | - | - | - | - | - | - |
| 21 Utilities | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
| 22 Insurance | - | - | - | - | 0.1 | 0.1 |
| 23 IT | - | - | - | - | 0.0 | 0.0 |
| 24 Professionals | - | - | - | - | 0.0 | 0.0 |
| 25 Administrative Services Fees | - | 0.1 | - | - | 0.1 | 0.2 |
| 26 Total Operating Expenses | 0.5 | 0.6 | 0.6 | 0.7 | 0.9 | 3.3 |
| 27 **Net Cash Flow b/f Non-Op Disb.** | **(0.9)** | **(1.3)** | **0.5** | **(0.8)** | **0.7** | **(1.8)** |
| 28 R/E & Other Taxes | - | - | - | 0.1 | - | 0.1 |
| 29 Capex | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 30 Loan Principal and Interest | - | - | - | 0.5 | - | 0.5 |
| 31 **Net Cash Flows b/f Rx** | **(0.9)** | **(1.4)** | **0.5** | **(1.4)** | **0.7** | **(2.5)** |
| 32 **Restructuring Disbursments** | | | | | | |
| 33 Chapter 11 Filing Fees | 0.0 | - | - | - | - | 0.0 |
| 34 US Trustee Fees | - | - | - | - | - | - |
| 35 Adequate Assurance - Utility Deposit | - | 0.2 | - | - | - | 0.2 |
| 36 DIP Administration Fees and Interest | 0.1 | 0.1 | - | - | - | 0.1 |
| 37 Sale Proceeds | - | - | - | - | - | - |
| 38 Total Process Costs | 0.1 | 0.2 | - | - | - | 0.3 |
| 39 Bass, Berry & Sims PLC | - | - | - | - | - | - |
| 40 Local Counsel | - | - | - | - | - | - |
| 41 Ankura | - | - | - | - | - | - |
| 42 Independent Director | - | - | - | - | - | - |
| 43 Collection Agency | - | - | - | - | - | - |
| 44 Claims Agent | - | - | - | - | - | - |
| 45 Patient Care Ombudsman | - | - | - | - | - | - |
| 46 Total Debtor Prof. Fees | - | - | - | - | - | - |
| 47 UCC Prof. Fees | - | - | - | - | - | - |
| 48 Restructuring Prof. Fees - Lender | - | - | - | - | - | - |
| 49 Total  Professional Fees | - | - | - | - | - | - |
| 50 **Net Cash Flow a/f Rx** | **(1.0)** | **(1.6)** | **0.5** | **(1.4)** | **0.7** | **(2.8)** |
| 51 **Cash Balances & Availability** | | | | | | |
| 52 Beginning Book | 0.1 | 2.6 | 1.0 | 1.5 | 0.2 | 0.1 |
| 53 Net Cash Flow | (1.0) | (1.6) | 0.5 | (1.4) | 0.7 | (2.8) |
| 54 Add-back of Float before Filing | - | - | - | - | - | - |
| 55 **DIP Draw / (Repayment)** | **3.6** | **-** | **-** | **-** | **-** | **3.6** |
| 56 Ending Book | 2.6 | 1.0 | 1.5 | 0.2 | 0.8 | 0.8 |
| 57 Float | - | - | - | - | - | - |
| 58 Ending Bank | 2.6 | 1.0 | 1.5 | 0.2 | 0.8 | 0.8 |
| 59 Minimum Liquidity | - | - | - | - | - | - |
| 60 **Bank Availability, Net** | **2.6** | **1.0** | **1.5** | **0.2** | **0.8** | **0.8** |
| 61 DIP Availability | | | | | | |
| 62 **Total Availability** | **2.6** | **1.0** | **1.5** | **0.2** | **0.8** | **0.8** |

**CHMS - Weekly Cash Flow Forecast**
**Privileged and Confidential**
*Draft - Subject to Material Change*

| ($ in millions) | | F | F | F | F | F | Total Interim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 1 | 2 | 3 | 4 | 5 | Period |
| # | Description | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | |
| 63 | **CIBC (The Groves)** | | | | | | |
| 64 | **Receipts** | | | | | | |
| 65 | Census % | 75.1% | 75.1% | 75.1% | 75.1% | 75.1% | 75.1% |
| 66 | Receipts | 0.1 | 0.2 | 1.3 | 0.6 | 2.0 | 4.2 |
| 67 | Total Room & Board | 0.1 | 0.2 | 1.3 | 0.6 | 2.0 | 4.2 |
| 68 | Misc. Receipts | - | - | - | - | - | - |
| 69 | **Total Receipts** | **0.1** | **0.2** | **1.3** | **0.6** | **2.0** | **4.2** |
| 70 | **Operating Disbursements** | | | | | | |
| 71 | Payroll | 0.4 | 0.5 | 0.4 | 0.5 | 0.4 | 2.1 |
| 72 | Payroll - Checks | - | - | - | - | - | - |
| 73 | Payroll Taxes | 0.1 | 0.2 | 0.1 | 0.2 | 0.1 | 0.7 |
| 74 | Employee Benefits | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
| 75 | Employee Reimbursements | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 76 | Health Insurance | - | - | - | - | 0.1 | 0.1 |
| 77 | Workers Compensation | - | - | - | - | 0.1 | 0.1 |
| 78 | Total Employee Expenses | 0.5 | 0.7 | 0.5 | 0.7 | 0.8 | 3.1 |
| 79 | Contractor / Agency | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 1.2 |
| 80 | Medical Director | - | 0.0 | - | - | - | 0.0 |
| 81 | Operating Expenses | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.0 |
| 82 | Provider Taxes | - | - | - | - | - | - |
| 83 | Utilities | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
| 84 | Insurance | - | - | - | - | 0.0 | 0.0 |
| 85 | IT | - | - | - | - | 0.0 | 0.0 |
| 86 | Professionals | - | - | - | - | 0.0 | 0.0 |
| 87 | Administrative Services Fees | - | 0.1 | - | - | 0.1 | 0.1 |
| 88 | Total Operating Expenses | 0.4 | 0.5 | 0.4 | 0.5 | 0.7 | 2.6 |
| 89 | **Net Cash Flow b/f Non-Op Disb.** | **(0.8)** | **(0.9)** | **0.4** | **(0.5)** | **0.5** | **(1.4)** |
| 90 | R/E & Other Taxes | - | - | - | 0.0 | - | 0.0 |
| 91 | Capex | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 92 | Loan Principal and Interest | - | - | - | 0.5 | - | 0.5 |
| 93 | **Net Cash Flows b/f Rx** | **(0.8)** | **(0.9)** | **0.4** | **(1.1)** | **0.5** | **(2.0)** |
| 94 | **Restructuring Disbursments** | | | | | | |
| 95 | Chapter 11 Filing Fees | 0.0 | - | - | - | - | 0.0 |
| 96 | US Trustee Fees | - | - | - | - | - | - |
| 97 | Adequate Assurance - Utility Deposit | - | 0.1 | - | - | - | 0.1 |
| 98 | DIP Administration Fees and Interest | 0.0 | 0.1 | - | - | - | 0.1 |
| 99 | Sale Proceeds | - | - | - | - | - | - |
| 100 | Total Process Costs | 0.1 | 0.2 | - | - | - | 0.3 |
| 101 | Bass, Berry & Sims PLC | - | - | - | - | - | - |
| 102 | Local Counsel | - | - | - | - | - | - |
| 103 | Ankura | - | - | - | - | - | - |
| 104 | Independent Director | - | - | - | - | - | - |
| 105 | Collection Agency | - | - | - | - | - | - |
| 106 | Claims Agent | - | - | - | - | - | - |
| 107 | Patient Care Ombudsman | - | - | - | - | - | - |
| 108 | Total Debtor Prof. Fees | - | - | - | - | - | - |
| 109 | UCC Prof. Fees | - | - | - | - | - | - |
| 110 | Restructuring Prof. Fees - Lender | - | - | - | - | - | - |
| 111 | Total  Professional Fees | - | - | - | - | - | - |
| 112 | **Net Cash Flow a/f Rx** | **(0.9)** | **(1.1)** | **0.4** | **(1.1)** | **0.5** | **(2.2)** |
| 113 | **Cash Balances & Availability** | | | | | | |
| 114 | Beginning Book | 0.0 | 1.9 | 0.7 | 1.1 | 0.1 | 0.0 |
| 115 | Net Cash Flow | (0.9) | (1.1) | 0.4 | (1.1) | 0.5 | (2.2) |
| 116 | Add-back of Float before Filing | - | - | - | - | - | - |
| 117 | **DIP Draw / (Repayment)** | **2.7** | **-** | **-** | **-** | **-** | **2.7** |
| 118 | Ending Book | 1.9 | 0.7 | 1.1 | 0.1 | 0.5 | 0.5 |
| 119 | Float | - | - | - | - | - | - |
| 120 | Ending Bank | 1.9 | 0.7 | 1.1 | 0.1 | 0.5 | 0.5 |
| 121 | Minimum Liquidity | - | - | - | - | - | - |
| 122 | **Bank Availability, Net** | **1.9** | **0.7** | **1.1** | **0.1** | **0.5** | **0.5** |
| 123 | DIP Availability | | | | | | |
| 124 | **Total Availability** | **1.9** | **0.7** | **1.1** | **0.1** | **0.5** | **0.5** |

**CHMS - Weekly Cash Flow Forecast**
**Privileged and Confidential**
*Draft - Subject to Material Change*

| ($ in millions) | F | F | F | F | F | Total Interim Period |
| | 1 | 2 | 3 | 4 | 5 | |
| # Description | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | |
|---|---|---|---|---|---|---|
| 125 **CIBC (Consulate)** | | | | | | |
| 126 **Receipts** | | | | | | |
| 127 Census % | 82.7% | 82.7% | 82.7% | 82.7% | 82.7% | 82.7% |
| 128 Receipts | 0.0 | 0.1 | 0.2 | 0.3 | 0.5 | 1.1 |
| 129 Total Room & Board | 0.0 | 0.1 | 0.2 | 0.3 | 0.5 | 1.1 |
| 130 Misc. Receipts | - | - | - | - | - | - |
| 131 **Total Receipts** | **0.0** | **0.1** | **0.2** | **0.3** | **0.5** | **1.1** |
| 132 **Operating Disbursements** | | | | | | |
| 133 Payroll | - | 0.2 | - | 0.2 | - | 0.5 |
| 134 Payroll - Checks | - | - | - | - | - | - |
| 135 Payroll Taxes | - | 0.1 | - | 0.1 | - | 0.1 |
| 136 Employee Benefits | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 137 Employee Reimbursements | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 138 Health Insurance | - | - | - | - | 0.0 | 0.0 |
| 139 Workers Compensation | - | - | - | - | 0.0 | 0.0 |
| 140 Total Employee Expenses | - | 0.3 | 0.0 | 0.3 | 0.1 | 0.7 |
| 141 Contractor / Agency | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 |
| 142 Medical Director | - | 0.0 | - | - | - | 0.0 |
| 143 Operating Expenses | 0.0 | 0.1 | 0.0 | 0.1 | 0.0 | 0.3 |
| 144 Provider Taxes | - | - | - | - | - | - |
| 145 Utilities | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 146 Insurance | - | - | - | - | 0.0 | 0.0 |
| 147 IT | - | - | - | - | 0.0 | 0.0 |
| 148 Professionals | - | - | - | - | 0.0 | 0.0 |
| 149 Administrative Services Fees | - | 0.0 | - | - | 0.0 | 0.0 |
| 150 Total Operating Expenses | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.7 |
| 151 **Net Cash Flow b/f Non-Op Disb.** | **(0.1)** | **(0.4)** | **0.1** | **(0.2)** | **0.2** | **(0.4)** |
| 152 R/E & Other Taxes | - | - | - | 0.0 | - | 0.0 |
| 153 Capex | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 154 Loan Principal and Interest | - | - | - | 0.1 | - | 0.1 |
| 155 **Net Cash Flows b/f Rx** | **(0.1)** | **(0.4)** | **0.1** | **(0.3)** | **0.2** | **(0.5)** |
| 156 **Restructuring Disbursments** | | | | | | |
| 157 Chapter 11 Filing Fees | 0.0 | - | - | - | - | 0.0 |
| 158 US Trustee Fees | - | - | - | - | - | - |
| 159 Adequate Assurance - Utility Deposit | - | 0.0 | - | - | - | 0.0 |
| 160 DIP Administration Fees and Interest | 0.0 | 0.0 | - | - | - | 0.0 |
| 161 Sale Proceeds | - | - | - | - | - | - |
| 162 Total Process Costs | 0.0 | 0.1 | - | - | - | 0.1 |
| 163 Bass, Berry & Sims PLC | - | - | - | - | - | - |
| 164 Local Counsel | - | - | - | - | - | - |
| 165 Ankura | - | - | - | - | - | - |
| 166 Claims Agent | - | - | - | - | - | - |
| 167 Patient Care Ombudsman | - | - | - | - | - | - |
| 168 Total Debtor Prof. Fees | - | - | - | - | - | - |
| 169 UCC Prof. Fees | - | - | - | - | - | - |
| 170 Restructuring Prof. Fees - Lender | - | - | - | - | - | - |
| 171 Total  Professional Fees | - | - | - | - | - | - |
| 172 **Net Cash Flow a/f Rx** | **(0.1)** | **(0.5)** | **0.1** | **(0.3)** | **0.2** | **(0.6)** |
| 173 **Cash Balances & Availability** | | | | | | |
| 174 Beginning Book | 0.0 | 0.8 | 0.3 | 0.4 | 0.1 | 0.0 |
| 175 Net Cash Flow | (0.1) | (0.5) | 0.1 | (0.3) | 0.2 | (0.6) |
| 176 Add-back of Float before Filing | - | - | - | - | - | - |
| 177 **DIP Draw / (Repayment)** | **0.9** | **-** | **-** | **-** | **-** | **0.9** |
| 178 Ending Book | 0.8 | 0.3 | 0.4 | 0.1 | 0.3 | 0.3 |
| 179 Float | - | - | - | - | - | - |
| 180 Ending Bank | 0.8 | 0.3 | 0.4 | 0.1 | 0.3 | 0.3 |
| 181 Minimum Liquidity | - | - | - | - | - | - |
| 182 **Bank Availability, Net** | **0.8** | **0.3** | **0.4** | **0.1** | **0.3** | **0.3** |
| 183 DIP Availability | | | | | | |
| 184 **Total Availability** | **0.8** | **0.3** | **0.4** | **0.1** | **0.3** | **0.3** |

# **EXHIBIT J**

# **INTERIM DIP ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | Case No.: |
| SOUTH HILLS OPERATIONS, LLC, *et al.,*[1] | Chapter 11<br>*Joint Administration Requested* |
| Debtors. | |
| | Doc. No.: |
| SOUTH HILLS OPERATIONS, LLC, *et al.,* | Related to Document No. |
| Movant, | Hearing Date: |
| -vs - | Hearing Time: |
| CIBC BANK, USA, as Administrative Agent; US FOODS, INC.; PENNSYLVANIA DEPARTMENT HUMAN SERVICES; NEW WILMINGTON BOROUGH TAX COLLECTOR; RICHARD L. RAPONE, LAWRENCE COUNTY TREASURES; UNITY TOWNSHIP TAX COLLECTOR; WESTMORELAND COUNTY TAX CLAIM BUREAU; ROBERT OHR, TAX | Response Deadline: |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: South Hills Operations, LLC (5527); Monroeville Operations, LLC (3280); Mt. Lebanon Operations, LLC (1133); Murrysville Operations, LLC (9149); Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918); Maybrook-C Briarcliff Opco, LLC (5187); Maybrook-C Briarcliff Propco, LLC (1823); Maybrook-C Evergreen Opco, LLC (5388); Maybrook-C Evergreen Propco, LLC (2000); Maybrook-C Kade Opco, LLC (4033); Maybrook-C Kade Propco, LLC (2097); Maybrook-C Latrobe Opco, LLC (4148); Maybrook-C Latrobe Propco, LLC (2178); Maybrook-C Overlook Opco, LLC (7081); Maybrook-C Overlook Propco, LLC (6804); Maybrook-C Silver Oaks Opco, LLC (7146); Maybrook-C Silver Oaks Propco, LLC (9654); Maybrook-C Whitecliff Opco, LLC (6211); Maybrook-C Whitecliff Propco, LLC (4835).

COLLECTOR; MERCER COUNTY TAX
CLAIM BUREAU; WASHINGTON COUNTY
TAX CLAIM BUREAU; DONALD J.
PROGAR, TAX COLLECTOR; KEYSTONE
COLLECTION GROUP; JULIE LEVENTRY,
TAX COLLECTOR; SHELLEY BUCHANAN,
TAX COLLECTOR; CITY OF NEW CASTLE,

Respondents.

**INTERIM ORDER (I) AUTHORIZING THE MAYBROOK AND CONSULATE
DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
MAYBROOK AND CONSULATE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,
AND (VII) GRANTING RELATED RELIEF**

Upon the motion dated May 17, 2024 [Doc. No. [##]] (the "Maybrook DIP Motion") of

the above captioned debtors and debtors-in-possession (collectively, the "Debtors"), in the above-

captioned Chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an order (this

"Interim Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d),

364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Western

District of Pennsylvania (the "Local Rules"), *inter alia*:

i.        authorizing the Maybrook and Consulate Debtors[2] to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of $38,000,000.00 (the "Maybrook DIP Facility") consisting of (a) the New Money DIP Loan in the amount of $12,500,000.00 available upon entry of the Final Order,[3] and (b) the Roll-Up DIP Loan in the amount of $25,500,000.00 to satisfy a portion of the Maybrook and Consulate Prepetition Loan Facilities (as defined herein), subject to the terms and conditions of this Interim Order and the Maybrook DIP Credit Agreement by and among the Maybrook and Consulate Debtors and other credit parties thereto, as Borrowers, CIBC Bank USA ("CIBC"), as Administrative Agent (in such capacity, the "DIP Agent"), and the lender parties thereto from time to time, one (1) of whom as an "Insider" (as defined in 11 U.S.C. § 101(31))[4] (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), substantially in the form of **Exhibit A-1**, attached hereto;[5]

---

[2] Capitalized terms not otherwise defined herein shall have the definitions as ascribed to them in the Maybrook DIP Motion or the *Senior Secured Super-Priority Debtor-in-Possession Loan and Secured Agreement dated May 17, 2024* (the "Maybrook DIP Credit Agreement").

[3] Of the $12.5 million new money term loan, $3.6 million will be immediately available to the Maybrook and Consulate Debtors upon the entry of the Interim Order.

[4] Of the $38 million DIP Loan, Ephram Lahasky, an Insider of the Debtors, has committed to fund $2,000,000.00. *See* Annex A to the Maybrook DIP Credit Agreement.

[5] Upon entry of this Interim Order, an aggregate amount of $3.2 million of the Maybrook and Consulate Prepetition Loan Facilities, specifically from the Maybrook Prepetition Revolving Loan Facility and Consulate Prepetition Revolving Loan Facility, shall be fully rolled into the Maybrook DIP Facility and shall constitute DIP Obligations (as defined below) hereunder.

ii.        authorizing the Maybrook and Consulate Debtors to execute and deliver the Maybrook DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents (as defined in the Maybrook DIP Credit Agreement) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the Maybrook DIP Credit Agreement, the "Maybrook DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the Maybrook DIP Documents;

iii.        authorizing the Maybrook and Consulate Debtors to use proceeds of the Maybrook DIP Facility as permitted in the Maybrook DIP Documents and in accordance with this Interim Order, including, upon entry of this Interim Order, to refinance and Roll-Up a portion of the Maybrook and Consulate Prepetition Secured Obligations (as defined below) as provided in this Interim Order;

iv.        granting to the DIP Agent, for the benefit of itself and the DIP Lenders on account of the Maybrook DIP Facility and all obligations owing thereunder and under, or secured by, the Maybrook DIP Documents (collectively, and including all "Obligations" as described in the Maybrook DIP Credit Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases of the Maybrook and Consulate Debtors and

any Successor Cases (as defined herein), subject only to the Carve Out (as defined herein) and payable solely from the Collateral of the Maybrook and Consulate Debtors;

      v.      granting to the DIP Agent, for the benefit of itself and the DIP Lenders and the other Secured Parties (as defined in the Maybrook DIP Credit Agreement) under the Maybrook DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be on the terms and subject to the relative priorities set forth in the Maybrook DIP Documents and this Interim Order;

      vi.      authorizing and directing the Maybrook and Consulate Debtors to pay the principal, interest, fees, expenses and other amounts payable under the Maybrook DIP Documents as such become earned, due and payable, including, without limitation, continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the Maybrook DIP Documents;

      vii.      authorizing the Maybrook and Consulate Debtors to use the Maybrook and Consulate Prepetition Collateral (as defined herein), including the Cash Collateral of CIBC under the Maybrook and Consulate Prepetition Loan Documents (as defined herein), and providing adequate protection to CIBC for any and all diminution in value of any Maybrook and Consulate

Prepetition Collateral (including Cash Collateral), from and after the Petition Date for any reason, including, without limitation, any such diminution resulting from (i) the use of Cash Collateral, (ii) the priming of CIBC's security interests in and liens on any Maybrook and Consulate Prepetition Collateral (including by the Carve Out) by the DIP Liens (as defined herein) pursuant to the Maybrook DIP Documents and this Interim Order, (iii) the use, sale, or lease of the Maybrook and Consulate Prepetition Collateral, including Cash Collateral, and (iv) the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code or otherwise pursuant to Sections 361(a), 363(c), 364(c), 364(d)(1), and 507(b) of the Bankruptcy Code ("Diminution in Value");

viii.       vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Maybrook DIP Documents and this Interim Order;

ix.       subject to and effective upon entry of the Final Order, waiving the Maybrook and Consulate Debtors' ability to surcharge any DIP Collateral or Maybrook and Consulate Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code and any right of the Maybrook and Consulate Debtors under the "equities of the case" exception in Section 552(b) of the Bankruptcy Code;

x.       scheduling a final hearing (the "Final Hearing") within twenty-eight (28) days of the Petition Date to consider the relief requested in the Maybrook DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing;

xi.        waiving any applicable stay with respect to effectiveness and enforceability

of this Interim Order (including under Bankruptcy Rule 6004); and

xii.        granting the Maybrook and Consulate Debtors such other and further relief

as is just and proper.

The Court having considered the Maybrook DIP Motion, the exhibits attached thereto, the

*Declaration of Chief Restructuring Officer Louis E. Robichaux, IV, in Support of Debtors' Motion*

*for Interim and Final Orders (I) Authorizing the Maybrook and Consulate Debtors to Obtain*

*Postpetition Financing, (II) Authorizing the Maybrook and Consulate Debtors to Use Cash*

*Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV)*

*Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing,*

*and (VIII) Granting Related Relief* (the "DIP Declaration") and the *Declaration of Chief*

*Restructuring Officer Louis E. Robichaux, IV, in Support of Debtors' Chapter 11 Petitions and*

*First Day Motions* (the "First Day Declaration"), the Maybrook DIP Documents, and the evidence

submitted and argument made at the interim hearing held on [●] (the "Interim Hearing"); and

notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002,

4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and

concluded; and all objections, if any, to the interim relief requested in the Maybrook DIP Motion

having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the

interim relief requested in the Maybrook DIP Motion is necessary to avoid immediate and

irreparable harm to the Maybrook and Consulate Debtors and their estates, and otherwise is fair

and reasonable and in the best interests of the Maybrook and Consulate Debtors, their estates, their

creditors and equity holders, and all parties-in-interest, and is essential for the continued operation

of the Maybrook and Consulate Debtors' businesses and the preservation of the value of the their

assets; and it appearing that the Maybrook and Consulate Debtors' entry into the Maybrook DIP

Credit Agreement is a sound and prudent exercise of the Maybrook and Consulate Debtors'

business judgment; and after due deliberation and consideration, and good and sufficient cause

appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[6]**

      A.    <u>**Petition Date**</u>. On May 17, 2024 (the "<u>Petition Date</u>"), each of the Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Western District of Pennsylvania (the "<u>Court</u>").

---

[6] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.** **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed for any Debtor.

**C.** **Jurisdiction and Venue**. This Court has jurisdiction over the Chapter 11 Cases, the Maybrook DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Chapter 11 Cases and proceedings on the Maybrook DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**D.** **Committee Formation**. As of the date hereof, the United States Trustee for the Western District of Pennsylvania (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

**E.** **Notice**. Notice of the Maybrook DIP Motion and Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Maybrook DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

**F.** **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Creditors' Committee or other parties in-interest as set forth in paragraph 42 herein, the Maybrook and Consulate Debtors, on their behalf and on

9

behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

       i.      Obligations.

       1.      *Maybrook Debtors Obligations*: As of the Petition Date, the Maybrook Debtors[7] were justly and lawfully indebted and liable to CIBC under the terms of (A) a Loan and Security Agreement dated as June 15, 2016 (as amended and restated from time to time, the "Maybrook Prepetition Term Loan Facility"), (B) a Revolving Loan and Security Agreement dated as of August 16, 2016 (as amended and restated from time to time, the "Maybrook Prepetition Revolving Loan Facility" and with the Maybrook Prepetition Term Loan Facility, the "Maybrook Prepetition Loan Facilities"), and (C) a Guaranty dated as of August 15, 2016 (as reaffirmed from time to time, the "Maybrook Guaranty" and together with the Maybrook Prepetition Term Loan Facility and the Maybrook Prepetition Revolving Loan Facility, the "Maybrook Prepetition Loan Documents"). As of the Petition Date, the amount of such indebtedness was in the aggregate principal amount of not less than $47.9 million, exclusive of (if any) accrued and unpaid interest, escrows, reserves, prepayment premium, and fees, costs and

---

[7] The Maybrook Debtors shall include Maybrook-C Evergreen Opco, LLC, Maybrook-C Briarcliff Opco, LLC, Maybrook-C Silver Oaks Opco, LLC, Maybrook-C Overlook Opco, LLC, Maybrook-C Latrobe Opco, LLC, Maybrook-C Whitecliff Opco, LLC and Maybrook-C Kade Opco, Maybrook-C Evergreen Propco, LLC, Maybrook-C Briarcliff Propco, LLC, Maybrook-C Silver Oaks Propco, LLC, Maybrook-C Overlook Propco, LLC, Maybrook-C Latrobe Propco, LLC, Maybrook-C Whitecliff Propco, LLC and Maybrook-C Kade Propco, LLC.

expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Maybrook Prepetition Loan Documents) (collectively, the "Maybrook Prepetition Obligations").

        2.    *Consulate Debtor Obligations*: As of the Petition Date, the Consulate Debtors[8] were justly and lawfully indebted and liable to CIBC under the terms of (A) a Loan and Security Agreement dated as September 15, 2017 (as amended and restated from time to time, the "Consulate Prepetition Term Loan Facility"), (B) a Revolving Loan and Security Agreement dated as of September 15, 2017 (as amended and restated from time to time, the "Consulate Prepetition Revolving Loan Facility" and with the Consulate Prepetition Term Loan Facility, the "Consulate Prepetition Loan Facilities" (the Maybrook Prepetition Loan Facilities and the Consulate Prepetition Loan Facilities, the "Maybrook and Consulate Prepetition Loan Facilities"), and (C) a Guaranty dated as of September 15, 2017 (as reaffirmed from time to time, the "Consulate Guaranty" and together with the Consulate Prepetition Term Loan Facility and the Consulate Prepetition Revolving Loan Facility, the "Consulate Prepetition Loan Documents" and with the Maybrook Prepetition Loan Documents, the "Maybrook and Consulate Prepetition Loan Documents"). As of the Petition Date, the amount of such indebtedness was in the aggregate principal amount of not less than $7.2 million, exclusive of (if any) accrued and unpaid interest,

---

[8] The Consulate Debtors shall include Cheswick Rehabilitation and Wellness Center, LLC (9561); 3876 Saxonburg Boulevard Propco, LLC (3618); North Strabane Rehabilitation and Wellness Center, LLC (1677); 100 Tandem Village Road Propco, LLC (1918).

escrows, reserves, prepayment premium, and fees, costs and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Consulate Prepetition Loan Documents) (collectively, the "Consulate Prepetition Obligations" and with the Maybrook Prepetition Obligations, the "Maybrook and Consulate Prepetition Obligations").

3.      *CIBC Prepetition Liens*. Pursuant to the terms of the Maybrook and Consulate Prepetition Loan Documents, each of the Maybrook and Consulate Debtors granted CIBC first-priority liens and security interests (the "CIBC Prepetition Liens") in substantially all of the Maybrook and Consulate Debtors' property as more particularly described in the applicable Loan Documents (the "Maybrook and Consulate Prepetition Collateral").

4.      No portion of the Maybrook and Consulate Prepetition Obligations, as secured by the Maybrook and Consulate Prepetition Collateral (together, the "Maybrook and Consulate Prepetition Secured Obligations"), or any payments made to CIBC or applied to or paid on account of the Maybrook and Consulate Prepetition Obligations prior to the Petition Date are subject to avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, attack, recoupment, rejection, reduction, setoff, disallowance, impairment, counterclaim, cross-claim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law.

5.     The CIBC Prepetition Liens: (a) are valid, binding, perfected, enforceable, first-priority liens on and in the Maybrook and Consulate Prepetition Collateral; and (b) are not subject to avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, attack, recoupment, rejection, reduction, set-off, disallowance, impairment, counterclaim, cross-claim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law.

ii.     <u>No Control of the Debtors</u>. CIBC does not control the Maybrook and Consulate Debtors or their respective properties or operations, does not have authority to determine the manner in which any of the Maybrook and Consulate Debtor's operations are conducted (except to the extent expressly set forth in the Maybrook and Consulate Prepetition Loan Documents), and is not a control person or insider of the Maybrook and Consulate Debtors by virtue of any of the actions taken with respect to, in connection with, relating to or arising from the any of the Maybrook and Consulate Prepetition Loan Documents.

iii.     <u>Cash Collateral</u>. The Maybrook and Consulate Prepetition Collateral, as of the Petition Date, is subject to valid, perfected, enforceable, first-priority liens under the Loan Documents, and applicable law, for the benefit of CIBC. All cash, cash equivalents and deposit accounts, whenever acquired, of Maybrook and Consulate Debtors and their estates, and all proceeds, products, offspring, rents and profits of the Maybrook and Consulate Prepetition

13

Collateral are "cash collateral" of CIBC within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

        iv.        No Claims Against CIBC. No claims or causes of action exist against, or with respect to, CIBC under any of the Loan Documents or any other documents executed in connection therewith.

        v.        Release. The Maybrook and Consulate Debtors shall forever, unconditionally and irrevocably release, discharge, and acquit CIBC, and its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, members, directors, managers, employees, attorneys, agents, and professionals, past, present, and future, and its and their respective heirs, predecessors, successors, and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever that exist on the date hereof, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Loan Documents and/or the transactions contemplated thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims or causes of action arising under the Bankruptcy Code, and (iii) any and all claims or causes of action with respect to the extent, validity, priority, perfection, or avoidability of the CIBC Prepetition Liens and the Maybrook and Consulate Prepetition Secured Obligations. The Maybrook and Consulate Debtors

further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Maybrook and Consulate Prepetition Secured Obligations that Maybrook and Consulate Debtors now has or may claim to have against the Releasees, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court entering the Interim Order.

    **G.**  **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged permitted prior lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agent, CIBC, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged permitted prior lien and/or security interests. For the purposes hereof, the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a permitted prior lien and is expressly subject to the CIBC Prepetition Liens and DIP Liens (as defined herein).

    **H.**  **Findings Regarding Corporate Authority**. Each Maybrook and Consulate Debtor has all requisite corporate power and authority to execute and deliver the Maybrook DIP Documents to which it is a party and to perform its obligations thereunder.

    **I.**  **Findings Regarding Postpetition Financing.**

      *i.*  Request for Postpetition Financing. The Maybrook and Consulate Debtors seek authority to (a) use Cash Collateral on the terms described herein, and (b) enter into

the Maybrook DIP Facility on the terms described herein and in the Maybrook DIP Documents to refinance the Maybrook and Consulate Prepetition Secured Obligations, to administer their Chapter 11 Cases, and to fund their operations. At the Final Hearing, the Maybrook and Consulate Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

*ii.*        Priming of the Prepetition Liens. The priming of the CIBC Prepetition Liens on the Maybrook and Consulate Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the Maybrook DIP Facility and as further described below, will enable the Maybrook and Consulate Debtors to obtain the Maybrook DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors. CIBC is entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution in Value of each of their respective interests in the Maybrook and Consulate Prepetition Collateral (including Cash Collateral). For avoidance of doubt, the priming liens granted in connection with this Interim Order apply only to the Maybrook and Consulate Prepetition Collateral and do not prime any lien on the assets of the Cuarzo Debtors (as defined herein).

iii. *Need for Postpetition Financing and Use of Cash Collateral*. The Maybrook and Consulate Debtors have an immediate and ongoing need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the Maybrook DIP Facility in order to, among other things, administer and preserve the value of their estates. The ability of the Maybrook and Consulate Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, finance their operations, and maintain the high standard of care for their residents, requires the availability of working capital from the Maybrook DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Maybrook and Consulate Debtors, their estates, and parties-in-interest, including their residents. The Maybrook and Consulate Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties, or care for their residents in the ordinary course of business during the Interim Period without access to the Maybrook DIP Facility and the authority to use of Cash Collateral.

iv. *No Credit Available on More Favorable Terms*. Given their current financial condition, financing arrangements, and capital structure, the Maybrook and Consulate Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the Maybrook DIP Facility. The Maybrook and Consulate Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Maybrook and Consulate Debtors have also

17

been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Maybrook and Consulate Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Maybrook and Consulate Debtors and their estates that is subject to a lien. As described in the DIP Declaration, financing on a postpetition basis on better terms is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Maybrook and Consulate Debtors' existing and after-acquired assets with the priorities set forth in paragraph 6 hereof; (2) superpriority claims and liens against all assets of the Maybrook and Consulate Debtors; (3) the other protections set forth in this Interim Order; and (4) and partial refinancing of the Maybrook and Consulate Prepetition Secured Obligations through the Roll-Up DIP Loan.

v. *Use of Proceeds of the Maybrook DIP Facility*. As a condition to entry into the Maybrook DIP Credit Agreement, the extension of credit under the Maybrook DIP Facility and the authorization to use Cash Collateral, the DIP Agent, the DIP Lenders, CIBC, and the Maybrook and Consulate Debtors have agreed, that proceeds of the Maybrook DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the Maybrook DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the Maybrook DIP Documents and subject

18

to such variances as permitted in the Maybrook DIP Credit Agreement, and as set forth in paragraph 20 hereof, the "Maybrook Budget"),[9] solely for: (a) the partial replacement and refinancing of the Maybrook and Consulate Prepetition Secured Obligations into DIP Obligations to the extent provided for in this Interim Order, the Final Order and the Maybrook DIP Documents, and subject to the rights preserved in paragraph 42 of this Interim Order; (b) working capital; (c) permitted payment of costs of administering the Chapter 11 Cases; (d) payment of such other prepetition obligations as set forth in the Maybrook Budget or otherwise approved by the DIP Agent in its sole discretion, and as approved by the Court; (e) payment of interest, fees, expenses and other amounts (including legal and other professionals' fees and expenses of the DIP Agent) owed under the Maybrook DIP Documents; (f) payment of certain adequate protection amounts to CIBC, as set forth in paragraphs 16 hereof; and (g) other general corporate purposes of the Maybrook and Consulate Debtors permitted by the Maybrook Budget and the Maybrook DIP Documents. The DIP Agent and the DIP Lenders are relying upon the Maybrook Budget in entering into the Maybrook DIP Credit Agreement and the other Maybrook DIP Documents and providing the Maybrook DIP Facility, and CIBC is relying upon the Maybrook Budget in consenting to the terms of this Interim Order. All references in this Interim Order restricting the use of Loans (as defined in the Maybrook DIP Credit Agreement) to payment of amounts consistent with the Maybrook Budget shall mean the most recent approved Maybrook Budget,

---

[9] A copy of the Maybrook Budget is attached hereto as Exhibit A-2.

subject to the condition that no time shall the operational or accrued professional fee disbursements in the aggregate exceed ten percent (10%) of aggregate total disbursements for such period as set forth in the Maybrook Budget (as more fully defined in, and subject to the conditions of, the Maybrook DIP Credit Agreement, the "Permitted Variance").

   *vi.*   *Application of Proceeds of Prepetition Collateral*. As a condition to entry into the Maybrook DIP Credit Agreement, the extension of credit under the Maybrook DIP Facility and authorization to use Cash Collateral, the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, and CIBC have agreed that, as of and commencing on the date of the Interim Hearing, the Maybrook and Consulate Debtors shall apply the proceeds of DIP Collateral (as defined herein) in accordance with this Interim Order and as provided in the Maybrook DIP Documents.

   *vii.*   *Roll-up of Maybrook and Consulate Prepetition Secured Obligations.* Upon entry of this Interim Order, without any further action by the Maybrook and Consulate Debtors or any other party, an aggregate amount of $17,656,191.05 million of outstanding Maybrook Prepetition Obligations and $7,843,808.95 million of outstanding Consulate Prepetition Obligations shall be repaid and refinanced with the proceeds of the Loans, to effect a roll-up (the "Roll-Up") of a portion of the Maybrook Prepetition Obligations and the entirety of the Consulate Prepetition Obligations into DIP Obligations under and as further described in the Maybrook DIP Documents (the "DIP Roll-Up Obligations"). Upon entry of the Proposed Interim

Order, subject to satisfaction of the applicable conditions precedent, only $3,200,00.00 of the Roll-Up shall be rolled up (the "Interim Roll-Up"), and the remainder of the Roll-Up shall be rolled up upon entry of the Proposed Final Order, subject to satisfaction of the applicable conditions precedent. The Roll-Up shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of CIBC who is also a DIP Lender to fund amounts, and provide other consideration to the Maybrook and Consulate Debtors, under the Maybrook DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Maybrook and Consulate Prepetition Secured Obligations. CIBC would not otherwise consent to the use of their Cash Collateral or the subordination of the CIBC Prepetition Liens to the DIP Liens, and the DIP Lenders would not be willing to provide the Maybrook DIP Facility or extend credit to the Maybrook and Consulate Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations. Moreover, the replacement and refinancing of a portion of the Maybrook and Consulate Prepetition Secured Obligations through the Roll-Up: (a) will benefit the Maybrook and Consulate Debtors and their estates as a result of the DIP Lenders' agreement to provide "new money" availability under the Maybrook DIP Facility in a manner favorable to the Maybrook and Consulate Debtors, and (b) will enable the Maybrook and Consulate Debtors to obtain urgently needed financing that they need to administer these Chapter 11 Cases and fund their operations. Because the Roll-Up is subject to the entry of the Final Order

21

and the reservation of rights in paragraph 42 below, it will not prejudice the right of any other party in interest.

      **J.**      **Adequate Protection**. CIBC is entitled to receive adequate protection to the extent of any Diminution in Value of its respective interests in the Maybrook and Consulate Prepetition Collateral. Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, and subject to the Carve Out and to paragraph 42 herein, as adequate protection: (i) CIBC shall receive:

      *i.*      *Prepetition Adequate Protection Liens*. To the extent of any Diminution in Value from and after the Petition Date resulting from, among other things, the use, sale or lease of the Cash Collateral of the Maybrook and Consulate Debtors, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and to the extent Maybrook and Consulate Debtors (or their estates) have assets that are not already subject to a continuing Lien in favor of CIBC in accordance with Bankruptcy Code section 552(b)(2), CIBC is hereby granted, solely to the extent of any Diminution in Value (all such Liens, the "Prepetition Adequate Protection Liens"):

      1.      valid, binding, continuing, enforceable, unavoidable and fully perfected, postpetition Liens on all of Maybrook and Consulate Debtors' rights in tangible and intangible assets, in the same order and priority as existed between CIBC as to the Maybrook and Consulate Prepetition Collateral as of the Petition Date, including, without limitation, (A) the Maybrook and Consulate Prepetition Collateral and (B) all other prepetition and postpetition

property of Maybrook and Consulate Debtors' estates, and all products and proceeds thereof, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to (y) valid, perfected, unavoidable and enforceable Liens in existence on or as of the Petition Date or (z) valid and unavoidable Liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property," and together with the Maybrook and Consulate Prepetition Collateral, the "Property"), including, without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, claims and causes of action, including commercial tort claims (other than Avoidance Actions (defined herein)) set forth on Schedule 11.21 to the Maybrook DIP Credit Agreement, and the proceeds of all of the foregoing;

2.    For the avoidance of doubt and notwithstanding subsection (i) immediately above, the Prepetition Adequate Protection Liens shall **not** include Avoidance Actions, but, subject to a Final Order, such Prepetition Adequate Protection Liens shall include the products and proceeds thereof. Such claims and causes of actions shall include those claims and causes of action arising under or permitted by Bankruptcy Code sections 502(d), 506(c), 544,

545, 547, 548, 549, and 550 and any other avoidance claims and causes of action arising under state or federal law (collectively, the "Avoidance Actions");

    3.    The Prepetition Adequate Protection Liens so granted are in addition to all security interests, liens, and rights of setoff existing in favor of CIBC on the Petition Date, and are and shall be valid, perfected, enforceable, and effective as of the Petition Date without any further action of the Maybrook and Consulate Debtors or CIBC and without the necessity of the execution, filing or recording of any financing statements, security agreements, deeds of trust, or other documents, or of obtaining control agreements over bank accounts. Notwithstanding the foregoing, CIBC is hereby authorized, but not required, to file or record any financing statements, security agreements, deeds of trust, or other documents in any jurisdiction or take any other action in order to validate and perfect the Prepetition Adequate Protection Liens granted hereunder.

    *ii.*    *Prepetition Superpriority Claim.* CIBC is hereby granted, solely to the extent of any Diminution in Value and, to the extent such claims arise, payable solely from the Collateral of the Maybrook and Consulate Debtors, allowed superpriority administrative expense claims against each of the Maybrook and Consulate Debtors under section 507(b) of the Bankruptcy Code in respect of the Adequate Protection Obligations with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition Superpriority Claim"). The Prepetition Superpriority Claim

shall be payable from all of Maybrook and Consulate Debtors' assets, but not from the assets of any other Debtor.

   **K.** <u>**Sections 506(c) and 552(b).**</u> In light of: (i) the DIP Agent's and DIP Lenders' agreement that their DIP Liens and superpriority claims against the Maybrook and Consulate Debtors shall be subject to the Carve Out, (ii) the agreement of CIBC that the CIBC Prepetition Liens shall be subject to the Carve Out and subordinate to the DIP Liens, and (iii) the payment of expenses as set forth in the Maybrook Budget in accordance with and subject to the terms and conditions of this Interim Order and the Maybrook DIP Documents, (a) subject to entry of a Final Order, CIBC is each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Agent, the DIP Lenders, and CIBC are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

   **L.** <u>**Good Faith of the DIP Agent and DIP Lenders**</u>.

     i.  *Willingness to Provide Financing*. The DIP Lenders have indicated a willingness to provide financing to the Maybrook and Consulate Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the Maybrook DIP Facility and the Maybrook DIP Documents; (c) satisfaction of the closing conditions set forth in the Maybrook DIP Documents; and (d) findings by this Court that the Maybrook DIP Facility is essential to the Maybrook and Consulate Debtors' estates, that the DIP

Lenders are extending credit to the Maybrook and Consulate Debtors pursuant to the Maybrook DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the Maybrook DIP Documents will have the protections provided by Section 364(e) of the Bankruptcy Code. Based upon the record presented at the Interim Hearing, the Maybrook DIP Facility has been negotiated in good faith and at arm's length between the Maybrook and Consulate Debtors, on the one hand, and the DIP Agent and the DIP Lenders, on the other. All of the DIP Obligations and all other liabilities and obligations of the Maybrook and Consulate Debtors under this Interim Order and the Maybrook DIP Documents or in respect of credit card debt, overdrafts and other liabilities arising from treasury, depository, credit card, and cash management services, or in connection with any automated clearinghouse transfers of funds owing to the DIP Agent or the DIP Lenders shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code. The DIP Agent and the DIP Lenders shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

ii.    *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the Maybrook DIP Facility and the Maybrook DIP

26

Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Maybrook and Consulate Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Maybrook and Consulate Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the Maybrook DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, and CIBC, with the assistance and counsel of their respective advisors. Use of Cash Collateral and credit to be extended under the Maybrook DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agent, the DIP Lenders, and CIBC within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders, and CIBC are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

> **M.**    **Jurisdiction and Venue; Core Proceeding**. This Court has jurisdiction over these Chapter 11 Cases, the Maybrook DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Maybrook DIP Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for

the relief sought herein are sections 105, 361, 362, 263, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and the applicable Local Rules.

**N.**    **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Absent the immediate grant by the Court of the interim relief sought by the Maybrook DIP Motion, the Maybrook and Consulate Debtors' estates will be immediately and irreparably harmed pending the Final Hearing. The Maybrook and Consulate Debtors' obtaining the Maybrook DIP Facility in accordance with the terms of this Interim Order and the Maybrook DIP Documents is in the best interests of the Maybrook and Consulate Debtors' estates and is consistent with the exercise of their fiduciary duties.

**O.**    **Interplay Between Maybrook DIP Motion and Cuarzo DIP Motion**. Contemporaneously with the filing of the Maybrook DIP Motion, Monroeville Operations, LLC, South Hills Operations, LLC, Murrysville Operations, LLC and Mt. Lebanon Operations, LLC (the "Cuarzo Debtors"), each of whom are not included as a Maybrook and Consulate Debtor but are certain of the above-captioned Debtors, have also sought approval of post-petition debtor-in-possession financing, the terms and conditions of which are set forth in the *Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Cuarzo Debtors To Obtain Postpetition Financing, (II) Authorizing The Cuarzo Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief*

28

[Doc. No. __] (the "Cuarzo DIP Motion").  All terms and conditions of this Interim Order, the Maybrook DIP Credit Agreement, and the Maybrook DIP Documents, are intended to apply exclusively to the Maybrook and Consulate Debtors, and not to the Cuarzo Debtors.  The relief sought by the Cuarzo Debtors is set forth in the *Interim Order (I) Authorizing the Cuarzo Debtors to Obtain Postpetition Financing, (II) Authorizing the Cuarzo Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Doc. No. []] (the "Cuarzo Interim DIP Order").

   **P.**  **Interim Hearing**. As set forth in the Maybrook DIP Motion, notice of the Interim Hearing and the relief requested in the Maybrook DIP Motion has been provided by the Maybrook and Consulate Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the Office of the United States Trustee; (ii) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; (iii) the list of the 30 largest unsecured creditors of the Debtors; (iv) the named Respondents in the Motion; and (v) the notice recipients identified in the Motion.. The Maybrook and Consulate Debtors have made reasonable efforts to afford the best notice possible under the circumstances in compliance with Bankruptcy Rules 4001(b) and (c) and applicable Local Rules and no other notice is required in connection with the relief set forth in this Interim Order. Based upon the foregoing findings and conclusions, the Maybrook DIP Motion, the

DIP Declaration, the First Day Declaration, and the record before the Court with respect to the Maybrook DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

<p align="center">**IT IS HEREBY ORDERED** that:</p>

1.      <u>Interim Financing Approved</u>. The Maybrook DIP Motion is granted as set forth herein, the interim financing as set forth in this Interim Order is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the Maybrook DIP Documents and this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits in their entirety. Subject to the terms of this Interim Order, the rights of all parties in interest to object to the final relief sought by the Maybrook DIP Motion are reserved in full.

<p align="center">**Authorization of the Maybrook DIP Facility**</p>

2.      <u>Authorization of the Maybrook DIP Facility</u>. The Maybrook DIP Facility, including the Roll-Up, is hereby approved as set forth herein. The Maybrook and Consulate Debtors are expressly and immediately authorized and empowered to execute and deliver the Maybrook DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the Maybrook DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for

<p align="center">30</p>

the performance by the Maybrook and Consulate Debtors under the Maybrook DIP Facility and

the creation and perfection of the DIP Liens described in and provided for by this Interim Order

and the Maybrook DIP Documents, including each of Maybrook and Consulate Debtors providing

its joint and several guarantee of all of the DIP Obligations and such acts as shall be necessary or

desirable in order to effect the Roll-Up and replacement and refinancing of the DIP Roll-Up

Obligations. The Maybrook and Consulate Debtors are hereby authorized and directed to pay, in

accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other

amounts all to the extent provided in this Interim Order or the Maybrook DIP Documents. All

collections and proceeds, whether from ordinary course collections, asset sales, debt or equity

issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as

required by this Interim Order and the Maybrook DIP Documents. Upon execution and delivery,

the Maybrook DIP Documents shall represent valid and binding obligations of the Maybrook and

Consulate Debtors, enforceable against each of the Maybrook and Consulate Debtors and their

estates in accordance with their terms.

        i.      Notwithstanding anything to the contrary in the Maybrook DIP

Documents, the satisfaction of outstanding real estate taxes due and owing by the Maybrook and

Consulate Debtors as of the Petition Date shall not be a condition precedent to funding on an

interim basis, but shall be paid upon the earlier of (a) approval by this Court, after notice and

hearing, or (b) upon the sale or disposition of all or substantially all of the DIP Collateral or the Prepetition Collateral.

3.      <u>Authorization to Borrow</u>. To prevent immediate and irreparable harm to the Maybrook and Consulate Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined below), and subject to the terms, conditions, limitations on availability and reserves (as applicable) set forth in the Maybrook DIP Documents and this Interim Order, the Maybrook and Consulate Debtors shall be deemed to have requested, and the DIP Agent and the DIP Lenders are hereby authorized to make, Loans (as defined in the Maybrook DIP Credit Agreement), the proceeds of which shall be used to effect the Roll-Up and for general corporate purposes in accordance with the Maybrook DIP Credit Agreement and the provisions of this Interim Order. Loans (as defined in the Maybrook DIP Credit Agreement) made to effect the Roll-Up shall be included in the DIP Obligations, and $3,200,000 of the Maybrook and Consulate Prepetition Secured Obligations shall be converted and "rolled up" into DIP Obligations as provided in this Interim Order, provided that the Roll-Up shall be subject to the reservation of rights set forth in paragraph 42 of this Interim Order.

4.      <u>DIP Obligations</u>. The Maybrook DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Maybrook and Consulate Debtors' DIP Obligations, which shall be enforceable against the Maybrook and Consulate Debtors,

their estates and any successors thereto, including any trustee appointed in the Chapter 11 Cases of

the Maybrook and Consulate Debtors, or in any case under Chapter 7 of the Bankruptcy Code upon

the conversion of any of the Chapter 11 Cases of the Maybrook and Consulate Debtors, or in any

other proceedings superseding or related to any of the foregoing (collectively, the "Successor

Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, and any other

indebtedness or obligations, contingent or absolute, which may now or from time to time be owing

by any of the Maybrook and Consulate Debtors to the DIP Agent or any of the DIP Lenders, in each

case, under, or secured by, the Maybrook DIP Documents or this Interim Order, including all

principal, accrued interest, costs, fees, expenses and other amounts under the Maybrook DIP

Documents. The Maybrook and Consulate Debtors shall be jointly and severally liable for the DIP

Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use

of Cash Collateral shall automatically cease on the Termination Date (as defined herein), except as

provided in paragraph 33 herein. No obligation, payment, transfer, or grant of collateral security

hereunder or under the Maybrook DIP Documents (including any DIP Obligation or DIP Liens (as

defined below), and including in connection with any adequate protection provided to CIBC

hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy

Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the

Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law),

or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 42 below.

5.      DIP Liens. In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all real and personal property and other assets, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Maybrook and Consulate Debtors and their bankruptcy estates (collectively, the "DIP Collateral"), including, without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of

34

money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Maybrook and Consulate Debtors, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests, leased real property (including, for the avoidance of doubt, any ground leases), and all proceeds of all of such real property or other interests; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and the proceeds thereof; (d) subject to entry of a Final Order, the proceeds (the "Avoidance Proceeds") of any Avoidance Actions (other than actions brought pursuant to section 549 of the Bankruptcy Code), but not the Avoidance Actions themselves; (e) subject to entry of a Final Order, the Maybrook and Consulate Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof; (f) all Maybrook and Consulate Prepetition Collateral; (g) all other DIP Collateral whether or not subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (h) to the extent not otherwise included, all proceeds, commercial tort claims set forth on Schedule 11.21 to the Maybrook DIP Credit Agreement, insurance claims and other rights to payments not otherwise included in the foregoing and proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rent and profits of, each of the foregoing.

6.      <u>DIP Lien Priority</u>. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim Order. The DIP Liens shall consist of:

i.      <u>Priming DIP Liens on Maybrook and Consulate Prepetition Collateral</u>. Valid, binding, continuing, enforceable, and fully perfected, first priority (subject to permitted prior liens but only to the extent such permitted prior liens are senior by operation of law to CIBC's Liens, security interests and liens upon all DIP Collateral which is Maybrook and Consulate Prepetition Collateral, which security interests in and liens upon, pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be prior and senior in all respects to (i) the security interests and liens in favor of CIBC with respect to DIP Collateral, (ii) the Adequate Protection Liens with respect to the DIP Collateral, and (iii) any security interest in, or other lien upon, any DIP Collateral that on the Petition Date was not a properly perfected, valid, enforceable and unavoidable security interest or lien.  For avoidance of doubt, the DIP Liens shall not prime any lien arising from or relating to the Real Estate Taxes.

ii.      <u>Liens Junior to Certain Other Liens</u>. Valid, binding, continuing, enforceable, and fully perfected, first priority security interests and liens upon all DIP Collateral that is not Maybrook and Consulate Prepetition Collateral (whether such DIP Collateral is in existence on, or created, acquired, arising after, the Petition Date), which security interests in and

liens upon, pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be junior to (but only to) any properly perfected, valid, unavoidable, and enforceable permitted prior liens.

iii.      <u>Unencumbered Property</u>. Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, and fully perfected, first priority security interests and liens upon all prepetition and postpetition Unencumbered Property of the Maybrook and Consulate Debtors whether existing on the Petition Date or thereafter acquired (other than Avoidance Actions), that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to a properly perfected, valid, enforceable and unavoidable lien.

iv.      <u>First Lien on Avoidance Proceeds</u>. Subject to the entry of the Final Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on Avoidance Proceeds of any Maybrook and Consulate Debtor's Avoidance Actions.

v.      <u>DIP Liens Not Subordinate</u>. Other than as set forth herein or in the Maybrook DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a

case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the

dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to

Sections 506(c) (subject to entry of a Final Order), 510, 549 or 550 of the Bankruptcy Code. No

lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the

Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. In no event shall any person

who pays (or through the extension of credit to any Maybrook and Consulate Debtor, causes to be

paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims,

privileges, liens or priorities granted to or in favor of, or conferred upon, the DIP Agent or any DIP

Lender by the terms of any DIP Documents or this Interim Order unless and until the DIP

Obligations owed to the DIP Lenders and the Maybrook and Consulate Prepetition Secured

Obligations owed to CIBC have been indefeasibly paid in full in cash.

7.     DIP Superpriority Claims. Upon entry of this Interim Order, the DIP Agent,

on behalf of itself and the DIP Lenders, is hereby granted, pursuant to section 364(c)(1) of the

Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter

11 Cases of the Maybrook and Consulate Debtors and any Successor Cases (collectively, the "DIP

Superpriority Claims") for all DIP Obligations: (a) subject only to the Carve Out, having priority

over any and all administrative expense claims and unsecured claims against the Maybrook and

Consulate Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any

time existing or arising, of any kind or nature whatsoever, including administrative expenses of

the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; (b) which shall at all times be senior to the rights of the Maybrook and Consulate Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law; and (c) shall be payable, to the extent such DIP Superpriority Claims arise, solely from the assets of the Maybrook and Consulate Debtors. The DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from all prepetition and postpetition property of the Maybrook and Consulate Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

8.      No Obligation to Extend Credit. The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance, or to issue, amend, renew or extend any letters of credit or bankers' acceptance under the Maybrook DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance under the Maybrook DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and in accordance with the terms of the Maybrook DIP Credit Agreement.

9.      Use of Proceeds of DIP Facility. From and after the Petition Date, the Maybrook and Consulate Debtors shall use advances of credit under the Maybrook DIP Facility, in accordance with the Maybrook Budget (subject to such variances as are permitted under the Maybrook DIP Credit Agreement), only for the purposes specifically set forth in this Interim Order and the Maybrook DIP Documents, and in compliance with the terms and conditions in this Interim Order and the Maybrook DIP Documents.

10.      DIP Roll-Up Obligations. Upon entry of this Interim Order, without any further action by the Maybrook and Consulate Debtors or any other party, and as a condition to the provision of liquidity under the Maybrook DIP Facility, all DIP Roll-Up Obligations to the extent of the Interim Roll-Up shall be deemed to have replaced and refinanced the corresponding portion of the Maybrook and Consulate Prepetition Secured Obligations and shall automatically constitute DIP Obligations.  Notwithstanding anything to the contrary contained in this Interim Order or the Maybrook DIP Documents, for the avoidance of doubt, any release hereunder, or any payment or satisfaction of any or all of the DIP Obligations, DIP Roll-Up Obligations, or the Maybrook and Consulate Prepetition Obligations, shall not have any effect on any obligations of any Borrower or any guarantor with respect to any of the Maybrook and Consulate Prepetition Obligations, except, and to the extent, that such Maybrook and Consulate Prepetition Obligations constitute DIP Roll-Up Obligations.

**Authorization to Use Cash Collateral**

40

11.     <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, the Maybrook DIP Facility, and the Maybrook DIP Documents and in accordance with the Maybrook Budget (subject to such variances as permitted in the Maybrook DIP Credit Agreement), the Maybrook and Consulate Debtors are authorized to use Cash Collateral until the Termination Date (as defined herein); *provided, however*, that during the Remedies Notice Period (as defined herein), the Maybrook and Consulate Debtors may use Cash Collateral in accordance with the terms and provisions of the Maybrook Budget or as otherwise agreed by the DIP Agent in its sole discretion, and the Carve Out Account shall be funded following delivery of the Carve Out Trigger Notice (as defined herein) as provided in paragraph 39 of this Interim Order. Nothing in this Interim Order shall authorize the disposition of any assets of the Maybrook and Consulate Debtors or their estates outside the ordinary course of business, or any Maybrook and Consulate Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the Maybrook DIP Facility, the Maybrook DIP Documents, and in accordance with the Maybrook Budget or by subsequent order of this Court.

12.     <u>Prepetition Adequate Protection Liens</u>.

i.      *Prepetition Adequate Protection Liens*. Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of CIBC against any Diminution in Value of such interests in the Maybrook and Consulate Prepetition Collateral, the Maybrook and Consulate Debtors hereby grant to CIBC, continuing, valid, binding,

enforceable, non-avoidable and automatically perfected Prepetition Adequate Protection Liens; provided that the Prepetition Adequate Protection Liens will attach to Avoidance Proceeds only upon entry of the Final Order. The Prepetition Adequate Protection Liens are subject to the reservation of rights set forth in paragraph 42 of this Interim Order.

13.    Priority of Prepetition Adequate Protection Liens.

i.    The Prepetition Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to the DIP Liens and DIP Superpriority Claims. The Prepetition Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Property.

ii.    Except as provided herein or in the Maybrook DIP Credit Agreement, the Prepetition Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee or other estate representative appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The Prepetition Adequate Protection Liens shall not be subject to sections 506(c) (subject to entry of a Final Order), 510, 549, 552(b) (subject to entry of a Final Order) or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Liens or the Prepetition Adequate Protection Liens.

42

14.    <u>Adequate Protection Superpriority Claims</u>. As further adequate protection of the interests of CIBC in the Maybrook and Consulate Prepetition Collateral securing the Maybrook and Consulate Prepetition Secured Obligations against any Diminution in Value of such interests in such Maybrook and Consulate Prepetition Collateral, CIBC is hereby granted an allowed Prepetition Superpriority Claim. The Prepetition Superpriority Claim shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code and shall be payable from all prepetition and postpetition property of the Maybrook and Consulate Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

15.    <u>Priority of the Adequate Protection Superpriority Claims</u>. The Prepetition Superpriority Claim shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to the DIP Superpriority Claims. The Prepetition Superpriority Claim shall have priority over all other administrative expense claims and unsecured claims against the Maybrook and Consulate Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

16.    <u>Adequate Protection Payments and Protections</u>.

43

i.      As further adequate protection (the "Prepetition Adequate Protection Payments"), the Maybrook and Consulate Debtors are authorized and directed to provide adequate protection to CIBC in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) immediately upon entry of this Interim Order, payment of any unpaid interest, reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by or owed to CIBC arising prior to or after the Petition Date, and (ii) the reasonable and documented interest, fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by or owed to CIBC arising subsequent to the Petition Date. Solely to the extent provided for in the Maybrook and Consulate Prepetition Loan Documents, until the earlier to occur of (a) receipt by CIBC of releases and discharges of claims and liabilities in form and substance satisfactory CIBC, in its sole discretion, or (b) the expiration of the Challenge Deadline (as defined below) without the commencement of a Challenge (as defined below), as part of the adequate protection provided under this paragraph 16, CIBC shall be entitled to current payment of all interest, costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred in connection with contingent indemnification, reimbursement or similar

continuing obligations arising under the Maybrook and Consulate Prepetition Loan Documents or

otherwise in respect of the Maybrook and Consulate Prepetition Secured Obligations, including in

connection with or responding to:

a.      formal or informal inquiries and/or discovery requests, any

adversary proceeding, cause of action, objection, claim, defense, or other challenge as

contemplated in paragraph 42 hereof, or

b.      any Challenge against CIBC related to the Maybrook and

Consulate Prepetition Loan Documents and the Maybrook and Consulate Prepetition Secured

Obligations, or the Liens granted to CIBC, as applicable, whether in these Chapter 11 Cases or

independently in another forum, court, or venue. Subject to compliance with the procedures set

forth in paragraph 35 of this Interim Order, payment of costs, expenses, and other amounts

(including reasonable and documented attorneys' fees) incurred in connection with prepetition

indemnification obligations under the Maybrook and Consulate Prepetition Loan Documents

shall be made as and when they arise (and may be paid with the proceeds of the Maybrook DIP

Facility and/or from the proceeds of DIP Collateral), without further notice to or consent from the

Maybrook and Consulate Debtors, a Committee (if appointed), or any other parties in interest and

without further order of this Court; *provided*, that (i) any such indemnification claims shall be

subject to the terms of the Maybrook and Consulate Prepetition Loan Documents (including with

respect to application of proceeds), (ii) the rights of parties in interest with requisite standing to

object to any such indemnification claim(s) are hereby reserved in accordance with paragraph 42

hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed

indemnification claim(s). For the avoidance of doubt, the Maybrook and Consulate Debtors shall

not indemnify the DIP Lenders and/or DIP Agent from and against any successful challenge.

17.     Adequate Protection Reservation. Nothing herein shall impair or modify the

application of section 507(b) of the Bankruptcy Code in the event that the adequate protection

provided to CIBC hereunder is insufficient to compensate for any Diminution in Value of their

respective interests in the Maybrook and Consulate Prepetition Collateral during the Chapter 11

Cases or any Successor Cases. The receipt by CIBC of the adequate protection provided herein

shall not be deemed an admission that the interests of CIBC are adequately protected. Further, this

Interim Order shall not prejudice or limit the rights of CIBC to seek additional relief with respect

to the use of Cash Collateral or for additional adequate protection in a manner consistent with the

Maybrook and Consulate Prepetition Loan Documents, and all parties-in-interests' rights are

reserved with respect thereto.

**Provisions Common to DIP Financing and use of Cash Collateral**

18.     Amendment of the Maybrook DIP Documents. The Maybrook DIP

Documents may from time to time be amended, modified, or supplemented by the parties thereto

without further order of the Court if the amendment, modification, or supplement is (a) non-

material or non-adverse to the Maybrook and Consulate Debtors and (b) in accordance with the

46

Maybrook DIP Documents. In the case of a material amendment, modification, or supplement to the Maybrook DIP Documents that is adverse to the Maybrook and Consulate Debtors' estates, the Maybrook and Consulate Debtors shall provide notice (which shall be provided through electronic mail) to counsel to a Committee (if appointed) and the U.S. Trustee (collectively, the "Notice Parties"), each of whom shall have five (5) days from the date of such notice to object in writing to such amendment, modification or supplement. If all Notice Parties indicate that they have no objection to the amendment, modification or supplement (or if no objections are timely received), the Maybrook and Consulate Debtors may proceed to execute the amendment, modification or supplement, which shall become effective immediately upon execution. If a Notice Party timely objects to such amendment, modification or supplement, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification or supplement; *provided* that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard. Any material modification, amendment or supplement that becomes effective in accordance with this paragraph 18 shall be filed with the Court.

19.    Maybrook Budget. All borrowings under the Maybrook DIP Facility and all use of Cash Collateral shall be in compliance with the approved Maybrook Budget, subject to the Permitted Variance, and the Maybrook and Consulate Debtors shall not use any portion of the proceeds of the Maybrook DIP Facility or any Cash Collateral, directly or indirectly, in excess of

47

the amounts set forth in the Maybrook Budget, except (and solely to the extent of) any variance permitted under the Maybrook DIP Credit Agreement. The Maybrook Budget may be updated and amended from time to time in accordance with the Maybrook DIP Credit Agreement, provided that (i) such updated or amended Maybrook Budget shall be provided promptly to counsel for CIBC and any Committee; (ii) the Maybrook and Consulate Debtors shall not make any payments on account of any prepetition claim except in accordance with the Maybrook Budget or as otherwise permitted or required by an order of this Court; and (iii) the Maybrook and Consulate Debtors shall be required always to comply with the Maybrook Budget as set forth in Maybrook DIP Credit Agreement, subject to the Permitted Variance.[10]

i.      With respect to the Allowed Professional Fees (as defined herein) incurred by Case Professionals (as defined herein), each Cash Professional shall use commercially reasonable efforts to record time entries, in accordance with the requirements of the Bankruptcy Code, in such a manner that will allow for the identification of whether services rendered were primarily in relation to the Maybrook and Consulate Debtors, the Cuarzo Debtors, or for general services applicable to all Debtors in the Chapter 11 Cases.  Services rendered: (i) by Case Professionals to and for the benefit of the Maybrook and Consulate Debtors shall be subject to the Maybrook Budget; (ii) for the benefit of the Cuarzo Debtors shall be subject to the budget

---

[10] The Maybrook Budget attached to this Interim Order as Exhibit A-1 has been approved by and is satisfactory to the DIP Lenders.

identified in the Cuarzo Interim DIP Order; and (iii) for general case administration for the benefit of all Debtors in these Chapter 11 Cases shall be allocated as follows: (y) four-thirteenths (4/13) shall be allocated to the Cuarzo Debtors and be subject to the budget identified in the Cuarzo Interim DIP Order; and (z) nine-thirteenths (9/13) shall be allocated to the Maybrook and Consulate Debtors and be subject to the Maybrook Budget.

20.    <u>Maybrook Budget Compliance</u>. The Maybrook and Consulate Debtors shall at all times comply with the Maybrook Budget, on the terms and subject to the variances set forth in the Maybrook DIP Credit Agreement. The Maybrook and Consulate Debtors shall provide all reports and other information as required in the Maybrook DIP Credit Agreement (subject to the grace periods provided therein). The Maybrook and Consulate Debtors' failure to comply with the Maybrook Budget (on the terms and subject to the variances set forth in the Maybrook DIP Credit Agreement) or to provide the reports and other information required in the Maybrook DIP Credit Agreement shall constitute an Event of Default (as defined herein), following the expiration of any applicable grace period set forth in the Maybrook DIP Credit Agreement.

21.    <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to: (a) permit the Maybrook and Consulate Debtors to grant the DIP Liens, Prepetition Adequate Protection Liens, DIP Superpriority Claims, and Prepetition Adequate Protection Superpriority Claims; (b) permit the Maybrook and Consulate

49

Debtors to perform such acts as the DIP Agent may reasonably request to assure the perfection

and priority of the liens granted herein; (c) permit CIBC to file, in the applicable registries of

deeds and other appropriate public records, as prepetition lender in its sole discretion deems

necessary or advisable, the assignments of UCC financing statements, mortgage assignments and

related documents to reflect the transfer of the agency provisions pursuant to related documents;

(d) permit the Maybrook and Consulate Debtors to incur all liabilities and obligations to the DIP

Agent, DIP Lenders, and CIBC under the Maybrook DIP Documents, the Maybrook DIP Facility,

and this Interim Order, as applicable; and (e) authorize the Maybrook and Consulate Debtors to

pay, and the DIP Agent, the DIP Lenders, and CIBC to retain and apply, payments made in

accordance with the terms of this Interim Order and the Maybrook DIP Documents or the

Maybrook and Consulate Prepetition Loan Documents, as applicable.

22.     Perfection of DIP Liens and Prepetition Adequate Protection Liens. This

Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and

priority of all liens granted herein, including the DIP Liens and the Prepetition Adequate Protection

Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or

other instrument or document which may otherwise be required under the law or regulation of any

jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into

any deposit account control agreement or mortgage) to validate or perfect (in accordance with

applicable non-bankruptcy law) the DIP Liens and the Prepetition Adequate Protection Liens, or

50

to evidence or entitle the DIP Agent, the DIP Lenders, and CIBC to the priorities granted herein.

Notwithstanding the foregoing, each of the DIP Agent and CIBC is authorized to file, in the

applicable registries of deeds and other appropriate public records, as it in its sole discretion deems

necessary or advisable, (i) notice of this Interim Order, and (ii) such financing statements, security

agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with

applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Prepetition

Adequate Protection Liens, and all such financing statements, mortgages, notices, and other

documents shall be deemed to have been filed or recorded as of the Petition Date; *provided,*

*however*, that no such filing or recordation shall be necessary or required in order to create or

perfect the DIP Liens or the Prepetition Adequate Protection Liens. The Maybrook and Consulate

Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP

Agent and CIBC all such financing statements, mortgages, notices, and other documents as the

DIP Agent and CIBC may reasonably request. Each of the DIP Agent and CIBC, in its discretion,

may file a photocopy of this Interim Order as a financing statement with any filing or recording

office or with any registry of deeds or similar office, in addition to or in lieu of such financing

statements, notices of lien, or similar instrument.. To the extent CIBC is listed as lender loss payee,

loss payable, or additional insured under any of the Maybrook and Consulate Debtors' insurance

policies, the DIP Agent shall also be deemed to be the secured party under such documents or to

be the lender loss payee or additional insured, as applicable. CIBC shall serve as agent for the DIP

Agent for purposes of perfecting the DIP Agent's liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

23.    <u>Application of Proceeds of Collateral/Non-Ordinary Course Proceeds</u>. As a condition to the entry of the Maybrook DIP Documents, the extension of credit under the Maybrook DIP Facility and the authorization to use Cash Collateral, the Maybrook and Consulate Debtors have agreed that, as of and commencing on the date of the Interim Hearing, all proceeds of any Dispositions (as defined in the Maybrook DIP Credit Agreement) of DIP Collateral received by the DIP Agent or any Lender (as defined in the Maybrook DIP Credit Agreement), and all net proceeds (as applicable) realized from the Maybrook and Consulate Debtors on account of the DIP Collateral (whether pursuant to cash dominion or arising from realization on DIP Collateral, setoff or otherwise), will be presumed to constitute and arise from DIP Collateral existing on the Petition Date and shall be promptly following their receipt transferred to the DIP Agent and applied (or, despite any prior application, reapplied) to pay, or in the case of contingent obligations, to cash collateralize, the DIP Obligations or the Maybrook and Consulate Prepetition Secured Obligations until indefeasible payment in full in cash of the DIP Obligations and the Maybrook and Consulate Prepetition Secured Obligations. Not unless and until all DIP Obligations and Maybrook and Consulate Prepetition Secured Obligations are paid in full in cash, may proceeds of Dispositions be applied to pay any other claim against the Maybrook and Consulate Debtors or their estates. If

proceeds of Dispositions are applied to the Maybrook and Consulate Prepetition Secured

Obligations, then such application shall be as provided in Maybrook and Consulate Prepetition

Loan Documents; if proceeds of Dispositions are applied to the DIP Obligations, then such

application shall be as provided in the Maybrook DIP Credit Agreement.

24.    Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured

Parties.

i.    Unless the DIP Agent, and CIBC, as applicable, shall have provided

their prior written consent, or all DIP Obligations and all Maybrook and Consulate Prepetition

Secured Obligations (excluding contingent indemnification obligations for which no claim has

been asserted) have been indefeasibly paid in full in cash and the lending commitments under the

Maybrook DIP Facility have terminated, there shall not be entered in any of these Chapter 11

Cases or any Successor Cases any order (including any order confirming any plan of

reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the

incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other

Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to

administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the

DIP Superpriority Claims, the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or

the Adequate Protection Superpriority Claims; (ii) the use of Cash Collateral for any purpose other

than as permitted in the Maybrook DIP Documents and this Interim Order; (iii) the return of goods

53

pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Maybrook and Consulate Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the DIP Agent's, the DIP Lenders', or CIBC's rights under this Interim Order, the Maybrook DIP Documents, the Maybrook Prepeption Loan Documents, or the Consulate Prepetition Loan Documents, as applicable, with respect any DIP Obligations or Maybrook and Consulate Prepetition Secured Obligations.

ii.    Until the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, the Maybrook and Consulate Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Maybrook DIP Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the DIP Agent all such information and documents that any or all of the Maybrook and Consulate Debtors are obligated (including upon reasonable request by any of the DIP Agent) to provide under the Maybrook DIP Documents or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the DIP Agent and the advisors of each of the DIP Agent and CIBC to visit and inspect any of the Maybrook and Consulate Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Maybrook and Consulate Debtors'

business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Maybrook DIP Documents and/or the Maybrook Loan Documents and Buckey Loan Documents; (iv) permit the DIP Agent, CIBC and their respective advisors to consult with the Maybrook and Consulate Debtors' management and advisors on matters concerning the Maybrook and Consulate Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the DIP Agent and CIBC to conduct, at their discretion and at the Maybrook and Consulate Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and Prepetition Collateral in accordance with the Maybrook DIP Documents, the Maybrook Prepetition Loan Documents, and the Consulate Prepetition Loan Documents.

25.    Credit Bidding. Subject to entry of the Final Order and subject to Section 363(k) of the Bankruptcy Code, in connection with any sale process authorized by the Court, the DIP Agent (by or through an acquisition vehicle, and in accordance with the terms of the Maybrook DIP Credit Agreement), the DIP Lenders, and CIBC (by or through an acquisition vehicle, and in accordance with the terms of the Maybrook Prepetition Loan Documents and Consulate Prepetition Loan Documents), may credit bid up to the full amount of the applicable outstanding

DIP Obligations and/or Maybrook and Consulate Prepetition Secured Obligations, in each case including any accrued and unpaid interest and expenses (each a "Credit Bid") in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through section 363 or section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to the rights and duties of the parties under the Maybrook DIP Documents, the Maybrook Prepetition Loan Documents and the Consulate Prepetition Loan Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid including, but not limited to, payment in full and in cash of all Maybrook and Consulate Prepetition Secured Obligations. Each of the DIP Agent, the DIP Lenders, and CIBC shall be considered a "Qualified Bidder" with respect to its rights to acquire all or any of the assets by Credit Bid.

26.    Proceeds of Subsequent Financing. If the Maybrook and Consulate Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c), or 364(d) or in violation of the Maybrook DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and Maybrook and Consulate Prepetition Secured Obligations, and the termination of the DIP Lenders' obligation to extend credit under the Maybrook DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Maybrook and

Consulate Debtors and their estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations and following indefeasible payment in full in cash of the DIP Obligations, to CIBC for application against the Maybrook and Consulate Prepetition Secured Obligations and following indefeasible payment in full in cash of the DIP Obligations and Maybrook and Consulate Prepetition Secured Obligations, in accordance with this Interim Order and the Maybrook DIP Documents, Maybrook Prepetition Loan Documents or Consulate Prepetition Loan Documents, as applicable.

27.    Cash Collection. Unless otherwise agreed to in writing by the DIP Agent, or otherwise provided for herein, the Maybrook and Consulate Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). Following the occurrence and during the continuance of an Event of Default, the Maybrook and Consulate Debtors and the financial institutions where the Maybrook and Consulate Debtors' Cash Collection Accounts are maintained (a those accounts are defined and identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent.

28.    Maintenance of DIP Collateral. Until the indefeasible payment in full in cash of all DIP Obligations, all Maybrook and Consulate Prepetition Secured Obligations, and the

termination of the DIP Lenders' obligation to extend credit under the Maybrook DIP Facility, the Maybrook and Consulate Debtors shall: (a) insure the DIP Collateral as required under the Maybrook DIP Facility, the Maybrook Prepetition Loan Documents or the Consulate Prepetition Loan Documents, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any Cash Management Order, or as otherwise required by the Maybrook DIP Documents or this Interim Order.

29.    <u>Disposition of DIP Collateral</u>. Until the indefeasible payment in full in cash of all DIP Obligations and the Maybrook and Consulate Prepetition Secured Obligations, the Maybrook and Consulate Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Maybrook and Consulate Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent and CIBC, as applicable (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, DIP Lenders, CIBC, or from any order of this Court), except as otherwise provided for in the Maybrook DIP Documents or otherwise ordered by the Court.

30.    <u>DIP Termination Date</u>. On the DIP Termination Date: (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facility will terminate, other than as required in paragraph 39 with respect to the Carve Out, all treasury, hedging obligations, such cash collateral shall not be subject to or subordinate to the Carve Out; (b) all authority to use Cash Collateral shall cease, *provided,*

*however*, that during the Remedies Notice Period (as defined herein), the Maybrook and Consulate Debtors may use Cash Collateral to pay payroll and other expenses that the DIP Agent approves as critical to keeping the Maybrook and Consulate Debtors' business operating in accordance with the Maybrook Budget; *provided further* that following delivery of the Carve Out Trigger Notice (as defined herein), the Maybrook and Consulate Debtors shall fund the Carve Out Account (as defined herein) in accordance with paragraph 39 of this Interim Order; and (c) upon the expiration of the Remedies Notice Period, the DIP Agent shall be entitled to exercise rights and remedies under the Maybrook DIP Documents in accordance with this Interim Order (including paragraph 33). For the purposes of this Interim Order, "DIP Termination Date" shall mean the "Termination Date" as defined in the Maybrook DIP Credit Agreement.  Notwithstanding anything to the contrary in this Interim Order or the Maybrook DIP Credit Agreement, in the event the Maybrook and Consulate Debtors consummate a sale of all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code, upon entry of a Final Order, then notwithstanding the occurrence of the Termination Date (as defined in the Maybrook DIP Credit Agreement), the Maybrook and Consulate Debtors shall have the authority to continue using, and CIBC consents to the continued use of, Cash Collateral in accordance with the Maybrook Budget for a period of [60] days after closing, with the ability to seek additional time either by CIBC's consent or approval by the Court.

31. <u>Events of Default</u>. The occurrence of any of the following events, unless waived by the DIP Agent  in writing and in accordance with the terms of the Maybrook DIP Credit Agreement, shall constitute an event of default (an "<u>Event of Default</u>"): (a) the failure of the Maybrook and Consulate Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, including the failure to comply with the Case Milestones (as defined herein), or (b) the occurrence of an "Event of Default" under the Maybrook DIP Credit Agreement.

32. <u>Case Milestones</u>. As a condition to the Maybrook DIP Facility and the use of Cash Collateral, the Maybrook and Consulate Debtors shall comply with the Required Milestones (as defined in the Maybrook DIP Credit Agreement, attached as <u>Schedule 11.18</u> to the Maybrook DIP Credit Agreement (as may be amended from time to time in accordance with the Maybrook DIP Documents, the "<u>Case Milestones</u>")). For the avoidance of doubt, the failure of the Maybrook and Consulate Debtors to comply with any of the Case Milestones shall (a) constitute an immediate Event of Default under the Maybrook DIP Credit Agreement and this Interim Order; (b) subject to the expiration of the Remedies Notice Period (as defined below), result in the automatic termination of the Maybrook and Consulate Debtors' authority to use Cash Collateral under this Interim Order; and (c) permit the DIP Agent, subject to paragraph 33, to exercise the rights and remedies provided for in this Interim Order and the Maybrook DIP Documents.

33.    <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default under the Maybrook DIP Documents or this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period) (a) the DIP Agent may declare (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Maybrook and Consulate Debtors to the extent any such commitment remains under the Maybrook DIP Facility, (iii) termination of the Maybrook DIP Facility and the Maybrook DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery by the DIP Agent of the Carve Out Trigger Notice (as defined herein) to the Maybrook and Consulate Debtors, the U.S. Trustee, and counsel to a Committee (if appointed); and (b) the DIP Agent may declare a termination, reduction or restriction on the ability of the Maybrook and Consulate Debtors to use Cash Collateral (the date which is the earliest to occur of any such date a Termination Declaration is delivered and the DIP Termination Date shall be referred to herein as the ("<u>Termination Date</u>")). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Maybrook and Consulate Debtors, counsel to a Committee

(if appointed), and the U.S. Trustee. The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and CIBC is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), subject to first funding the Carve Out (as defined herein), the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the Maybrook DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens; *provided* that upon the repayment in full in cash of the DIP Obligations, CIBC shall be entitled to exercise its rights and remedies in accordance with the Maybrook and Consulate Prepetition Loan Documents and this Interim Order to satisfy the Maybrook and Consulate Prepetition Secured Obligations, the Prepetition Adequate Protection Liens, and the Prepetition Superpriority Claims. During the Remedies Notice Period, the Maybrook and Consulate Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period; *provided* that the sole issue that the Maybrook and Consulate Debtors may bring before the Court at any such emergency hearing is whether an Event of Default has occurred and/or is continuing, and the Maybrook and Consulate Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or CIBC. Unless the Court orders otherwise, the automatic stay, as to DIP Agent, the DIP Lenders, and CIBC, as applicable, shall automatically be terminated at the end of the Remedies Notice Period

without further notice or order. Unless the Court orders otherwise, upon expiration of the Remedies

Notice Period, the DIP Agent, the DIP Lenders, and CIBC, shall be permitted to exercise all

remedies set forth herein, in the Maybrook DIP Documents, the Maybrook and Consulate

Prepetition Loan Documents, as applicable, and as otherwise available at law without further order

of or application or motion to the Court consistent with paragraph 30 of this Interim Order. Upon

the occurrence and during the continuation of an Event of Default and the expiration of the

Remedies Notice Period, the DIP Agent and any liquidator or other professional will have the right

to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights or other

intellectual property to the extent necessary or appropriate in order to sell, lease or otherwise

dispose of any of the DIP Collateral, including pursuant to any Court approved sale process.

34.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No</u>
<u>Modification or Stay of this Interim Order</u>. The DIP Agent, the DIP Lenders, and CIBC have acted

in good faith in connection with this Interim Order and are entitled to rely upon the protections

granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in

this Interim Order and the record made during the Interim Hearing, and in accordance with section

364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are

hereafter reargued, reconsidered, reversed, modified, amended, or vacated by a subsequent order

of this Court or any other court, the DIP Agent, the DIP Lenders, and CIBC are entitled to the

protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth

therein. Any such modification, amendment or vacatur shall not affect the extent, validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority granted, perfected, authorized or created hereby, unless modification, amendment or vacatur pertains to an authorization to obtain credit or incur debt, or to the granting of a priority lien, that is stayed pending appeal. Any liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including to all rights, remedies, privileges and benefits granted herein.

35.    <u>DIP and Other Expenses</u>. In addition to the Adequate Protection Payments, the Maybrook and Consulate Debtors are authorized and directed to pay (a) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses due and outstanding as of the Petition Date of the DIP Agent and DIP Lenders in accordance with the Maybrook DIP Documents and (b) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, in connection with the Maybrook DIP Facility, as provided in the Maybrook DIP Documents, including attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses. Without limitation of the generality of the foregoing, pursuant and subject to the DIP Orders and the Maybrook DIP Documents, the

Loan Parties shall timely pay the reasonable and documented prepetition and postpetition fees and expenses Gutnicki LLP and Campbell & Levine, LLC, as counsel to the DIP Agent and CIBC. Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the DIP Agent, the DIP Lenders, and CIBC in respect to the Adequate Protection Payments shall not be required to submit invoices in any particular format, however any time that such professionals seek payment of fees and expenses from the Maybrook and Consulate Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Maybrook and Consulate Debtors. Any objections raised by the Maybrook and Consulate Debtors, the U.S. Trustee or a Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice; if after ten (10) days such objection remains unresolved, it will be subject to resolution by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Maybrook and Consulate Debtors. Notwithstanding the foregoing, the Maybrook and Consulate

65

Debtors are authorized and directed to pay on the Interim Facility Effective Date (as defined in the Maybrook DIP Credit Agreement) all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agent, the DIP Lenders, and CIBC (in respect to the Prepetition Adequate Protection Payments) incurred on or prior to such date without the need for any professional engaged by the DIP Agent, the DIP Lenders, or CIBC to first deliver a copy of its invoice to any other party as provided for herein. No attorney or advisor to the DIP Agent, the DIP Lenders, or CIBC shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Maybrook and Consulate Debtors to the (i) DIP Agent or DIP Lenders in connection with or with respect to the Maybrook DIP Facility; and (ii) CIBC in connection or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Maybrook and Consulate Debtors.

36.    <u>Indemnification</u>. The Maybrook and Consulate Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lenders and their respective shareholders, partners, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, in accordance with and only if and to the extent provided pursuant to the terms and conditions of the Maybrook DIP Credit Agreement.

37.    <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, and CIBC will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim

allowed herein. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, CIBC is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases with respect to the Maybrook and Consulate Prepetition Secured Obligations. Any proof of claim filed by CIBC will also be deemed to constitute the filing of such proof of claim in the Chapter 11 Cases of all other Debtors against which a claim may be asserted under the Maybrook and Consulate Prepetition Loan Documents, as applicable. Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of the DIP Agent, the DIP Lenders, CIBC arising under, or in connection with, the Maybrook DIP Documents or the Maybrook and Consulate Prepetition Loan Documents, as applicable.

38.     Rights of Access and Information. Without limiting the rights of access and information afforded the DIP Agent and the DIP Lenders under the Maybrook DIP Documents, the Maybrook and Consulate Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and CIBC reasonable access to the Maybrook and Consulate Debtors' premises and their books and records in accordance with the Maybrook DIP Documents and the Maybrook and Consulate Prepetition Loan Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such

67

information as may be reasonably requested. The DIP Lenders may participate in any such visit or

inspection at the expense of the Maybrook and Consulate Debtors as set forth in the Maybrook

DIP Documents. In addition, the Maybrook and Consulate Debtors authorize their independent

certified public accountants, financial advisors, investment bankers and consultants, who are not

Case Professionals (defined herein), to cooperate, consult with, and provide to the DIP Agent and

CIBC all such information as may be reasonably requested with respect to the business, results of

operations and financial condition of any of the Maybrook and Consulate Debtors.

       39.    <u>Carve Out</u>.

       i.    As used in this Interim Order, the "<u>Carve Out</u>" means, subject, in

each case, to application of any retainers that may be held by the applicable professionals, without

duplication: (i) the payment of all allowed and unpaid professional fees and disbursements

incurred by the Maybrook and Consulate Debtors and any statutory committees appointed in the

Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for any of their

respective professionals retained by final order of the Court, which order has not been reversed,

vacated or stayed, unless such stay has been vacated (the "<u>Case Professionals</u>") at any time prior

to the delivery of the Carve Out Trigger Notice (as defined below) allowed by this Court (the

"<u>Allowed Professional Fees</u>"), in an aggregate amount not to exceed those amounts that are

reflected as a reserve for estimated professional fees and disbursements in the most recent

Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to

the delivery of a Carve Out Trigger Notice (the "Professional Fee Carve Out Cap"); (ii) after

delivery of a notice by the DIP Agent to the Maybrook and Consulate Debtors that an Event of

Default has occurred and is continuing and the DIP Agent has delivered notice to the Maybrook

and Consulate Debtors to the effect that the application of the Carve Out has occurred (the "Carve

Out Trigger Notice"), the payment of allowed and unpaid professional fees and disbursements

incurred by the Case Professionals following the delivery of the Carve Out Trigger Notice in an

aggregate amount not in excess of $300,000 (the "Wind-Down Carve Out Amount"), *plus* (iii)

the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk

of the Court, which fees shall not be limited to amounts that may be set forth in the Maybrook

Budget.  Notwithstanding anything to the contrary in this Order, the Maybrook DIP Motion, the

Maybrook DIP Documents or the Maybrook and Consulate Prepetition Loan Documents, the

Carve Out is, and shall be, senior and shall be funded before payment of any obligations arising

from or relating to the DIP Obligations and the Maybrook and Consulate Prepetition Obligations

including, without limitation: (w) the DIP Liens; (x) the DIP Superpriority Claims; (y) the

Prepetition Adequate Protection Liens; and (z) Prepetition Superpriority Claims.

        ii.        Notwithstanding the foregoing, so long as no Carve Out Trigger

Notice has been issued by the DIP Agent, the Maybrook and Consulate Debtors shall be permitted

to pay compensation and reimbursement of expenses allowed and payable under sections 328, 330

and 331 of the Bankruptcy Code but solely to the extent the same are reflected as estimated

professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP

Agent by the Maybrook and Consulate Debtors prior to the delivery of a Carve Out Trigger Notice,

as the same may be due and payable and otherwise allowed and payable by order of the Court. The

Carve Out shall not be deemed increased if actual fees of Case Professionals are higher in fact than

the estimates provided on the Maybrook Budget. No portion of the Carve-Out may be used in

contravention of the restrictions or the limitations on the use of the Carve-Out set forth in this

Interim Order.

iii.        *No Direct Obligation to Pay Professional Fees*. The DIP Agent, the

DIP Lenders and CIBC shall not be responsible for the direct payment or reimbursement of any

fees or disbursements of any Case Professionals incurred in connection with the Chapter 11 Cases

or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order

or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or CIBC in any way to

pay compensation to or to reimburse expenses of any Case Professional or to guarantee that the

Maybrook and Consulate Debtors have sufficient funds to pay such compensation or

reimbursement.

iv.        *Funding of Carve Out Following Delivery of Carve Out Trigger*

*Notice.* Delivery of the Carve Out Trigger Notice by the DIP Agent to the Maybrook and Consulate

Debtors shall be deemed a draw request and notice of borrowing by the Maybrook and Consulate

Debtors for New Money DIP Loans under the Maybrook DIP Credit Agreement (as defined

70

therein) in an amount equal to the sum of (i) the amount of the Professional Fee Carve Out Cap, (ii) the Wind Down Carve Out Amount, and (iii) the amounts contemplated under paragraph (a)(iii) above. To the extent the amounts contemplated in the immediately preceding sentence are reflected as a reserve for professional fees and disbursements in the most recent Maybrook Budget delivered to the DIP Agent by the Maybrook and Consulate Debtors prior to delivery of a Carve Out Trigger Notice, the DIP Agent shall make available to the Maybrook and Consulate Debtors such amounts (which shall constitute New Money DIP Loans, as defined in the Maybrook DIP Credit Agreement). The Maybrook and Consulate Debtors shall deposit and hold such amounts in a segregated account (the "Carve Out Account") designated by the DIP Lenders in trust exclusively to pay the amounts described in this paragraph 39. The funds in the Carve Out Account shall remain subject to the DIP Liens and Prepetition Adequate Protection Liens and any amounts or funds in the Carve Out Account that are not required to be used to pay Allowed Professional Fees shall be returned to the DIP Agent, for application to the DIP Obligations in accordance with the Maybrook DIP Credit Agreement and following payment in full of the DIP Obligations, CIBC for distribution in accordance with the Maybrook and Consulate Prepetition Loan Documents.

v.      *Payment of Carve Out After Carve Out Trigger Notice*. Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the Maybrook DIP Documents, the Bankruptcy Code and applicable law.

71

40.    <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out</u>. The

Maybrook DIP Facility, the DIP Collateral, the Maybrook and Consulate Prepetition Collateral, the

Cash Collateral and the Carve Out may not be used in connection with: (a) except to contest the

occurrence of an Event of Default, preventing, hindering, or delaying any of the DIP Agent's, the

DIP Lenders', or CIBC's enforcement or realization upon any of the DIP Collateral or Maybrook

and Consulate Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided

for in this Interim Order and the Maybrook DIP Documents; (c) except as permitted in the

Maybrook DIP Documents, selling or otherwise disposing of DIP Collateral without the consent of

the DIP Agent; (d) except as permitted in the Maybrook DIP Documents, using or seeking to use

any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (e)

except as permitted in the Maybrook DIP Documents, incurring Debt (as defined in the Maybrook

DIP Credit Agreement) from any person other than the DIP Lender without the prior consent of

the DIP Agent; (f) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP

Lenders, or CIBC under this Interim Order, the Maybrook DIP Documents, or the Maybrook and

Consulate Prepetition Loan Documents, including seeking to use Cash Collateral and/or DIP

Collateral on a contested basis; (g) objecting to or challenging in any way the DIP Liens, the DIP

Obligations, the CIBC Prepetition Liens, the Maybrook and Consulate Prepetition Secured

Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Maybrook and

Consulate Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the

DIP Agent, the DIP Lenders, or CIBC, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Agent, the DIP Lenders, CIBC, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the CIBC Prepetition Liens, the Maybrook and Consulate Prepetition Secured Obligations, or any other rights or interests of any of the DIP Agent, the DIP Lenders, or CIBC; or (j) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Maybrook and Consulate Prepetition Secured Obligations; *provided, however*, that the Carve Out and such collateral proceeds and loans under the Maybrook DIP Documents may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $25,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens and the Maybrook and Consulate Prepetition Secured Obligations, in accordance with paragraph 42 of this Interim Order.

41.    Payment of Compensation. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses or shall affect the right of the DIP Agent, the

DIP Lenders, or CIBC to object to the allowance and payment of such fees and expenses. So long as an unwaived Event of Default has not occurred, the Maybrook and Consulate Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Maybrook Budget provided by the Maybrook and Consulate Debtors to the DIP Agent.

42.     Effect of Stipulations on Third Parties.

i.     *Generally*. The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order, including without limitation Paragraph F (collectively, the "Prepetition Lien and Claim Stipulations"), are and shall be binding on the Maybrook and Consulate Debtors. In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Maybrook and Consulate Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 42) challenging

the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than three (3) days before the hearing approving the sale of the assets of the Maybrook and Consulate Debtors (the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time in the sole discretion of CIBC, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline; *provided* that if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Deadline or (2) the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court; and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

ii. *Binding Effect*. To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition

Lien and Claim Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Maybrook and Consulate Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (i) above except to the extent that any of such Prepetition Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (i) above. To the extent any such Challenge proceeding is timely and properly commenced, CIBC shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Maybrook and Consulate Prepetition Loan Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 42, the Court may fashion any appropriate remedy.

43.    <u>No Third-Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

44. <u>Section 506(c) Claims</u>. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, CIBC, or any of their respective claims, the DIP Collateral, or the Maybrook and Consulate Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the DIP Lenders, or CIBC, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

45. <u>No Marshaling/Applications of Proceeds</u>. Subject to entry of a Final Order, the DIP Agent, the DIP Lenders, and CIBC shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Maybrook and Consulate Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the Maybrook DIP Documents notwithstanding any other agreement or provision to the contrary.

46. <u>Section 552(b)</u>. Subject to entry of a Final Order, CIBC shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to CIBC with respect to proceeds, product, offspring or profits of any of the Maybrook and Consulate Prepetition Collateral.

47.     <u>Limits on Lender Liability</u>. Nothing in this Interim Order, any of the Maybrook DIP Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or CIBC of any liability for any claims arising from any activities by the Maybrook and Consulate Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases. The DIP Agent and the DIP Lenders shall not, solely by reason of having made loans under the Maybrook DIP Facility, be deemed in control of the operations of the Maybrook and Consulate Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Maybrook and Consulate Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order or the Maybrook DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or CIBC of any liability for any claims arising from the prepetition or postpetition activities of any of the Maybrook and Consulate Debtors. Neither the DIP Agent or CIBC are control persons or insiders of the Maybrook and Consulate Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Maybrook DIP Facility, the Maybrook DIP Documents, and/or the Maybrook and Consulate Prepetition Loan Documents.

78

48.    <u>Insurance Proceeds and Policies</u>. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the DIP Lenders) and CIBC shall be, and shall be deemed to be, without any further action or notice, named as additional insured and lender loss payee on each insurance policy maintained by the Maybrook and Consulate Debtors that in any way relates to the DIP Collateral.

49.    <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that Maybrook and Consulate Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the Maybrook DIP Facility and the Maybrook DIP Documents.

50.    <u>No Superior Rights of Reclamation</u>. Based on the findings and rulings herein regarding the integrated nature of the Maybrook DIP Facility and the Maybrook and Consulate Prepetition Loan Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

51.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Maybrook DIP Documents and the Maybrook and Consulate Prepetition Loan Documents, as applicable: (a) the DIP Agent's, the DIP Lenders', and CIBC's right to seek

any other or supplemental relief in respect of the Maybrook and Consulate Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, and CIBC under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, the DIP Lenders, or CIBC. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Maybrook and Consulate Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order.

52.     No Waiver by Failure to Seek Relief. The failure of the DIP Agent, the DIP Lenders, or CIBC to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Maybrook DIP Documents, the Maybrook and Consulate Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder,

thereunder, or otherwise of the DIP Agent, the DIP Lenders, CIBC, a Committee (if appointed), or any party in interest.

53.    Binding Effect of Interim Order. Immediately upon entry by this Court, and except as expressly provided herein, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Maybrook and Consulate Debtors, the DIP Agent, the DIP Lenders, CIBC, all other creditors of any of the Maybrook and Consulate Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

54.    No Modification of Interim Order. Until and unless the DIP Obligations and the Maybrook and Consulate Prepetition Secured Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the Maybrook DIP Facility have been terminated, the Maybrook and Consulate Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent or CIBC, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Maybrook and Consulate Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the

Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or junior Prepetition Superpriority Claim, other than the Carve Out; (b) without the prior written consent of the DIP Agent or CIBC for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Maybrook and Consulate Prepetition Collateral; (c) without the prior written consent of the DIP Agent, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the Maybrook DIP Documents; or (d) without the prior written consent of CIBC, any lien on any of the DIP Collateral with priority equal or superior to the CIBC Prepetition Liens or junior Prepetition Adequate Protection Liens (other than the DIP Liens). The Maybrook and Consulate Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent or CIBC, as applicable and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or CIBC.

55.    <u>Interim Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Maybrook DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

56.    <u>Discharge</u>. The DIP Obligations and, subject to paragraph 42 herein, the obligations of the Maybrook and Consulate Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of

reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d)

of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other

than contingent indemnification obligations for which no claim has been asserted), on or before

the effective date of such confirmed plan of reorganization, unless each of the DIP Agent, the DIP

Lenders, and CIBC, as applicable, has otherwise agreed in writing.

57.    <u>Survival</u>. The provisions of this Interim Order and any actions taken

pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of

reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a

case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any

Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11

Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims,

liens, security interests, and other protections granted to the DIP Agent, DIP Lenders, and CIBC

granted pursuant to this Interim Order and/or the Maybrook DIP Documents, notwithstanding the

entry of any such orders described in (a)-(d), above, shall continue in the Chapter 11 Cases, in

any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and

shall maintain their priority as provided by this Interim Order until: (i) in respect of the Maybrook

DIP Facility, all the DIP Obligations, pursuant to the Maybrook DIP Documents and this Interim

Order, have been indefeasibly paid in full in cash (other than contingent obligations with respect

to then unasserted claims), and all commitments to extend credit under the Maybrook DIP Facility

are terminated, and (ii) in respect of the Maybrook and Consulate Prepetition Loan Documents, all of the Maybrook and Consulate Prepetition Secured Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and the Challenge Deadline has passed without a Challenge being asserted. The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the Maybrook DIP Documents and/or the indefeasible repayment of the DIP Obligations.

58.    Final Hearing. The Final Hearing to consider entry of the Final Order and final approval of the Maybrook DIP Facility is scheduled for **[DATE], 2024, at [ ].M. (Prevailing Eastern time)** before the Honorable [JUDGE], United States Bankruptcy Judge at the United States Bankruptcy Court for the Western District of Pennsylvania. On or before [DATE], 2024, the Maybrook and Consulate Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Maybrook DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) counsel for a Committee (if appointed); and (c) any party which has filed prior to such date a request for notices with this Court. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than

**[INSERT DATE] at 4:00 PM (Prevailing Eastern time)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Bass Berry & Simms, PLC, 150 Third Avenue South, Suite 2800, Nashville, Tennessee, 37201, Attn: Glenn B. Rose, Esq., and Whiteford Taylor & Preston, LLP, 11 Stanwix Street, Suite 1400, Pittsburgh, Pennsylvania, 15222, Attn: Daniel R. Schimizzi; (ii) counsel for the DIP Agent and the Prepetition Secured Lender, Gutnicki, LLP, 10440 N. Central Expressway, Suite 800, Dallas, Texas, 75231, Attn:  Liz Boydston, Esq., and Max Schlan, Esq.; (iii) counsel to the Committee (if appointed); and (iv) the U.S. Trustee.

59.     *Nunc Pro Tunc* Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

60.     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the Maybrook DIP Facility, and/or this Interim Order.

Prepared by: */s/*_____
Daniel R. Schimizzi, Proposed Local Counsel to the Debtors

BY THE COURT:

_____

[]
United States Bankruptcy Court

## Schedule 2.1(p)

## LEASES

Lease Agreement dated August 15, 2016 by and between Maybrook-C Briarcliff Propco, LLC, as lessor, and Maybrook-C Briarcliff Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Evergreen Propco, LLC, as lessor, and Maybrook-C Evergreen Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Kade Propco, LLC, as lessor, and Maybrook-C Kade Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Latrobe Propco, LLC, as lessor, and Maybrook-C Latrobe Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Overlook Propco, LLC, as lessor, and Maybrook-C Overlook Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Silver Oaks Propco, LLC, as lessor, and Maybrook-C Silver Oaks Opco, LLC, as lessee.

Lease Agreement dated August 15, 2016 by and between Maybrook-C Whitecliff Propco, LLC, as lessor, and Maybrook-C Whitecliff Opco, LLC, as lessee.

Lease dated September 15, 2017, by and between (i) 100 Tandem Village Road Propco, LLC, 200 Tandem Village Road Propco, LLC, and 3876 Saxonburg Boulevard Propco, LLC, each a Delaware limited liability company (collectively, as "Lessor"), and (ii) North Strabane Rehabilitation and Wellness Center, LLC, North Strabane Retirement Village, LLC, and Cheswick Rehabilitation and Wellness Center, LLC, each a Delaware limited liability company (collectively, "Lessee").

4890-4151-2374, v. 18

## Schedule 2.1(J)

## LITIGATION

1. Civil action filed by the United States Department of Labor ("DOL") alleging violations of federal wage and hour laws, case number 2:18-cv-01608-WSS, United States District Court for the Western District of Pennsylvania (the "DOL Action")[1]

2. Subpoenas[2] issued by the United States Department of Labor arising from or relating to an ongoing investigation of certain Borrowers and certain affiliates the Borrowers to determine the existence of any violation of Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1334

---

[1] The Maybrook and Consulate Debtors make this disclosure out of an abundance of caution because, while 11 U.S.C. 362 applies as a stay to the DOL Action, the exception identified in 11 U.S.C. § 362(b)(4) may allow the DOL, upon appropriate motion and order of the Bankruptcy Court, to continue the DOL Action.

[2] The Maybrook and Consulate Debtors provided true and correct copies of the Subpoenas issued by the United States Department of Labor to counsel for the Administrative Agent on May 14, 2024.

## Schedule 2.1(t)

## LABOR AGREEMENTS

(a)     Agreement between The Grove at Irwin - Briarcliff (Maybrook-C Briarcliff Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15, 2016 – June 30, 2021);

(b)     Agreement between Maybrook-C Briarcliff Opco, LLC, dba The Grove at Irwin and OPEIU Healthcare Pennsylvania Local 112, Local 112 OPEIU, AFL-CIO, CLC (dated March 31, 2017);

(c)     Memorandum of Agreement (in negotiations) between Maybrook-C Briarcliff Opco, LLC d/b/a The Grove at Irwin and OPEIU Local 153, AFL-CIO, CLC  (January 1, 2022 – December 31, 2024);

(d)     Agreement between The Grove at Harmony - Evergreen (Maybrook-C Evergreen Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15, 2016 – June 30, 2021);

(e)     Agreement between The Grove at Washington (Maybrook-C Kade Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15, 2016 – June 30, 2021);

(f)     Agreement between Latrobe Health Rehabilitation Center (Maybrook-C Latrobe Opco, LLC) and International Brotherhood of Teamsters Local Union No. 30 (April 1, 2021 – March 31, 2026);

(g)     Agreement between The Grove at New Castle (Maybrook-C Silver Oaks Opco, LLC) and SEIU Healthcare Pennsylvania CTW, CLC (August 15, 2016 – June 30, 2021);

(h)     Collective Bargaining Agreement between South Hills Operations, LLC d/b/a South Hills Rehabilitation and Nursing Center and General Teamsters Local Union 585 (January 1, 2022 – December 31, 2024);

(i)     Agreement between Cheswick Rehabilitation and Wellness Center and SEIU Healthcare Pennsylvania CTW, CLC (September 1, 2022 – August 31, 2025);

(j)     Agreement between North Strabane Rehabilitation and Wellness Center LLC, North Strabane Retirement Village, LLC and SEIU Healthcare Pennsylvania CTW, CLC (September 1, 2017 – August 1, 2022);

(k)     Tentative Agreement (in negotiations) between North Strabane Rehabilitation and Wellness, LLC and SEIU Healthcare Pennsylvania (September 1, 2022 – August 31, 2025);

(l)     Memorandum of Agreement between SEIU Healthcare Pennsylvania and North Strabane Rehabilitation and Wellness, LLC (extending agreement through August 31, 2025);

(m)     Agreement between Monroeville Operations LLC (Monroeville Rehabilitation and Wellness Center), Mt Lebanon Operations LLC (Mt Lebanon Rehabilitation and Wellness Center), Murrysville Operations LLC (Murrysville Rehabilitation and Wellness Center) and SEIU Healthcare Pennsylvania CTW, CLC (February 1, 2017 – June 30, 2021); and

(n)     Tentative Agreement between SEIU Healthcare PA and Monroeville Rehabilitation & Wellness Center, Mt. Lebanon Rehabilitation and Wellness Center, Murrysville Rehabilitation & Wellness Center, The Grove at Harmony, The Grove at Irwin, The Grove at New Castle, The Grove at Washington (September 8, 2022 – May 31, 2025).

## Schedule 2.1(ff)

## OWNED AND LEASED REAL ESTATE

## COLLATERAL LOCATIONS

Briarcliff Owner Borrower holds fee simple title to the real property located at 249 Maus Drive, Irwin, Westmoreland County, Pennsylvania

Evergreen Owner Borrower holds fee simple title to the real property located at 191 Evergreen Mill Road, Harmony, Butler County, Pennsylvania

Kade Owner Borrower holds fee simple title to the real property located at 1198 W. Wylie Avenue, Washington, Washington County, Pennsylvania

Latrobe Owner Borrower holds fee simple title to the real property located at 576 Fred Rogers Drive, Latrobe, Westmoreland County, Pennsylvania

Overlook Owner Borrower holds fee simple title to the real property located at 520 New Castle Street, New Wilmington, Lawrence County, Pennsylvania

Silver Oaks Owner Borrower holds fee simple title to the real property located at 715 Harbor Street, New Castle, Lawrence County, Pennsylvania

Whitecliff Owner Borrower holds fee simple title to the real property located at 110 Fredonia Road, Greenville, Mercer County, Pennsylvania

Cheswick Owner Borrower holds fee simple title to the real property located at 3876 Saxonburg Boulevard, Cheswick, Allegheny County, Pennsylvania 15024

North Strabane Owner Borrower holds fee simple title to the real property located at 100 Tandem Village Road, Canonsburg, Washington County, Pennsylvania 15317.

North Strabane AL Owner Borrower holds fee simple title to the real property located at 200 Tandem Village Road, Canonsburg, Washington County, Pennsylvania 15317

**Schedule 2.1(nn)**

**MATERIAL CONTRACTS**

All Leases identified on **Schedule 2.1(p)**

All Labor Agreements identified on **Schedule 2.1(t)**

The following material payor contracts:

| Debtor | Payor |
|---|---|
| Cheswick Rehabilitation and Wellness Center, LLC | Amerihealth |
| Cheswick Rehabilitation and Wellness Center, LLC | UPMC |
| Cheswick Rehabilitation and Wellness Center, LLC | PA Health & Wellness |
| Cheswick Rehabilitation and Wellness Center, LLC | Highmark |
| Cheswick Rehabilitation and Wellness Center, LLC | Aetna |
| Cheswick Rehabilitation and Wellness Center, LLC | Highmark WholeCare/Gateway |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | Amerihealth |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | UPMC |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | PA Health & Wellness |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | Highmark |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | Aetna |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | Highmark WholeCare/Gateway |
| Maybrook-C Whitecliff Opco LLC d/b/a The Grove at Greenville | Cigna |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | Amerihealth |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | UPMC |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | PA Health & Wellness |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | Highmark |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | Aetna |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | Highmark WholeCare/Gateway |
| Maybrook-C Evergreen Opco LLC d/b/a The Grove at Harmony | Cigna |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | Amerihealth |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | UPMC |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | PA Health & Wellness |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | Highmark |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | Aetna |
| Maybrook-C Briarcliff Opco LLC d/b/a The Grove at North Huntingdon | Highmark WholeCare/Gateway |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | Amerihealth |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | UPMC |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | PA Health & Wellness |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | Highmark |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | Aetna |
| Maybrook-C Latrobe Opco d/b/a The Grove at Latrobe | Highmark WholeCare/Gateway |

| | |
|---|---|
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | Amerihealth |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | UPMC |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | PA Health & Wellness |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | Highmark |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | Aetna |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | Highmark WholeCare/Gateway |
| Maybrook-C Silver Oaks Opco LLC d/b/a The Grove at New Castle | Cigna |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | Amerihealth |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | UPMC |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | PA Health & Wellness |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | Highmark |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | Aetna |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | Highmark WholeCare/Gateway |
| Maybrook-C Overlook Opco LLC d/b/a The Grove at New Wilmington | Cigna |
| North Strabane Rehabilitation and Wellness Center, LLC | Amerihealth |
| North Strabane Rehabilitation and Wellness Center, LLC | UPMC |
| North Strabane Rehabilitation and Wellness Center, LLC | PA Health & Wellness |
| North Strabane Rehabilitation and Wellness Center, LLC | Highmark |
| North Strabane Rehabilitation and Wellness Center, LLC | Aetna |
| North Strabane Rehabilitation and Wellness Center, LLC | Highmark WholeCare/Gateway |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | Amerihealth |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | UPMC |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | PA Health & Wellness |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | Highmark |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | Aetna |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | Highmark WholeCare/Gateway |
| Maybrook-C Kade Opco LLC d/b/a The Grove at Washington | Cigna |

**Schedule 2.1(oo)**

**FILINGS AND PERFECTION**

| GRANTOR | FILING REQUIREMENT OR OTHER ACTION | FILING OFFICE |
|---|---|---|
| **Borrowers** | UCC-1 | DE Department of State |
| **MAYBROOK-C BRIARCLIFF PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Westmoreland County, PA Recorder of Deeds |
| **MAYBROOK-C EVERGREEN PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Butler County, PA Recorder of Deeds |
| **MAYBROOK-C KADE PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Washington County, PA Recorder of Deeds |
| **MAYBROOK-C LATROBE PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Westmoreland County, PA Recorder of Deeds |
| **MAYBROOK-C OVERLOOK PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Lawrence County, PA Recorder of Deeds |
| **MAYBROOK-C SILVER OAKS PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Lawrence County, PA Recorder of Deeds |
| **MAYBROOK-C WHITECLIFF PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Mercer County, PA Recorder of Deeds |
| **100 TANDEM VILLAGE ROAD PROPCO, LLC** | Mortgage/Assignment of Rents/Subordination and Attornment | Washington County, PA Recorder of Deeds |
| **3876 SAXONBURG BOULEVARD PROPCO, LLC,** | Mortgage/Assignment of Rents/Subordination and Attornment | Allegheny County, PA Recorder of Deeds |

**Schedule 2.1(pp)**

**BORROWER INFORMATION**

| BORROWER (exact legal name) | STATE OF ORGANIZATION | FEDERAL EMPLOYER IDENTIFICATION NUMBER | CHIEF EXECUTIVE OFFICE | ORGANIZATIONAL IDENTIFICATION NUMBER |
|---|---|---|---|---|
| Maybrook-C Briarcliff Propco, LLC | DE | 81-1501823 | 249 Maus Drive, Irwin, Westmoreland County, Pennsylvania | 5898320 |
| Maybrook-C Evergreen Propco, LLC | DE | 81-1502000 | 191 Evergreen Mill Road, Harmony, Butler County, Pennsylvania | 5898325 |
| Maybrook-C Kade Propco, LLC | DE | 81-1502097 | 1198 W. Wylie Avenue, Washington, Washington County, Pennsylvania | 5898328 |
| Maybrook-C Latrobe Propco, LLC | DE | 81-1502178 | 576 Fred Rogers Drive, Latrobe, Westmoreland County, Pennsylvania | 5898338 |
| Maybrook-C Overlook Propco, LLC | DE | 81-1486804 | 520 New Castle Street, New Wilmington, Lawrence County, Pennsylvania | 5898347 |
| Maybrook-C Silver Oaks Propco, LLC | DE | 81-1459654 | 715 Harbor Street, New Castle, Lawrence County, Pennsylvania | 5898354 |
| Maybrook-C Whitecliff Propco, LLC | DE | 81-1434835 | 110 Fredonia Road, Greenville, Mercer County, Pennsylvania | 5898372 |
| Maybrook-C Briarcliff Opco, LLC | DE | 81-0905187 | 249 Maus Drive, Irwin, Westmoreland | 5898318 |

4890-4151-2374, v. 18

| | | | County, Pennsylvania | |
|---|---|---|---|---|
| Maybrook-C Evergreen Opco, LLC | DE | 81-0905388 | 191 Evergreen Mill Road, Harmony, Butler County, Pennsylvania | 5898322 |
| Maybrook-C Kade Opco, LLC | DE | 81-0974033 | 1198 W. Wylie Avenue, Washington, Washington County, Pennsylvania | 5898327 |
| Maybrook-C Latrobe Opco, LLC | DE | 81-0974148 | 576 Fred Rogers Drive, Latrobe, Westmoreland County, Pennsylvania | 5898334 |
| Maybrook-C Overlook Opco, LLC | DE | 81-1081081 | 520 New Castle Street, New Wilmington, Lawrence County, Pennsylvania | 5898315 |
| Maybrook-C Silver Oaks Opco, LLC | DE | 81-1087146 | 715 Harbor Street, New Castle, Lawrence County, Pennsylvania | 5898352 |
| Maybrook-C Whitecliff Opco, LLC | DE | 81-1096211 | 110 Fredonia Road, Greenville, Mercer County, Pennsylvania | 5898369 |
| 100 TANDEM VILLAGE ROAD PROPCO, LLC | DE | 82-2221918 | 600 Broadway, Lynbrook, New York 11563 | 6481766 |
| 3876 SAXONBURG BOULEVARD PROPCO, LLC | DE | 82-2233618 | 600 Broadway, Lynbrook, New York 11563 | 6481782 |
| Cheswick Rehabilitation and Wellness Center, LLC | DE | 82-2209561 | 600 Broadway, Lynbrook, New York 11563 | 6481915 |
| North Strabane Rehabilitation and Wellness Center, LLC | DE | 82-2191677 | 600 Broadway, Lynbrook, New York 11563 | 6481919 |

### Schedule 2.1(qq)

### DEPOSITARY AND OTHER DEPOSIT ACCOUNTS

| Debtor | Bank Name | Account Number | Account Type |
|---|---|---|---|
| 100 Tandem Village Road Propco, LLC | CIBC Bank USA | x 3536 | Operating |
| 3876 Saxonburg Boulevard Propco, LLC | CIBC Bank USA | x 3067 | Operating |
| Cheswick Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 8343 | Clearing |
| Cheswick Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 9343 | Government Receipts |
| Cheswick Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 7853 | Operating |
| Cheswick Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 8702 | Payroll |
| Cheswick Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 4511 | Loss Reserve |
| Cheswick Rehabilitation and Wellness Center, LLC | CitiBank USA | x 0168 | Resident Funds |
| Maybrook-C Briarcliff Opco, LLC | CIBC Bank USA | x 6427 | Clearing |
| Maybrook-C Briarcliff Opco, LLC | CIBC Bank USA | x 1152 | Government Receipts |
| Maybrook-C Briarcliff Opco, LLC | CIBC Bank USA | x 5587 | Operating |
| Maybrook-C Briarcliff Opco, LLC | CIBC Bank USA | x 8714 | Payroll |
| Maybrook-C Briarcliff Opco, LLC | CitiBank USA | x 2142 | Resident Funds |
| Maybrook-C Briarcliff Propco, LLC | CIBC Bank USA | x 4115 | Operating |

| | | | |
|---|---|---|---|
| Maybrook-C Evergreen Opco, LLC | CIBC Bank USA | x 9417 | Clearing |
| Maybrook-C Evergreen Opco, LLC | CIBC Bank USA | x 6337 | Government Receipts |
| Maybrook-C Evergreen Opco, LLC | CIBC Bank USA | x 0637 | Operating |
| Maybrook-C Evergreen Opco, LLC | CIBC Bank USA | x 2782 | Payroll |
| Maybrook-C Evergreen Opco, LLC | CitiBank USA | x 2177 | Resident Funds |
| Maybrook-C Evergreen Propco, LLC | CIBC Bank USA | x 0505 | Operating |
| Maybrook-C Kade Opco, LLC | CIBC Bank USA | x 7690 | Clearing |
| Maybrook-C Kade Opco, LLC | CIBC Bank USA | x 4788 | Government Receipts |
| Maybrook-C Kade Opco, LLC | CIBC Bank USA | x 8639 | Operating |
| Maybrook-C Kade Opco, LLC | CIBC Bank USA | x 6304 | Payroll |
| Maybrook-C Kade Opco, LLC | CitiBank USA | x 2088 | Resident Funds |
| Maybrook-C Kade Propco, LLC | CIBC Bank USA | x 8923 | CapEx |
| Maybrook-C Kade Propco, LLC | CIBC Bank USA | x 4256 | Debt Service |
| Maybrook-C Kade Propco, LLC | CIBC Bank USA | x 2937 | Operating |
| Maybrook-C Kade Propco, LLC | CIBC Bank USA | x 7874 | operating |

| Maybrook-C Latrobe Opco, LLC | CIBC Bank USA | x 3971 | Government Receipts |
|---|---|---|---|
| Maybrook-C Latrobe Opco, LLC | CIBC Bank USA | x 0431 | Operating |
| Maybrook-C Latrobe Opco, LLC | CIBC Bank USA | x 2163 | Payroll |
| Maybrook-C Latrobe Opco, LLC | CIBC Bank USA | x 5616 | Clearing |
| Maybrook-C Latrobe Opco, LLC | Citizens Bank USA | x 5592 | Resident Funds |
| Maybrook-C Latrobe Propco, LLC | CIBC Bank USA | x 7567 | Operating |
| Maybrook-C Overlook Opco, LLC | CIBC Bank USA | x 4145 | Clearing |
| Maybrook-C Overlook Opco, LLC | CIBC Bank USA | x 2790 | Government Receipts |
| Maybrook-C Overlook Opco, LLC | CIBC Bank USA | x 4016 | Operating |
| Maybrook-C Overlook Opco, LLC | CIBC Bank USA | x 1554 | Payroll |
| Maybrook-C Overlook Opco, LLC | CitiBank USA | x 2207 | Resident Funds |
| Maybrook-C Overlook Propco, LLC | CIBC Bank USA | x 6288 | Operating |
| Maybrook-C Silver Oaks Opco, LLC | CIBC Bank USA | x 7054 | Clearing |
| Maybrook-C Silver Oaks Opco, LLC | CIBC Bank USA | x 3343 | Government Receipts |
| Maybrook-C Silver Oaks Opco, LLC | CIBC Bank USA | x 6846 | Operating |

| | | | |
|---|---|---|---|
| Maybrook-C Silver Oaks Opco, LLC | CIBC Bank USA | x 4382 | Payroll |
| Maybrook-C Silver Oaks Opco, LLC | CitiBank USA | x 2118 | Resident Funds |
| Maybrook-C Silver Oaks Propco, LLC | CIBC Bank USA | x 2594 | Operating |
| Maybrook-C Whitecliff Opco, LLC | CIBC Bank USA | x 5712 | Clearing |
| Maybrook-C Whitecliff Opco, LLC | CIBC Bank USA | x 4459 | Government Receipts |
| Maybrook-C Whitecliff Opco, LLC | CIBC Bank USA | x 2241 | Operating |
| Maybrook-C Whitecliff Opco, LLC | CIBC Bank USA | x 8496 | Payroll |
| Maybrook-C Whitecliff Opco, LLC | CitiBank USA | x 2053 | Resident Funds |
| Maybrook-C Whitecliff Propco, LLC | CIBC Bank USA | x 6705 | Operating |
| North Strabane Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 4984 | CapEx |
| North Strabane Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 7299 | Clearing |
| North Strabane Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 9185 | Government Receipts |
| North Strabane Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 2829 | Operating |
| North Strabane Rehabilitation and Wellness Center, LLC | CIBC Bank USA | x 1431 | Payroll |
| North Strabane Rehabilitation and Wellness Center, LLC | CitiBank USA | x 0133 | Resident Funds |

4890-4151-2374, v. 18

**Schedule 2.1(ss)**

**OWNERSHIP OF BORROWERS**

| Borrower | Member | Membership Percentage |
|---|---|---|
| **MAYBROOK-C EVERGREEN PROPCO, LLC; MAYBROOK-C BRIARCLIFF PROPCO, LLC; MAYBROOK-C SILVER OAKS PROPCO, LLC; MAYBROOK-C OVERLOOK PROPCO, LLC; MAYBROOK-C LATROBE PROPCO, LLC; MAYBROOK-C WHITECLIFF PROPCO, LLC; MAYBROOK-C KADE PROPCO, LLC;** | Maybrook-C Propco Holdings, LLC | 100% |
| **MAYBROOK-C EVERGREEN OPCO, LLC; MAYBROOK-C BRIARCLIFF OPCO, LLC; MAYBROOK-C SILVER OAKS OPCO, LLC; MAYBROOK-C OVERLOOK OPCO, LLC; MAYBROOK-C LATROBE OPCO, LLC; MAYBROOK-C WHITECLIFF OPCO, LLC; MAYBROOK-C KADE OPCO, LLC** | Maybrook-C Opco Holdings, LLC | 100% |



ORGANIZATIONAL STRUCTURE OF CONSULATE PENNSYLVANIA (WEST)

August 10, 2017

**Schedule 6.5**
**Post- Closing Items**

Borrowers shall deliver the fully executed Certificate and Resolutions for CHMS Group, LLC, a New York limited liability company, on or prior to May, 21, 2024.

## Schedule 11.18

## REQUIRED MILESTONES

- The DIP Facility will contain the following milestones:
    - By **May 17, 2024**, the Debtors will file chapter 11 petitions for relief and various first day motions reasonably acceptable to CIBC, including an appropriate motion seeking approval of the DIP Facility on an interim and final basis;
    - By **May 22, 2024**, the Borrowers will obtain approval of the Interim DIP Order acceptable to the DIP Lender on a final basis;
    - By **May 24, 2024,** the Borrowers will file the Sale and Procedures Motion acceptable to the DIP Lender, together with a motion to expedite hearing on the foregoing;
    - By **May 24, 2024**, the Debtors will file applications: (i) to retain the Chief Restructuring Officer as chief restructuring officer and financial advisor to the Debtors; and (ii) to retain Blueprint as the investment banker for the Borrowers, provided that such applications must be heard on the "2nd Day" hearings in these Chapter 11 Cases;
    - By **June 7, 2024**, the Borrowers will obtain the entry of a final order from the Bankruptcy Court (the "Procedures Order") approving the Bidding Procedures (as defined in the Sales and Procedures Motion), which shall require a sale closing by **September 16, 2024**;
    - By **June 18, 2024**, the Borrowers will obtain approval of the Final DIP Order acceptable to DIP Lender;
    - **July 12, 2024**, shall be the Bid Deadline (as defined in the Procedures Order);
    - By **July 17, 2024**, to the extent that the Borrowers receive more than one (1) Qualified Bid (as defined in the Procedures Order) by the Bid Deadline, the Borrowers shall conduct an Auction pursuant to the Procedures Order;
    - By **August 7, 2024**, the Borrowers will obtain a final order (the "Sale Order") granting the relief requested in the Sale and Procedures Motion and approving a sale of the Borrowers' assets pursuant to one or more Successful Bidder(s); and,
    - By **September 16, 2024**, the Borrowers shall have closed on the transactions authorized under the Sale Order.

## **Schedule 11.21**

## **COMMERCIAL TORT CLAIMS**

None.